IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

NYEISHA S. GHEE and LISA Y. CAMPBELL,
ADMINISTRATORS OF THE ESTATE OF
MARK KAHLIL GHEE, DECEASED,

       Plaintiffs,

v.                                                           Civil Action No.:  3:26-cv-159

PINETREE APARTMENTS, LLC,                    Circuit Court for the
CLEARFIELD/PINETREE APARTMENTS, LLC          City of Petersburg, Virginia
BEACHWOLD PARTNERS, LP,                      Case No. CL26000099-00
BEACHWOLD HOLDINGS, LLC,
SOUTH OXFORD MANAGEMENT, LLC,
NADRA YOHANNES,
RICKY MCCONNELL,
ALVIN PEEBLES, and
PESTNOW OF CENTRAL VIRGINIA, LLC

       Defendants.

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that defendants Pinetree Apartments, LLC, Clearfield/Pinetree

Apartments, LLC, Beachwold Partners, LP, Beachwold Holdings, LLC, South Oxford

Management, LLC, Nadra Yohannes, Ricky McConnell, and Alvin Peebles (collectively

"Defendants"),[1] by counsel, respectfully file this Notice of Removal pursuant to 28 U.S.C. §§ 1332,

1441, and 1446, to remove to the United States District Court for the Eastern District of Virginia

an action initiated against Defendants in the Petersburg Circuit Court, Virginia.

## I.    COMMENCEMENT OF THE ACTION AND TIMELINESS OF REMOVAL.

On or about February 2, 2026, Plaintiffs filed a civil action against Defendants in the

---

[1] The only defendant that is not represented by undersigned counsel is PestNow of Central Virginia, LLC ("PestNow"). Although not necessary because PestNow has been fraudulently joined, PestNow has consented to the removal of the action. *See infra* Section VI.

Petersburg Circuit Court, Virginia, case number CL26000099-00 (hereinafter "State Court Action"). In accordance with 28 U.S.C. § 1446(a), a true and correct copy of all process, pleadings, and orders received by counsel for the Defendants in the State Court Action are attached to this Notice of Removal as **Exhibit A** and incorporated herein by reference.

The Complaint in the State Court Action asserts a wrongful death claim against Defendants arising from an apartment fire on February 20, 2024.[2] *See* Compl. (Ex. A). One of the Administrators of the Estate of Mark Ghee (the "Estate"), Nyeisha Ghee ("Ms. Ghee"), has an action currently pending against Pinetree Apartments, LLC, in the Eastern District Court of Virginia, Richmond Division, for the same incident giving rise to the State Court Action, which Ms. Ghee filed on December 19, 2024, and which Pinetree Apartments, LLC, removed to this Court on January 13, 2025 (the "Pending Federal Action"). *See* **Exhibit B**. On February 6, 2026, Ms. Ghee filed a Motion for Leave to Amend in the Pending Federal Action, requesting leave to file her Third Amended Complaint. *See* **Exhibit C**. Ms. Ghee also filed an identical personal injury Complaint in State Court on February 2, 2026 ("Ghee State Claim") (No. CL26000100-00), which Defendants are also removing this day.

Because the State Court Action arises out of the same incident as the Pending Federal Action and the Ghee State Claim, Defendants plan to file a Rule 42 Consolidation Motion, which permits the court to "join for hearing or trial any or all matters at issue . . . for convenience, to avoid prejudice, or to expedite and economize[.]" Fed. R. Civ. P. 42. In particular, a major question for consolidation will concern the removal of the actions to federal court, because Plaintiffs have fraudulently joined several non-diverse defendants to the State Court Action, including PestNow of Central Virginia, LLC ("PestNow"), Nadra Yohannes ("Yohannes"), Ricky McConnell

---

[2] The factual allegations and developed record are discussed more fully in Section IV. *See infra.*

("McConnell"), and Alvin Peebles ("Peebles," collectively with Yohannes and McConnell, the "Individuals"). *See infra* Section IV.

## II.    TIMELINESS OF REMOVAL.

The first defendants to be served with process in the State Court Action were Pinetree Apartments, LLC; Clearfield/Pinetree Apartments, LLC; Beachwold Partners, LP; and South Oxford Management, LLC, which were served with process via the Secretary of the Commonwealth on February 6, 2026. Thus, this Notice of Removal is timely filed because it is filed not more than thirty (30) days after the first defendant received a copy of the Summons and Complaint, through service or otherwise. 28 U.S.C. § 1446(b). The Eastern District of Virginia, Richmond Division, is the federal district embracing Petersburg, Virginia, where the State Court Action was originally filed. 28 U.S.C. § 127(a). Thus, Defendants' Notice of Removal is properly filed in this District and Division.  28 U.S.C. § 1441(a).

## III.    STATUTORY BASIS FOR JURISDICTION

The State Court Action is removable under 28 U.S.C. § 1332(a). The Court has subject matter jurisdiction over the State Court Action because it is between citizens of different states and the amount in controversy exceeds $75,000.00 and arises under the laws of the United States. 28 U.S.C. §1332(a).

### A.  <u>Amount in Controversy</u>

Plaintiffs' Complaint alleges a wrongful death claim in the amount of eighty million dollars ($80,000.00), plus three-hundred and fifty thousand dollars ($350,000) in punitive damages. Therefore, based on the relief sought, and the nature of the alleged harms, the amount in controversy in this matter exceeds the sum of $75,000.00 exclusive of interests and costs. For these reasons, the amount in controversy requirement is satisfied.

### B.  <u>Citizenship of the Parties</u>

3

Plaintiffs Nyeisha Ghee and Lisa Y. Campbell, as the administrators of the Estate, are citizens of Virginia, as alleged in the Complaint. *See* Compl. ¶ 9. When the improperly named defendants are properly excluded from this lawsuit, *see infra* Section IV, the only remaining defendants are Pinetree Apartments, LLC; Clearfield/Pinetree Apartments, LLC; Beachwold Partners, LP; Beachwold Holdings, LLC; Beachwold Residential, LLC; and South Oxford Management, LLC (collectively the "Affiliated Entities"). The Affiliated Entities are each limited-liability companies and/or partnerships, which take the citizenship of each state where its members are citizens. *Gen. Tech. Applications, Inc. v. Exro Ltda,* 388 F.3d 114, 121 (4th Cir. 2004). None of the Affiliated Entities have Virginia members, and thus they are diverse from the Plaintiffs for the purposes of this action.

1. ***Pinetree Apartments, LLC; Clearfield/Pinetree Apartments, LLC; and Beachwold Partners, LP.***

Pinetree Apartments, LLC ("Pinetree"), was the owner of the subject apartment complex at the time of the fire that gives rise to Plaintiffs' Complaint. Pinetree is a limited liability company whose sole member is Clearfield/Pinetree Apartments, LLC ("Clearfield"). One of the members of Clearfield is Beachwold Partners, LP, which is a passive investment entity. The names and citizenships of Clearfield's members (including the names and members of Beachwold Partners, LP) were identified in the Pending Federal Action, where they were filed under seal with the Court. *See* (No. 3:25-cv-17, ECF No. 15). There have not been any changes in the organizational structure of these entities since January 2025. As none of the members are Virginia residents, each of these entities (Pinetree, Clearfield, and Beachwold Partners, LP) is considered diverse from Plaintiffs under 28 U.S.C. § 1332(a).

