**V I R G I N I A:  IN THE CIRCUIT COURT FOR THE CITY OF PETERSBURG**

NYEISHA S. GHEE and LISA Y. CAMPBELL,
ADMINISTRATORS OF THE ESTATE OF
MARK KAHLIL GHEE, DECEASED,

        Plaintiffs,

        v.

PINETREE APARTMENTS, LLC,

CLEARFIELD/PINETREE APARTMENTS, LLC,

BEACHWOLD PARTNERS, LP,

BEACHWOLD HOLDINGS, LLC,

BEACHWOLD RESIDENTIAL, LLC,

SOUTH OXFORD MANAGEMENT, LLC,

NADRA YOHANNES,

RICKY MCCONNELL,

ALVIN PEEBLES, and

PESTNOW OF CENTRAL VIRGINIA, LLC,

        Defendants.

Case No.: _____

**JURY TRIAL DEMANDED**



RECEIVED

FEB 0 3 2026

Maytee E. Parham
Clerk of Circuit Court
Petersburg, Virginia

## COMPLAINT

COME NOW Plaintiffs Nyeisha S. Ghee and Lisa Y. Campbell, Administrators of the

Estate of Mark Kahlil Ghee, Deceased, by counsel, and move this Court for judgment against

Defendants Pinetree Apartments, LLC ("Pinetree"), Clearfield/Pinetree Apartments, LLC

("Clearfield"), Beachwold Partners, LP ("Beachwold Partners"), Beachwold Holdings, LLC

("Beachwold Holdings"), Beachwold Residential, LLC ("Beachwold Residential"), South Oxford

Management, LLC ("South Oxford"), Nadra Yohannes ("Yohannes"), Ricky McConnell

**EXHIBIT A**

("McConnell"), Alvin Peebles ("Peebles"), and PestNow of Central Virginia, LLC ("PestNow"),

for the reasons stated below:

## I.    **INTRODUCTION**

1.    On February 20, 2024, three-year-old Mark Ghee died in a fire at Apartment G8 in
Pinetree Apartments—a ground-floor unit rented by his mother, Nyeisha S. Ghee ("Ms. Ghee").
When a fierce fire was discovered in the middle of the night, Ms. Ghee's two older sons escaped
through the front door of the apartment. Ms. Ghee and Mark were in the primary bedroom (the
"Primary Bedroom") and tried to escape through a sliding glass door that led outside. However,
no matter how hard she tried or how many times she attempted, the door simply wouldn't open.
Ms. Ghee then realized that she and Mark would have to run through the flame-engulfed apartment
to escape out the front door. But when she turned from the sliding glass door to grab Mark for their
escape, he was gone. Firefighters later found his body on the floor, not far from the front door.

2.    The sliding glass door that turned Ms. Ghee's bedroom into a fiery prison was not
a new problem. Not only did Ms. Ghee's door have a history of problems, but sliding doors all
over Pinetree Apartments had the same problem: they wouldn't open. The reason was widespread,
systemic problems with water intrusion and termite infestations. Improperly installed flashing
around patio sliding glass doors was directing water into the walls instead of away from them. The
accumulation of water-attracted termites that chewed away at the waterlogged wood framing
supporting the sliding glass doors. Defendant PestNow, a third-party exterminator, failed to follow
the instructions for applying termiticide and failed to stop the termite damage. From 2019 through
early 2024 and beyond, dozens of times, contractors pulled back the siding around the sliding glass
doors and found wood "decay" and "rot"—their words—including the horizontal headers above
the sliding glass doors and the vertical jack studs beside the doors.

2

3.      Rot and decay at these locations caused the wooden frame around the sliding glass doors to shift out of square, preventing the doors from moving. About three months after the fire, Plaintiffs' expert took a photo, shown below, of the damaged wood in the wall at the back of the Primary Bedroom in Ms. Ghee's apartment. Before taking this photo, Plaintiffs' expert inserted a putty knife into the wood to show the extent of the damage. Before the fire, drywall covered this damaged wood.



4.      These problems were well known to management at Pinetree. Tenants flooded the email inboxes and voicemails of the manager (as well as third-party apartment review websites) with complaints about water leaking into their units through the walls surrounding their patio sliding glass doors. They included numerous photos and videos with their complaints, showing damaged, soggy carpets and black mold in the affected areas. Management, described below as a

network of interconnected companies, most bearing the name "Beachwold,"[1] knew about sliding glass door problems, both in general and with regard to Ms. Ghee's specific door.

5.     Yet, instead of properly addressing these systemic problems, Pinetree's management chose to make cheap, cosmetic fixes that *hid* the damage instead of addressing the underlying problem with the doors. In Ms. Ghee's apartment, this included *painting over termite holes* beside the door the day before she took possession of the apartment.  As a result, Ms. Ghee never knew the structural trap in which she was living with three-year-old Mark, until the night of February 20, 2024—when it was too late to make a difference.

6.     PestNow also contributed to Mark's death in multiple ways, including by applying termiticide only to the exterior of Building G without inspecting or treating the interior of Unit G8 and Building G's other units, by not applying termiticide at the joints of Building G's abutting concrete slabs, and by allowing its technicians to apply termiticides at the perimeter of  Building G even though they were not certified to apply termiticides.  In short, PestNow knowingly skirted state law and the standard of care intended to protect the public. PestNow's failures and negligence in termite treatment contributed to the termite damage that affected Unit G8's sliding glass door and caused Mark's death.

---

[1] Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, and South Oxford are referred to herein as the "Beachwold Defendants." Three New Yorkers, referred to as "Ownership" by employees – Gideon Friedman, Amir Hazan, and Chuck Rubenstein – assembled and control the Beachwold Defendants.

## II.    <u>JURISDICTION</u>

7.     Jurisdiction exists in this case under Virginia Code § 8.01-50 *et seq*. (wrongful death statute) or, alternatively, under Virginia Code § 8.01-25 *et seq*. (survival statute). This Court has personal and subject-matter jurisdiction over the parties under Virginia Code § 8.01-328.1.

## III.    <u>VENUE</u>

8.     Venue is proper in this Court pursuant to Virginia Code § 8.01-262 (4) as the cause of action arose in the City of Petersburg.

## IV.    <u>PARTIES</u>

### A.    **Plaintiffs**

9.     Plaintiffs NYEISHA S. GHEE and LISA Y. CAMPBELL are the ADMINISTRATORS OF THE ESTATE OF MARK KAHLIL GHEE, DECEASED. The Plaintiffs are residents of Dinwiddie County, located in the Commonwealth of Virginia.

a.     The Plaintiffs were qualified and duly appointed Administrators of the Estate of Mark Kahlil Ghee, Deceased, by the Circuit Court of the City of Petersburg on May 14, 2024. A copy of the Certificate of Qualification is attached hereto as <u>Exhibit 1</u>. Plaintiffs bring this action in their capacity as ADMINISTRATORS OF THE ESTATE OF MARK KAHLIL GHEE, DECEASED, pursuant to, among other statutes, Virginia Code § 8.01-50 <u>*et seq*</u>. (wrongful death statute), and, alternatively, pursuant to Virginia Code § 8.01-25 et seq. (survival statute). All relief available under the foregoing statutes is sought herein by the Plaintiffs.

b.     Mark is survived by the following statutory beneficiaries (the "Statutory Beneficiaries") per Virginia Code § 8.01-53: Ms. Ghee, born November 5, 1994; William A. Coleman his father, born January 22, 1993; Elijah D. Ghee ("Elijah") his brother, born July 6, 2013; and Joshua A. Ghee ("Joshua") his other brother, born October 1, 2015. Photos of Mark, his mother, and his brothers are shown below. (Left to right on all photos; top left,  Joshua, Ms. Ghee

(partially obscured), Mark, and Elijah; top right, Ms. Ghee and Mark; bottom left, Mark and Elijah; bottom right, Ms. Ghee, Joshua, and Mark.)







**B.**     **Defendants**

10.     At all relevant times, Defendant PINETREE APARTMENTS, LLC was a Virginia limited liability company.

11.     At all relevant times, Pinetree had one LLC member, Defendant CLEARFIELD/PINETREE APARTMENTS, LLC, another Virginia LLC.

12.     At all relevant times, Clearfield had 33 members, including Defendant BEACHWOLD PARTNERS, LP, a New York limited partnership with a Park Avenue, New York address.

13.     At all relevant times, Defendant BEACHWOLD HOLDINGS, LLC was a Texas limited liability company.

14.     At all relevant times, Defendant BEACHWOLD RESIDENTIAL, LLC was a Delaware limited liability company with the same Park Avenue address as Beachwold Partners.

15.     At all relevant times, Defendant SOUTH OXFORD MANAGEMENT, LLC, was a Texas limited liability company with the same Park Avenue address as Beachwold Partners and Beachwold Residential. South Oxford was listed as the sole "Manager" on both leases signed by Ms. Ghee.

16.     At all relevant times, Defendant NADRA YOHANNES ("Yohannes") was South Oxford's Regional Manager.  At all relevant times, she has resided in Toano, Virginia (and currently resides there). Her portfolio of properties included Pinetree Apartments.

17.     At all relevant times, Defendants RICKY MCCONNELL ("McConnell") and ALVIN PEEBLES ("Peebles) were Virginia residents who served as Maintenance Technicians or Maintenance Supervisors at Pinetree Apartments. All currently reside in Virginia.

18.    Defendant PESTNOW OF CENTRAL VIRGINIA, LLC was a Virginia limited liability company, with its principal place of business and territory in Central Virginia. PestNow was hired to control pests, including termites, at Pinetree Apartments.

## VI.    **FACTS**

### A.    **Termite holes and the sliding glass door's deteriorating wooden framing were hidden from Ms. Ghee.**

19.    Pinetree and other apartment owners partnered with Petersburg Redevelopment and Housing Authority ("PRHA") to offer subsidized apartments to lower-income Central Virginians. Pinetree selected Unit G8, a vacant first-floor, two-bedroom apartment, for Ms. Ghee and her family. In early June 2022, Ms. Ghee and her family would move into the unit.

20.    From around 2017 until mid-2019, Donisha Bugg lived in Unit G8, the same unit assigned to Ms. Ghee and her family by South Oxford. During her tenancy, Ms. Bugg observed "termite damage above the sliding glass door to my bedroom, as well as above the sliding glass door to my mother's bedroom." She also noted "many small holes in the wood above the sliding glass doors" in both the Primary and Secondary bedrooms leading to the patio. On three to four occasions, she saw insects she believed were termites. On about four occasions, Ms. Bugg informed Pinetree and South Oxford of termite issues and corresponding damage in Unit G8. However, Ms. Bugg never saw evidence that the termite damage had been repaired.[2]

21.    PRHA inspects and approves housing prior to a tenant moving in. On May 24, 2022, PRHA employee Marrietta Paschal conducted an initial inspection of Unit G8. The unit failed inspection. Ms. Paschal stated in an email that the unit initially failed inspection "due to the sliding doors in the bedrooms and the window in the living room having severe chipping, paint, as well as

---

[2] From approximately 2014 to the summer of 2024, Eric Hansen lived in Pinetree Apartments Unit G4. On at least two occasions while smoking on his deck outside the sliding glass door, Mr. Hansen saw a "whole bunch of termites swarming."

them being hard to open." During the May 24, 2022 inspection, Paschal completed an Inspection Checklist, in which she noted the Master Bedroom sliding glass door "can't open." Regarding the Second Bedroom, she wrote, "chipping paint around sliding door can't open/hard to open."

22.    After the inspection, on May 31, 2022, South Oxford employees made multiple work order entries regarding repairs in Unit G8, all categorized as "Priority: High." One work order, referring to the PRHA inspection, noted "Brief Desc: Inspection Repairs." The "Problem Description" states: "The windows need to be fixed. They are difficult to open/close."

23.    Another May 31, 2022 work order states "Brief Desc: Chipping Paint." The "Problem Description" reads: "Chipping paint around window sills and sliding doors." Upon information and belief, the "chipping paint" was the damage caused by termites in the drywall and finished wood trim,[3] which South Oxford employees simply painted over to conceal the termite damage.[4] They painted over the visible termite damage, but left untouched the termite-damaged deteriorated wooden framing behind the drywall inside the back wall of the Primary Bedroom. By the time Ms. Ghee took possession of Unit G8 in June 2022, the termite holes above and around the sliding glass doors were made invisible to her and her family.

24.    Another May 31, 2022 Unit G8 work order notes "sliding door locks" in the "Brief Desc." The "Problem Description" states, "Fix both sliding doors. We need to ensure the locking mechanism works (MANDATORY)."

---

[3] Indeed, at deposition, PestNow's corporate representative testified: "A lot of times when termites enter the interior of a structure they will eat the wood" resulting in "divots" or "bubbling" of the paint. "They'll eat the paper on the drywall, which will cause the paint to bubble or blister."

[4] Multiple prior tenants have stated that Pinetree painted over mold in their apartments. See the affidavits of Debra Smith and Vanessa Schane, Exhibit 2 and 3 attached hereto, as well as the video of an irate tenant, which is attached as Exhibit 4, which can be viewed at the following link: https://youtube.com/watch/D_Ylm9BBntA.

25.     Any repair to the locking mechanism would have necessarily involved sliding the door. Therefore, the South Oxford employee undertaking the repair on May 31, 2022, would have known that the sliding glass door did not slide easily, if at all, along its track. Upon information and belief, the sliding glass door was not repaired, but simply lubricated on its sliding track to temporarily permit movement.

26.     After May 31, 2022, no work was done on the sliding glass door in the Primary Bedroom.

27.     On or about June 1, 2022, two South Oxford employees gave Ms. Ghee a walkthrough tour of Unit G8. She was not informed of any of the issues with the apartment discussed above and she was not otherwise aware of them.

28.     Around July 7, 2023, South Oxford posted a notice on the front door of Unit G8 stating that it would conduct an annual routine inspection of the unit. In response to this notice, Ms. Ghee looked around Unit G8 to identify any issues. She tried to open the sliding glass door but could not get it to move. She did not know whether it was a temporary or permanent issue, or whether a more aggressive effort would move the door. Ms. Ghee took time off from work to be present for the scheduled inspection, but no one came to her apartment that day. She assumed the inspection took place on another day while she was at work.

29.     Later in July 2023, Ms. Ghee was standing in the doorway of Unit G8 when a South Oxford maintenance worker approached, who matched the description of William Norris, Jr. She told him she could not open the sliding glass door in the Primary Bedroom and asked him to fix it. He replied, "I got you," or words to that effect. After Ms. Ghee asked the maintenance worker to fix the sliding door so it would open, she never attempted to use it other than at the time of the fire. This

was because she feared snakes in the swamp behind her home.[5] Ms. Ghee never knew why the sliding door would not open the one time she tried to open it before the fire.

30.    At all relevant times, the termites, the entry point of the water infiltration that allowed the termites to thrive, the deteriorated and deteriorating supporting wooden framing, and access to each of them were within the exterior rear wall of Unit G8, and/or Units G6 and G7, and were under the Beachwold Defendants' control.

31.    At all relevant times, the Beachwold Defendants had the authority and obligation to prevent the water infiltration described above, to treat for termites, to repair the wood rot, and to ensure the sliding glass doors functioned properly.[6]

32.    The termites, the entry point of water infiltration that allowed them to thrive, the deterioration to the supporting wood framing, and access to each of these were not known to or visible to Ms. Ghee before the fire, and she was unaware of them before the fire.

---

[5] Ms. Ghee's fear of snakes is not unfounded. A 2019 PefstNow report describing the status of several Pinetree units noted "G8-Snakes." Further, records show a emergency work order made in 2017 for a previous G8 tenant who saw "a snake in front of her door." Other tenants also reported snakes.

[6] Among other life safety regulations, at the time of the February 20, 2024 fire, the 2021 Virginia Property Maintenance Code was in effect. The 2021 Virginia Property Maintenance Code Section 702.3 states:

> **702.3 Doors**. Means of egress doors shall be maintained and, to the extent required by the code in effect at the time of construction, shall be readily openable from the side from which egress is to be made without needing keys, special knowledge, or effort.

In turn, the 2021 Virginia Property Maintenance Code, on page 15, defines "maintained" as follows:

> **MAINTAINED.** To keep unimpaired in an appropriate condition, operation, and continuance as installed in accordance with the applicable building code, or as previously approved, and in accordance with the applicable operational and maintenance provisions of this code.

However, as noted herein, the sliding glass door assembly in Unit G8 was not maintained. Termites and water infiltration had deteriorated the supporting wooden framing that held the sliding glass door frame in place. This failure to maintain constituted a violation of 2021 VPMC Section 702.3.

33.    Effective June 1, 2022, Pinetree leased Unit G8 to Ms. Ghee for use as a private residence by her and her three children, Elijah, Joshua, and Mark.