2. ***South Oxford Management, LLC; Beachwold Residential, LLC; and Beachwold Holdings, LLC.***

South Oxford Management, LLC ("South Oxford") is 100% owned by Beachwold

Residential, LLC ("Residential"). Residential has two individual members, both of whom are residents of New York. Beachwold Holdings, LLC ("Holdings"), has six individual members, one of whom is a resident of Illinois and the remainer of whom are residents of New York.[3] Because a limited liability company takes the citizenship of the states of its members, South Oxford and Residential are considered residents of New York for the purposes of diversity jurisdiction, and Holdings is considered a resident of New York and Illinois for the purposes of diversity jurisdiction. They are thus all considered diverse from Plaintiffs under 28 U.S.C. § 1332(a).

## IV. THE EXERCISE OF DIVERSITY JURISDICTION IS PROPER BECAUSE THE INCLUSION OF PESTNOW, YOHANNES, MCCONNELL, AND PEEBLES CONSTITUTES FRAUDULENT JOINDER.

### A. Legal Standard for Fraudulent Joinder.

The removal of civil actions from state court to federal court is controlled by 28 U.S.C. § 1446. While ordinarily all defendants must be completely diverse from the plaintiff to permit removal, a court should ignore any defendants that have been fraudulently joined to the lawsuit. *See Johnson v. Am. Towers, LLC*, 781 F.3d 693, 704 (4th Cir. 2015) ("Under that doctrine, naming non-diverse defendants does not defeat diversity jurisdiction. Rather, the fraudulent doctrine 'effectively permits a district court to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction.'" (quoting *Mayes v. Rapoport*, 198 F.3d 457, 464 (4th Cir. 1999)). This doctrine does not require a showing of fraud by the plaintiff (although fraud would be sufficient), but the doctrine should also be applied when "there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court[.]" *Mayes*, 198 F.3d. at 461 n.8 & 464. Critically, the "'no possibility' language cannot be taken literally and

---

[3] The membership of Holdings and Residential will be filed with this Court under seal.

[] what is meant is that there is **'no reasonable basis' for predicting liability** on the claims alleged." *Cordill v. Purdue Pharma, L.P.*, No. 1:02CV00121, 2002 U.S. Dist. LEXIS 21476, *6 (W.D. Va. Nov. 2, 2002) (quoting *In re Rezulin Products Liability Litigation*, 133 F. Supp. 2d 272, 280 n.5 (S.D.N.Y. 2001)) (emphasis added). In determining whether joinder is fraudulent, "the court is not bound by allegations in the pleadings, **but may instead consider the entire record, and determine the basis of joinder by any means available.**" *AIDS Counseling & Testing Cntrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990) (emphasis added).

   **B. Factual Allegations Pertaining to the Fraudulent Joinder Issue.**

        This personal injury case arises from an apartment fire at the Pinetree apartment complex on February 20, 2024. How the fire started is undetermined. As such, the Complaint's claims are unrelated to the cause of the fire. Instead, the Complaint asserts an egress claim, alleging that the sliding glass door in the apartment unit's master bedroom (the "Sliding Door") – which was almost completely destroyed in the fire – did not slide open when Ms. Ghee attempted to exit the apartment during the fire with her son. *See* Compl. ¶¶ 99-100. Plaintiffs allege that the Sliding Door's operation was impeded because water and termite damage in the header above the Sliding Door had caused the framing to shift, resulting in compression and deformation of the Sliding Door (the "Compression Issue"). *See* Compl. ¶ 104. Plaintiffs claim that the Compression Issue was concealed from Ms. Ghee when she took possession of the apartment, creating a potential exception to the general rule that the tenant takes the premises in whatever condition it is in, "assuming all risk of personal injury from defects therein." *Isabell v. Commercial Investment Associates, Inc.*, 273 Va. 605, 611-12 (2007) (quoting *Caudill v. Gibson Fuel Co.*, 185 Va. 233, 239-41 (1946)).

        Because Plaintiffs' Complaint is lengthy at 51 pages and 164 allegations, the following timeline is provided to distill the key aspects of Plaintiffs' claim against Defendants generally as

needed to resolve the fraudulent joinder question. However, the Court is <u>not</u> confined to the Plaintiffs' allegations when deciding fraudulent joinder. *See AIDS Counseling*, 903 F.2d at 1004.

1.      Pinetree Apartments was built in 1995.[4] *See* Compl. ¶ 37.

2.      PestNow was the third-party exterminator utilized by Pinetree from at least 2019 until the fire. *See* Compl. ¶ 42. On March 18, 2019, PestNow observed live termites on the exterior foundation of Building G. *See* Compl. ¶ 51. On April 4-5, 2019, PestNow treated Building G for termites. *See* Compl. ¶ 52. When spraying the termiticide, PestNow did not inspect Building G's interior or drill holes in the abutting concrete slabs and the perimeter of the building, which was recommended on the termiticide label. *See id.* On May 2020, a PestNow technician inspected the exterior of Building G and did not see termites. *See* Compl. ¶ 53. After May 2020, no PestNow document records the results of any termite inspection and/or treatment to Building G. *See* Compl. ¶¶ 42-59.

3.      Yohannes, as the South Oxford Regional Manager over the Pinetree apartments, was aware of the negative termite inspection conducted on Building G in May 2020. Compl. ¶ 60.

4.      Between 2018 and 2024, some Pinetree tenants reported concerns of moisture, mold, and water leaks around their sliding glass doors. *See* Compl. ¶¶ 42-47; 69. For some of the units experiencing water leaks, it was determined that the flashing had been installed incorrectly. *See* Compl. ¶ 54. A few of these concerns were reported to Yohannes, and McConnell – a maintenance supervisor – was aware of some issues. *See* Compl. ¶ 119. Pinetree hired third-party contractors to repair the headers above the sliding glass doors that were experiencing water intrusion. *See* Compl. ¶¶ 63-89. None of the complaints about water intrusion or third-party

---

[4] Pinetree Apartments, LLC, purchased the property in 2011, and the property was sold after the fire that is the subject of this lawsuit.

contractor repairs pertained to Unit G-8, and the only complaint concerning mold (but no structural concern) in Unit G-8 was in 2021, over a year before Ms. Ghee's tenancy. *See* Compl. ¶ 37.

5.      Sometime in early 2022, Ms. Ghee applied for financial assistance from the Petersburg Redevelopment and Housing Authority ("PRHA") to live at Pinetree apartments. *See* Compl. ¶ 19. On May 24, 2022, the PRHA conducted an initial inspection of Unit G-8. Compl. ¶ 21. During the inspection, the PRHA noted that Sliding Door was difficult to open. *See id.* Several work orders were entered, including a request to fix "chipping paint around window sills and sliding doors." *See* Compl. ¶ 23. Plaintiffs allege "by information and belief" that the chipping paint was caused by termite and/or water damage. *Id.* McConnell painted the Sliding Door header and sent a video to the PRHA to document the work completed. *See* McConnell Depo. 96:21-22 (**Exhibit D**); *see also* **Exhibit E**. Additionally, McConnell greased the Sliding Door, which allowed the Sliding Door to move smoothly. The PRHA inspector reported that "Maintenance was able to get to the windows/doors to open smoothly while I was present by lubricating the seals." *See* (**Exhibit F**); *see also* Compl. ¶ 119 (acknowledging the seals were greased, which allowed movement). The PRHA passed Unit G-8 as safe for Ms. Ghee's tenancy. *See* 24 C.F.R. § 5.703(a).

6.      Effective June 1, 2022, Ms. Ghee rented Apartment G-8 from Pinetree. Compl. ¶ 33. That same day, she received a walk-through tour of Unit G-8, during which she was not informed of any issues with the Sliding Door. Compl. ¶ 27. Ms. Ghee signed an inventory and condition form in her lease that instructed her to test for safety items and gave her a place to list damage to the apartment, and she did not list any. *See* Inventory and Condition Form (**Exhibit G**).