34.    The floor plan below depicts the general layout of Unit G8 as it was constructed, when it was first occupied, and when the fire occurred.



Riffe Fire Investigations case #2402131
Measurements by Brian Riffe
Not to scale
6-3-24

35.    The Primary Bedroom contained a sliding glass door that opened onto a concrete patio outside Apartment G8. The sliding glass door assembly consisted of two double-paned tempered glass panels. One panel was stationary, and the other moved when pushed to the left. The sliding glass door was the only exit leading directly from the Primary Bedroom to outside of Unit G8.

**B.    The Pinetree Apartments, built on the edge of a swamp, were plagued with moisture problems. Tenants frequently made complaints.**

36.    At all relevant times, throughout the Pinetree Apartments complex there were: a) improperly installed flashing around patio sliding glass doors; b) extensive moisture and water damage, including near patio sliding glass doors; c) termite infestation and related wood damage; d)

water rot requiring significant carpentry repairs above and near sliding glass doors; and e) immovable or difficult-to-move sliding glass doors. These problems were caused in part by improperly installed flashing that channeled rainwater into the buildings rather than away from them. Each of these problems was documented throughout the Pinetree Apartment complex, affecting many buildings and units, including Unit G8. The issues were cumulative and additive, meaning each one worsened the others. In the case of Unit G8, these problems prevented Ms. Ghee from opening the sliding glass door in the Primary Bedroom on the morning of the fire, leading to Mark's death.

37.    Pinetree Apartments were built in 1995. The complex was built on the edge of Blackwater Swamp, a large swamp in southeastern Virginia. Accordingly, tenants at Pinetree Apartments frequently reported moisture problems, mold, water leaks, termites, and related damage, especially in first floor primary bedrooms around patio sliding glass doors. William Norris, one of South Oxford's Maintenance Technicians, testified that tenants had regularly been complaining about the issues for years. Moisture would come into the units and the inside of the walls when it rained. For example, Diane Taylor, a prior resident of Unit G8, left a voicemail with South Oxford stating, "there is black mold growing in our apartment." *See* Exhibit 5, which can be viewed at the following link: https://youtu.be/jD6xjxt11BE.

38.    The below demonstrates numerous other examples of tenants reporting moisture problems, water leaks, and related damage, especially around patio sliding glass doors.

a.    On January 8, 2020, a tenant sent Pinetree and South Oxford photos of mold on the edge of her patio sliding glass doors and pictures of her efforts to clean it. *See* Exhibit 6, attached hereto.

b.    On or around May 4, 2020, a tenant informed South Oxford of the wet floor at the base of his sliding glass door. Pinetree and South Oxford received a video from the tenant

showing water accumulating on the carpet bordering the sliding glass door along with mold growing on the door frame. The video is attached hereto as <u>Exhibit 7</u>, which can be viewed at the following link: https://youtu.be/9lM6sVF4ACE.

   c. On July 21, 2020, a tenant sent pictures to Pinetree and South Oxford showing water pouring into her apartment from around the edges of her primary bedroom sliding glass doors. She said she was forced to "stuff plastic in the whole [*sic*] and cover it with tape to try to keep the water out." The tenant said she contacted management multiple times and that maintenance came by but said a contractor would need to fix the problem. She emphasized, "[m]y request to get this fixed continues to get ignored." She observed that water was "pouring in from the outside when it rains." Photos she sent to Pinetree and South Oxford are shown below.

 

   d. At an unknown time, Pinetree and South Oxford also received videos from a tenant of water rapidly coming in through the top of a patio sliding door. The videos are attached as <u>Exhibits 8 and 9,</u> which can be viewed at the following links, respectively: https://youtu.be/B2cCkeA9BiA and https://youtu.be/bXZwYMJFijg.

14

e.    On October 18, 2020, the resident in Unit L8 observed, "[t]here appears to be black mold growing inside the windowsills of the windows and patios." On January 6, 2021, the same resident stated, "[t]here is also mold on the wall near the patio in the second room."

f.    On November 14, 2020, a tenant complained that for over a year, "water has been leaking through my patio door into my home causing mold and mildew." She was told that contractors were supposed to come and perform repairs but "that never happened." She added, "maintenance came by in November of last year and check it, but nothing was ever done to resolve the issue."

g.    On November 11, 2021, another resident reported that she had "growth on all her windows and that way she was concerned because her and her son had been getting sick more often."

h.    On September 24, 2023, the resident in Unit H1 emailed Pinetree and South Oxford to report a leak in the master bedroom above the sliding glass door. She noted, "[w]hen you touch up over the door it's soft to the touch."

i.    On or about January 18, 2024, the tenant in Unit F1 reported, the "master bedroom patio door has a huge crack and will not open." The matter was termed a "window moisture issue" by the Pinetree technician.

39.    Pinetree's corporate representative testified that maintenance requests by tenants would be logged in an electronic system to create and manage work orders. The tenant could submit a work order online, or the tenant would contact the leasing office and an employee may enter the work order. A sample of work orders shows that Pinetree was continually dealing with tenant complaints of moisture problems, mold, water leaks, termites, and related damage.

40.    A November 3, 2023 work order for Unit F8 noted that the areas "[a]round the

windows and patio doors are showing signs of moisture."

      a.    A January 18, 2024 work order for Unit F1 noted that the "second bedroom around patio door has signs of moisture."

      b.    A January 29, 2024 work order for Unit H8 also noted "front window and patio door mildew again."

      c.    And a February 13, 2024 work order for Unit F2 noted that "mold has collected on the window sills."

41.    The foregoing work orders are a *tiny* sample of work orders concerning moisture, mold, and water leaks surrounding patio sliding glass doors compiled by Pinetree. Indeed, in 2017 and 2018, over *40* work orders were created concerning such issues. A condensed spreadsheet listing of relevant work orders in those years that has been compiled by Plaintiffs is attached as Exhibit 10.

**C.    Termites infested the Pinetree Apartments; Defendant PestNow illegally varied from termiticide application requirements.**

42.    From at least 2019 until the fire, moisture and wet conditions attracted termites to Pinetree Apartments and the termites damaged the apartments, including Unit G8. Pinetree utilized a third-party exterminator, Defendant PestNow, to eradicate termites using termiticide.

43.    At all relevant times, the application and use of termiticides were tightly regulated by Virginia. Among other requirements, the containers of the termiticide used by PestNow were labeled with instructions that Virginia law required PestNow to follow. The following paragraphs demonstrate PestNow's consistent disregard for the labelled instructions in treating numerous termite infestations at Pinetree Apartments.

44.    According to Plaintiffs' expert Robert Kunst, the most common termite in the Petersburg, Virginia, area is the Eastern Subterranean Light Termite. Kunst provided an affidavit

in this case stating that these termites are often found in damp environments, such as the Pinetree Apartments complex adjacent to the Blackwater Swamp. The affidavit is attached as <u>Exhibit 11</u>. According to Kunst, Eastern Subterranean Light Termites readily move from one building to another, travelling an average radius of approximately half a mile from their nest. This range easily covers the buildings at Pinetree Apartment and goes well beyond their bounds.

45.     Documents from Defendant PestNow reveal that termites infested Pinetree Apartments as early as 2019. On February 25, 2019, after complaints of termites inside Unit E3, Defendant PestNow inspected the unit and found "active termites inside the unit as well as on the exterior of the building."

46.     On March 5, 2019, PestNow technicians applied termiticide to the exterior of Building E and the interior of only Unit E3. There is no indication that other units in Building E were inspected to determine if interior treatment was needed.

47.     The termiticide instructions mandated that if the exterior of a building was treated with a termiticide, the interior of the building must be inspected as well.[7] However, PestNow did not inspect the inside of units unless it was already inside the unit for other pest control or if Beachwold Defendants specifically asked it to do so. In almost all instances, the Beachwold Defendants made no such request.

48.     Further, each Pinetree Apartment building is built on a main slab with multiple abutting concrete slabs. When PestNow applied termiticide at the exterior of a building in the

---

[7] Virginia Code § 3.2-3939(B) provides "it is unlawful for any person to use or cause to be used any pesticide in a manner inconsistent with its labeling or regulations of the board, provided that such deviation may include provision set forth in section 2 (ee) of the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.)"

Pinetree Apartment complex, the termiticide label and the standard of care required PestNow to drill holes between the abutting slabs when applying the termiticide. PestNow did not do this.

49.    Additionally, one or more PestNow's technicians who applied a termiticide at Pinetree Apartments were not Certified Applicators as required by Virginia Code § 3.2–3932.  *See* the transcript of the deposition of the corporate representative of PestNow at 32:6-32:18, stating that PestNow technician Jeff Zalinski was not a Certified Applicator. PestNow's failure to follow the termiticide label instructions continued as it responded to Pinetree's termite infestations through and after the February 20, 2024 fire, as demonstrated below.

50.    On March 13, 2019, during an inspection of Building N, a PestNow technician "found live termites on the interior of Unit 1 and also termite damage to the wall studs of Unit 1. He also found live termites between units 7 & 8." There is no indication that the interiors of any units other than N1 were inspected. PestNow's plan to treat only the exterior building without inspecting the units inside violates the termiticide label instructions.

51.    On March 18, 2019, PestNow conducted a wood-destroying insect inspection of Buildings A-P and clubhouse. Visible live termites were observed on the exterior foundations of Buildings B, C, G, J, K, O, and P, and Building J had active termites under the splash guard on the exterior foundation. PestNow recommended treatment for termites for these structures. The inspection report noted that "some degree of damage, including hidden damage, may be present," and advised the buyer to "contact a qualified structural professional to determine the extent of the damage and the need for repairs if any questions arise" regarding the termite damage. The report also noted that the structures may have been previously treated for wood-destroying insects, evidenced by preexisting drill marks and old termite bait stations found.

18

52.     PestNow technicians treated the exterior perimeter of buildings B, C, G, J, K, O, and P on April 4-5, 2019. PestNow again failed to follow the termiticide label instructions by not inspecting the buildings' interiors when treating their exteriors, and by failing to drill holes in the abutting concrete slabs at the perimeter of each of these buildings.

53.     The following year, on May 6, 2020, a technician performed an exterior termite reinspection of Building G. The invoice notes that "Pinetree staff is aware that if an interior inspection is needed that they are to contact us. The annual inspection for termites is only an exterior inspection."

54.     By mid-2020, Pinetree's termite problems were well known. On July 9, 2020, Beachwold Residential employee Ashlee Vega emailed Defendant Nadra Yohannes, the South Oxford Regional Manager assigned to Pinetree Apartments, regarding "Termite Reports for Clearfield and Pinetree," stating, "the lender just asked us to have a new inspection done for Pinetree because the last one was completed in 2019 and there was evidence in some buildings of termites. Hopefully, one can be scheduled fairly soon. Let me know if and when the inspectors would be able to go out to Pinetree."[8]

55.     On February 5, 2021, a tenant in Unit F6 reported "some type of insect that appears to look like termites not sure." The tenant complained that "the termites have taken over." She reported them crawling on the kitchen floor and bathroom. The assigned South Oxford employee, Technician William Norris, reported finding bugs that "look like flying ants." During a home inspection on February 17, 2021, a PestNow technician found "swarmer termites in bathroom tub

---

[8] The next day, on July 10, 2020 a PestNow invoice says that no wood destroying insects were found at Pinetree Apartments. The lack of visible termites only indicates that no live termite activity was seen at the time of the inspection. Plaintiff's termite expert Robert Kunst stated in his affidavit that Subterranean Termits normally swarm in the springtime. Live termites continued to be seen in the following years.

19

in Unit F6." He recommended a full-perimeter soil-treatment trench around Building F. He warned, "termites are very likely to swarm again after treatment."[9] He then treated the exterior of Building F for termites on February 23, 2021. There is no indication the other units in Building F were inspected, despite the swarm being discovered in Unit F6's interior.

56.    On March 8, 2023, Pinetree Property Manager Crystal Spruill informed Yohannes that "Apt C8 is swarming with termites." PestNow invoiced Pinetree for cockroach treatment in select units in multiple buildings throughout the complex. While treating for cockroaches, PestNow also noted there was live termite activity seen only in Unit C8. PestNow then conducted "warranty treatment" for Unit C8 and Building C. There is no indication the other units in Building C were inspected for termites.

57.    A PestNow technician performed a termite reinspection on September 25, 2023. He found evidence of termites, termite shelter tubes, and termite galleries in the pool house. Two days later, the exposed wood in the pool house interior was treated.

58.    On May 8, 2024, the tenant in Unit O5 reported "thousands ants coming from the balcony door &amp; (*sic*) around the trim of the carpet by the balcony is where they be it&apos;s (*sic*) a hole that they coming thru they near my dresser…."  Although Pinetree's work order notes that the unit was "added to the extermination list," there is no corresponding paperwork from PestNow showing that any inspection of Unit O5 was requested or completed.

59.    As a direct and proximate result of PestNow's disregard of label instructions and Virginia law, termites continued to destroy the areas inside the wall surrounding the sliding glass door in Ms. Ghee's Primary Bedroom, eventually resulting in Mark's death.

---

[9] Indeed, PestNow's Service Summary Report for March 2, 2021 indicates that F6 reports "Termites seen again."

**D.     Patio sliding glass doors did not open and failed city compliance inspections and PRHA move-in inspections.**

60.     Numerous problems existed with sliding glass doors at the Pinetree Apartments complex, including dozens of sliding glass doors that could not be opened or were damaged by moisture.

61.     Indicative of the systemic problems, a Pinetree Apartments' sliding glass door failed the City of Petersburg Code Compliance Division's inspection. During an October 5, 2021, inspection of Unit E1, the City's Code Compliance inspector documented "damaged drywall located above rear exit, causing damage to wall and door frame" in the rear bedroom. In the hallway, the inspector observed "multiple holes … in and along laundry room ceiling due to water damage." The inspector ordered that, **"all affected material needs to be Cut out, replaced, and sealed to prevent organic growth."** (Emphasis in original). A $300 fine was imposed for the violation. The inspector also noted that the rear sliding door was "improperly fitted" and "swollen" from "constant contact with water." An additional $300 fine was imposed for that violation. The inspector identified multiple code violations and imposed fines totaling $800.

62.     Similarly, Pinetree Apartments also frequently failed PRHA move-in inspections.

**E.     Outside contractors repeatedly reported rotten wood framing around patio sliding glass doors and improperly installed flashing that channeled rainwater into the walls of the apartment buildings rather than away from them.**

63.     Pinetree contracted with multiple construction companies to repair the symptoms of the systemic water and termite damage around patio sliding glass doors on a piecemeal basis. These repairs began well before Ms. Ghee and Mark's original occupancy (June 2022) and continued through, and after, the date of the fire (February 20, 2024). According to contractors, the wood surrounding the sliding glass doors was often "rotten" – the same as the allegations in this Complaint. Pinetree Apartments Maintenance Technicians McConnell and Norris have

21

testified that water intrusion around patio sliding glass doors was caused by incorrectly installed flashing. Norris explained, "when the building was built, whomever contractor was didn't flash the door, putting the flashing in properly around, at the – at the sliding glass door. And now, the water, instead of running away from the building onto the vinyl, is actually going behind the vinyl." Norris said that the problem has been known since at least 2018. Indeed, according to multiple contractors, inspection of the areas surrounding sliding glass doors disclosed that the flashing had been installed in the wrong way. The below paragraphs demonstrate the significant number of recorded instances where contractors found rot and decay around sliding glass doors.

64.    In July 2019, extensive repairs were made to Unit N1 because the sliding glass door had moisture damage and termite problems.

65.    On September 25, 2020, Pinetree received a contractor's signed proposal to repair "Multiple Patio door Leaks." Eight units were affected, including two in building G.

66.    On March 1, 2021, a contractor hired by Pinetree to investigate water damage in the apartments found extensive and costly damage throughout the complex.

67.    On June 10, 2021, contractor Mueller Builders, LLC ("Mueller") invoiced Pinetree for the following: "removed siding, installed new flashing around patio doors, then reinstalled the siding on six (6) units." The cost of the work totaled $4,250.

68.    On September 15, 2021, a conmtractor recommended extensive repairs for water damage to Unit H5. The contractor recommended a comprehensive 11-item demolition and repair plan for the roof, soffit, gutter, and porch/balcony, totaling $21,043. Photos show water damage and mold on the apartment's exterior.

69.    On December 22, 2021, THS National, LLC ("THS") submitted an Estimate for Unit E1 and E2 Patio Door Repairs. The proposal states: "Upon inspection, THS observed water

damages to the interior drywall finishes above and around the patio door in the bedroom. It is likely the water is entering around the patio door in the unit above E2, as well as entering around the patio door at unit E 1. THS proposes the following scope of work to address the source of the leaks and repair the interior water damage…. Scope of work does not include repairs to rotten framing. If at the time of demolition rotten framing is discovered, a change order will be issued for the necessary rot repairs…. Total (A): $ 6,768.00."