7.      Ms. Ghee never tested the Sliding Door until July 2023, when she found it could not move. *See* Compl. ¶ 28. Later in July 2023, Ms. Ghee orally reported the problem with the Sliding Door to a maintenance person walking near her apartment, who replied "I got you" or

words to that effect. Compl. ¶ 29. Ms. Ghee never saw maintenance fix her Sliding Door, never asked Pinetree whether the Sliding Door had actually been repaired, and never tested the Sliding Door again prior to the fire. *See id. generally.* Ms. Ghee also never reported observing bugs or termites during her tenancy to the Pinetree office personnel. *See id. generally.*

      8.     During the fire on February 20, 2024, Ms. Ghee alleges that she attempted to open the Sliding Door but was unable to do so. Compl. ¶¶ 99-100.

      9.     Ms. Ghee's son, Mark Khalil Ghee ("Mark" or the "Decedent"), died in the fire. Compl. ¶ 108.

      10.    A photograph taken approximately two months after the fire shows deteriorated wood behind the sheetrock of the bedroom's back wall. *See* Compl. ¶ 3. The Sliding Door itself was mostly destroyed in the fire.[5]

      There has been significant discovery in the Pending Federal Action over the last year into Plaintiffs' allegations, including any theories Plaintiffs might have against PestNow and the Individuals. PestNow's Rule 30(b)(6) corporate representative was deposed in November 2025, and PestNow has produced over a thousand pages in discovery in response to subpoena. Pinetree has also produced over 8,000 pages pertaining to the alleged water and termite issues at the Pinetree apartment complex. The entire record, which may be considered here, supports that

---

[5] There were several joint, post-fire inspections involving Plaintiffs' counsel and experts. All of Plaintiffs' requests to preserve items from the apartment were honored. Specifically, Plaintiffs requested that the damaged Sliding Door and the sliding door from the other bedroom be preserved as part of the joint post-fire inspections. However, Plaintiff, through her counsel and experts, never requested to preserve the wood framing surrounding the Sliding Door. Plaintiffs first disclosed the alleged theory on the wooden framing surrounding the door when filing Ms. Ghee's original Complaint in December 2024, well after the parties agreed to disposing of the damaged parts of the apartment that were not requested to be preserved during the multiple post-fire inspections. Plaintiffs never asked pre-litigation for the identity of the termite contractor and never gave PestNow notice of the pre-litigation inspection. Similarly, Pinetree did not place PestNow on notice because it never received any information on this liability theory pre-litigation.

Plaintiffs cannot state a claim against PestNow or the Individuals, and they have been fraudulently joined to this lawsuit in an attempt to defeat federal diversity jurisdiction. *See Mayes*, 198 F.3d at 464.

### C. **PestNow Has Been Fraudulently Joined Because the Estate Does Not Have Its Own Cause of Action Against PestNow.**

PestNow has been fraudulently joined to this action because Plaintiffs cannot bring their own action against PestNow. *See Mayes*, 198 F.3d at 464. While Pinetree (or South Oxford, the property manager) may have a future claim against PestNow, the Estate does not. Ms. Ghee and her children were not even tenants when PestNow applied the termiticide to Building G in 2019. PestNow's alleged failure to properly treat the termites in 2019 does not give the Estate a right of action, either under general tort law or by statute. Further, Plaintiffs' claims of termite damage in 2019 are speculative and cannot be established as a matter of law.

#### i. *PestNow Did Not Separately Owe Future Tenants Tort Duties.*

Plaintiffs cannot sue PestNow because tenants do not have their own personal right of action for a contractor's work *before* tenancy. In June 2022, when Ms. Ghee took possession of Unit G-8, only the property owner had a legally cognizable duty. *See, e.g.*, *Steward v. Holland Family Props., LLC*, 284 Va. 282, 287 (2012). Plaintiffs make just two allegations that pertain to PestNow's work *on Building G*, in which Ms. Ghee's unit was located:

- "PestNow technicians treated the exterior perimeter of buildings B, C, G, J, K, O and P on April 4-5, 2019. PestNow … **failed** to follow the termiticide label instructions by **not inspecting** the building's interiors when treating their exteriors, and by **failing** to drill holes in the abutting concrete slabs at the perimeter[.]" Compl. ¶ 52 (emphasis added).

- "[O]n May 6, 2020, a technician performed an exterior termite reinspection of Building G. The invoice notes that 'Pinetree staff is aware that if an interior inspection is needed that they are to contact us. The annual inspection for termites is **only** an exterior inspection.'" Compl. ¶ 53 (emphasis added).

Plaintiffs ties their damages directly to PestNow's alleged failure to apply termiticide broadly enough to eradicate the termites, baldly speculating this allowed termites to continue destroying the unit's wall. Compl. ¶ 59. Plaintiffs cannot recover for PestNow's failure to act three years before Ms. Ghee's tenancy.

A tenant who did not take occupancy until years after the work is not a third-party beneficiary. *Cf. Valley Landscape Co. v. Rolland*, 218 Va. 257 (1977) (noting the "third party must show that the parties to the contract clearly and definitely intended it to confer a benefit upon him" at the time of contracting (citation omitted)). PestNow's records state its inspections are a snapshot in time. *See* **Exhibit H**. In an absence of privity (or even temporal proximity), "[c]ommon law does not require every person to consider the welfare of mankind in general, particularly when abiding by limited contract terms[.]" *Cawlo v. Rose Hill Reserve Homeowners Ass'n*, 106 Va. Cir. 235, 240 (2020). Without the contract – which PestNow had with Pinetree, not with Ms. Ghee or her son – PestNow had no duty to perform. *See Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 255 (2019) ("No matter the alleged harm, tort liability cannot be imposed upon a contracting party for failing to do a contractual task when no common-law tort duty would have required him to do it anyway[.]"); *see also A View Est. Trust v. Allstate Ins. Co.*, 109 Va. Cir. 26, 29 (Norfolk 2021) (noting that Virginia has "refused to adopt the 'modern rule' regarding 'contorts.'"). Paragraphs 61-62 make it clear that Plaintiffs' alleged damage is from PestNow's failure to apply termiticides broadly. *See supra* (emphasis above). As such, Plaintiffs claim a "lack of performance of something that would have prevented harm[.]" *Tingler*, 834 S.E.2d at 256 (citation omitted). The Estate cannot bring this nonfeasance claim against PestNow.

Plaintiffs may seek to extend the timeframe in which to consider PestNow's actions based on PestNow's continued role as Pinetree's exterminator through Ms. Ghee's tenancy. The allegations pertaining to PestNow's treatment of termites after 2019 is scattered at best:[6]

- In February 2021, PestNow treated Building F (termites in Unit F-6). *See* Compl. ¶ 55.
- In March 2023, PestNow treated Building C (termites in Unit C-8). *See* Compl. ¶ 56.
- In September 2023, PestNow treated termites at the pool house. *See* Compl. ¶ 57.

These buildings were not Building G. Nor is there any support for a claim that application of termiticide to these buildings failed to kill those infestations. Not only would it be extremely speculative to claim that termites in these buildings somehow traveled to Unit G-8 and infected the header above the Sliding Door, *see infra* Section IV.C.i, but any claim that PestNow did not adequately treat Building F, Building C, or the Pool House would also be a non-actionable claim for non-feasance – again, a failure to perform something that could have prevented harm, not an active creation of harm. *See Tingler*, 834 S.E.2d at 256. PestNow performed the work for Pinetree. Further, PestNow performed its work at Pinetree pursuant to a termite bond,[7] with follow-up invoicing (not a traditional contract), which termite bond never guaranteed that there would not be future termites or that the termites would be eradicated. PestNow did not agree to perform this work for the benefit of Unit G-8, and the simple failure to perform is contractual duties does not create common law duties to Plaintiff. PestNow and Plaintiffs are strangers. *See Richmond Shopping Cntr., Inc. v. Wiley N. Jackson, Co.*, 220 Va. 135 (1979) ("incidental beneficiaries may not sue thereon").