70.    In or about March 2022, THS repaired the patio door in Unit E1 (and possibly Unit E2) for "rotten framing." The work cost $5,950.

71.    Contractor MBS Construction ("MBS") also performed a significant amount of carpentry repairs at Pinetree. In April 2022, MBS performed extensive repairs to the area above and around the sliding glass doors in Unit O10. The invoice for the work totaled $6,000. MBS "[r]emoved sheet rock from ceiling of bedroom and around patio door in bedroom, […] repaired sheet rock around second bedroom sliding patio door. … Repaired flashing on patio above patio doors to resolve leak issue. That will included (*sic*) removing vinyl siding and reinstalling. Replaced studs in the wall and header across patio door in first bedroom." "[S]tuds in the wall and across patio door in first bedroom" is exactly where decaying wood was found above the sliding glass door in Unit G8 following the fire.

72.    On May 23, 2022, MBS performed another demolition and repair above a sliding glass door, this time in Unit P1, at a cost of $4,000.  The invoice states, "[r]emoved sliding glass patio door cut out sheet rock, removed rotten header above door, removed insulation from exterior wall  removed rotten door  jack removed backside of vinyl siding from the exterior. Replaced rotten two by fours in the wall. Reinstalled new insulation. Reinstalled vinyl siding and J channel, reinstall patio door, replaced sheet rock around patio door and mud and tape one coat.

Repaired flashing on patio above door." Again, this is the same damage found above the Primary Bedroom sliding glass door in Ms. Ghee's apartment after the fire.

73.     A June 21, 2022 MBS invoice for $3,400 notes a repair to the siding above the patio door in Unit F8. The invoice reads, "cut out sheet rock above patio sliding door, [and] cut out rotten header above patio door…," then replaced and reinstalled materials. Again, this is the same damage found to the header above the Primary Bedroom sliding glass door in Ms. Ghee's apartment after the fire.

74.     An August 2, 2022 invoice for Unit C12 notes that MBS "cut out wet, damaged sheet rock from ceiling of bedroom and above patio door" and "[r]emoved exterior siding above patio sliding door." They then replaced the header and installed new Tyvek and flashing above the patio door, costing Pinetree $3,200 in total.

75.     Another MBS invoice for $4,375 from August 2, 2022, for Unit D3 states "cut out and removed wet damaged sheet rock from around both bedroom patio doors," and "also kilzed and bleached around bedroom number one patio door." An August 17, 2022 work invoice for Unit O10 details removing "vinyl siding from above sliding glass door, removed flashing from underneath patio band board, reflash above door and added new Tyvek to wall." Again, this is the same damage to the header found above the Primary Bedroom sliding glass door in Ms. Ghee's apartment after the fire.

76.     A February 6, 2023 MBS invoice for Unit K1 outlines removing the master bedroom sliding patio door, repairing the jamb leg and patio door roller, and repairing sheet rock around the interior of the patio door.

77.     Another February 6, 2023 MBS invoice, this one for Unit M3, details that they "sealed, flashing and patio and vinyl corner coming down side of upper balcony." This repair cost

$3,200.

78.     A March 10, 2023 MBS invoice for Unit E8 describes the work done as including "cleaned moldy areas from patio, sliding glass doors in both rooms, repaired minor sheet rock repair. Sealed and painted areas."

79.     A May 11, 2023 MBS invoice for Unit O10 describes the work done as "repaired flashing and installed Tyvek… installed flashing under bottom layer of shingles from where first row of shingles and starter was installed wrong. … Repaired flashing under sliding glass door and sealed."

80.     A June 26, 2023 MBS invoice for Unit K8 describes the work done as "repaired flashing across both patios above sliding glass doors. Replaced Rottenwood (*sic*) above master bedroom, patio door and replaced. Celtics on area. Installed Tyvek on walls of both patio door areas." The invoice totaled $3,200.

81.     An October 31, 2023 MBS invoice for Unit D5 describes the work done as "repaired sheet rock above patio door. Repaired siding and flashing, above patio also had to repair gutter.

82.     A second MBS October 31, 2023 invoice, this one for Unit H1, describes the work done as "cut out and Removed damaged sheet rock from bedroom wall above patio door. removed 4 x 4 post under exterior deck that was not installed properly. … Replaced all rotted Celtics…" The invoice totaled $4,200.

83.     A December 4, 2023 MBS invoice for Unit J6 describes the work done as "repaired patio door header. Replaced flashing and installed tyvex (*sic*) on exterior wall. … Repaired sheetrock [drywall] on wall around patio door."

84.     A February 23, 2024 MBS invoice for Unit J3 describes the work done as including "removed two sections of glass panel from patio sliding door repaired roller guides on patio door and repaired roller wheels on patio door. Reinstall patio doors into the frame adjusted lock on the patio door."

85.     A May 30, 2024 MBS invoice for Unit H3 describes the work done as "cut out and removed interior sheet rock above patio door and section on ceiling. … Cut out and removed all rotten wall sheeting. Removed double 2 x 10 rotten header removed section of rotten wall plate on top…. Installed a drip edge on top under the patio decking boards." These repairs cost $5,275.

86.     A May 31, 2024 MBS invoice for Unit E1 describes the work done as "repaired wall and installed wall wrap also replaced flashing and drip edge. Replace one piece of vinyl siding that was nailed through the face."

87.     An August 2, 2024 MBS invoice for Unit O6 describes the work done as "removed flashing drip edge that was installed upside down underneath the band board of patio. Reinstalled flashing correctly…. Repaired sheet rock in both bedrooms around patio doors. Cleaned and painted one coat over discoloration on sheet rock." Pinetree knew it was not making repairs promptly and internally blamed one of its contractors in emails.

88.     On December 29, 2021 Pinetree Apartments Manager Dionne Mason sent an email to Yohannes about patio door repairs needed for Unit E1, complaining that "Mueller [a contractor] has not been dependable for months. The delay can result in a fine for Pinetree and could cause a strain on the property manager and inspector working relationship, by any and everything going forward to be written up, with no lee way (sic), strict deadlines once the trust is broken between the property manager and inspectors."

89.     At a minimum, the contractor repairs discussed above required removing the vinyl siding around the door, repairing and/or replacing the flashing, and replacing the vinyl siding. Frequently, these repairs also required removing and replacing water-damaged drywall. Dozens of instances reveal even greater damage to the underlying wooden framing supporting a sliding glass door. This is the same type of damage that was hidden in the rear wall of Ms. Ghee's Primary Bedroom.

**F.     The Beachwold Defendants refused to authorize the repairs badly needed throughout the Pinetree Apartments complex.**

90.     The wooden framing rotting in the back wall of Ms. Ghee's Primary Bedroom without her knowledge was not an isolated event at Pinetree Apartments. Despite input from contractors and tenants, and despite their knowledge of the systemic structural issues at Pinetree Apartments, the Beachwold Defendants resisted significant repair expenditures. They hid costly structural issues from tenants (including Ms. Ghee and her family), slow-walked repairs, and ignored the clear need for complex-wide repairs to address improperly installed flashing, water infiltration, and termite problems. Pinetree Apartments' Maintenance Technician Norris testified that Beachwold Defendants would only address single issues at a time, never doing the more costly but necessary larger-scale repairs.

91.     Since at least early 2019, Beachwold was trying to sell Pinetree Apartments. This desire to sell motivated the Beachwold Defendants to cut costs to maximize the profit to be realized when the property was sold.[10] As such, Beachwold Defendants ignored long-term maintenance needs and repairs that addressed recurring issues across the complex. They were highly involved

---

[10] Consistent with this effort, on February 26, 2019, Dan DeStefano emailed Gideon Friedman, advising, "Gideon, termites reported at one building at Pinetree. Trying not to spend money at the property, but we don't have much of a choice."

and controlling in decision-making for maintenance expenditures. The Beachwold Defendants personally negotiated with contractors to minimize repairs and expenditures,[11] pressured middle-management employees to reduce costs,[12] and disregarded recommended repairs, as shown below.

92.    On March 14, 2019 DeStefano emailed Gideon Friedman, Beachwold Residential's CEO. The subject line of the email read, "Termites N1-Pinetree." DeStefano exclaimed, "Gideon—we have bad termite infestation at Pinetree. Photos attached. We're moving forward with treatment of this building for $3,000. There is interior repair and the Exterminator notes framing damage. Ross's construction manager will assess. This is the second termite building in a month – they are not adjacent buildings or particularly close. I asked Ross to walk all unit interiors and think we need to have Exterminator survey the exteriors…" Another Beachwold Residential employee, Kate Kerrigan, remarked to DeStefano, "Those pics… wow." The photos sent by DeStefano are shown below.

 

PINETREE005421                                                                                         PINETREE005423

---

[11] On April 12, 2022, a South Oxford manager at Pinetree informed Beachwold executive Rob Glass that a Pinetree unit "has severe water damage around both patio doors. It's similar to the issues we've had with the other units. Estimated cost is $6,800, material and labor included... Do you approve with moving forward[?]" Subsequently, Glass negotiated with a contractor to perform the repairs. Glass told MBS, "[w]e are pretty tight on budget here, if I give you both jobs to complete together and one project while you were out there, can you knock it down to $10,000 total?"

[12] Defendant Yohannes testified that Beachwold Defendants limited costly repairs at Pinetree Apartments.



PINETREE005422



PINETREE005424

29

93.     In response to this infestation, PestNow "recommended treating the full exterior of building N by trenching and rodding around the exterior of all 10 Townhomes in the cluster for Termites." PestNow also "recommend[ed] that the other additional 14 clusters of Townhomes be treated for termites as well." Despite the Beachwold Defendants' strong reaction to the infestion, a PestNow invoice indicates Beachwold opted only to pay for the exterior treatment of Building N, **disregarding PestNow's recommendation to treat the exteriors of 14 additional buildings**.

94.     Shortly after Building N was treated, a March 18, 2019 letter states that Pinetree/Beachwold had PestNow inspect buildings A-P "as requested for the purchase of the property." PestNow found "live termites on the exterior" of Buildings B, C, G, J, K, O, and P. They recommended treating the exteriors of these buildings, but also to treat Buildings A, D, F, H, I, L, and M "for preventative measures." There is no indication that the Beachwold Defendants has Buildings A, D, F, H, I, L, and M treated as PestNow recommended.

95.     In August 2020, Pinetree Apartments Manager Ebone Gamby identified eight units across multiple buildings with leaking patio doors. She observed that three "are having the worst problem, but the other five are headed down the same path." On August 26, 2020, Mueller documented water damage to patio sliding glass doors in eight units – D3, D8, F1, G1, K1, O3, O6, and O8. Mueller recommended removing and replacing entire doors. These structural repairs were estimated to cost $14,400. Pinetree rejected Mueller's recommendation and opted for cheaper repairs to only add new flashing around the doors, costing $6,800 total. Further, no repair was done at all on two of the units included in the original proposal.

96.     The Beachwold Defendants had the means to eradicate moisture and termite issues at the complex, but rejected the systemic repairs that the complex required. Instead, the Beachwold Defendants pursued a path of petty parsimony until August 2024 (six months after the fire), when,

after five years of trying, they finally sold Pinetree Apartments. In short, the Beachwold Defendants chose not to make the systemic repairs around patio sliding glass doors that the circumstances demanded. As a direct and proximate result, Mark died and Ms. Ghee was severely burned.

### G.    The Defendants' failures sealed Mark in a burning building.

97.    In the early morning on February 20, 2024, when Ms. Ghee first learned of the fire, she was asleep in her bed in the Primary Bedroom. Only Mark was in the living room when Ms. Ghee entered, the two older boys having escaped through Unit G8's front door.

98.    When Ms. Ghee entered the living room, she saw flames at  Unit G8's front door. As a result, she decided the safest course of action was to take Mark into her arms and exit through the sliding glass door in the Primary Bedroom.

99.    Once in the Primary Bedroom and still holding Mark in her arms, she pushed the thumb latch down to unlock the door and tried to move it to her left, but it would not slide. She then placed Mark on her bed so she could use both hands to slide the door to the left.  But once again, she could not get the door to slide open.

100.    When Ms. Ghee turned to get Mark from her bed and exit Unit G8 through the front door, Mark had disappeared in the smoke. She searched and called for Mark but could not find him. Thinking that perhaps Mark had found his way through the smoke to the front door and safety, Ms. Ghee exited the apartment's flaming front door, hoping to see Mark outside.

101.    But Mark was nowhere to be seen.  As a result, desperate to rescue Mark, Ms. Ghee re-entered her apartment and resumed her search for him. Ms. Ghee suffered horrendous burns searching for Mark.  A photo of Ms. Ghee following the fire is shown below.



102.    Finally, the heat and smoke were too much for Ms. Ghee to tolerate and, distraught, she left through the front door of Unit G8 without Mark.

103.    Below is a photograph that fairly and accurately depicts the exterior of Unit G8 (the ground-floor apartment), showing the damage caused by the fire.



104.    Approximately three months after the fire, Plaintiffs' expert Dano Holland, examined Unit G8. In the back wall of the Primary Bedroom, he found water and termite damage to the jack stud (the vertical piece of the wooden framing that supports the ends of the header beam holding the sliding door in place inside the drywall) and to other parts of this wooden framing. *See* the diagram below. The water and termite damage caused the wooden framing to shift, resulting in compression and deformation of the sliding glass door frame. In his accompanying Affidavit, attached as <u>Exhibit 12</u> (excluding supporting documentation), Mr. Holland opines that the foregoing caused the door to be out of square and unable to move.



105.    Ms. Ghee was unable to open the sliding glass door because the vertical and horizontal wooden framing around it had rotted due to termite infestation and water damage. The rotten wood sagged at one end, making the door out of square and preventing it from sliding on its track.

33

106.    Water and termites infiltrated and infested the supporting wooden framing behind the drywall, causing the wooden framing to rot. This framing was intended to hold the sliding door's frame in place. Despite substantial evidence that the supporting wooden framing above and to the side of the sliding glass doors was eaten away by termites and soaked with water damage, damage evidenced over and over again throughout the apartment complex, Pinetree and South Oxford never made the necessary repairs.

107.    On the same day that Plaintiffs' experts inspected the remnants of the fire in Unit G8, they also examined Unit G6, the downstairs unit right next to Ms. Ghee's apartment. Like G8, Plaintiffs' experts found termite damage and rotten wood in the door jam next to the patio sliding glass door. The header above the sliding glass door in the unit was also destroyed.  Photos showing the foregoing are below.








108.    Pinetree and South Oxford controlled the space between the interior and exterior back walls of the Primary Bedroom. Their failure to maintain this area prevented Ms. Ghee from opening the sliding glass door during the fire, resulting in Mark's death.

**H.    Pinetree had no employees.  It was controlled by the "Beachwold Empire."**

109.    Pinetree, the LLC that owned and leased the Pinetree Apartments, **had no employees.** Like the multi-layered entity model used by many nursing home operators to provide maximum liability insulation, Pinetree was operated and managed by a group of entities with "Beachwold" in their names—Beachwold Partners, Beachwold Holdings, and Beachwold Residential. These same entities controlled South Oxford. These four entities owned and controlled Pinetree, the LLC that owned Pinetree Apartments, and Clearfield, the 33-member entity that owned Pinetree.

110.    A chart illustrating the Beachwold Empire is shown below.



I.    **A bottom-to-top description of Beachwold's Empire.**

111.    At all relevant times, Defendant Pinetree owned Pinetree Apartments, the 144-unit complex located at 3100 Pinetree Drive, Petersburg, Virginia, and leased Unit G8 to Ms. Ghee.

112.    Defendant Beachwold Holdings owned 100% of Pinetree prior to May 1, 2023.

113.    Thereafter, Pinetree was owned by Defendant Clearfield. *See* the federal court filing made by Pinetree, attached hereto as Exhibit 13.

114.    One of Clearfield's members was Defendant Beachwold Partners, whose six owners all shared the last name "Friedman," including Gideon Friedman. Along with Hazan, Friedman was also an individual owner of Defendant Clearfield.

115.    During the relevant period, South Oxford was the apartment manager of Pinetree Apartments.[13] South Oxford is listed as the sole "Manager" on both leases signed by Ms. Ghee.

    a.    The connections between Pinetree and South Oxford, along with their controlling entities, are partially revealed in the Pinetree leases, which provide "[a]lthough personal liability insurance coverage is not required, should you voluntarily choose to purchase a policy, your renter's insurance provider must add Pinetree Apartments ["Pinetree Apartments, LLC LLC" (*sic*) in the Lease Addendum] and South Oxford Management, LLC as additional interests on your policy."

    b.    For payroll purposes, South Oxford employed Defendants Yohannes, McConnell, and Peebles.