---

[6] To try to beef up the claim, Plaintiffs add a sighting at Unit O-5 (with no reference to PestNow) in May 2024, after the subject fire and after Plaintiffs had sustained the alleged injuries.

[7] A termite bond is a general termite service agreement to ensure that inspectors will visit and inspect the building for evidence of termites. The bond provides that PestNow will perform is annual inspection and, if notified, will return and perform as-needed treatment.

I-3031168.1

In the Pending Federal Action, Plaintiffs have taken the tack that the foregoing arguments are inapplicable because the source of duty they are claiming arises out of normal negligence law. They argue that PestNow was "in such a position" that "if it did not use ordinary care … [it] would cause danger of injury," and rely upon *RGR, LLC v. Seattle*, which held that a crossing owner owed the decedent a duty of care to maintain its property to prevent a collision between a dump truck and a train. *See* 288 Va. 260 (2014). However, *RGR* is inapposite as it does not pertain to the source of duty law, and in relying on *RGR*, Plaintiffs completely ignore this well-established body of law. The source of duty requires that the court distinguish between whether the original duty performed by the proposed defendant arose from tort or contract. *See Richmond Metro. Auth. v. McDevitt St. Bovis*, 256 Va. 553, 558 (1998) ("In determining whether a cause of action sounds in contract or tort, **the source of the duty violated must be ascertained**." (emphasis added)). As the Supreme Court of Virginia has explained:

> If the cause of complaint be for an act of omission or non-feasance which, without proof of a contract to do what was left undone, would not give rise to any cause of action (because no duty apart from contract to do what is complained of exists) then the action is founded upon contract, and not upon tort. If, on the other hand, the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of the contract, to take due care, and the defendants are negligent, then the action is one of tort.

*Id.* at 558. The Court has made clear that courts should "safeguard against turning every breach of contract into an actionable claim" under tort law. *Id.* at 560. PestNow only performed the termiticide treatment because of its agreement with Pinetree, and any failures in its performance stem from contract law, not tort law. As such, PestNow cannot be held liable to Plaintiffs for nonfeasance, and PestNow is not a proper defendant here.

Plaintiffs' reference to Restatement (Second) of Torts § 324A (1965) is similarly problematic and unpersuasive in this context. In *Cawlo v. Rose Hill Reserve Homeowners Ass'n*, the plaintiff tried to argue that the defendant assumed a duty of care by accepting a contract to

remediate tree growth with his homeowner's association, which was breached when a tree fell. 106 Va. Cir. 235, 243. The plaintiff explicitly relied upon the Restatement, which the Court rejected:

> Mr. Wingo did not contract with the Cawlos but contracted with the HOA and the management company. He did not assume a duty to the Cawlos or understood them or the public at large who gain access to that part of the property to be intended third-party beneficiaries. Without an express assumption of duty to the plaintiffs, they cannot recover under what is essentially a breached contract claim between Wingo and the HOA's management company.

> Mr. Wingo inspected the property as he was contracted to do. He allegedly failed to identify the hazardous tree that ultimately fell. A year later that tree fell and injured the plaintiffs. It is clear from the facts pled that Mr. Wingo did not increase the danger or create an imminent danger. Plaintiffs seek to hold Wingo accountable for what he failed to do. Absent an express assumption to the named Plaintiffs . . . Wingo operated under no common law or statutory law duty of care that would subject him to tort liability brought by the owners and occupants of an adjoining property. For reasons stated, the demurrer must be sustained because Mr. Wingo's inaction does not allow recovery for personal injuries.

*Id.* at 243 (noting there was "no indication that he ever interacted with the Cawlos"). PestNow did not assume any duties toward future tenants when it performed the termicide treatment. Plaintiffs cannot bring an action in tort for this claim because, like in *Cawlo*, it is essentially a breach of contract claim between Pinetree and PestNow.

Plaintiffs' claim under Va. Code § 3.2-3939(B) is also flawed, as the Statute reads: "It is unlawful for any person to use or cause to be used any pesticide in a manner inconsistent with its labeling or regulations of the Board[.]" Va. Code § 3.2-3939(B). Plaintiffs claim that this Statute is triggered because PestNow did not apply the termicide in accordance with the label, which would have required "PestNow to drill holes between the abutting slabs when applying the termicide," which PestNow did not do. *See* Compl. ¶ 48. Plaintiffs asserts that her son "belonged to the class of persons for whose benefit" this Code was enacted, but this is not provided from the Statute's plain reading. *See* Compl. ¶ 155. In *Kaltman v. All Am. Pest Control, Inc.*, the Supreme

14

Court of Virginia held that the protected class under this Statute was "consumers who allegedly were injured as a result of improper use of a pesticide[.]" 281 Va. 483, 498 (2011). The Kaltmans hired All American Pest Control, Inc., who treated the Kaltmans' home with Orthene pesticide (unlicensed for residential use), and the Kaltmans sustained injuries from the noxious fumes. *Id.* at 487-88. Unlike the Kaltmans, the Decedent was not even in residence when PestNow treated Building G, and Plaintiffs do not allege he died from the termiticide. In fact, unlike in *Kaltman*, Plaintiffs allege termiticide was the proper chemical, but that it was not applied broadly enough in Building G to achieve its purpose. *See* Compl. ¶¶ 52-53. As the Estate's proposed claim does not stem from the actual chemical applied, the Decedent was not within the class of persons that Va. Code § 3.2-3939(B) was intended to benefit.

The Estate simply does not have its own claim against PestNow, and any claim that Pinetree has against PestNow would not begin to run until after Plaintiffs obtained judgment against Pinetree. Notably, any alleged wrongdoing by PestNow for improper termiticide would be imputed to Pinetree, which, as the owner of the complex, has a different standard of care. Landlords cannot delegate their duties by hiring third-party contractors. *See Love v. Schmidt*, 239 Va. 357, 360-61 (1990) ("[I]f a duty to maintain a premises in a safe condition is imposed by contract or by law, it cannot be delegated to an independent contractor."); *Boland v. Rivanna Ptnrs.*, 69 Va Cir. 308, 310 (Charlottesville 2005) ("It is settled law that a landlord cannot delegate its common law duty[.]"). This is the way that Virginia landlord law works: the tenant, to the extent the Estate can meet its burden of proof, claims against the landlord, who might then have a separate claim against the contractor, but the Estate does not have its own claim directly against the contractor for the contractor's failure to perform its contractual duties.

### ii. *Plaintiffs' Claims Against PestNow Are Fatally Speculative.*

Plaintiffs' claims against PestNow also fail for being fatally remote and speculative, which is confirmed in the record. *See Mayes*, 198 F.3d at 464. Plaintiffs' entire theory against PestNow hinges on a very specific causal chain that the Estate cannot establish:

(1) The species at issue is the <u>Eastern Subterranean Light Termite</u> ("Subterranean Termite);
(2) The Subterranean Termite existed <u>in Unit G-8</u>;
(3) The Subterranean Termite existing in the walls of Unit G-8 <u>in March 2019</u>; and
(4) The <u>same colony of Subterranean Termites</u> continued to exist in the walls of Unit G-8 for five years until the fire.

The multiple layers of speculation in this assertion, along with the absence of records to support these claims, means that the Estate will never be able to state a claim against PestNow.