---

[13]  In 2019, Beachwold terminated Pinetree Apartments' previous manager, Ross Companies, and installed its alter ego, South Oxford, as Manager of the apartment complex. To date, the Beachwold Defendants have refused to provide the Plaintiffs with any agreements between Pinetree and South Oxford.  However, the Plaintiff has obtained the 2017 agreement between Pinetree and Ross. Gideon Friedman signed that agreement on behalf of Pinetree – again, an LLC with no employees.  *See* Exhibit 14.

c.    Additionally, during the relevant period, there was a single server for all file materials across entities, and the same IT department managed the server. All documents and communications for all corporate defendants (except PestNow) were kept on the same server.

d.    Although the leases Ms. Ghee signed were with "Pinetree Apartments," the insurance coverage known to the Plaintiffs—including both primary and umbrella coverage—lists South Oxford as the first named insured. Beachwold Residential and Beachwold Holdings are also named insureds by endorsement. This, again, attests to the connections between Pinetree, Clearfield, Beachwold Holdings, Beachwold Partners, Beachwold Residential.

116.    Another Beachwold entity, Defendant Beachwold Residential, has owned 100% of South Oxford since May 1, 2023. According to a market observer, Beachwold Residential earns annual income of $51.2 million and has between "201-500 employees." According to Beachwold Residential's website, its "Team Members" include numerous South Oxford employees... Pinetree asserts that "some employees are assigned or designated to specific entities or companies—for example, Rob Glass is a South Oxford employee by payroll, but he holds the title of Vice President of Asset Management for Beachwold Residential." (Rob Glass is referred to below as "Glass.")

117.    At all relevant times, Friedman was the Chief Executive Officer of Beachwold Residential.

a.    According to Beachwold Residential's website, in 2016, Friedman "founded South Oxford Management, a property management company headquartered in Dallas Texas, to manage Beachwold's portfolio." As noted above, Friedman was also a member of Defendant Clearfield, both individually and as a member of Beachwold Partners.

      b.      In addition to Friedman, Ownership included Hazan and Rubenstein. Hazan serves as Chief Investment Officer, a position he has held since 2016. Rubenstein is listed as General Counsel on Beachwold's "Team Members" website page.

### J.    Pinetree Apartment's structural problems caused by water intrusion and termite infestations were well known by the Beachwold Defendants, including South Oxford.

118.    Although the foregoing description starts with Pinetree (the owner and lessor of Pinetree Apartments) and then proceeds to identify Pinetree's single member, and so on, all the way up to Friedman, Hazan, and Rubenstein, it is important to understand that decisions and mandates relevant to the issues in this case were made and imposed from the top down. The Beachwold Defendants wanted to unload Pinetree Apartments for the highest possible profit. As a result, for five years (beginning in 2019 and continuing until Pinetree Apartments was sold in August of 2024), the Beachwold Defendants allowed only piecemeal repairs at Pinetree Apartments, despite the clear need for across-the-board, immediate repairs.

119.    Documents obtained in this case confirm top-to-bottom awareness of Pinetree Apartments' problems caused by water intrusion and termite infestation. Beachwold Residential's CEO Friedman, its Vice Presidents, its Asset Managers, South Oxford's Regional Manager, and South Oxford's Maintenance Technicians and Leasing Professionals all knew of the problems, as well Ownership's directive to wring maximum profits from the complex by shortchanging needed repairs. A summary of the foregoing individuals' top-to-bottom knowledge and involvement, as well as the seamless intra-entity nature of their communications, is shown in the table below.

| Employee | Title | Knowledge/Involvement |
|---|---|---|
| Gideon Friedman | CEO, Beachwold Residential | In February 2019, received an email from DeStefano exclaiming, "Gideon—we have a bad termite |

| | | |
|---|---|---|
| | | infestation at Pinetree. Photos attached."[14] In the same month "DeStefano informed Friedman, "This is the second termite building in a month." Recognizing the breadth of the problem at the complex, DeStefano added, "they are not adjacent buildings or particularly close." |
| Dan DeStefano | Senior Vice President, Asset Management, Beachwold Residential | DeStefano was informed in February 2019 that "termites [were] eating through the wood" "into the drywall" and "behind the siding" at a building near the apartment that Ms. Ghee rented. |
| Rob Glass | Vice President, Asset Management, Beachwold Residential | In April 2022, Regional Manager Yohannes informed Glass that Pinetree's Unit O10 "has severe water damage around both patio doors." She further indicated the extent of the problems, saying, "It's similar to the issues we've had with the other units." The invoice noted that flashing "on patio above patio doors to resolve leak issue." The invoice also specified the replacement of supporting beams, including the header across the patio door in the first bedroom. The reference is precisely where decaying wood was found above the sliding glass door in G8 following the fire. |
| Tracy Arruda | Executive Vice President, South Oxford | Arruda emailed DeStefano, "We are looking at approximately $8K to complete this [repair]project. I just spoke to the rep for the company. He said the bandboard does need replacing and the sheething needs replacing upstairs. There are holes in it due to water damage. He said it's a liability concern …" |
| Yohannes | South Oxford Regional Manager | Yohannes was informed of numerous resident complaints, including water damage around patio sliding glass doors, which she failed to address adequately. Indicative of her knowledge of the problems, in April 2022, Yohannes asked outside contractor MBS to inspect the patio door in Unit D3, stating, "we have water damage that needs repair." |
| McConnell, Peebles, and Norris | South Oxford Maintenance Technicians | McConnell, Peebles, and Norris were aware of water intruding into the walls around over a dozen patio sliding glass doors. All were directed to spend little annually on the apartment units, and to cut corners in preparing the units for new residents, including |

---

[14] The photos are referred to and shown above at Paragraph 92.

|  |  | painting over moisture-laden areas and termite holes. Incident to a local housing authority's inspection of Unit G8 and days and/or hours before Ms. Ghee took her June 1, 2022 walkthrough of Unit G8, Defendants McConnell and/or Peebles painted over termite holes and moisture-laden wood to hide the water damage and termite infestation and allegedly greased the sliding glass doors to mask the out-of-square condition of the doors. |
|--|--|--|

120.    Beachwold executives, including Ownership, closely monitored developments at Pinetree Apartments and tightly controlled expenditures on it. They did so because they were trying to unload the property and aimed to maximize their net profit by minimizing repairs and capital improvements. Demonstrating their detailed knowledge of the events at the Petersburg apartment complex, Beachwold executives received photos of live termites and the damage they caused, exterminator reports of infestation in the buildings, and numerous outside contractor invoices for repairs made necessary by termites and water infiltration. Repeatedly, the Beachwold Defendants declined to carry out repairs across the entire complex and minimized expenditures. As photos and videos attached as exhibits and included in this Complaint demonstrate, Pinetree tenants, mostly lower-income families with little leverage to improve their situation, were left to endure slumlord-imposed conditions in parts of their apartments.  Three-year-old Mark died as a result of those conditions.

121.    The Defendants should be held liable for their own torts. Also, the foregoing indicates that there was unity of interest and ownership by Beachwold Partners, Beachwold Residential, and Beachwold Holdings of Pinetree, Clearfield, and South Oxford such that the separate personalities of the latter three LLCs no longer and/or never existed. Therefore, the corporate veil should be pierced.  Among other things discussed above, Pinetree's absence of any employees; the use of South Oxford employees to sign and act on behalf of Pinetree; direct

insurance coverage only in the name South Oxford, not Pinetree; and all decision-making vested in entities one or two levels up from Pinetree, show the entity structure(s) employed by the Beachwold Defendants to be a sham. To adhere to that separateness would work an injustice in this matter.

## VI.    COUNTS

### Count I

### Common Law Fraud

**(Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, Yohannes, McConnell, and Peebles)**

122.    The Plaintiffs incorporate the foregoing paragraphs as if set forth in full in this Count.

123.    By painting over mold and moisture-laden wood around the sliding glass doors and the holes eaten by termites in the finished wood trim of Unit G8, McConnell, and Peebles, agents and/or employees of the Beachwold Defendants acting within the scope of their agency or employment, concealed a material fact from Ms. Ghee – namely, that there were termites, related water infiltration, and deteriorated wood inside the back wall of the Primary Bedroom, which, in turn, interfered with the operation of the sliding glass door. (Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, Yohannes, McConnell, and Peebles, are referred to in this count as the "Count I Defendants.")

124.    McConnell and Peebles intentionally concealed these material facts to mislead Ms. Ghee. They knew that the flashing around patio sliding glass windows had been improperly installed, directing water to seep into the apartment walls and attracting wood-destroying termites. Indeed, wood-destroying termites had infested the buildings since at least 2019 and destroyed supporting beams and jack studs throughout the complex. They knew that apartment-wide repairs were necessary but only paid for repairs on a piecemeal basis. They knew that efforts to ready units

41

for new tenants would conceal the foregoing issues. They knew that unless a unit had the siding removed and extensive repairs and replacements were undertaken, the apartment turnover preparations would simply conceal moisture and termite issues. Even so, McConnell and Peebles carried out the concealment efforts at Unit G8 mere hours before Ms. Ghee took occupancy on June 1, 2022.

125.    Ms. Ghee relied on the Count I Defendants to provide her and her sons with a safe apartment. She would not have moved into the apartment if she had known that behind the drywall there was wood damage and termites that interfered with the operation of the sliding glass door in the Primary Bedroom. However, by painting over the termite holes, McConnell and Peebles ensured that she would not know this information, and before the fire, she never learned this information from any source.

126.    With full knowledge that for years water infiltration and termite infestation were interfering with operation of many sliding glass doors at Pinetree Apartments, thereby endangering the lives of their tenants, Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes purposefully withheld the cash required to eliminate the resulting damage and were complicit in causing the fraudulent conduct of McConnell and Peebles.

127.    The foregoing constitutes willful and wanton conduct, demonstrates a conscious disregard for the rights of others (including Ms. Ghee and Mark), and warrants the imposition of punitive damages.

128.    As a direct and proximate result of the Count I Defendants' fraud, Mark died.

129.    As a direct and proximate result of the Count I Defendants' fraud and pursuant to Virginia Code § 8.01-50, *et seq.,* the Statutory Beneficiaries have sustained damages, are entitled

to recover for those damages, and seek recovery from the Count I Defendants for their damages, including, but not limited to:

a.    Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent;

b.    Loss of services, protection, care, and assistance provided by the decedent; and

c.    Reasonable funeral expenses.

## Count II

### Concealment of a Latent Defect

**(Defendant Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes)**

130.    The Plaintiffs incorporate Paragraphs 1 through 121 as if set forth in full in this Count.

131.    When Pinetree transferred possession of Apartment G8 to Ms. Ghee on June 1, 2022, a latent defect existed in the drywall in the back wall of the Primary Bedroom—namely, water damage and termites that were causing the wooden framing behind the drywall to deteriorate and deflect, thereby interfering with the operation of the sliding glass door. (Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes are referred to in this count as the "Count II Defendants.")

132.    When Pinetree transferred possession of Apartment G8 to Ms. Ghee on June 1, 2022, the Count II Defendants knew of this latent structural defect, but Ms. Ghee did not and could not have discovered it through reasonable inspection.

133.    The Count II Defendants owed Mark a duty to disclose this latent defect, but they purposefully failed to do so.

134.    Although not required as an element of this cause of action, Plaintiffs note that Ms. Ghee relied on the Count II Defendants to provide her and her sons with a safe apartment. She would not have moved into the apartment if she had known that behind the drywall there were termites, water infiltration, and deteriorated wood that interfered with the operation of the sliding glass door. But the Count II Defendants never disclosed this, and before the fire, she never learned of it from any source.

135.    The conduct of the Count II Defendants described above constitutes willful and wanton conduct. It demonstrates a conscious disregard for the rights of others, including Mark.

136.    As a direct and proximate result of the Count II Defednants' failure to disclose this latent defect, Mark died.

137.    As a direct and proximate result of the death of Mark Ghee, and pursuant to Virginia Code § 8.01-50, *et seq.,* the Statutory Beneficiaries have sustained damages, are entitled to recover for those damages, and seek recovery from the Count II Defendants for their damages, including, but not limited to:

a.    Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent;

b.    Loss of services, protection, care, and assistance provided by the decedent; and

c.    Reasonable funeral expenses.

## Count III

### Failure to Maintain the Inside of the Back Wall of the Primary Bedroom, An Area in the Beachwold Defendants' Control

**(Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes)**

44

138.    The Plaintiffs incorporate Paragraphs 1 through 121 as if set forth in full in this Count.

139.    Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes (referred to in this count as the "Count III Defendants") owed Mark Ghee numerous duties, including but not limited to the duty, after transferring possession of Apartment G8 to his mother, to exercise ordinary care and diligence to maintain the inside of the back wall of the Primary Bedroom in a reasonably safe condition.

140.    The Count III Defendants negligently breached the duty described above.

141.    The conduct of the Count III Defendants described above constitutes willful and wanton conduct. It demonstrates a conscious disregard for the rights of others, including Mark Ghee.

142.    As a direct and proximate result of the Count III Defendants' conduct described above in this count, Mark Ghee died.

143.    As a direct and proximate result of the death of Mark Ghee, and pursuant to Virginia Code § 8.01-50, *et seq.,* the Statutory Beneficiaries have sustained damages, are entitled to recover for those damages, and seek recovery from the Count III Defendants for their damages, including, but not limited to:

      a.    Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent;

      b.    Loss of services, protection, care, and assistance provided by the decedent; and,

      c.    Reasonable funeral expenses.

45

### Count IV

### Violations of the Virginia Consumer Protection Act

**(Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, and South Oxford)**

144.    The Plaintiffs incorporate Paragraphs 1 through 121 and Counts I and II as if set forth in full in this Count.

145.    Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, and South Oxford (the foregoing Defendants are collectively referred to in this count as "the Count IV Defendants") actively concealed the termite damage to the walls of Ms. Ghee's apartment in violation of Virginia Code § 59.1-200(14), a subsection of the Virginia Consumer Protection Act, Virginia Code § 59.1-196 *et seq.*

146.    Ms. Ghee relied on the Count IV Defendants to provide her and her sons with a safe apartment. She would not have moved into the apartment if she had known that behind the drywall there was water damage and termites that interfered with the operation of the sliding glass door. By painting over the termite holes, however, the Count IV Defendants ensured that she would not know this information. The Count IV Defendants concealed a material fact from Ms. Ghee – namely, that there were termites and related water infiltration and deteriorated wood inside the back wall of the Primary Bedroom, which, in turn, interfered with the operation of the sliding glass door.

147.    The Count IV Defendants' fraudulent acts were a direct and proximate cause of Mark Ghee's death.

148.    Because Count IV Defendants' violations of the Virginia Consumer Protection Act were willful, Plaintiffs are entitled to treble compensatory damages.

149.    In addition, Plaintiffs are entitled to their reasonable attorneys' fees and court costs for this Count.

150.    As a direct and proximate result of the Count IV Defendants' fraudulent acts, and pursuant to Virginia Code § 8.01-50, *et seq.,* the Statutory Beneficiaries have sustained damages, are entitled to recover for those damages, and seek recovery from the Count IV Defendants for their damages, including, but not limited to:

    a.    Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent;

    b.    Loss of services, protection, care, and assistance provided by the decedent and

    c.    Reasonable funeral expenses.

### Count V

### Negligence and Negligence *Per Se*

### (Defendant PestNow)

151.    The Plaintiffs incorporate Paragraphs 1 through 121 as if set forth in full in this Count.

152.    Having undertaken to apply termiticides at Pinetree Apartments, including Building G,  PestNow owed Ms. Ghee and her son Mark numerous duties, including but not limited to the duty to apply the termiticides according to their termiticide label instructions, the duty otherwise properly to apply termiticides, and the duty to assign only personnel who were Certified Applicators to apply the termiticides.

153.    As noted above, PestNow was required under Virginia law to apply the termiticides as mandated on their label. Virginia Code § 3.2-3939(B).

154.    PestNow negligently breached the foregoing duties.

47

155.    Furthermore, Mark Ghee belonged to the class of persons for whose benefit the statute was enacted, the harm that occurred, termite damage proximately causing Mark's injuries and death, and was the type of harm that the statute was designed to protect against; therefore, the Foregoing Defendants were negligent *per se.*

156.    The foregoing statutory violation was a proximate cause of Mark's injuries and death.

157.    As a direct and proximate result of PestNow's negligence, Mark suffered pain, physical and mental injury, and death.

158.    The conduct of PestNow described above constitutes willful and wanton conduct and demonstrates a conscious disregard for the rights of others, including Mark.