Plaintiffs do not even have the records necessary to show that the specific type of termite in March 2019 was Subterranean Termites. Plaintiffs have submitted an expert affidavit that the Subterranean Termite is the "most common termite" in the Petersburg area. *See* Compl. ¶ 44. Plaintiffs' theory hinges on this because of the way that Subterranean Termites allegedly move. *See* Kunst Aff. ¶ 6 (Compl., Attach.). However, the Subterranean Termites is not the only termite in Petersburg, Virginia, and there will never be any evidence that the termites in Building G were Subterranean Termites.[8] The PestNow record from March 2019 in Building G only says "termites." (Ex. H). In PestNow's corporate representative deposition, PestNow testified that if a PestNow record just says "termites," it cannot be established that the species was Subterranean Termite. PestNow Depo. 141:7-143:18 (**Exhibit I**). There are no other records from the March 2019 inspection of Building G. Further, Plaintiffs cannot use an expert to bridge this impossibly speculative gap as experts are not permitted to hypothesize as to information not in the record. *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994) ("When the

---

[8] There are over 2,000 species of termites in the world, over 40 in the United States, and at least 3 types that are prevalent in Virginia.

assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court."); *Smith v. Schlage Lock Co.*, LLC, 986 F.3d 482, 489 (4th Cir. 2021) ("Experts cannot base their opinions on speculation.").

There is also no way to know the quantity of termites or the size of the affected area in 2019. *See* PestNow Depo. 141:7-22 (Ex. I). PestNow's record on Building G does not say that the termites were near Ms. Ghee's unit (G-8), so Plaintiffs cannot even establish that PestNow found termites near the apartment in 2019. *See* Ex. H (only finding "live termites on exterior foundation"). Building G has eight separate units. There will never be any records or testimony that PestNow found termites in Ms. Ghee's unit in 2019. Without showing that her unit was infected in 2019, Plaintiffs cannot show that PestNow's actions in 2019 could have prevented the alleged damage. *See supra* (noting this is a nonfeasance claim).

Plaintiffs' claim against PestNow also relies upon an unbroken continuation of the *same colony of termites* in Unit G-8 from 2019 until 2024. *See* Compl. ¶ 59 (noting that "termites continued to destroy the areas inside the wall" (emphasis added)). Once again, Plaintiffs' theory relies upon an unbroken continuation; otherwise, the treatment rendered in 2019, even if done perfectly, could not have prevented the alleged damage. *See supra*. However, when PestNow rechecked Building G in 2020, there was no evidence showing the 2019 application of termiticide did not do its job:

Q: [W]hen your company back in April 2019 treats Building G and then comes back and does the reinspection in 2020 and finds no signs of exterior termites, is that a sign to you that your prior treatment had worked and killed the termites in the area?

A: I would – I would say yes. If the previous inspection reported live, active termites and a year later we come out and find nothing, then I would say the treatment was doing what it was supposed to do.

PestNow Depo. at 162:16-163:1 (Ex. I). PestNow testified that when performing the re-examination, the technician would be looking at ground-floor doors, exactly like the Sliding Door.

17

*Id.* 148:13-149:16. Plaintiffs' claim of ongoing termite damage from 2019 to 2024 is too speculative to stand.

Moreover, Ms. Ghee and her family lived in the unit for 21 months before the fire, and Ms. Ghee never reported any bugs, let alone termites. The absence of the allegation of reporting termites in the Complaint should be considered particularly significant because its absence is not merely forgetfulness; Ms. Ghee withdrew the allegation that she reported bugs in her Pending Federal Action as being incorrect. *See* (**Exhibit J**). A simple paint job, as Plaintiffs allege, would never have concealed ongoing termite damage for 21 months within Unit G-8. These facts are not just inconvenient to Plaintiffs' claim against PestNow, but fatal to her claims that the same colony of termites was inside the wall after PestNow completed its work in 2019.

### D. **The Individuals Have Been Fraudulently Joined Because Their Alleged Wrongs Consist of Nonfeasance, Not Malfeasance, Which Cannot Subject Them to Individual Suit by the Plaintiff.**

The Court find that the Individuals are fraudulently joined. Yohannes was the regional manager over the Pinetree Apartments from May 2019 to January 2024 (before the fire). Compl. ¶ 16. McConnell and Peebles were maintenance personnel, from May 2022 to October 2023, and January 2020 to March 2022, respectively. *See* Compl. ¶¶ 17-18. None of the Individuals caused water and/or termites to enter Unit G-8. The *most* they allegedly did was fail to inspect or repair the unit, which is intrinsically nonfeasance for which they are not individually subject to suit. Even Plaintiffs' creative allegations, knowing this standard against individual employees, cannot transform such monitoring or inspection into malfeasance.

> i. *Individual Employees Are Not Appropriately Named Because Their Alleged Conduct Was Nonfeasance, Not Malfeasance, and They Did Not Cause the Alleged Defect.*

The Individuals did not cause the alleged defect. The allegations against them are sparse:

| EMPLOYEE | ALLEGATIONS |
|---|---|
| Nadra Yohannes | Yohannes was emailed about obtaining a termite inspection for Pinetree in 2020 (which was negative). *See* Compl. ¶ 54 & n.8.<br><br>Yohannes was "informed" of resident complaints "which she failed to address adequately." *See* Compl. ¶ 119.[9]<br><br>Yohannes "purposefully withheld the cash required to eliminate the resulting damage and [was] complicit in causing the fraudulent conduct of McConnell and Peebles." *See* Compl. ¶ 126. |
| Ricky McConnell | McConnell was "aware of water intruding into the walls around … sliding glass doors" and was "directed to spend little annually[.]" *See* Compl. ¶ 119.<br><br>McConnell "painted over termite holes and moisture-laden wood to hide the water damage and termite infestation and allegedly greased the sliding glass doors to mask the out-of-square condition[.]" *See id.* |
| Alvin Peebles | Plaintiffs allege the same facts against Peebles as they do against McConnell. However, Peebles was <u>no longer employed</u> when Unit G-8 was repaired in May 2022. *See* (**<u>Exhibit K</u>**). More to the point, there is a video of the work performed, with McConnell's voice on it. There is no remaining logical dispute that it was not McConnell who performed the work. *See* McConnell Depo. 96:21-22 ("I did the work. I mean, that's obviously my voice.") (Ex. D); *see also* Ex. E. |

These alleged inactions, within the scope of employment, only go to nonfeasance rather than malfeasance, and thus should not subject them to individual suit.

Virginia precedent establishes clear boundaries for when employees face personal tort liability. "[A]n employee may be liable for his own misfeasance (i.e., performance of an affirmative act done improperly), but not for his own nonfeasance (i.e., omission to do some act which ought to be performed)." *Harris v. Morrison*, 32 Va. Cir. 298, 298 (Richmond 1993); *Hope v. Commonwealth*, 92 Va. Cir. 6, 12 (Staunton 2015) (quoting *id.*). There is a "fundamental difference" between causing physical harm and "lack of performance of something that would have prevented harm." *Brannon v. BOP Reston F, LLC*, 113 Va. Cir. 287, 294 (Fairfax 2024)

---

[9] Even though elsewhere in the Complaint Plaintiffs reference specific communications about which Yohannes was "informed," none of these communications pertained to Ms. Ghee's unit.