159.    As a direct and proximate result of the death of Mark Ghee, and pursuant to Virginia Code § 8.01-50, *et seq.,* the Statutory Beneficiaries have sustained damages, are entitled to recover for those damages, and seek recovery from PestNow for their damages, including, but not limited to:

    a.    Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent;

    b.    Loss of services, protection, care, and assistance provided by the decedent and

    c.    Reasonable funeral expenses.

## Count VI

## Private Nuisance

**(Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes)**

160.    The Plaintiffs incorporate Paragraphs 1 through 121 as if set forth in full in this Count.

161.    At all relevant times, Pinetree Apartments was a private nuisance, created and perpetuated by all the Defendants Pinetree, Clearfield, Beachwold Partners, Beachwold Holdings, Beachwold Residential, South Oxford, and Yohannes (collectively referred to as the "Count VI Defendants"). As noted herein, the flashing around the patio sliding glass door in Ms. Ghee's Primary Bedroom was incorrectly and/or improperly installed, causing water to be channeled into the wall around the door, resulting in water and moisture damage, mold, wood rot, and termite infestation. The Count VI Defendants were aware of the foregoing problems throughout the complex and in Ms. Ghee's apartment, but opted not to repair the damage or to see that PestNow inspected for and properly applied termiticide to kill the termites. Instead, the Count VI Defendants purposefully withheld, or caused to be withheld, the resources, especially money, necessary to maintain Pinetree Apartments and Ms. Ghee's apartment and opted instead to allow its agents to cover up the cause of various deficiencies by painting over evidence of these deficiencies, thereby allowing the termites to spread throughout Pinetree Apartments, including but not limited to Unit G8.

162.    The foregoing endangered the life and health of Ms. Ghee and her sons, including Mark. Not only were the foregoing conditions exceedingly unhealthy, but they also impeded the movement of the sliding glass door, the only direct escape from the Primary Bedroom.

163.    As a direct and proximate result of the foregoing private nuisance, Ms. Ghee and Mark were unable to escape from the fire, and Mark suffered pain, physical and mental injury, and death.

164.    As a direct and proximate result of the private nuisance described above, and pursuant to Virginia Code § 8.01-50, *et seq.,* the Statutory Beneficiaries have sustained damages,

49

are entitled to recover for those damages, and seek recovery from the Count VI Defendants for their damages, including, but not limited to:

    a.    Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent;

    b.    Loss of services, protection, care, and assistance provided by the decedent and

    c.    Reasonable funeral expenses.

WHEREFORE, Plaintiffs Nyeisha S. Ghee and Lisa Y. Campbell, Administrators of the Estate of Mark Kahlil Ghee, Deceased demand judgment against the Defendants Pinetree Apartments, LLC, Clearfield/Pinetree Apartments, LLC, Beachwold Partners, LP, Beachwold Holdings, LLC, Beachwold Residential, LLC, South Oxford Management, LLC, Nadra Yohannes, Ricky McConnell, Alvin Peebles, and PestNow of Central Virginia, LLC in the amount of eighty million dollars ($80,000,000) in compensatory damages, plus three hundred and fifty thousand dollars ($350,000) in punitive damages, plus interest from February 20, 2024, costs, treble damages and attorneys' fees as to the VCPA claim, and other relief that this Court deems appropriate.

Trial by jury is demanded.

Respectfully submitted,

NYEISHA S. GHEE and LISA Y. CAMPBELL,
ADMINISTRATORS OF THE ESTATE OF
MARK KAHLIL GHEE, DECEASED

By: _____
Counsel

Charles H. Cuthbert, Jr. (VSB# 14519)
Richard M. Cuthbert (VSB# 82025)
CUTHBERT LAW OFFICES
A Professional Corporation
220 North Sycamore Street
Petersburg, Virginia 23803-3228
Phone: (804) 733-3100
Fax: (804) 732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com

Mark J. Krudys (VSB# 30718)
Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
Truist Place, 919 East Main Street, Suite 2020
Richmond, VA, 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com; dzemel@krudys.com

*Counsel for Plaintiffs Nyeisha S. Ghee and Lisa Y. Campbell, Co-Administrators of the Estate of Mark Kahlil Ghee, Deceased*

51

**Table of Contents of Exhibits (all are incorporated by reference)**

| Ex. # | Exhibit Description |
|---|---|
| 1 | Certificate of Qualification of Nyeisha S. Ghee and Lisa Y. Campbell as Administrators of the Estate of Mark Kahlil Ghee, Deceased |
| 2 | Affidavit of Debra Smith |
| 3 | Affidavit of Vanessa Schane |
| 4 | Two videos capturing irate tenant complaining of Pinetree employee painting over mold around window |
| 5 | Audio voicemail message from tenant Diane Taylor |
| 6 | Photos sent by Alyssa Allen |
| 7 | Video by tenant Michael Artis of wet carpet and mold by sliding glass door and related emails |
| 8 | Video 1 - water leaking from above window during rain |
| 9 | Video 2 - water leaking from above window during rain |
| 10 | Condensed spreadsheet listing of relevant work orders in those years compiled by Plaintiffs |
| 11 | Affidavit of Robert Kunst (excluding supporting documentation) |
| 12 | Affidavit of Dano Holland |
| 13 | Pinetree Apartments, LLC's Supplemental Financial Interest Disclosure Statement, ECF No. 12. filed in *Ghee v. Pinetree Apartments, LLC,* Case No. 3:25-cv-17-RCY, currently pending in the Eastern District of Virginia |
| 14 | 2017 agreement between Pinetree and Ross |

# EXHIBIT 1

**CERTIFICATE/LETTER OF QUALIFICATION -**    Court File No. 202400134
**FOR PROSECUTION OR DEFENSE OF CIVIL ACTION**
COMMONWEALTH OF VIRGINIA
VA. CODE §§ 64.2-454

**Petersburg** Circuit Court

I, the duly qualified clerk/deputy clerk of this Court, **CERTIFY** that on **May 14, 2024**
DATE

**NYEISHA SHQUEL GHEE and LISA YVETTE CAMPBELL** ,
NAME(S) OF PERSON(S) QUALIFYING

duly qualified in this Court, under the provisions of Virginia Code § 64.2-454, as **Administrators** of the estate of

**MARK KAHLIL GHEE**  deceased, solely for the purpose of prosecution or defense of a civil action for personal injury and/or death by wrongful act.

The powers of the fiduciary(ies) named above continue in full force and effect.

**$25.00** bond has been posted.

Given under my hand and the seal of this Court on

May 14, 2024
DATE

**Maytee E. Parham** , Clerk

by_____ 𝒪·_____, Deputy Clerk

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


NYEISHA S. GHEE,

      Plaintiff,

    v.                           Civil Action No.: 3:25-cv-17-RCY


PINETREE APARTMENTS, LLC,

      Defendant.


**AFFIDAVIT OF DEBRA SMITH**

1. My name is Debra Smith.

2. I currently live at 20923 River Terrace Rd, South Chesterfield, Virginia.

3. I am over eighteen years old and competent to make this affidavit.

4. I have personal knowledge of the statements in this affidavit.

5. I lived at Pinetree Apartments, Unit L10, from 2010 to 2024. My daughters, ~~Amani~~ *Amoni*

Smith, Ayanna (Emily) Smith, and Vanessa Shane, also lived there at certain times.

6. I had many maintenance issues with my apartment.

7. Oftentimes, I had to submit multiple requests for repairs before the problem was fixed, and some issues were never resolved.

8. Multiple times, water entered my apartment from the unit above, causing damage in the bathroom, the living room closet, the master bedroom, and the hallway.

9. The first time I complained about mold on my ceiling, the maintenance worker simply painted over it. The same happened with mold by a windowsill – Pinetree painted over the mold.

*D.S. 11/10/25*

GHEE000497

10.     I have reviewed Pinetree documents concerning some of my complaints.

a.     In March 2023, I reported that my ceiling needed repair. The ceiling in my bathroom was falling apart due to water damage. The ceiling in my main bedroom was also badly damaged, with water pooling from a leak, causing the carpet below to become waterlogged and stained. The maintenance worker promised to fix it, but never did. I placed plastic over the carpet to prevent further damage.

b.     In July 2023, I complained that the master bedroom sliding door was jammed and would not open or close.

11.     The fuse box in my apartment was old, and in 2023, it began smoking. I called the fire department. Pinetree replaced the fuse box but used old and new wires, did not label them, and had to do additional repairs later. After hearing about the February 2024 fire, I wondered if a similar electrical issue caused it.

12.     I recall the tenant above my apartment was named Cora Lee, but I do not remember her last name.

13.     Photos of the apartment taken by myself and/or my daughters are attached as **Exhibits A-M**.

14.     I, Debra Smith, swear under penalty of perjury that the statements in this Affidavit are true and correct to the best of my knowledge and belief.

11/10/25
Date

Debra Smith

COMMONWEALTH OF VIRGINIA          )

                                  )  to wit

CITY/COUNTY OF _Richmond_          )


    I _Juliana Neelley_ , a Notary Public in and for the State and

County or City aforesaid, do hereby certify that on _November 10, 2025_ Debra Smith personally

appeared before me in my jurisdiction aforesaid, and, having proved to me through documentary

evidence of his identity, and after being duly sworn, acknowledged that the information

contained in the foregoing Affidavit is true and correct to the best of his knowledge and belief

and signed the same before me.


WITNESS under my hand and official seal:

_____

(notary signature)


My Commission Expires: _05/31/2028_

My Notary Registration No.: _8105085_



GHEE000500

PLAINTIFF'S
EXHIBIT

A



GHEE000501

PLAINTIFF'S
EXHIBIT

B



GHEE000502

PLAINTIFF'S
EXHIBIT

C



GHEE000503

PLAINTIFF'S
EXHIBIT

D



GHEE000504

PLAINTIFF'S EXHIBIT
E



GHEE000505

PLAINTIFF'S
EXHIBIT

F



GHEE000506

PLAINTIFF'S
EXHIBIT

G



GHEE000507

PLAINTIFF'S
EXHIBIT

H



GHEE000508

PLAINTIFF'S
EXHIBIT

I



GHEE000509

PLAINTIFF'S
EXHIBIT

J



GHEE000510

PLAINTIFF'S
EXHIBIT

K



GHEE000511

PLAINTIFF'S
EXHIBIT

L

GHEE000512

PLAINTIFF'S
EXHIBIT

M

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

NYEISHA S. GHEE,

       Plaintiff,

v.                                        Civil Action No.: 3:25-cv-17-RCY

PINETREE APARTMENTS, LLC,

       Defendant.

## AFFIDAVIT OF VANESSA SCHANE

1.     My name is Vanessa Schane. I currently reside at 411 Crescent Avenue, Colonial Heights, Virginia, 23834.

2.     I am over eighteen years old and competent to make this affidavit. I have personal knowledge of the statements made in this affidavit.

3.     I lived at Pinetree Apartments in Petersburg, Virginia with my mother, Debra Smith, and sisters, Ayanna (Emily) Smith and Amani Smith, for a number of years.

4.     I believe that we moved into Pinetree Apartments around 2010. We lived in Unit L 10. I moved out in or about 2014, but I continued to visit my family at the apartment regularly. My mother remained in the apartment until 2024.

5.     We had mold in the ceiling of the apartment. There was mold on the ceiling near the washing machine and elsewhere in the apartment. While living in the apartment, I came down with pneumonia, which I attribute to the mold.

6.     We complained about the mold, but maintenance workers merely painted over the mold. I went with a Pinetree maintenance man to show him the mold in the apartment and how

GHEE000513

it had been merely painted over. There was mold in the master bedroom and some in the hall, and it was really bad in the bathroom. There were specks of green in the painted area.

7.    We were not permitted to replace the carpet, even after it had become damp with water multiple times. (Only new tenants were permitted to change the carpet.)

8.    Frustrated with Pinetree's response, at one point, my mother got a bucket of bleach and attempted to clean the mold herself.

9.    When we first moved into the Pinetree complex, the staff was responsive.  But then things went downhill fast. For example, I no longer saw groundskeepers at the property. Pinetree stopped cutting the grass or trimming the bushes.

10.    The Pinetree maintenance staff was very ineffective, and there was constant turnover.

11.    Also, Pinetree employees began to blame tenants whenever tenants complained about issues with their apartments.

12.    Attached are photos of the damaged areas in my mother's apartment.

I, Vanessa Schane, swear under penalty of perjury that the statements in this Affidavit are true and correct to the best of my knowledge and belief.

GHEE000514

_‑ 11/11/2025_                 _Vanessa Schane_

Date                                       Vanessa Schane


COMMONWEALTH OF VIRGINIA      )

                                    ) to wit

CITY/COUNTY OF  _Petersburg_     )


I _Charles H. Cuthbert, Jr_, a Notary Public in and for the State and County or City aforesaid, do hereby certify that on  _Nov. 11, 2025_, Vanessa Schane personally appeared before me in my jurisdiction aforesaid, and, having proved to me through documentary evidence of her identity, and after being duly sworn, acknowledged that the information contained in the foregoing Affidavit is true and correct to the best of her knowledge and belief and signed the same before me.


WITNESS under my hand and official seal:

_C H Cuthbert Jr._

(notary signature)


My Commission Expires: _Nov. 30, 2027_

My Notary Registration No.: _215642_

Charles H. Cuthbert, Jr.
NOTARY PUBLIC
Commonwealth of Virginia
Reg. # 215642
My Commission Expires _____

3



PLAINTIFF'S
EXHIBIT

A



GHEE000517

PLAINTIFF'S
EXHIBIT

B



GHEE000518

PLAINTIFF'S
EXHIBIT

C



GHEE000519

**PLAINTIFF'S EXHIBIT**

**D**



GHEE000520

PLAINTIFF'S
EXHIBIT

E



GHEE000521

PLAINTIFF'S
EXHIBIT

F



GHEE000522

PLAINTIFF'S
EXHIBIT

G



PLAINTIFF'S EXHIBIT

H



GHEE000524

PLAINTIFF'S
EXHIBIT

I



GHEE000525

**PLAINTIFF'S EXHIBIT**

**J**



GHEE000526

PLAINTIFF'S
EXHIBIT

K



GHEE000527

PLAINTIFF'S
EXHIBIT

L



# EXHIBIT 4

Link: https://youtube.com/watch/D_Ylm9BBntA

# EXHIBIT 5

Link: https://youtu.be/jD6xjxt11BE

# EXHIBIT 6



PINETREE003120



PINETREE003121



PINETREE003122



PINETREE003123



PINETREE003129

# EXHIBIT 7

Link: https://youtu.be/9lM6sVF4ACE

**To:**       Pinetree Manager[PinetreeMgr@somliving.com]
**From:**     Kristin Mayton
**Sent:**     Tue 8/18/2020 7:20:24 AM
**Subject:**  RE: Michael Artis

He called yesterday and left me a message stating the floor still hasn't been fixed. His number is 804-479-4013. I just spoke to him and told him to call you as well.

---

**From:** Pinetree Manager <PinetreeMgr@somliving.com>
**Sent:** Monday, June 08, 2020 1:14 PM
**To:** Kristin Mayton <maytonk@cvrc-va.org>
**Subject:** RE: Michael Artis
**Importance:** High

Good Afternoon Ms. Mayton ,
I have made several attempt to contact Mr.Artis , but he has not responded to my letters . Phone number on fie doesn't work .