(quotation omitted). Courts do not consider this a formulaic line, but instead look at the gravamen of the Complaint: "When the allegations are viewed in this manner, courts do not myopically focus on whether some 'action or inaction as to the particular act or omission . . . has caused the damage,' but rather, they … determine whether the allegations in the aggregate constitute nonfeasance or misfeasance." *Tingler*, at 298 Va. at 91. There are public policy reasons for limiting personal tort liability against individual employees for job-related nonfeasance, including avoiding imposing an unfair burden on individuals. *See, e.g.*, *First Va. Bank-Colonial v. Baker*, 225 Va. 72, 79 (1983). Instead, the employee's omission "would be a duty owing to his employer, rather than a positive act towards the plaintiff." *Linnin v. Michielsens*, 372 F. Supp. 2d 811, 823 (E.D. Va. 2005) (quoting *Pusey v. Riner*, 26 Va. Cir. 321, 325 (Fairfax 1992)).

The allegations describe at most nonfeasance: failures by employees to inspect, repair, or disclose building conditions. *Cf. Saunders v. Boddie-Noell Enters.*, No. 7:08-cv-110, 2008 U.S. Dist. LEXIS 48715, *5 (W.D. Va. June 25, 2008) ("Plaintiff's allegations, that defendant omitted to do acts which should have been performed, constitute acts of nonfeasance, and not misfeasance."). The Complaint contains generalized allegations about moisture and termite problems at Pinetree but does not tie these Individuals to specific knowledge of Unit G-8's Sliding Door. Instead, Plaintiffs focus their allegations on an issue that occurred in a small subset of apartments with water intrusion. *See* Compl. ¶¶ 36-41. These allegations are irrelevant to Plaintiffs' Complaint, including because those tenants complained of *visible* damage (unlike alleged hidden damage), and because moisture issues (which were repaired) were unconnected

with the operation of the Sliding Door.[10] Plaintiffs cannot claim that employees without knowledge of Unit G-8, the Sliding Door, or Ms. Ghee, committed malfeasance.

To attempt to transform her claim from nonfeasance to malfeasance, Plaintiffs will likely focus on McConnell painting the trim in Unit G-8 before Ms. Ghee's move-in, which Plaintiffs improperly assume was to cover up the unfounded claim there was exterior signs of termite damage. The Court should not give credence to Plaintiffs' speculative assertion that McConnel painted over visible termite damage. Even if the wooden header did have damage, damaged wood framing in April 2024 does not mean visible termite damage on the exterior walls, causing chipping paint, in May 2022 – the damage could have occurred earlier (maybe even before 2011, when Pinetree purchased the property) and have been remediated but not replaced, or the damage could have arisen after the May 2022 work. There are also obvious, alternative explanations for chipping paint on exterior wooden surfaces unrelated to termite damage. For example, other unrelated causes may include, but are not limited to, the following:

- temperature blisters (light exposure, high temperatures, high humidity);
- moister blisters (rain and dew, ice and snow, high moisture content from other sources);
- poor workmanship (low-quality paint and materials, improper preparation of the surface, incorrect application techniques);
- intercoat peeling (separation of the newer paint film from old paint coat due to weak bonding);
- cross-grain cracking (coatings from repeat painting become too thick and cracks); and
- the normal lifespan of paint (depending on condition of the wood, quality of paint, environmental conditions, surface preparation, and application techniques).

---

[10] Plaintiffs attempt to compare Ms. Ghee's apartment to a small subset of apartments where water "was pouring in from the outside when it rains." *See* Compl. ¶ 44(c). When this occurred, taping was ineffective at keeping water out – evidence that a layer of paint never would have either. *See id.* Plaintiffs has also never claimed water was pouring into Ms. Ghee's apartment when it rained. Notably, the tenant in K-1 – the unit referenced in Paragraph 44(c), which was repaired in 2020 before Ms. Ghee's tenancy – never complained that the sliding door could not open from water damage.

All but one of these possibilities do not even relate to moisture or termite damage and can occur without any underlying structural defect in the wood. None of the factual assertions in Plaintiffs' Complaint make any of these possibilities (or others) less likely than Plaintiffs' termite damage speculation. The work order itself does not even touch upon the cause. *See* Compl. ¶ 23.

Plaintiffs also cannot claim malfeasance because the Sliding Door was operable when Ms. Ghee took possession of Unit G-8. The Petersburg Redevelopment and Housing Authority ("PRHA") inspector who passed Unit G-8 reported that "Maintenance was able to get to the windows/doors to open smoothly while I was present by lubricating the seals." *See* (Ex. F); *see also* Compl. ¶ 119 (acknowledging the seals were greased, which allowed movement). Plaintiffs want to characterize Pinetree's repairs as "temporary," but how could a reasonable maintenance person like McConnell think a functional sliding door requires any further attention when simultaneously the PRHA inspector passed the unit after considering the issue resolved? A property owner is not required to provide an egress point that will never need maintenance. An apartment complex may choose to make a repair that fixes the problem short of replacement. Particularly, McConnell – as an individual maintenance employee – did not owe a unique individual tort duty to look beyond a functional sliding door for additional possible repairs.

Even if Plaintiffs are allowed to make the unreasonable assumption that McConnell should have known to do something further to repair the operable Sliding Door, McConnell did not do anything that prevented the Sliding Door from functioning. The case is like *Alier v. Gorbel, Inc.*, in which the Roanoke Circuit Court rejected the plaintiff's argument that a crane inspector committed malfeasance because "by negligently inspecting the crane and affirmatively certifying it as safe, the alleged structural defects in the crane structure grew and worsened." *Alier v. Gorbel, Inc.*, 115 Va. Cir. 295, 295-96 (Roanoke 2025) (finding the alleged violation to be nonfeasance).

I-3031168.1

Similarly, Plaintiffs assert that the failure to repair the Sliding Door in May 2022 permitted the alleged pre-existing natural condition of termites and/or water infiltration, which Plaintiffs allege may have begun as early as 2019 (but such date is unknown), to continue to worsen. *See* Compl. ¶¶ 30-31. Nothing about painting the header above the Sliding Door attracted additional termites or accelerated the deterioration. Nothing about painting the Sliding Door impeded the function of the Sliding Door. Nothing about McConnell's work in Unit G-8 in May 2022 could conceivably have made the Sliding Door's function worse than it was when McConnell entered the apartment.

Plaintiffs' claim is that McConnell allegedly did not repair the Sliding Door. The gravamen of such an allegation is not malfeasance, but nonfeasance. Regardless of any claim Plaintiffs might eventually make against Pinetree, for the purposes of this removal, Plaintiffs cannot state a claim against an employee like McConnell for failure to repair the Sliding Door.

### ii. *Plaintiffs Cannot State a Claim for Fraud Against the Individuals.*

#### a. There Is No Fraudulent Concealment Claim for Repair Work in Unit G-8.

The Individuals cannot be charged with fraud because the defect is not plausibly alleged as existing when Ms. Ghee took possession. Plaintiffs are extremely clear that the defect is the Compression Issue: "namely, water damage and termites that were causing the wooden framing behind the drywall to deteriorate and deflect, thereby interfering with the operation of the sliding glass door." *See, e.g.*, Compl. ¶ 131. The Compression Issue requires (1) that there was both water and termite damage; (2) that resulting damage placed pressure on the Sliding Door's frame; (3) that the pressure caused the Sliding Door's frame to compress and shift out of square; and (4) that the Sliding Door would not open because of the compression. Plaintiffs have even provided an expert diagram detailing the specific causal chain. *See id.* ¶ 104. It is not enough for Plaintiffs to

show damage when McConnell made the repairs (which they cannot do),[11] because without a compression effect on the Sliding Door, there is no defect. If Plaintiffs are to show the Compression Issue was in place when Ms. Ghee took possession, then Plaintiffs must show that the door was inoperable on June 1, 2022. As described above, the Sliding Door moved smoothly, and thus there was no Compression Issue. *See* Compl. ¶ 119.