 

EBONE GAMBY
community manager

804.862.1231
3100 Pinetree Drive
Petersburg, VA 23803
LivePinetreeApts.com

---

**From:** Kristin Mayton <maytonk@cvrc-va.org>
**Sent:** Monday, May 4, 2020 8:01 AM
**To:** Pinetree Manager <PinetreeMgr@somliving.com>
**Subject:** Michael Artis

Good Morning,  Michael Artis sent me a video and picture of his floor near the sliding glass door. I have attached the video here. He states he has informed the office but no one has come to correct the issue yet. Please advise. Thank you

---

**From:** Pinetree Manager <PinetreeMgr@somliving.com>
**Sent:** Tuesday, March 10, 2020 3:57 PM
**To:** Kristin Mayton <maytonk@cvrc-va.org>
**Subject:** RE: HAP contract for Deandre Jacobs
**Importance:** High

# EXHIBIT 8

Link: https://youtu.be/B2cCkeA9BiA

# EXHIBIT 9

Link: https://youtu.be/bXZwYMJFijg

# EXHIBIT 10

**Condensed List of Relevant Entries from Ross Work Order Chart**

| Unit | Brief Desc. | Problem Description | Technician Notes | Full Description | Call Date | Complete Date |
|---|---|---|---|---|---|---|
| G3 | Garbage Disposal/Leak | leak in master bedroom by sliding door -pb | | | 3/30/17 | 4/3/17 |
| G3 | Moisture Build Up/Leak | moisture build up concerns around sliding door in hallway bedroom and window; leak around sliding door in master bedroom and leak/moisture build up in master bathroom -pb | Checked and no leak cleaned the spot | | 5/31/17 | 7/5/17 |
| G3 | Leak In Master Bedroom | leak coming from ceiling by patio sliding door in master bedroom -pb | | No signs of previous leak. (Completed by temp) -ST | 7/7/17 | 8/3/17 |
| J6 | Failed Section 8 Re-Inspection | master bedroom sliding glass door frame is peeling; repair insulate bedroom windows both patio screen doors are off | complete (Rob) -pb | | 8/18/17 | 9/29/17 |
| I6 | Bedroom Patio Door | When it rains, water leaks from ceiling near frame of bedroom sliding door. | | | 8/25/17 | |
| K8 | Moisture Build Up | moisture build up concerns on all windows and sliding doors in the home -pb | | put window in done Baron -pb | 12/4/17 | 1/16/18 |
| D6 | AMG Around Sliding Door | amg around sliding doors in both bedrooms -pb | | remove agm and kilz trim | 7/16/18 | 9/6/18 |
| P6 | Patio Door Sealed Shut | master bedroom sliding door won't open -pb | | Adjusted sliding door in the master bedroom (Lawrence Jones- temp) | 8/1/18 | 8/27/18 |
| E3 | | Sliding door in master bdrm is hard to open and screen is off track | | replace toilet flapper put sliding screen door back on track | 1/3/19 | 1/28/19 |
| F4 | mold in 2nd bedroom by window | mold in 2nd bdrm by sliding glass door leak under kitchen sink | | washer hose put back on amg clean and kilz from all windows | 1/11/19 | 3/20/19 |
| F3 | | mold around sliding doors in both rooms | | remove amg around sliding glass door and caulked place screen doors on track | 1/23/19 | 1/28/19 |
| A3 | | mold around sliding door in bdrm and around baseboard in d/r, door off track in mster bdrm | | killz windows put bedroom door back on track | 3/18/19 | 3/19/19 |
| F3 | mold around sliding doors | mold around both sliding doors | | clean amg and kilz | 3/19/19 | 3/19/19 |
| D3 | Section 8 failed items | leak around sliding door in bdrm | | | 3/20/19 | 5/2/19 |
| G4 | water damaged floor | water damage to the floor in front of sliding glass doors- master bedroom. | | check wet carpet it was dry | 5/13/19 | 5/20/19 |
| D6 | AMG Around Sliding Door | amg around sliding doors in both bedrooms -pb | | remove agm and kilz trim | 7/16/18 | 9/6/18 |
| F4 | mold in 2nd bedroom by window | mold in 2nd bdrm by sliding glass door | | amg clean and kilz from all windows | 1/11/19 | 3/20/19 |

| | | | | | | |
|---|---|---|---|---|---|---|
| F3 | | mold around sliding doors in both rooms | | remove amg around sliding glass door and caulked place screen doors on track | 1/23/19 | 1/28/19 |
| F3 | mold around sliding doors | mold around both sliding doors | | clean amg and kilz | 3/19/19 | 3/19/19 |
| A3 | amg around l/r window, master bdrm | amg around l/r window, master bdrm window and 2nd bedroom window. | | kilz and caulk around windows | 4/23/19 | 5/2/19 |
| K1 | possible AMG | AMG on the dry wall around and on the master bedroom patio door. | | | 5/17/19 | |
| E9 | Outside | Balcony wood is molded. Unsafe and uncomfortable to sit on -pb | | | 8/28/17 | |
| F1 | | mold in l/r, 2nd bdrm and mster bdrm | | caulk and kilz all windows | 1/22/19 | 2/12/19 |
| P6 | Mold along side of living room wind | Mold along side of living room windows and second bedroom window | | remove amg caulk and kilz all windows | 2/7/19 | 2/22/19 |
| K8 | It look like black mold from water | It look like black mold from water leaks on my children window and screen doors. | | clean all windows and kilz | 3/13/19 | 3/15/19 |
| A3 | mold around l/r and 2nd bdrm window | mold around l/r and 2nd bdrm window | | clean and kilz | 3/28/19 | 4/9/19 |
| F4 | | second bedroom has mold in window and needs new blinds for the window . Second bedroom screen needs to be replaced . | | | 6/17/19 | |
| A1 | Moisture Buildup | Moisture buildup on downstairs patio entry and living room, 2nd bedroom windows. Not holding in heat; bad condensation on windows causing moisture build-ups. Prev. work order was put in last year around November. | | The Windows condensate, the person of household was told its up to them to clean window. It is not up to us. -Marc | 1/9/17 | 2/9/17 |
| H2 | Heat | Poss. moisture buildup on MB Patio door. | | moisture build up of the patio door frame is normal. The patio door frames here are aluminum which will condensate and build up mildew. I went ahead and cleaned and caulked the patio door frame. - Lucas | 1/23/17 | 1/24/17 |
| J2 | Severl W/O Requests | Previous leak in MBed ceiling by patio door | | G/D reset and cleaned; previous leak been taken care of | 1/31/17 | 2/7/17 |
| F6 | Other | Items to be completed for housing inspection: ...3.Both patio thresholds have black dirt around door frame. Complete as first time courtesy, but this is a residents responsibility to keep clean per lease.(leave copy for resident) | | | 2/1/17 | 2/2/17 |
| F1 | Bad Seal | 4. Leak through patio door in master bedroom -pb | | | 3/27/17 | 3/29/17 |
| B7 | Leak From Patio Door | leak coming from attic area in master bedroom (leaks every time it rains) -pb | Roof repairs made | | 6/5/17 | 7/19/17 |
| D3 | Punch List | master bedroom patio slat is cracked -pb | All items have been done | | 6/29/17 | 7/3/17 |

| | | | | | | |
|---|---|---|---|---|---|---|
| J4 | Turn List | 2nd bedroom door hinge loose<br>2nd bedroom wand to patio bent<br>2nd bedroom patio missing slat<br>master bedroom missing slat | All items are completed. | | 7/27/17 | 7/29/17 |
| F2 | Turn List | screen downstairs off<br>master bedroom patio missing two slats | All items are completed. | | 7/27/17 | 7/29/17 |
| I3 | LEAKS/Carpet Wet | Ceiling leak in master bedroom by patio | | | 8/4/17 | 10/16/17 |
| E3 | NEW MOVE IN ISSUES | 2nd bedroom patio door does not lock | Lock was repaired on patio door. | | 8/12/17 | 8/12/17 |
| J6 | Failed Section 8 Re-Inspection | master bedroom sliding glass door frame is peeling; repair insulate bedroom windows<br>both patio screen doors are off | complete (Rob) -pb | | 8/18/17 | 9/29/17 |
| F3 | Punch List | master bedroom:<br>   "moisture build up" around patio door frame and leak<br>master bathroom:<br>   "growing moisture build-up" around cabinet | | | 8/29/17 | 10/28/17 |
| K8 | Leak | Resident reported today that window and patio doors leaks when it rain. | | complete Rob -pb | 11/14/17 | 11/30/17 |
| K8 | Windows/Patios | draft coming through 2nd bedroom window and patios -pb | Monika spoke with James about the limited avenues that we have to try to repair his window draft in his occupants room; Monika stated to James that the first step is having Baron replace the sash (take sash from vacant) and expressed to James that Baron will come out today -pb | Replaced window sash MT | 1/8/18 | 1/8/18 |
| | | | | | | |
| G1 | Dry Rotten | patio doors dry rotted; discoloration on carpet<br>vinyl siding outside building hanging off -pb | | Put vinyl back up<br>Patio ok prime around door<br>Completed by Andrew -MT | 2/10/18 | 2/22/18 |
| D1 | Seal Patio Doors | seal patio doors -pb | | | 3/30/18 | 4/2/18 |
| B3 | Master Bed Patio Door | master bedroom patio door will not open -pb | | DOOR FIXED | 6/9/18 | 7/26/18 |
| A1 | Punch List | 2nd bedroom door does not close properly<br>master bedroom paint chipping around baseboards and patio light switch | | resident moved in | 6/13/18 | 7/10/18 |

| | | | | | | |
|---|---|---|---|---|---|---|
| E8 | Failed Section 8 Re-Inspection | Insulation needed for all windows and patio doors -pb | | weather strips applied to windows, doors -temps -pb | 6/16/18 | 6/22/18 |
| O6 | Water Leak Through Patio Doors | second bedroom patio door leaks when it rains -pb | | sealed around door. | 6/23/18 | 8/13/18 |
| N1 | Master Patio Door Leak | master bedroom patio door leaking inside -pb | | SEAL PATIO TRIM FROM UPSTAIRS PATIO & OUTSIDE OF PATIO DOOR DOWN STAIRS TOREY OLDS | 7/24/18 | 7/31/18 |
| F1 | | water coming in patio | | water was coming in patio window seal window at top | 9/17/18 | 9/17/18 |
| I6 | Multiple items | 2nd bdr Patio door leaking. | | work done by J.Tally window was caulked | 11/1/18 | 11/12/18 |
| F1 | Patio Door | MB Patio door leaks when it rains. | | work done by T.Tally caulk around patio door | 11/1/18 | 11/6/18 |
| P2 | make ready | caulk master patio door<br>caulk master attic access door | | all work done | 11/10/18 | 11/13/18 |
| P7 | Make Ready | 2nd bedroom window cracked replace (damage, need price)<br>caulk around patio doors<br>slat in master bdrm (damage, price) | | all work done | 11/10/18 | 11/13/18 |
| E10 | Move in | 2nd Bdr - Paint chipped by patio door.<br>Both Patio doors - drop bar attachment plates are rusted. | | all work done | 1/25/19 | 3/13/19 |
| A3 | amg around l/r window, master bdrm | amg around l/r window, master bdrm window and 2nd bedroom window. | | kilz and caulk around windows | 4/23/19 | 5/2/19 |
| B7 | Ceiling Leak | Leak from ceiling in M. Bedroom since move in. Starting to produce odor. | | Roofer came out and fixed problem. Sprayed killz on surface where stains were. -Marc | 1/11/17 | 2/9/17 |
| I3 | SheetRock | master bedroom ceiling is wet (when it rains. . . this came from an unfinished job from the previous company . . .a piece of sheetrock was put there but that did not help) | Have a contractor coming to check for were the leak is coming from. 6/1/17there is another order for this for contractor. | | 5/1/17 | 6/22/17 |
| L1 | Window Leak | Rain leaks into window in mater bedroom. It's coming from the frame near the top of window. | | sunshine 11/28/2017 -pb | 7/23/17 | 11/30/17 |
| H2 | NEW MOVE IN ISSUES | master bedroom screen is missing and hard to open living room window has stuff on it and is hard to see out of -pb | Ordered screen | | 8/7/17 | 8/11/17 |
| K2 | Leak Inside Master Bedroom Wall | master bedroom ceiling has visible wet spot | | | 9/6/17 | 12/4/17 |
| J5 | Balcony | balcony doors do not open -pb | | complete (Rob) -pb | 11/9/17 | 11/18/17 |
| G8 | Master Bathroom Ceiling Hole | master bathroom has hole in ceiling from prior leak -pb | | done; Baron -pb | 3/19/18 | 3/19/18 |

| | | | | | | |
|---|---|---|---|---|---|---|
| B10 | Ceiling Leak | ceiling leak in master bedroom - pb | | check ceiling OK ; Baron - pb | 4/14/18 | 4/16/18 |
| K9 | Master Bathroom Ceiling Leak | master bathroom ceiling leak - pb | | patch ceiling in master and bathroom , paint ceiling master and bathroom Baron - pb | 4/25/18 | 5/11/18 |
| E5 | Possible Roof Leak | Possible roof leak over master bath and water intrusion above window at foyer - pb | | roof was replaced already | 7/23/18 | 9/6/18 |
| J4 | Master Bedroom Ceiling Water Damage | Taylor stated that there is visible water damage to the ceiling but she had not seen a leak , she did notice that the ceiling spackles had fallen a bit but never reported a leak to us stated that the ceiling looks as though it is about to cave in at any moment - pb | | Roof repaired by contractor, all done | 7/25/18 | 7/26/18 |
| E5 | Clean Water Up & Caulk | clean water up and caulk around window seals to prevent leak - pb | | cleaned water stains, caulked around window, and used stain kilz, complete | 8/7/18 | 8/13/18 |
| D3 | multiple items | MB slide glass doors leaking on the inside. Second bedroom glass doors leaking on the inside. | | window flashing caulked and slide glass door caulked as well condensation line open and drain clear carpet shop vac and fan placed for drying of carpet | 9/6/18 | 9/10/18 |
| I3 | Water leak/ Window | Foyer window does not stay up it keeps coming down. ( check the spring/ballast) | | water was leaking from sidding trim put back in place | 9/10/18 | 10/3/18 |
| F3 | Leaks | Ceiling leak in the 2nd bedroom ceiling | | leak coming from upstairs hvac leak was fixed open condensation lines | 9/14/18 | 9/17/18 |
| E4 | Downstairs window leaking when it rains | Downstairs window leaking when it rains | | Window seal at top of window and caulked around window. Torey | 10/11/18 | 10/18/18 |
| E8 | Multiple Items | Living room windows leaks, possible amg? | | replaced bedroom blind caulk outside window | 11/16/18 | 11/26/18 |
| A3 | Multiple items | master bedroom door frame loose | | bedroom door frame repaired w/d door back on track | 1/3/19 | 1/9/19 |
| A5 | | 2nd bdrm door is offset, won't close | | added to new work order | 3/16/19 | 4/12/19 |
| B8 | water leak in apartment | water leaking in apartment from front window | | caulk window from outside | 6/10/19 | 6/18/19 |
| G8 | Draft Throughout Home | bad draft coming through all windows and doors - pb | | installed foam at windows. Completed by Andrew - MT | 1/6/18 | 2/21/18 |
| H5 | Outside | Wood is broken off and you can see through the floor, wood is severely dry rotted and is a big safety risk for me and my children. | | | 10/25/17 | 11/18/17 |
| G4 | Moisture Build Up | moisture build up concerns in all window seals balcony wood dry rotted - pb | | | 12/28/17 | 1/16/18 |
| K5 | Multiple | Downstairs window seal has dry rotted Bdr- Paint keeps falling off? Stated her curtains keep falling. | | work done by William repair drywall and caulk window | 4/8/19 | 4/11/19 |

# EXHIBIT 11

**PLAINTIFF'S EXHIBIT**

**23**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

NYEISHA S. GHEE,

      Plaintiff,

v.                                  Civil Action No.: 3:25-cv-17-RCY

PINETREE APARTMENTS, LLC,

      Defendant.

### AFFIDAVIT OF ROBERT L. KUNST

1.      My name is Robert L. Kunst. My office address is 4565 LaSalle Street, Mandeville, Louisiana 70471.

2.      I am over eighteen years old and competent to make this Affidavit.

3.      I am in the business of termite and pest control, lawn care, and horticulture. I have served as an expert witness in over 400 cases, typically addressing termite and moisture issues. I am licensed in Alabama, Louisiana, Mississippi, South Carolina, Tennessee, and Virginia as a certified pesticide applicator and in related areas of pest control. Attached as **Kunst Exhibit 1** is a copy of my curriculum vitae.

4.      I have reviewed the following:

      a.      The Amended Complaint and its exhibits in this matter.

      b.      The Affidavit and Addendum thereto of Donisha L. Bugg and the Affidavit of Eric Hansen.[1] Copies of these documents are attached as **Kunst Exhibits 2, 3,** and **4,** respectively.

---

[1] During the period from approximately 2017 through the middle of 2019, Ms. Bugg lived in Pinetree Apartments, Apt. G8 (the same apartment where the Plaintiff lived when the fire took place). In her Addendum Ms. Bugg observed that "[t]here was termite damage above the sliding

c.      Aerial images of Pinetree Apartments, 3100 Pinetree Drive, Petersburg, Virginia, from the Petersburg, Virginia Geographic Information System, included in the official website of the City of Petersburg, copies attached as **Kunst Exhibit 5.**

d.      Diagram showing all Pinetree Apartment buildings, PINETREE00666, copy attached as **Kunst Exhibit 6.**

e.      Documents obtained by subpoena from PestNow, the pest control company retained by Defendant and/or its management company to inspect and treat Pinetree Apartments for termites. These documents contain many references to termite activity.[2] Copies of these documents are attached as **Kunst Exhibit 7.**

---

glass door to my bedroom, as well as above the sliding glass door to my mother's bedroom." **Kunst Exhibit 3**, at GHEE000489. On 3-4 occasions, she saw insects that she thought were termites. *Id.* Ms. Bugg never saw that the termite damage had been repaired. *Id.*

From approximately 2014 to the summer of 2024, Eric Hansen lived in Pinetree Apartments, Apt. G4. On at least two occasions while on his deck smoking, Hansen saw a "whole bunch of termites swarming." **Kunst Exhibit 4**, at GHEE000493. This was in the springtime, in the morning. *Id.* He also saw the wood on his deck deteriorating. "It was falling apart. All of the decks at Pinetree were deteriorating." *Id.,* at GHEE000494.