Equally detrimental to Plaintiffs' fraud claim is the fact that the Compression Issue, if it occurred, would be impossible to conceal. Fraudulent concealment requires "conceal[ment of] the material fact while knowing that plaintiff was acting on the assumption that the fact did not exist." *Guy v. Tidewater Inv. Props.*, 41 Va. Cir. 218, 220-221 (Norfolk 1996); *see also Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 368 (2003); *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999). No concealment can occur when Plaintiffs could have discovered – and indeed, did discover – the alleged Compression Issue by simply attempting to open the Sliding Door. *See* Compl. ¶ 34. A layer of paint on a door's header, no matter how thickly applied, cannot conceal whether a door functions. The Supreme Court of Virginia has disclaimed liability for even affirmative misrepresentations when the defect can be discovered by a cursory inspection. *See Kuczmanski v. Gill*, 225 Va. 367, 370 (1982). Nothing Pinetree could have done would have concealed an inoperable Sliding Door in the main bedroom where Ms. Ghee slept for 14 months before the fire. As such, a fraudulent concealment claim is not possible.

Plaintiffs like to use the phrase "lipstick on pig" when referring to the May 2022 repairs – but in doing so, Plaintiffs make the Defendants' point that the alleged damage in Unit G-8 could not be concealed. The phrase to "put lipstick on a pig" means making superficial or cosmetic

---

[11] There is not a single person who will testify that the wooden header was "moisture laden" when repaired. Nor is it reasonable that paint over a wet area would conceal ongoing water damage for 21 months. *See supra* note 10.

changes to something in a futile effort to disguise its fundamental failings – i.e., a pig will roll around in the mud, and the lipstick will smear and dirty and eventually come off, and you will know it is a pig. The apartments to which Plaintiffs compares Ms. Ghee's unit had visible, ongoing damage, with leaks that could be filmed on video – and if Ms. Ghee's apartment had the same issue, no paint job in May 2022 could have kept that concealed from her. *See supra* note 10. It would not take long for water to wash that new paint away, or termites to cause more paint bubbling, which would be extremely visible to Ms. Ghee, who was sleeping in the same room. Ms. Ghee lived in that unit for two winters before the fire. Plaintiffs' allegations that the paint looked the same in February 2024 as it did in March 2022 when freshly applied is fatal to any claims of ongoing concealed damage.

b.  <u>Yohannes Was Not "Complicit" in the Repair Work to Unit G-8.</u>

Even more absurd is Plaintiffs' claim that Yohannes was "complicit" in the alleged fraud. *See* Compl. ¶ 126. Fraud requires a showing that Yohannes had knowledge of the "material fact." *See Cohn*, 266 Va. at 368 (the plaintiff "produced no evidence that Bonhomme was aware of this bias, much less that she intentionally concealed it"). Plaintiffs do not assert, nor could they, that an alleged request to repair to the Sliding Door in Unit G-8 was ever communicated higher than ground-level maintenance at Pinetree. Yohannes did not know of alleged water and/or termite damage in Unit G-8. *See* Yohannes Depo. 68:19-22 (**Exhibit L**) (she never knew of termite damage in Unit G-8). Yohannes did not know the Sliding Door in Unit G-8 would not open. Yohannes was not aware of when McConnell prepared Unit G-8 in May 2022 or know Ms. Ghee specifically. *See id.* at 65:7-11. Fraud under Rule 9(b) requires, at minimum, some allegation of Yohannes's "malice, intent, [or] knowledge" about Ms. Ghee's unit, as well as stating "with particularity the circumstances constituting fraud or mistake."

I-3031168.1

Plaintiffs appear to connect Yohannes to the alleged fraud because she "withheld the cash required" for repairs, but this general allegation is for nonfeasance and non-actionable. *See supra*; *Harris*, 298 at 298. Further, while Plaintiffs claim that Yohannes generally encouraged cutting corners, there is nothing Plaintiffs have uncovered in months of discovery in the Pending Federal Action supports such a character assassination – if such a thing was even admissible.[12] *See* Fed. R. Evid. 404. Neither do the allegations in the Complaint plausibly support that necessary repairs were avoided. As bears repeating, Plaintiffs are relying on apartments where repairs were made. Such is the illogicity of Plaintiffs' claims. Plaintiffs have not identified any safety-related tenant complaints for which repairs were <u>not</u> performed because of Yohannes' decision to restrict necessary funds.

The repaired apartments are also not substantially similar to Plaintiffs' apartment because there is no evidence that the Compression Issue occurred, and thus they cannot be admitted for notice. As the Supreme Court of Virginia has observed:

> [I]t is well settled that evidence of prior accidents or occurrences is **not admissible** and can have **no effect** in establishing the defendant's knowledge of a danger unless the plaintiff shows that those prior accidents or occurrences happened at substantially the same place and under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue, or by the acts of the same person.

*Roll "R" Way Rinks, Inc. v. Smith*, 218 Va. 321, 325 (1977) (quoting *Spurlin v. Richardson*, 203 Va. 984, 989 (1962)) (emphasis added). The defect and causation must be the same. *Funkhouser v. Ford Motor Co.*, 285 Va. 272, 275 (2013). One analogous Georgia case found that although

---

[12] William Norris, maintenance, was never disciplined at Pinetree for going over budget. *See* Norris Depo. 202:24-203:9 (Ex. M). Bonuses were awarded by meeting the budget for the entire expense category (e.g., leasing, administrative, services, taxes and insurance, payroll, and repairs), not just maintenance. In 2022, Pinetree employees did not earn any bonus in Q1 or Q4, and only $24.90 in Q2 and $75.00 in Q3. This amount does not incentivize employees to "cut corners" on safety.

there were other incidents of "falling walls" at an apartment complex, the plaintiff was unable to show that the "missing or different blocks in other walls were in that state because of original construction, alteration, vandalism, collisions with the wall, or … deterioration. . . . **There is no showing of substantial similarity**[.]" *Smith v. Hous. Auth.*, 212 Ga. App. 503, 505 (1994) (emphasis added).

Even if Plaintiffs' allegations supported that Yohannes withheld funds from other units, or even had notice about the potential water intrusion issue, Plaintiffs cannot state a claim against Yohannes regarding her intent as to Unit G-8.[13] There are not even any allegations that Yohannes thought water intrusion and/or termite damage might affect the operability of a sliding door. *See* Yohannes Depo. 80:15-17 (water damage was not her expertise); 132:12-14 (she did not understand flashing); 178:18-180:6 (stating that she is "not a construction specialist" and "not a builder"). Yohannes was questioned about other apartment units with repaired flashing, but not a single unit discussed with Yohannes reported related opening issues. There is no record in Pinetree's 8,000-plus-page production showing Yohannes or other employees thought water damage above the sliding doors would impede operation. When William Norris (maintenance supervisor) was asked whether it made sense that the "weight of the building" would "push[] on the sliding glass door" after the water damage occurred, he answered that Plaintiffs' theory did not make sense "because I haven't seen it happen like that." Norris Depo. 182:7-19 (**<u>Exhibit M</u>**). Even

---

[13] Even if Plaintiffs attempts to argue that there was an affirmative direction to withhold general repair funds, Plaintiffs cannot show that Yohannes directed that McConnell fail to repair the alleged hazardous condition in Unit G-8. As such, her alleged actions are distinguishable from the ruling in *Harris v. Webster*, where the Court refused the argument of fraudulent joinder because the manager specifically directed the employee "not to clean [the spill] up as they were too busy in the store." No. 3:08CV397, 2008 U.S. Dist. LEXIS 72271, *10 (E.D. Va. Sept. 23, 2008); *Logan v. Boddie-Noell Enters.*, 834 F. Supp. 2d 484, 492 (2011) (interpreting *Harris* and holding that "only [a] manager's affirmative direction to her subordinates to refrain from removing [the alleged hazard would] constitute[] an affirmative act").

if Yohannes knew about Ms. Ghee's apartment, which she did not, if the repairs had nothing to do with the Sliding Door's functionality, fraud cannot be shown.