[2] These PestNow records reveal the following:

| Date | Bates # | Building(s)/ Unit(s) involved | Excerpt |
|------|---------|-------------------------------|---------|
| 02/25/2019 | 1135 | E3 | "TERMITES FOUND IN 3 E… I FOUND LIVE WOOD DESTROYING INSECTS" |
| 03/05/2019 | 1136 | E | "TREATED THE EXTERIOR OF BUILDING E FOR TERMITES." |
| 03/13/2019 | 1112 | N | "I FOUND EVIDENCE OF WOOD DESTROYING INSECTS I FOUND TERMITE DAMAGE" |
| 03/18/2019 | 1113 | N | "PERFORMED TERMITE TREATMENT ON UNIT N…" |
| 03/18/2019 | 507-509 | B, C, G, K, O, P, J | "Visible live insects: LIVE TERMITES ON EXTERIOR FOUNDATION OF BLDGS. B, C, G, K, O, AND P AND BLDG. J HAD ACTIVE TERMITES UNDER THE SPLASH GUARD ON THE EXTERIOR FOUNDATION" |

| 04/04/2019 | 505 | B, C, G, J, K | "PERFORMED A TERMITE TREATMENT AROUND THE FULL EXTERIOR PERIMETER… TREATMENT WAS DONE ON B, C, G, J & K" |
| 04/05/2019 | 506 | O, P | "I TRENCHED AND GROUND RODDED THE EXTERIOR PERIMETER OF BUILDINGS O & P FOR TERMITES." |
| 04/26/2019 | 1086-1088 | Pool house | "I TRENCHED AND RODDED AROUND THE PERIMETER OF THE POOL HOUSE FOR TERMITES." |
| 05/06/2020 | 510-512 | G | "I DID A THOROUGH EXTERIOR INSPECTION OF BUILDING G FOR TERMITES. PINETREE STAFF IS AWARE THAT IF AN INTERIOR INSPECTION IS NEEDED THAT THEY ARE TO CONTACT US. THE ANNUAL INSPECTION FOR TERMITES IS ONLY AN EXTERIOR INSPECTION." |
| 02/17/2021 | 891, 893-895 | F6 | I FOUND SWARMER TERMITES IN BATHROOM TUB IN UNIT F6. I RECOMMEND A FULL PERIMETER SOIL TREATMENT TRENCH…" |
| 02/23/2021 | 892 | F | "TREATED EXTERIOR OF BUILDING F FOR TERMITES…" |
| 03/07/2023 | 647-650 | C8 | "… FOUND EVIDENCE OF TERMITE ACTICITY INSIDE UNIT C8…" |
| 03/13/2023 | 651-653 | C8 | "BLDG C UNIT C-8 WARRANTY TREATMENT FOR TERMITES" |
| 09/25/2023 | 567-572 | Pool pump house | "… FOUND EVIDENCE OF TERMITES, TERMITE SHELTER TUBES AND GALLERIES ON WALL STUDS IN DETACHED POOL PUMP HOUSE…" |
| 09/27/2023 | 564-566 | Pool house | "TREATED INTERIOR POOL HOUSE EXPOSED WOOD FOR TERMITES" |
| 02/13/2024 | 263 | F6 | "F6 is complaining about Termites." |
| 02/13/2024 | 264 | E8 | "Please add E8 to the list [of units for termite inspection]" |
| 02/13/2025 | 521-523 | F6, E3 | "… I FOUND NO TERMITE ACTIVITY DURING MY INSPECTION EXCEPT FOR UNIT F6 IN BUILDING F and UNIT E3 IN BUILDING E. PROPERTY MANAGEMENT IS AWARE THAT THIS INSPECTION IS ONLY AN EXTERIOR INSPECTION. INSPECTIONS FOR THE INTERIOR MUST BE REQUESTED BY MANAGEMENT." |

3

5. Further, through my work, I am aware of instances where termite damage has interfered with the operation of sliding glass doors.

6. The most prevalent type of Subterranean termites found in the area of Petersburg, Virginia are the (*reticulitermes virginicus, reticulitermes flavipes, reticulitermes hageni*). These termites are frequently found in damp environments. Due to the proximity of Pinetree Apartments to the swamp, depicted in the aerial images referred to above as **Kunst Exhibit 5**, it is not surprising that termites infested various Pinetree Apartment buildings.

7. Subterranean Termites readily travel from one building to another building nearby and in doing so have a average radius of approximately a half a mile from their nest. A Google Earth image approximately showing a half-mile radius from Apartment G8 is shown in the attached as **Kunst Exhibit 8**.

8. The PestNow records show termite infestation at the following Pinetree Apartment buildings: B, C, E, F, G, J, K, N, O, P, and the Pool Pump House. *See* footnote 2. Because of the proximity of these buildings to the swamp shown in **Kunst Exhibit 5**, as well as the proximity of the Pinetree Apartment buildings to each other, this is not surprising.

9. Periodically, Subterranean Termites swarm, normally in the springtime.

10. Subterranean Termites typically swarm in the morning, although in my experience and observation Subterranean Termites sometimes swarm at other times of day as well.

11. Of great relevance to the issues in this matter and this Affidavit, on September 12, 2025, Defendant Pinetree Apartments, LLC ("Pinetree") produced to Plaintiff documents that showed that MBS Construction ("MBS"), a local contractor hired by Pinetree, performed a similar repair numerous times on Pinetree Apartment sliding glass doors and the wood surrounding the doors, including the area above the doors. These repairs preceded Ms. Ghee's original occupancy

4

(June 2022) and continued through, and after, the date of the fire (Feb. 20, 2024). According to MBS, the wood above the doors was oftentimes "rotten" –the same as Ms. Ghee's allegations in the current case. *See* the chart below (emphasis added).

| Bates | Date | Unit | Scope of work | Total amount invoiced |
|-------|------|------|---------------|-----------------------|
| 2035 | 4.20.22 | O10 | "Removed sheet rock from ceiling of bedroom and around patio door in bedroom, [...] repaired sheet rock around second bedroom sliding patio door. Mudded and taped one coat. sheet rock areas from repair. Repaired flashing on patio above patio doors to resolve leak issue. That will included (sic) removing vinyl siding and reinstalling. Replaced studs in the wall and header across patio door in first bedroom." | $6,000 |
| 2037 | 5.23.22 | P1 | "Removed sliding glass patio door cut out sheet rock, removed **rotten** header above door, removed insulation from exterior wall removed **rotten** door jack removed backside of vinyl siding from the exterior.<br>Replaced **rotten** two by fours in the wall, Reinstalled new insulation. Reinstalled vinyl siding and J channel, reinstall patio door, **replaced sheet rock** around patio door and mud and tape one coat. Repaired flashing on patio above door." | $4,000 |
| 2039 | 6.21.22 | F8 | "Cut sheet rock above patio sliding door, cut out **rotten header** above patio door, **replaced header** above patio door. Installed new sheet rock above patio door. Mud and taped first coat on sheet rock. Remove vinyl siding from outside of apartment above patio door and installed new Tyvek. and flashed above patio door. Reinstalled J-channel and siding." | $3,400 |
| 2041 | 8.2.22 | C12 | "Cut out **wet, damaged sheet rock** from ceiling of bedroom and above patio door. Found that the dryer vent had water in it from water getting in from exterior. [...] Removed exterior siding above patio siding door. [...] | $3,200 |

| | | | Installed installed new Tyvek and flashing above patio door." | |
|------|--------|-----|-----|---------|
| 2043 | 8.2.22 | D3 | "Cut out and removed wet damaged sheet rock from around both bedroom patio doors. Placed header above one patio door. Installed new sheet rock in mud and tape first coat sheet rock. Also kilzed and bleached around bedroom number one patio door. Removed vinyl siding above patio doors and repaired flashing and added Tyvek around wall above patio doors. Reinstalled vinyl siding." | $4,375 |
| 2045 | 8.17.22 | O10 | "Removed vinyl siding from above sliding glass door, removed flashing from underneath patio band board, reflash above door and added new Tyvek to wall. Reinstalled vinyl siding." | $1,500 |
| 2049 | 2.6.23 | K1 | "Removed master bedroom, sliding patio door. Repaired jamb leg. Reinstall door and repaired patio door roller. Secured door, sealed door, repaired sheet rock around interior of patio room. Repaired sheet rock around patio door and other bedroom." | $650 |
| 2051 | 2.6.23 | M3 | "Removed vinyl siding from exterior building on corner and above patio door. Sealed, flashing and patio and vinyl corner coming down side of upper balcony. Repaired flashing reinstalled siding above patio door cut out and repaired wall around patio door installed new sheet rock and taped and mudded first coat on wall." | $3,200 |
| 2053 | 3.10.23 | E8 | "Clean moldy areas from patio, sliding glass doors in both rooms, repaired minor sheet rock repair,Sealed and painted areas." | $375 |
| 2055 | 5.11.23 | O10 | "Removed vinyl siding from exterior, repaired flashing and installed Tyvek, reinstalled vinyl siding, […] Repaired hanging siding coming down gable end. […] Repaired vinyl corner, going up side of balcony, repaired flashing under sliding glass door and sealed. […]" | $950 |
| 2057 | 6.26.23 | K8 | "Removed vinyl siding from two sliding door patio areas. Repaired flashing across both patios above sliding glass doors. Replaced **Rottenwood** (sic) above master bedroom, patio door and replaced Celtics on area. | $3,200 |

| | | | Installed Tyvek on walls of both patio door areas. Sealed both doors, reinstalled vinyl siding." | |
|---|---|---|---|---|
| 2069 | 10.31.23 | D5 | "repaired sheet rock above patio door. Repaired siding and flashing, above patio also had to repair gutter. […]" | $1,675 |
| 2071-72 | 10.31.23 | H1 | **"cut out and Removed damaged sheet rock** from bedroom wall above patio door. removed 4 x 4 post under exterior deck that was not installed properly. Vinyl siding was cut away from building to install 4 x 4 post. Removed all of vinyl siding from exterior wall under patio repaired for damage studs and wall. **Replaced all rotted Celtics** with half-inch OSB Tyveked exterior wall. Reinstalled 4 x 4, post with metal flashing behind 4 x 4, attached to building reinstall all vinyl siding repaired flashing across topped balcony. Reinstalled sheet rock mud and taped […]" | $4,200 |
| 2074 | 12.4.23 | J6 | "Removed vinyl siding from exterior patio. Repaired patio door header. Replaced flashing and installed tyvex on exterior wall. Reinstalled siding. Repaired Sheetrock on wall around patio door. Patio door is sealed." | $2,825 |
| 2022 | 2.23.24 | J3 | "Removed two sections of glass panel from patio sliding door repaired roller guides on patio door and repaired roller wheels on patio door. Reinstall patio doors into the frame adjusted lock on the patio door. […]" | $600 |
| 2031 | 4.5.24 | N2 | "Removed glass patio door. Removed door rollers from patio door leveled patio door threshold door was not level purchased and installed two new rollers onto patio door, reinstalled patio door." | $425 |
| 2024-25 | 5.30.24 | H3 | "Cut out and removed interior sheet rock above patio door and section on ceiling. Removed exterior vinyl siding wall of patio door. **Cut out and removed all rotten wall sheeting**. removed double 2 x 10 rotten header removed section of **rotten wall plate** on top replaced two studs in the wall also replaced jackstand for header rebuilt 2 x 10 header. Resecured patio sliding glass door. Removed upper patio band board and replaced flashing behind it and installed a drip edge on top Under The patio decking boards. reinstalled patio | $5,275 |

| | | | board and bolted to building. resecure decking boards from up top installed half-inch OSB on wall. Install building wrap. Reinstalled vinyl siding. Installed new sheet rock that had to be removed." | |
|------|---------|----|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|---------|
| 2029 | 5.31.24 | E1 | "Removed vinyl siding around patio door area. Repaired wall and installed wall wrap also replaced flashing and drip edge. replace one piece of vinyl siding that was nailed through the face. cleaned out gutters on top above upper patio. sealed base of siding on top of upper patio under sliding glass door area." | $2,275 |
| 2027 | 8.2.24  | O6 | "Removed upper vinyl siding from above patio sliding doors. Removed flashing drip edge that was installed upside down underneath the band board of patio. Reinstalled flashing correctly. Sealed corners. Repaired sheet rock in both bedrooms around patio doors. Cleaned and painted one coat over discoloration on sheet rock. Reinstalled Jay channel and vinyl siding." | $2,775 |

12.     The foregoing documents indicate that the areas above many of Pinetree Apartments' sliding glass doors regularly collected water, creating the conditions favored by termites.  According to the documents, including the MBS invoices, rotten wood was regularly found in the area around and above the sliding glass doors. Thus, the conditions found in the wooden support above the sliding glass door in Ms. Ghee's primary bedroom were not a one-time event, but instead typical for the units. Indeed, the breadth of the problem and MBS's criticism of the original carpentry work indicate that the foregoing problems were widespread.  *See*, for example, the notes accompanying the August 2, 2024 repairs to unit O6 (Bates 2027, the last entry in the table immediately above).

I, Robert L. Kunst, swear under penalty of perjury that the statements in this Affidavit are true and correct to the best of my knowledge and belief.

_____    _____
Date                          Robert L. Kunst

STATE OF LOUISIANA

CITY/PARISH _St. Tammany_

    I _Emily Hartzog_____, a Notary Public for the State of Louisiana, do hereby certify that on _10 / 6 /2025_____, Robert L. Kunst personally appeared before me in my jurisdiction aforesaid and, after being duly sworn, acknowledged that the information contained in the foregoing Affidavit is true and correct to the best of his knowledge and belief and signed the same before me.

WITNESS under my hand and official seal:

_Emily Hartzog_____
(notary signature)

My commission expires: _commissioned for life_

9

# EXHIBIT 12

PLAINTIFF'S
EXHIBIT

**33**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

NYEISHA S. GHEE,

      Plaintiff,

v.                                 Civil Action No.: 3:25-cv-17-RCY

PINETREE APARTMENTS, LLC,

      Defendant.

## AFFIDAVIT OF DANO HOLLAND

1.      My name is Dano Holland.

2.      I am over eighteen years old and competent to make this Affidavit.

3.      I am a licensed professional engineer.  Attached as **Holland Exhibit 1** is

a copy of my CV.

4.      I work full time as a forensic engineer and am the sole employee of my firm,

Holland Forensic Engineering Group, PLC, of which I am the sole owner.

5.      I live at 8508 Burroughs Court, Richmond, VA and have an office in my home.

6.      I investigated the aftermath of the fire that took place on February 20, 2024, in

Building G of Pinetree Apartments, 3100 Pinetree Drive, Petersburg, VA 23803.

7.      As part of my investigation, I visited Building G on May 22, 2024, with the

permission of a representative of Pinetree Apartments, who was present during my visit.

8.      While at Building G on May 22, 2024, I took many photographs as I walked

through the eight apartments in Building G, including the two apartments damaged by the fire--

Apartment G8 (the ground floor apartment occupied by the plaintiff at the time of the fire) and G7 (the apartment above G8).

9.    During my on-site investigation, I observed that both G7 and G8 had two bedrooms and that G7's two bedrooms were located directly above G8's two bedrooms.

10.    Below, I refer to the plaintiff's bedroom in G8 as the Primary Bedroom.

11.    Each bedroom had a sliding glass door assembly, consisting of a stationary glass panel and a sliding glass panel.

12.    The sliding glass doors of G8's two bedrooms opened onto a concrete pad that served as a patio.

13.    The sliding glass doors of G7's two bedrooms opened onto a wooden deck.

14.    Attached as **Holland Exhibit 2** is a photograph I took.  It depicts the wooden deck of G7 and below it the patio of G8.

15.    Before my on-site inspection, the sliding glass door assembly serving G8's Primary Bedroom had been removed from the back wall of the Primary Bedroom and, I was told, was destroyed during the fire.

16.    During my on-site inspection, it was evident that the two-panel glass door assembly in the back wall of the Primary Bedroom had not been well maintained.  Please see the next paragraph for more detail.  This failure to maintain constituted a violation of 2021 VPMC Section 702.3, copy attached as **Holland Exhibit 3**.