Plaintiffs cannot convert Yohannes' alleged failure to act regarding Unit G-8 into an affirmative claim. In *Logan v. Boddie-Noell Enters.*, the Western District Court of Virginia found that a store manager had been fraudulently joined because the manager's decision to place warning cones in certain areas and not in the one place the plaintiff claimed would have prevented her injury was simply nonfeasance. 834 F. Supp. 2d 484, 492 (2011) (rejecting plaintiff's "attempt to characterize Robinson's failure to place cones in the dining room as an affirmative act by arguing that doing so, she affirmatively selected alternative locations to fail"). This case is similar in that Plaintiffs allege Yohannes was aware of *other units* besides Unit G-8 that needed repairs, and thus, Yohannes should have done something about Unit G-8. Yohannes was pressured about this very issue during her deposition in an objectionable line of questioning:

> Q:    My question is: When you're finding it so prevalently, why didn't you go in and inspect all around the sliding glass doors to see if there was that damage to the jack studs and to the headers?
>
> A:    Sixteen times out of 114 units would not require removing the drywall from 144 units. . . . I'm no construction specialist[.]

*See* Yohannes Depo. 178:1-180:6 (Ex. L). Yohannes had no knowledge of the other units, and she disagreed that knowledge about the other units would reasonably have made her look at Unit G-8. Like the Court observed in *Logan*, Yohannes' knowledge of repairs to other units did "not convert her omission into an act." *Id.* at 492. Plaintiffs' claim against Yohannes must fail for nonfeasance.

### iii.  Other Actions Against the Individuals Are Not Viable.

Other causes of action against the Individuals should also be outright denied. For example, Count III alleges that the Individuals owed a duty to maintain the inside of the back wall, but individual employees do not have a common law duty to tenants to maintain the premises. *See*

28

*supra*. Count VI alleges a private nuisance against Yohannes, but Virginia nuisance law requires the defendant to have some property interest or control over the nuisance-creating condition, and individuals without such interests are not proper nuisance defendants. *See, e.g.*, *In re Chinese Drywall Cases*, 80 Va. Cir. 69, 86 (Norfolk 2010). Plaintiffs have taken a scatter-shot approach to including the Individuals in various claims that simply cannot lie against employees.

## V.    NOTICE

In accordance with 28 U.S.C. § 1446(d), prompt written notice of the filing of this Notice of Removal is being given to all other parties, and a true and correct copy of the Notice of Removal is being filed with the Circuit Court for Petersburg, Virginia.

## VI.    CONSENT

Pursuant to 28 U.S.C. § 1441(b)(2)(A), defendants who have been properly joined and served in an action must join in or consent to a removal. It is well settled that fraudulently joined defendants need not join in the Notice of Removal. *See, e.g.*, *Fleming v. United Teacher Assocs. Ins. Co.*, 250 F. Supp. 2d 658, 663 (S.D. W. Va. 2003) ("[A]pplication of this requirement to improperly or fraudulently joined parties would be nonsensical, as removal in these cases is based on the contention that no other proper defendant exists." (quoting *Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 816 (4th Cir. 1993)). However, despite the fact that such consent is not necessary, PestNow has consented to this Notice of Removal. Further, the undersigned counsel represents the Individuals, and the Individuals similarly consent to this removal.  Therefore, the rule of unanimity is met for all named defendants in this case, both proper and improper. *See* 28 U.S.C. § 1441(b)(2)(A).

## VII.    REQUEST FOR DISCOVERY AND ORAL ARGUMENT

Defendants anticipate that Plaintiffs will oppose this removal and request remand. Because other actions are also pending that concern the same factual issues, *see supra*, Defendants intend

to file a Rule 42 motion for consolidation. As part of that Motion, and any other questions in any form before this Court regarding the propriety of the removal of this action, Defendants respectfully request the opportunity to conduct jurisdictional discovery (if necessary), file a brief, affidavits, and other relevant evidence, and present oral argument to confirm that this Court has jurisdiction and that this case has been properly removed.

## VIII.  CONCLUSION

For the foregoing reasons, defendants Pinetree Apartments, LLC, Clearfield/Pinetree Apartments, LLC, Beachwold Partners, LP, Beachwold Holdings, LLC, and South Oxford Management, LLC, Nadra Yohannes, Ricky McConnell, and Alvin Peebles hereby remove this this matter from the Petersburg Circuit Court to the United States District Court for the Eastern District of Virginia, based on diversity jurisdiction. *See* 28 U.S.C. §§ 1332, 1441, and 1446.

**PINETREE APARTMENTS, LLC, CLEARFIELD/PINETREE APARTMENTS, LLC, BEACHWOLD PARTNERS, LP, BEACHWOLD HOLDINGS, LLC, SOUTH OXFORD MANAGEMENT, LLC, NADRA YOHANNES, RICKY MCCONNELL, and ALVIN PEEBLES**

By:  */s/ Joseph P. Moriarty*
    Joseph P. Moriarty (VSB No. 68465)
    Kevin M. Kennedy (VSB No. 75071)
    Bryn L. Clegg (VSB No. 96923)
    WILLCOX & SAVAGE, P.C.
    440 Monticello Avenue, Suite 2200
    Norfolk, Virginia 23510-2243
    Telephone: (757) 628-5500
    Facsimile:  (757) 628-5566
    jmoriarty@wilsav.com
    kkennedy@wilsav.com
    bclegg@wilsav.com
    *Counsel for Defendants*

I-3031168.1

## CERTIFICATION

I hereby certify that on this 27th day of February, 2026, I electronically filed the forgoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Charles H Cuthbert, Jr. (VSB No. 14519)
Richard M. Cuthbert (VSB No. 82025)
Cuthbert Law Offices, P.C.
220 North Sycamore Street
Petersburg, VA 23803-3228
Telephone:  804-733-3100
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com
*Counsel for Plaintiff*

Mark J. Krudys (VSB No. 30718)
Daniel Guinnane Zemel (VSB No. 95073)
The Krudys Law Firm, PLC
Truist Place
919 East Main Street, Suite 2020
Richmond, VA 23219
Telephone:  804-774-7950
mkrudys@krudys.com
dzemel@krudys.com
*Counsel for Plaintiff*

Alexander Francuzenko (VAS No. 36510)
Dunn Craig Francuzenko
3251 Blenheim Blvd., Suite 404
Fairfax, VA 22030
Telephone: 703-856-7480
alex@dunncraig.com
*Counsel for PestNow of Central Virginia, LLC*

*/s/ Joseph P. Moriarty*
Joseph P. Moriarty (VSB No. 68465)
Kevin M. Kennedy (VSB No. 75071)
Bryn L. Clegg (VSB No. 96923)
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510-2243
Telephone: (757) 628-5500
jmoriarty@wilsav.com
kkennedy@wilsav.com
bclegg@wilsav.com
*Counsel for Counsel for Pinetree Apartments, LLC, Clearfield/Pinetree Apartments, LLC, Beachwold Partners, LP, Beachwold Holdings, LLC, South Oxford Management, LLC, Nadra Yohannes, Ricky McConnell, and Alvin Peebles*

I-3031168.1