17.    During my inspection of the back wall of the Primary Bedroom, I observed that termites and/or wood rot had deteriorated the supporting wood framing that held the sliding glass door in its proper place along its metal track.  Specifically, I found water and termite damage to the jack stud (the vertical piece of framing lumber that supports the ends of the header beam over the

2

sliding door) and the wooden framing above the sliding glass door assembly in the Primary Bedroom. *See* the diagram attached as **Holland Exhibit 4,** which, like all exhibits that I refer to in this Affidavit, is incorporated herein by reference. The water and termite damage caused the wood wall framing to shift, resulting in compression and deformation of the sliding glass door frame, as shown in **Holland Exhibit 4**. The foregoing caused the sliding glass door to be out of square and difficult if not impossible to move. *See* **Holland Exhibits 5, 6, and 7** for photographs taken by me, depicting this deteriorated wood.

18.     The foregoing likely caused the sliding glass door in the Primary Bedroom not to move easily along its track, if at all, when a repairman worked on it in May of 2022, as documented by work order 693154, copy attached as **Holland Exhibit 8**.

19.     Termites have to have a source of water to live. In the case of Apartment G8 and the deteriorated supporting wood framing that held the Primary Bedroom's sliding glass door in place along its track, the water that kept the termites alive and deteriorated (rotted) the supporting wood frame likely came from water infiltration originating near the wooden deck of G7 and/or in the area of G8's patio.


I, Dano Holland, swear under penalty of perjury that the statements in this Affidavit are true and correct to the best of my knowledge and belief.

_10/6/25_
Date

Dano Holland

3

COMMONWEALTH OF VIRGINIA

I _Brooke Daniel_ , a Notary Public at large in and for the State of

Virginia, do hereby certify that on _10/6/25_ , Dano Holland personally appeared

before me in my jurisdiction aforesaid and, after being duly sworn, acknowledged that the

information contained in the foregoing Affidavit is true and correct to the best of his knowledge

and belief and signed the same before me.


WITNESS under my hand and official seal:

_(signature)_

(notary signature)

My Commission Expires: _09/30/29_

My Notary Registration No.: _00357 887_

> Brooke Alexandria Daniel
> Commonwealth of Virginia
> Notary Public
> Commission: 00357887
> My Commission Expires: 09/30/2029

4



Holland
Forensic
Engineering
Group, PLC

## DANO HOLLAND, P.E.

### EDUCATION
Clemson University, B.S., Civil Engineering, 1992

### PROFESSIONAL REGISTRATIONS & AFFILIATIONS
Professional Engineer Licensed in Virginia, Maryland and Washington, D.C.
International Institute of Building Enclosure Consultants
National Society of Professional Engineers
International Code Council
National Council of Examiners for Engineers and Surveyors

### CAREER HISTORY
**Holland Forensic Engineering Group, PLC**, N. Chesterfield, Virginia (2018-Present)
Principal & Lead Forensic Engineer
Conduct structural forensic engineering investigations and provide expert witness testimony for cases involving property damage and the structural integrity of single and multi-family residential structures, office buildings, churches, warehouses, medical facilities, hotels, manufacturing facilities, parking decks, shopping centers, schools, agricultural structures and industrial facilities, as well as water intrusion issues, exterior envelope issues, building code compliance, slip, trip and fall investigations, roofing failures, construction defects, retaining wall failures, construction collapses, floor system issues and water damage evaluation.

**FORCON International – VA, ltd.**, Richmond, Virginia (2004-2018) - Lead Forensic Civil/Structural Engineer

**Industrial Turnaround Corporation**, Chester, Virginia (2002-2004) – Project Manager

**Boozer Lumber Company**, Columbia, South Carolina (2002) - Engineering Manager

**Suitt Construction Company**, Richmond, Virginia (1995-2002) - Project Manager - Asst. Project Manager - Project Engineer

**Tindall Concrete Virginia**, Petersburg, Virginia (1992-1995) - Project Engineer

### PROFESSIONAL EXPERIENCE

### FORENSIC INVESTIGATION
• Structural forensic engineering investigation of commercial, industrial, and residential structures
• Building code and ADA compliance of structures and their related components
• Roof assessment and damage investigations
• Cause and origin of water infiltration and the presence of moisture in buildings



HOLLAND
EXHIBIT 1

• Evaluation of construction deficiencies
• Flood damage investigations
• Chimney failures
• Cracking and evaluation of movement in masonry and concrete structures
• Timber construction failures and deficiencies
• Retaining wall failures
• Construction collapses
• Water infiltration through foundation walls and roofs
• Wind and storm damage investigation
• Structural assessment and design repair recommendations of structures damaged by storms, fire, and vehicular impacts
• Evaluation of floors and related structural systems
• Water damage investigation
• Construction dispute analysis and assessment related to construction defects
• Evaluation of structures for damage related to earthquakes, ground movement, and vibration
• Premises liability
• Slip, trip, stumble, and fall evaluation
• Expert witness testimony

**CONSTRUCTION PROJECT MANAGEMENT**
• Responsible for the successful implementation, completion and profitability of projects up to seventeen million dollars
• Interpreted contract drawings and specifications to assure that construction conformed to applicable design and contract requirements
• Responsible for the overall coordination and management of project services including cost control, document control, scheduling, safety, quality control and contract administration
• Responsible for daily interaction and coordination with clients/owners
• Supervised and managed project staffs consisting of design consultants, superintendents, assistant superintendents, project engineers, site clerks, craft foremen and their crews as well all subcontracted labor
• Coordinated the functions of engineers, architects, contractors and client's personnel.
• Managed and reviewed all submittals, shop drawings, change orders, quantity surveys and document control
• Developed and maintained CPM construction schedule and monitored project to assure adherence with schedule
• Helped develop project engineers and assistant project managers
• Expedited pre-purchased equipment, materials and fabricated items
• Conducted progress and design review meetings
• Practiced daily dispute resolution, claim avoidance and risk management
• Performed client invoicing and managed project cash flow



Holland
Forensic
Engineering
Group, PLC

## DESIGN
• Designed structural precast concrete systems for parking decks, warehouse, manufacturing, and distribution facilities, food and chemical processing facilities in VA, NC, SC, GA, MD, and DE
• Developed construction drawings for use by internal and external contractors
• Supervised and scheduled assigned drafting staff
• Managed the smooth flow of design information among all internal departments, as well as outside agencies, as it pertained to specific projects
• Served as field engineer on projects and performed initial layout and coordination among general contractor, erection crew, and engineering
• Performed constructability reviews and made recommendations for change
• Monitored and reviewed designs and quality of services
• Addressed engineering concerns and coordinated the remedial repairs requested by clients and outside contractors

## SALES AND ESTIMATING
• Assisted in sales efforts and presentations of potential projects
• Assisted in proposal development
• Developed and maintained network of subcontractors, vendors and engineers to deliver services
• Estimated and developed costs of prospective projects
• Fostered and developed continuing relationships with established and potential clients
• Developed value engineering alternatives and evaluated associated financial affect
• Developed preliminary project capital budgets for clients

## PURCHASING
• Developed bid packages, project deliverables, scopes of work and solicited bids
• Drafted and executed subcontracts, purchase orders and change orders
• Assured compliance with required regulations, licenses and insurance coverage
• Negotiated claims and change orders
• Negotiated and awarded subcontracts



Blumberg No. 5557

HOLLAND
EXHIBIT 2

768

**2021**

Effective: January 18th, 2024

**Virginia Property Maintenance Code**

HOLLAND EXHIBIT 3

**702.3 Doors.** Means of egress doors shall be maintained and, to the extent required by the code in effect at the time of construction, shall be readily openable from the side from which egress is to be made without the need for keys, special knowledge, or effort.

**702.4 Emergency escape and rescue openings.** Required emergency escape and rescue openings shall be maintained in accordance with the code in effect at the time of construction and to the extent required by the code in effect at the time of construction shall be operational from the inside of the room without the use of keys or tools. Bars, grilles, grates, or similar devices are permitted to be placed over emergency escape and rescue openings provided the minimum net clear opening size complies with the code that was in effect at the time of construction and such devices shall be releasable or removable from the inside without the use of a key, tool, or force greater than that which is required for normal operation of the escape and rescue opening.

**703.3 Maintenance.** The required fire-resistance rating of fire-resistance-rated construction, including walls, firestops, shaft enclosures, partitions, smoke barriers, floors, fire-resistive coatings and sprayed fire-resistant materials applied to structural members, and joint systems, shall be maintained. Such elements shall be visually inspected annually by the owner and maintained as constructed in accordance with the applicable building code. Records of inspections and repairs shall be maintained. Where concealed, such elements shall not be required to be visually inspected by the owner unless the concealed space is accessible by the removal or movement of a panel, access door, ceiling tile, or entry to the space.

**703.8 Opening protective closers.** Where openings are required to be protected, opening protectives shall be maintained self-closing or automatic-closing by smoke detection.

**704.1 General.** Systems, devices, and equipment to detect a fire, actuate an alarm, or suppress or control a fire or any combination thereof shall be maintained in an operable condition at all times.

> **704.1.1 Maintenance.** Fire protection systems shall be maintained in accordance with the applicable building code and the Statewide Fire Prevention Code.

**704.2 Records.** Inspection, testing, and maintenance records shall be maintained in accordance with the Statewide Fire Prevention Code.

**704.3 Systems out of service.** Where a required fire protection system is taken out of service, it shall be taken out of service in accordance with the Statewide Fire Prevention Code, and the fire department and the fire code official shall be notified immediately.

**704.5 Fire department connection access.** Ready access to fire department connections shall be maintained at all times.

> **704.5.1 Clear space around connections.** A working space of not less than 36 inches (914 mm) in width, 36 inches (914 mm) in depth, and 78 inches (1981 mm) in height shall be maintained in front of and to the sides of wall-mounted fire department connections and around the circumference of free-standing fire department connections.

**704.6 Single-station and multiple-station smoke alarms.** Required or provided single-station and multiple-station smoke alarms shall be maintained in accordance with the applicable building code.



TERMITE & WATER DAMAGE HAVE
CAUSED THE WOOD WALL FRAMING
TO SHIFT RESULTING IN COMPRESSION
& DEFORMATION OF THE SLIDING
GLASS DOOR FRAME.

AS ORIGINALLY CONSTRUCTED

AT THE TIME OF THE FIRE

SLIDING GLASS DOOR IN REAR WALL OF MASTER BEDROOM



HOLLAND
EXHIBIT 4



HOLLAND
EXHIBIT 5

695



HOLLAND
EXHIBIT 6

704



Blumberg No. 5117

HOLLAND
EXHIBIT 7

712

Page : 1

| | |
|---|---|
| **Work Order No.** | 693154 |
| **Date Call:** | 05/24/2022 02:38 PM |
| **Date Scheduled:** | 05/24/2022 02:38 PM |

**Status**          Work Completed

| | |
|---|---|
| **Date Completed:** | 05/31/2022 02:50 PM |
| **Brief Desc:** | sliding door locks |
| **Job Site:** | piap/G8 |
| | 3100 Pinetree Drive |
| | Apt G8 |
| | Petersburg, VA 23803 |

**Caller Name:**                    **Caller Phone:**

**Priority:**          High
**Ok to enter?**     YES
**Category:**         Patio/Balcony

**Problem Description:**     Fix both sliding doors. We need to ensure the locking mechanism works (MANDATORY)

**Parts & Labor**

| Quantity/ Hours | Item Type/ Employee Name | Description | Unit Price | Total |
|---|---|---|---|---|
| .00 | peebles | | .00 | .00 |
| | | | **Total** | .00 |

| | |
|---|---|
| **Authorized by:** | _____ |
| **Signed by** | _____ |
| **Dated** | _____ |
| **Invoice No.** | _____ |



HOLLAND
EXHIBIT 8

05/07/2024 01:48 PM

**PT00004**

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

NYEISHA S. GHEE,

      Plaintiff,

v.                                     Civil Action No.: 3:25-cv-17-RCY

PINETREE APARTMENTS, LLC,

      Defendant.

## PINETREE APARTMENTS, LLC'S SUPPLEMENTAL
## FINANCIAL INTEREST DISCLOSURE STATEMENT

Pursuant to Local Rules 5 and 7.1(B), Defendant Pinetree Apartments, LLC ("Defendant" or "Pinetree"), by counsel, files the following supplemental financial disclosure, stating the following in support:

1.      Local Rule 7.1(B) requires that parties in a diversity case "name and identify the citizenship of every individual or entity whose citizenship is attributable to that party or intervenor[.]"

2.      A limited-liability company has the citizenship of each state where its members are citizens. *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 121 (4th Cir. 2004). For cases removed based on diversity jurisdiction, diversity is measured both when the state-court action is commenced, and when the state-court action is removed. *Rowland v. Patterson*, 882 F.2d 97, 99 (4th Cir. 1989) (en banc) (explaining that "diversity must have existed both at the time the action was originally commenced in state court and at the time of filing the petition for removal" (citing 14A Charles A. Wright et al., Federal Practice and Procedure § 3723, at 311–14 (1985)).

3.      In this matter, Defendant is now, and was at the time of filing of the Complaint, a limited liability company. Its sole member now, and at the time of filing the Complaint, is

Clearfield/Pinetree Apartments LLC ("Clearfield"). Clearfield's members now, and at the time of filing the Complaint, are individuals, and they reside outside of the Commonwealth of Virginia. Thus, Defendant is not a citizen of Virginia for purposes of diversity jurisdiction.

4.      The names and citizenship of Clearfield's members are identified in **Exhibit A**, filed herewith, which Defendant moves to file under seal.

5.      As shown in **Exhibit A**, the following are the states of citizenship for each of Clearfield's investors: Florida, Illinois, Louisiana, Maine, Massachusetts, New Jersey, New York, Tennessee, and Washington, as well as Puerto Rico and China.

6.      As none of Clearfield's members are residents of Virginia, Defendant is not a citizen of Virginia for the purposes of diversity jurisdiction. *See* 28 U.S.C. §1332(a).

7.      If any question arises regarding the propriety of the removal of this action, Defendant respectfully request the opportunity to conduct jurisdictional discovery (if necessary), file a brief, and present oral argument to confirm that this Court has jurisdiction and that this case has been properly removed.

WHEREFORE, for the foregoing reasons, as well as the reasons stated in the accompany Motion and Memorandum in Support to File Exhibit A to the Supplemental Financial Interest Disclosure Statement Under Seal, and for any reasons stated at any hearing on this matter, Defendant Pinetree Apartments, LLC, moves this Court to file **Exhibit A** under seal.

This 24th day of January, 2025.

**PINETREE APARTMENTS, LLC**


By:   ___*/s/ Joseph P. Moriarty*_____
        Joseph P. Moriarty (VSB No. 68465)
        Kevin M. Kennedy (VSB No. 75071)
        Bryn L. Clegg (VSB No. 96923)
        WILLCOX & SAVAGE, P.C.

2

440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510-2243
Telephone: (757) 628-5500
Facsimile: (757) 628-5566
jmoriarty@wilsav.com
kkennedy@wilsav.com
bclegg@wilsav.com
*Counsel for Defendant*
*Pinetree Apartments, LLC*

## CERTIFICATION

I hereby certify that on this 24th day of January, 2025, I electronically filed the forgoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Charles H Cuthbert, Jr., Esquire
Richard M. Cuthbert, Esquire
Cuthbert Law Offices, P.C.
220 North Sycamore Street
Petersburg, VA 23803-3228
Telephone:  804-733-3100
Facsimile:  804-732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com
*Counsel for Plaintiff*

*/s/ Joseph P. Moriarty*
Joseph P. Moriarty (VSB No. 68465)
Kevin M. Kennedy (VSB No. 75701)
Bryn L. Clegg (VSB No. 96923)
WILLCOX SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510-2243
Telephone: (757) 628-5500
Facsimile: (757) 628-5566
jmoriarty@wilsav.com
kkennedy@wilsav.com
bclegg@wilsav.com
*Counsel for Defendant*
*Pinetree Apartments, LLC*

3

# EXHIBIT 14

## PINETREE APARTMENTS

**PETERSBURG, VIRGINIA**

**MANAGEMENT AGREEMENT**

**BY AND BETWEEN**

**PINETREE APARTMENTS LLC
("OWNER")**

**AND**

**REALTY MANAGEMENT SERVICES, INC., D/B/A ROSS MANAGEMENT
SERVICES
("MANAGER")**

**DATED AS OF JANUARY 1, 2017**

G-SDT-ROSS 000025

**IN WITNESS WHEREOF,** the parties hereto have caused this instrument to be executed and delivered, as of the day and year first above written.

OWNER:

**PINETREE APARTMENTS LLC,** a Virginia limited liability company

By:
Name:          Gideon Z. Friedman
Its:                    Manager

MANAGER:

**REALTY MANAGEMENT SERVICES, INC., D/B/A ROSS MANAGEMENT SERVICES**

By:
Name:     DAVID MISROVICH
Its:             C.EO

G-SDT-ROSS 000045