**In the Matter Of:**

NYEISHA S. GHEE vs PINETREE APARTMENTS

**NADRA YOHANNES**

*January 06, 2026*



IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF VIRGINIA
Richmond Division
*********************************************************

NYEISHA S. GHEE,

                Plaintiff,

v.                     Civil Action Number
                            3:25-cv-17-RCY

PINETREE APARTMENTS, LLC,

                Defendant.
*********************************************************

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

NADRA YOHANNES

January 6, 2026

HALASZ REPORTING & VIDEOCONFERENCE

1011 East Main Street, Suite 100

Richmond, Virginia 23219

(804) 708-0025

STENOGRAPHICALLY REPORTED BY: GWENDA APPLEGATE, RMR-CRR

Page 2

Videotaped Videoconference Deposition of NADRA YOHANNES, taken and transcribed on behalf of the Plaintiff, by and before Gwenda E. Applegate, Registered Stenographic Court Reporter, Notary Public in and for the Commonwealth of Virginia at large, pursuant to the Federal Rules of Civil Procedure, and by Notice to Take Depositions; commencing January 6, 2026, by audiovisual means.

APPEARANCES OF COUNSEL:

        THE KRUDYS LAW FIRM, PLC

        919 East Main Street, Suite 2020

        Richmond, VA  23219

        mkrudys@krudys.com

By:  MARK J. KRUDYS, ESQ.

        -- and --

        CUTHBERT LAW OFFICES

        220 North Sycamore Street

        Petersburg, VA  23803

        ccuthbert@cuthbertlaw.com

By:  CHARLES H. CUTHBERT, ESQ.

        Counsel for the Plaintiff

Page 3

APPEARANCES OF COUNSEL CONT'D:

        WILCOX & SAVAGE

        440 Monticello Avenue, Suite 2200

        Norfolk, VA  23510

        kkennedy@wilsav.com

By:  KEVIN M. KENNEDY, ESQ.

        Counsel for the Defendant

ALSO PRESENT:  MARC LANGELIER, CLVS

Page 4

                I N D E X
WITNESS:
  NADRA YOHANNES
    Examination by Mr. Krudys ................7

                E X H I B I T S
NUMBER          DESCRIPTION:          MARKED:
Exhibit 158 Team Member List .................18
Exhibit 149 Defendant Pinetree Apartments ....56
            First Supplemental Answers to
            Plaintiff's First Set of
            Interrogatories

Exhibit 2   Photograph of Plaintiff and ......65
            child
Exhibit 5   Affidavit of Donisha Bugg ........67
Exhibit 6   Addendum to Affidavit of .........68
            Donisha Bugg

Exhibit 11  Work Order 693151 ................71

Exhibit 10  Work Order 693150 ................77

Exhibit 12  Pinetree 002756 Video ............78

Exhibit 14  Apartment Lease Contract .........81
            6/1/2022
Exhibit 15  5/1/2023 Lease Agreement .........82
Exhibit 16  Schematic of Apartment G8 ........85
Exhibit 17  Overview of apartment complex ....87
Exhibit 19  Email exchange between Allen .....89
            and Arruda

Page 5

            E X H I B I T S (Cont'd)
NUMBER          DESCRIPTION:          MARKED:
Exhibit 20  Kimberly Jones complaint on ......95
            3/4/2020

Exhibit 21  Complaint from Rose, Apartment ...97
            L8
Exhibit 22  T. Rose complaint of 1/6/2021 ....101
Exhibit 138B William Norris counseling .......104
            form

Exhibit 24  7/21/2020 message from Holly .....108
            Johnson
Exhibit 25  Video ...........................112
Exhibit 28  Pinetree002922 and 002924 ........113
Exhibit 30  9/8/2020 Email from Norris to ....114
            Yohannes

Exhibit 31  10/18/2020 Service Request .......118
            from T. Rose
Exhibit 32  11/14/202 Email from .............121
            Lewis-Davis to Pinetree
            Manager
Exhibit 33  11/11/21 Email to Yohannes .......124
            from Pinetree Manager

Exhibit 34  11/23/20 Email to Yohannes .......125
            from Pinetree Manager
Exhibit 3   Photograph of Plaintiff ..........126
Exhibit 35  9/24/23 Service Request by .......129
            Hester Graves

Exhibit 37  11/1/23 Work Order Apartment .....130
            F8
Exhibit 38  1/18/24 Work Order for ...........131
            Apartment F1

Page 6

E X H I B I T S (Cont'd)
NUMBER          DESCRIPTION:          MARKED:

Exhibit 53  2/5/21 Work Order for ............133
            Apartment F6

Exhibit 54  Photograph marked 002960 .........134

Exhibit 55  PestNow invoice of 2/17/2021 .....134

Exhibit 57A Customer Work Order Bates ........135
            005363
Exhibit 57B MBS Construction Services .......136
            Invoice 1031231

Exhibit 57C 11/23 Email from Yohannes to .....137
            S. Robinstein
Exhibit 44A PestNow Letter of 2/25/2019 ......139
Exhibit 44B February 2019 Email string .......141
Exhibit 44C 3/14/2019 Email ..................149
Exhibit 44D Photos Pinetree 005421-5424 ......152
Exhibit 42A Schematic layout of apartments ...155
Exhibit 44  PestNow Invoice and Work Order ...157
Exhibit 45  PestNow Invoice of 3/13/19 .......158
Exhibit 50A 5/17/19 Email string - Bates .....160
            Pinestree005435

Exhibit 51  5/6/2020 PestNow Invoice .........162

Exhibit 51A 7/2020 Email .....................165

Exhibit 68  Vanessa Schane Affidavit .........167

Exhibit 93  Invoice Register .................171

Exhibit 1   Photo marked 712 .................175

Page 7

(January 6, 2026, 9:31 a.m.)

        THE VIDEOGRAPHER:  Today is January 6th, 2026.  We are going on the record at 9:31 a.m.  Please swear in the witness.

                NADRA YOHANNES
        first duly sworn, testified as follows:
            E X A M I N A T I O N
BY MR. KRUDYS:
    Q    Okay.  Good morning.  My name is Mark Krudys, and I'm going to take your deposition today.  Present with me is Charlie Cuthbert.  You met him previously.
        Could you please state your full name.
    A    Nadra Wynter Yohannes.
    Q    All right.  Can you kindly spell your first name?
    A    N-A-D-R-A.
    Q    And Winter is spelled like the season?
    A    No, it's winter with a Y.
    Q    Oh, could you spell that for us, please.
    A    W-Y-N-T-E-R.
    Q    Oh, okay.  Thank you.

Page 8

    Q    And then could you kindly spell Yohannes?
    A    Y-O-H-A-N-N-E-S.
    Q    Have you ever gone by any other names?
    A    Yes.
    Q    What --
    A    Nadra Mays.
    Q    And how do you spell that?
    A    M-A-Y-S for the last name.
    Q    All right.  And at one point it was Nadra Mays Yohannes; is that correct?
    A    No, just Nadra Mays.
    Q    Okay.  All right.  When did your name change to Yohannes approximately?
    A    2014 I believe.
    Q    Okay.  All right.  That's good.
        Have you ever had your deposition taken before?
    A    No.
    Q    Okay.  I -- so as you can see, I'm dressed in a suit just like we would be in court, as is Mr. Kennedy.  You're under oath in connection with your testimony here today.  We don't have a judge to rule on any type of objections, but this proceeding carries the same solemnity and obligations of truthfulness as a trial.

Page 9

    Q    Do you understand that?
    A    Yes.
    Q    Okay.  Are you represented by counsel today?
    A    Yes.
    Q    And who is your counsel?
    A    Kevin Kennedy.
    Q    Is -- has -- did you retain him, or do you understand that he works for Pinetree Apartments and other entities?
    A    I understand that he works for Pinetree and other entities.
    Q    All right.  And are you paying him separately for his representation?
    A    I am not.
    Q    So you -- do you understand that Pinetree and/or other entities are providing his compensation?
    A    Yes.
    Q    Okay.  And you're receiving representation free of charge by Pinetree and/or other entities; is that right?
    A    Yes.
    Q    Okay.  Now, I don't want to know about any communications you had with Mr. Kennedy, but I just want to just generally know, how much time have you

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026

Page 10

put into the preparation for your deposition today?

A    Outside of my communication with Mr. Kennedy, none.

Q    Okay.  Have you reviewed any documents in preparation for your deposition today?

A    No.

Q    And any videos?

A    No.

Q    Have you spoken with anyone else in preparation for your deposition other than Mr. Kennedy or any of his legal colleagues?

A    No.

Q    Have you spoken with -- you have not spoken -- well, let me ask this question.
     When did you last speak to Ebone Gamby?

A    I don't recall.

Q    When did you last speak with J'Keia Williams?

A    I don't recall.

Q    When did you last speak with Crystal Spruill?

A    I spoke with Crystal approximately two weeks ago.

Q    And what did you speak about?

A    We're a part of a friends group.  We were

Page 11

having our Christmas brunch.

Q    She's a -- she previously had worked for South Oxford Management, like you; is that right?

A    Correct.

Q    Are there any other friends in that group besides Ms. Spruill?

A    Yes.

Q    Who else is in that group?

A    They are not employees or were they ever employees of Pinetree.

Q    Were they ever employees of South Oxford Management?

A    No.

Q    Okay.  So they're -- what you're saying is there are other individuals that are members of that group, but they share no connection with your former employment.  It's only Crystal Spruill that's a former colleague; is that right?

A    Correct.

Q    Okay.  And how -- just generally, how many members are there of this group?

A    There's about five of us.

Q    Is it -- is it like a public face group or is it a private chat group?

A    We're just friends who know each other.

Page 12

Q    Okay.  All right.

A    And we -- we get together several times a year to celebrate birthdays, Thanksgiving.

Q    Where does -- where does Ms. Spruill live currently?

A    I believe she lives in the Richmond area.  I don't know her exact address.

Q    Do you know who she works for now?

A    Yeah.  She works for Gates Hudson.

Q    And what is Gates Hudson?

A    It's a property management company.

Q    And it sounds like you work for a property management company now too; is that right?

A    Yes, I do.

Q    Okay.  Who do you work for?

A    Gates Hudson.

Q    Okay.  And do you -- do you manage the same properties or does she have a different area than you?

A    She's in a different portfolio.

Q    Okay.  And where is your portfolio and where's hers?

A    She's a property manager so she manages, my understanding it's Ingalls site.

Q    Okay.

Page 13

A    I have a portfolio that stretches from Charlottesville to Chesapeake, Virginia.

Q    Okay.  And that's kind of the similar type of work you had when you were with South Oxford Management; is that right?

A    Correct.

Q    All right.  I was going through a list of folks and as to when you last spoke with them.  Did you ever speak to Crystal Spruill about this case?

A    No, we didn't have any discussion regarding this case.

Q    Okay.  Well, do you -- do you know if her deposition is going to be taken in this matter?

A    No, I don't know.

Q    Had -- did you ever discuss the --

A    I'm sorry.  Do you mind just one moment?

Q    Yeah.

     (Pause)

     THE VIDEOGRAPHER:  Should we go off the record, Mark?

     MR. KRUDYS:  I think she's done.

     THE VIDEOGRAPHER:  Okay.

Page 14

BY MR. KRUDYS:

Q    All right.  So --

A    I'm sorry about that.  That's work.

Q    So as I told you, this is a legal proceeding.  And so like if we were in court, you know that a judge would not permit that.  So could you kindly turn off your phone during the rest of this deposition, please.

A    Sure.

Q    Okay.  Thank you.

     All right.

A    Okay.

Q    So do you know if -- did you know that Ms. Spruill is going to have her deposition taken?

A    I don't know.  I would assume so but I don't know.

Q    All right.  Have you sent any e -- have you sent any e-mails to Ms. Spruill, or texts concerning this case or Ms. Ghee's injuries or the death of her son?

A    No.

Q    Okay.  So your testimony is that you have not spoken with Crystal Spruill about this case in any way?

A    No.

Page 15

Q    Okay.  How about Kaitlin Fatone, do you know her?

A    Yes.

Q    All right.  When did you last speak with her?

A    I don't recall the exact date.  However, she did give me a phone call to let me know that I was going to be contacted by Mr. Kennedy.

Q    And when did she contact you and give you that call?

A    It was within the past few months.

Q    So you -- do you -- are you still on speaking terms with her or did you get that call out of the blue?

A    Out of the blue.

Q    Okay.  How about Tracy Arunda.  She was your former report-to; right?

A    Tracy Arruda.

Q    Arruda?  I apologize for mispronouncing it.

     She was somebody you previously reported to; correct?

A    Correct.

Q    All right.  When did you -- when have you last spoken with her?

A    I haven't spoken to her in over two years.

Page 16

Q    How about Dan DeStefano, when did you last speak with him?

A    In over two years.

Q    Same question for Rob Glass.

A    Same.  Over two years.

Q    Same question for Gideon Friedman.

A    The same.  Over two years.

Q    And finally -- no, actually, two more names.

     Amir Hazan, when did you last speak with him?

A    It would be the same.  Over two years.

Q    And Ethan Vaisman, or V-A-I-S-M-A-N, when did you last speak with him?

A    I don't even recall.

Q    Okay.  But do you know that name?

A    Yes.

Q    Okay.  All right.  So the folks that I spoke with [as spoken], who do you understand Tracy Arrunda to -- Arruda to have worked for when you were employed at South Oxford Management?

A    I understood that she was the senior vice president for South Oxford Management.

Q    And did you -- did you understand that Dan DeStefano was an employee of Beachwold Residential?

Page 17

A    I did.

Q    Did you understand that Rob Glass was an employee of Beachwold Residential?

A    Yes.

Q    Did you understand that Gideon Friedman was the chief executive officer of Beachwold Residential?

A    Yes.

Q    Did you understand that Amir Hazan was the chief investment officer, a principal of Beachwold Residential?

A    Yes.

Q    And what -- do you have an understanding as to -- well, did you understand Ethan Vaisman to be the director of investments at Beachwold Residential?

A    I don't recall what -- what his exact title was, but I know he was employed by Beachwold.

Q    Okay.  Do you know Beverly Ferguson?

A    Yes.  She was the president of South Oxford Management.

Q    How about Chuck Rubinstein?

     He may not have been there at the time. He's general counsel right now.

     Do you recall who the general counsel was at the time you were there?

A    No, I don't.

Page 18

Q    Okay.  Does that name, Chuck Rubinstein, is that familiar with you?

A    It sounds familiar, but I don't think that's someone I was -- I had conversations with.

Q    I understand.

So I'm going to -- actually, Marc is going to pull up an exhibit and show it to you.

MR. KRUDYS:  Marc, could you pull, please pull up Exhibit 158, Plaintiff's 158?

Is Marc there?  Oh, there, you are.

THE VIDEOGRAPHER:  (Complies).

(Plaintiff's Deposition Exhibit 158 was marked for identification)

BY MR. KRUDYS:

Q    All right.  This -- these are team members for Beachwold Residential and other entities on their website.

I asked you about Gideon Friedman, Amir Hazan, Beverly Ferguson and Chuck Rubinstein.  We talked about Dan DeStefano.

How about Bud Fagerli, do you know him?

A    I've seen the name but I'm not familiar with him.

Page 19

Q    Okay.  It says chief financial officer.  Did you -- oftentimes they refer to that as the CFO.

Did you -- did you know who the CFO was, of Beachwold was?

A    I don't recall.

Q    Ann Marie Kivo, did you ever have any contact with her?

A    Not professionally.  I did not report to her.

Q    What -- what did you understand -- was she -- so she has the same title as Tracy Arunda?

MR. KRUDYS:  Marc, is there a way you can make the two of them bigger, Ann Marie Kivo and Tracy Arunda, and the little blocks between them, below them?  Okay.

BY MR. KRUDYS:

Q    So they share the same title, executive vice president of South Oxford Management.

A    Uh-huh.

Q    But this is a current website.

Do you understand -- well, did -- was Ms. Kivo have that same position at the time that you worked for South Oxford Management, or was she -- did you understand she had a different position?

A    I -- I don't recall whether she was a

Page 20

regional vice president or an executive vice president.  I do know she was a vice president.

Q    Okay.  Well, you know, right now she has the same title as Tracy Arruda.  But back then when you worked there, you understood that she had a different title than executive vice president.  Is that right?  Did I get that right?

A    No.  I can't differentiate what her title was.

Q    Okay.

A    I didn't report to her so I paid no attention.

Q    Okay.  I understand.

And if we go back to that large page, Marc.

Toward the bottom, Theresa Purcell, do you know her?

A    I believe she, yes, she worked in risk management.

Q    For which entity, Beachwold Residential or South Oxford, or were they -- did they just blend in, were basically the same?

MR. KENNEDY:  Object to the form.

THE WITNESS:  I'm -- I'm not sure.

BY MR. KRUDYS:

Q    All right.  How about Deborah Farahmand,

Page 21

did you know her?

A    No.

Q    All right.  Going to the next page, Marc, here are some other individuals listed.

Do you -- and let me just read off the names, Erica Gerkman, Jake Richman, Mitch Shapiro, Sasha Rubinstein, Jennifer Roberts, Jacqueline Chiffriller, Nata Tsitsvidze, Dylan Topaz and Jennifer Negro?

And the Nata name was T-S-I-T-S-V-I-D-Z-E.

Do you recognize any of those individuals?

A    I recognize Mitch Shapiro and Jennifer Roberts.

Q    Let's talk about Mitch Shapiro first.  Director of asset management is his title.  Did you understand he was the director of asset management for Beachwold Residential?

A    I believe when I was employed with the company, he was just an asset manager.

Q    Just an asset manager with which -- with which company?

A    With Beachwold.

Q    Okay.  When you -- we -- I've seen two different Beachwold entities named, actually three; Beachwold Residential, Beachwold Holdings and

Page 22

Beachwold Partners.

Did you -- did you know of those three entities at the time or did you just know of Beachwold, the name itself, or Beachwold Residential?

In other words, what did you understand to be the entity or entities related to Beachwold?

A    I only knew of Beachwold.

Q    Okay.  So like Beachwold would be a generic name that would be used, and you're not sure if it was Beachwold Partners, Residential, or Holdings that would be utilized; is that right?

A    That's correct.

Q    All right.  So this is the website for, it says "Our Team of Beachwold."  And if we go to the first page, so Ann Marie Kivo and Tracy Arruda as well as Beverly Ferguson, they're actually employees, as you understand it, of South Oxford Management, not Beachwold Residential; correct?

A    Correct.

Q    All right.  So is that how it was when you were there, that the -- that the -- the team that would work together was a collection of people that were with South Oxford Management as well as Beachwold?

MR. KENNEDY:  Object to the form.

Page 23

THE WITNESS:  No, that was not my understanding.

BY MR. KRUDYS:

Q    All right.  What was your understanding then?

Because this lists South Oxford Management folks as all being team members along with Beachwold Residential.  Was that not the case at the time?

A    Not to my understanding.

Q    Okay.  But did you understand generally that Beachwold owned the properties and South Oxford Management managed them?

A    That was my understanding.

Q    Okay.  And then was Beachwold Residential or Beachwold referred to as management or ownership?

A    No.  They were referred to as Beachwold.

Q    Okay.  We were talking just briefly about Mitch Shapiro, asset management.  And then Jennifer Roberts, it says on this that she's a director of tax credit compliance.

What did you understand her role to be?

A    She headed the compliance department or -- so she oversaw, like, utility allowances.

Q    And what else, like the tax credits for the property?

Page 24

A    I had very little interaction with her on a day-to-day basis so I don't know what her -- the entirety of her job functions were.

Q    All right.  Who do you understand -- like, for instance, Pinetree Apartments at a period of time was up for sale while you were working there; right?

A    Correct.

Q    All right.  So who do you understand, of these folks that I've showed you, were involved with the purchase and/or sale of properties?

Would that be like Friedman?  Hazan?  Who were the ones that -- or Mitch Shapiro?  Who were the ones that were dealing with, as you understood it from your perspective, buying the properties and/or selling the properties?

A    I don't know the details of who the individuals were that were involved.

Q    Well, there's -- there's folks that you know that managed the properties.  Were there any of the persons that you identified that had a role beyond managing the properties?

A    Could you clarify your question?

Q    Yeah.  Well, like the purchase and sale of properties, can you identify anybody that was involved with the purchase and sale of properties?

Page 25

A    My understanding is when it comes to the purchase or the sale of the property, the individuals directly involved with that would be from the Beachwold team.

Q    Okay.  And when -- when you refer to the Beachwold team, who -- who are you referring to?

A    That would be Gideon, Amir, Chuck, and any other members of their team involved in acquisitions and finance.

Q    All right.  So when you say Gideon, Amir and Chuck, you're referring to Gideon Friedman, Amir Hazan, and Chuck Rubinstein?

A    Correct.

Q    Okay.  All right.  Did you know who -- do you know if -- if Pine -- so there's -- there's the physical apartments themselves, Pinetree Apartments in Petersburg, but there's also this entity Pinetree Apartments, LLC.

Do you know anything about that entity, Pinetree Apartments, LLC?

A    I don't recall, no.

Q    Did you -- did you work for that entity?

A    I'm sorry?

Q    Did you work for that entity?  Were you an employee of that entity?

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                    Pages 26..29

Page 26

A    No.

Q    Okay.

A    I was an employee of South Oxford Management.

Q    Do you know anybody that was an employee of Pinetree Apartments, LLC?

A    No.

Q    Okay.  Do -- do you know who performed accounting services for Pinetree Apartments, LLC?

A    No.

Q    Do you know who made legal decisions for Pinetree Apartments, LLC?

A    No.

Q    Do you know who handled like property management insurance, paying the premiums for, I'm not -- I'm now going to say Pinetree Apartments, the building itself.

Do you know who paid the insurance to -- the property and casualty insurance for Pinetree Apartments during the time that you worked there?

A    No, I don't recall.

Q    Do you -- do you know anybody that made any daily operational decisions with regard to Pinetree Apartments other than South Oxford employees?

A    No.

Page 27

Q    Okay.

MR. KRUDYS:  Marc, you can take this down.

BY MR. KRUDYS:

Q    And the reason I take this down from time to time, so you can see me better and the like, and so that Gwenda, our reporter, can better see you to take down what you're saying.

Now, Pinetree Apartments was -- it's sometimes referred to as Section 8 housing; is that correct?

A    No, it's not Section 8 housing.

Q    Okay.  Did it have Section 8 tenants?

A    It had tenants with Section 8 vouchers.

Q    Okay.  So how -- how should we refer to those tenants?  Would it be tenants with Section 8 vouchers?  Is that how you guys would refer to them?

A    Yes.

Q    Okay.  And what was the percentage of persons with Section 8 vouchers living at Pinetree at the time that you worked there?

A    I don't know.

Q    During what period of time did you work for Pinetree -- I mean for South Oxford Management?

A    2019 to I believe December of 2023.

Q    So there's a --

Page 28

MR. KRUDYS:  Marc, if you --

BY MR. KRUDYS:

Q    So I've been told, I received a document that said that you worked there from May 20th of 2019 to January 12th of 2024.

Does that mesh with your understanding?

A    '24, '25, we're in '26.

That could be right.

Q    All right.  Was it a situation where -- you know how like folks give their notice and then sometimes they have time off and so they don't actually have to work for them?

Might it have been a situation where you gave notice in December and then you were formally paid like the first 12 days of January, but you actually didn't work for them during that period of time?

A    That could have been the case, because when I left, I did get paid out vacation days.

Q    So I understand you went to another position, left for another position.  Was that your current Gates Hudson job that you left for?

A    No.

Q    Where did you go to?

A    I went to BLDG Partners.

Page 29

Q    And is that another property management firm?

A    It's an ownership investment group.

Q    All right.  What period of time did you work for BLDG?

A    I was with BLDG January of '24 through September of 2025.

Q    And then you left -- did you go to any other entity before joining Gate Hudson?

A    No.

Q    And is it Gates with an "S" at the end or Gate with an "E" at the end?

A    It's Gates with an "S."

Q    Okay.  Why did you leave South Oxford?

A    I had the opportunity to become an asset manager with BLDG Partners and so I took it.

Q    When did you first consider leaving South Oxford Management?

A    I couldn't give you an exact date.

Q    Let me -- let me do it this way.

What -- did you ever share with any of your colleagues at South Oxford that you were thinking of leaving before you actually announced that you were leaving?

A    I don't recall.

Page 30

Q   Did you have like a work buddy, somebody -- who was the closest person you were with when you worked for South Oxford Management.

A   I wouldn't say the closest person, but I was friendly with some of the employees, for instance Crystal.

Q   And, and -- and she remains your friend through that you have; correct?

A   Correct.

Q   All right.  Where were you physically working when you worked for South Oxford Management?

A   I worked primarily remotely.

Q   But where -- does that mean you worked in your home?  Is that right?

A   I had an -- a home base for a portion of that time.  Initially I was based in Newport News out of our Cottage Grove office.

Q   Who else was working at the Cottage Grove office?

A   I don't recall.  That was years ago.

Q   All right.  And then -- and then was that office shut down or did you just kind of migrate to working at home?

A   The property was sold.

Q   Okay.  So what I -- what address did you

Page 31

physically work at during the time that you were employed with South Oxford from May of 2019 through January of 2024?

A   I would have to look up the -- the physical address of Cottage Grove Apartments.  My office was based there up until that property was sold, I believe maybe in 2022.

Q   All right.  And then from 2022 to leaving in '24, where did you work out of, your home?

A   Correct.

Q   And what was your home address at the time?

A   9478 Astilbe Lane --

Q   Can you --

A   Toano.

Q   Can you kindly spell Astilbe Lane?

A   A-S-T-I-L-B-E.

Q   And that's, you said Toano, like --

A   Correct.

Q   Okay.  Just west of Williamsburg; is that right?

A   Yes.

Q   Okay.  Is that where you live now?

A   Yes.

Q   Okay.  Tell us a little bit about yourself.  What area of the country did you grow up

Page 32

in?

A   I did not grow up in this country.

Q   What country did you grow up in?

A   Jamaica.

Q   I've been there about 25 years ago, enjoyed it very much.

Where did you go to high school?

A   Jamaica.

Q   And did you attend any schooling in the U.S.?

A   No.

Q   When did you emigrate to the U.S.?

A   1996.

Q   Are you a U.S. citizen?

A   Yes.

Q   When did you gain your citizenship?

A   I don't recall the year but it was in time to vote for President Obama.

Q   Okay.  And -- and that was his first or second election?

A   First.

Q   Okay.  Do you have any type of specialty licenses?  Like there's a residential building, RBC type license.  Do you have any of those?

A   No.

Page 33

Q   Okay.  Tell us about -- so the entire time that you were at South Oxford Management, you had the title of regional manager; is that right?

A   Correct.

Q   Could -- what was your region?

A   I had a property in North Chesterfield, two properties in Colonial Heights, one in Petersburg and one in Newport News.

Q   Oh.  So was the Newport News one the Cottage Grove that you referred to?

A   Correct.

Q   And then the Petersburg was Pinetree Apartments?

A   Correct.

Q   What was the North Chesterfield apartment complex?

A   The Bend At 4800.

Q   Okay.  And what -- what were the two properties in Colonial Heights?

A   Clearfield and Maddox Landing.

Q   Have you ever heard of an entity called Clearfield, LLC?

A   I don't remember.

Q   Do you recall an entity called Clearfield Pinetree, LLC?

Page 34

A   No.

Q   Did you understand for all these properties that you've identified, the one in Chesterfield, the two in Colonial Heights, one in Petersburg and one in Newport News, that all of those entities were owned by Beachwold?

A   That was my general understanding.

Q   And we know that Pinetree had Ross Management for a period of time and then it switched over to South Oxford Management.

You worked for South Oxford Management the whole time.  You did not formally work for Ross; is that right?

A   Correct.  I did not work for Ross.

Q   Okay.  So do you understand that -- and I think it's -- it's evident, but let me just ask the question, that South Oxford Management managed the properties that I refer -- that you just referred to at the same time that Beachwold owned them; is that right?

A   Correct.

Q   Okay.  Do you -- so at one point Pinetree was under the management of Ross or Ross Management or Ross companies, and then it switched over to South Oxford Management.

Page 35

Is it your understanding that that happened with multiple properties or just with Pinetree?

A   Multiple properties.

Q   Okay.  Did it all happen at the same time or at different times?

A   I believe it all happened at the same time.

Q   All right.  Do you know how many -- let me do it this way.

Do you know how many properties across the country switched over at the time?

A   No, I don't.

Q   Okay.  Do you know when the switch occurred?

A   I believe the switch occurred in 2019 on or about the time I came onboard.

Q   All right.  Well -- okay.  And who hired you?  Who is the person that hired you?

A   I was recruited by Tracy Arruda.

Q   Did you know her prior to you -- her recruiting you?

A   Yes.

Q   How did you know her?

A   She was part of the ownership group when I worked for Village Green Apartments in Chicago.

Q   And what period of time was that?

Page 36

A   '19 -- maybe 20 -- sometime around 2016.

Q   Okay.  Let me just back up and make sure I get this.

I'm sorry, you said you emigrated to the U.S. in -- what year was that?

A   1996.

Q   All right.  Let me just ask a general question.

Did you work for a whole number of companies from between 1996 and the time you worked for Village Green, or was it just a few companies?

A   I don't remember.  I was 19 years old.

Q   Okay.  Well, let's do it this way.

A   Can -- I'm sorry.  Could you clarify relevance?

Q   Well, I'm just -- just background for like which persons you knew that are associated with this.

Let me -- let me ask --

A   Okay.

Q   -- the question like this.  When did you first get in the property management area?

A   In property management, early 2000s.

Q   Okay.  And just generally, I don't want to be probing, but I just kind of --

A   Okay.

Page 37

Q   In the previous life, were you -- I mean, before you got into property management, were you a teacher?  Did you work in food services?  What did you do prior to getting into property management?

A   I worked for MBNA America.

Q   What -- and what is that?

A   A credit card company.

Q   Okay.  All right.  So in the -- was it -- was -- you worked in property management in a variety of capacities or places prior to Village Green in Chicago; is that right?

A   Correct.  Yes.

Q   All right.  Do you know of anybody else that I showed you the pictures of, "our team members," that you worked with previously other than Tracy Arruda?

A   No.

Q   Okay.  When you worked for -- when you worked at Village Green, Tracy Arruda was part of the ownership group of Village Green?

A   Village Green was the management company.

Q   Okay.

A   Tracy worked for the group that owned the property we managed.

Q   And do you know the name of that?

Page 38

A    I don't recall the exact name, no.

Q    Do you know if she had any connection with that ownership group with any of the team members that I showed you in Exhibit 158, Friedman, Hazan, Ferguson, all of those folks?

A    I don't know.

Q    Okay.  Who was -- when you worked for South Oxford Management, who was it that controlled -- or who was it that specified the budget for Pinetree Apartments and the other complexes that you were regional manager of?

A    The budgeting process was a collective effort.

Q    By whom?

A    And -- and finalized by the ownership group.

Q    All right.  When you say "the ownership group," who is that?

A    Finalized by Beachwold.

Q    All right.  So when you used the term Beachwold -- I mean ownership group, you're referring to Beachwold?

A    Correct.

Q    All right.  So is -- and you said that the budget process was a group of folks.

Page 39

Who besides the ownership group was involved with formulating the budget?

A    Essentially, I would get the preliminary information from the on-site team.  So I would get their input.  Then I would work on the budget, the budget spreadsheet itself.  That would then be sent to Tracy Arruda for her review.

It then went to Beverly for her review and then reviewed with the Beachwold team.

Q    So from Tracy Arruda to Beverly Ferguson, President of South Oxford Management, then on up to Mr. Friedman, Hazan and Rubinstein?

A    I -- I just know it went to the ownership group.  I don't know the exact individuals.

Q    All right.  But when you identify the ownership group at Beachwold, who would you identify besides Friedman, Hazan and Rubinstein as part of the ownership group?

A    Those would be the individuals that...

Q    Okay.  Do you know who owned Pinetree Apartments during the time that you served as regional manager?

A    I don't know the individual, no.

Q    Do you know the entity that owned it?

A    My understanding, that it was owned by

Page 40

Beachwold.

Q    Okay.  And had you ever heard of -- well, had you ever met any other persons in Gideon Friedman's family?  Like did you -- is he married?

A    I don't know.

Q    Did you ever meet anybody in his family like Lucy Friedman, Tanya, William Friedman, Samuel Friedman, or Ezra Friedman?

A    I don't know if they were at a company event.  I'm sorry but I don't recall.

Q    All right.  No, I understand.

Where -- have you been to company events before?

A    Yes.  They had company events.

Q    And what were the type of events that you attended?

A    We had our company holiday party, conferences, stuff like that.

Q    All right.  And where was that held?

A    There were several different locations.

Q    What other gatherings were there besides the company holiday party?

A    I -- I don't remember.  I'm sorry.  This was over two years ago.

Q    All right.  I understand.  But do you

Page 41

recall traveling to any locations for an event other than a holiday party?

A    Yes.  I had to travel to New York for the budget reviews.

Q    And how often were the budget reviews?

A    Once per year.

Q    All right.  And who ran the budget reviews?

A    I really can't say they were run by any one individual in particular.

Q    Well, remember how you were describing how it worked with the ownership group having final approval with regard to the budget?

Was Friedman, Hazan, or Rubinstein present at the budget meetings?

A    I don't remember if Rubinstein was present, but Friedman and Hazan were.

Q    All right.  Were they -- were they basically leading up the budget discussions?

A    There were several members from both Beachwold and South Oxford present.  The budget reviews were done in a conference room style setting.

Q    Okay.  How -- like how long did you -- would it -- would you deal with your portfolio of assets collectively or did you deal with each property?

Page 42

A    In what regard?

Q    Like when you're formulating a budget, do you have like a budget for the -- you had like six properties or so, or would you do them, each apartment complex, one at a time?

A    Each property had its own budget.

Q    Okay.  And how -- was the budget figured out on a per-apartment basis?  Is that what -- the way it was formulated?  Like, you know like how you -- how people price homes sometimes by square feet?  Is that how you did it, like a budget for each unit?

A    No.

Q    Okay.  So were there 144 units at Pinetree Apartments during the relevant period of time?  Is that right?

A    I don't recall.  I know it was under 200.

Q    All right.  I'll represent to you my understanding, 144.

A    Okay.

Q    So do you know what the approximate budget was per apartment unit?

A    No.

Q    All right.  Do you know what the approximate budget was for the complex itself?

Page 43

A    No.

Q    So you can't tell me if it's 300, 400, 500,000 at all, nothing like that?

A    I don't recall.  In that time, I have written and reviewed many, many budgets.

Q    All right.  So what did the budget cover?
Let me do it this way.  Would the budget cover things like cutting the grass, painting the interior of the apartments, things of that nature?

A    Yes.

Q    All right.

A    The budget would cover everything that a typical operating budget would cover:  Income, personal expenses, repair and maintenance, contract services, cap ex, all of that.

Q    So if -- so if an apartment complex -- I mean, if an apartment needs some paint and the like, that might be put down as a repair.  But how about if like -- as we know, we're going to go through some documents like MBS contractors and the like, ripping down the siding, taking down the plywood, replacing timbers on the inside.  Would that be part of the budget that would be set aside or would that be a separate expenditure outside of the budget?

A    That would typically be a separate

Page 44

expenditure.

Q    All right.  And do you know who paid that separate expenditure, what company?

A    All invoices would be processed and paid through the accounting department at South Oxford.

Q    All right.  But do you know what account South Oxford would use to pay it?

A    No, I don't.

Q    All right.  The -- who made -- who made decisions with regard to capital expenditures like this other -- like the separate improvements like we talked about like MBS?  Would that be something that Friedman, DeStefano and Rob Glass would be involved with deciding?

A    Capital expense would be approved by the ownership group.

Q    And when we defined that ownership group, is -- we're talking about Beachwold; right?

A    Correct.

Q    All right.  And the individual folks that make the decision, those would include Friedman, Hazan, DeStefano, Glass, and Shapiro; is that correct?

MR. KENNEDY:  Object to the form.

THE WITNESS:  Correct.

Page 45

BY MR. KRUDYS:

Q    All right.  Anybody else?

A    I don't know.

Q    Okay.  How are you doing with regard to time?  Do you need like a five-minute break?

A    No, I'm good.

Q    Okay.  Good.  Good.  Everybody has their own -- let me just, if I may, ask a question for our others.

MR. KRUDYS:  Mr. Kennedy, Gwenda and all, are you guys good?

MR. KENNEDY:  I'm good.

MR. KRUDYS:  Okay.  Thank you.  Thank you.

BY MR. KRUDYS:

Q    The company -- you know, most people get a transfer when they're paid.  Do you know who actually made your, paid your pay?  Was it South Oxford Management or some other entity?

A    South Oxford Management.

Q    All right.  Who paid for the budget of -- of Pinetree Apartments?

A    I'm sorry, I don't understand your question.

Q    All right.  So you have this entity Beachwold Residential and you've got another entity

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                    Pages 46..49

Page 46

South Oxford Management that manages the property and the like.

A   Uh-huh.

Q   Who paid South Oxford Management to do that managing of the property?  Was it Beachwold?

A   I would assume so.

Q   All right.  And, and what is that assumption based upon?

A   Based on the general practice that the ownership entity would hire a management company or a management agent to manage a property or a portfolio.  Those services come at a cost of a fee.  That fee would then be paid by the entity who hired the management agent.

Q   All right.  So the -- you -- was there a -- do you understand that there was a contract between Beachwold and South Oxford Management to perform management services at Pinetree Apartments?

A   I never saw such a contract.

Q   All right.  And that would basically -- the South Oxford Management and Beachwold were all kind of under the same umbrella of Gideon, Friedman, and Mr. Hazan; is that right?

MR. KENNEDY:  Object to the form.

THE WITNESS:  I -- yeah, I can't testify to

Page 47

that.

BY MR. KRUDYS:

Q   Okay.  Well, the budget that would be worked out is -- when the budgeting process was ongoing in New York, was it a situation where South Oxford would come up with a budget and present it to Beachwold, or would Beachwold be a part of and integrated in the discussion about the budget with people like Ms. Ferguson and Ms. Arruda and you?

A   It was our responsibility as South -- my responsibility, our responsibility, South Oxford responsibility as the management agent to create and present an operating budget on an annual basis for approval.

Q   All right.  And so would you -- would you -- would you have the budget already finalized when you went to New York, or was that something you would work out while in New York?

A   It would be finalized with regard to my entries to the budget.

Q   Can you better explain that to me?  What do you mean?

A   I would be finished working on the budget and we would be presenting it for approval.

Q   And how did you do that?  How did you know

Page 48

what approximately an appropriate budget was for Pinetree Apartments?

A   We could be here all day if I walked you through the -- the budgeting process.  But essentially, for any apartment, we begin by looking at the historical.  So we start with what we would call in the industry a T12, so past 12 months financials.  And then there are several calculations and projections that go into play.

Q   But is it basically a situation, Hey, we're going to get this much amount of money, X with regard to our rental income, and so the budget has to meet and fall within that amount of income that we will receive?

A   It's not that simple.

Q   But, I mean, that's, in essence, what is being done?

A   In essence, you start out by projecting this is what our occupancy is going to be.  And with that assumption, you also project how many units are going to turn over on a monthly basis, what are the projected costs to turn those units to make them market ready again.

Additionally, based on what's happened over the past 12 months or maybe 24 months if you have

Page 49

those historicals, what's happened at the community, and you extrapolate what's already been done and what may need to be done in the upcoming year.

Q   All right.  So if an apartment -- what was the -- like what was the -- just give me a range of what the two-bedroom apartment would go for or would rent for at Pinetree Apartments.  I know --

A   I don't remember.

Q   I mean, are we talking a thousand dollars, $2,000, or someplace in between?

A   I would think it would be someplace in between.

Q   All right.  So would it be -- let's just, can we pick out $1,500 as an approximate amount just for discussion purposes?  Is that okay with you?  Does that mesh appropriately?

A   I -- I -- I really don't like working with numbers that I -- I really can't.  This, this is me being under oath, and I don't want to assume --

Q   All right.

A   -- figures or anything.  If you have a number, if you have a budget that you want me to take a look at, I'm happy to do so.

Q   Well, let's do it this way.

Assume that the apartments go for, a two-

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                                                 Pages 50..53

Page 50

bedroom apartment goes for $1,500.  I -- if -- if I have a voucher for the apartments that I've gotten from, for instance, Virginia -- I mean Petersburg Rehabilitation and Housing Authority, would I be paying -- would the -- would the cost of my apartment be a combination of what I would pay and the voucher?  Is that right?

A    Well, regardless of the voucher or not, the rent charge is going to be the same across the board.

Q    Okay.  That was kind of my -- my question.

So the rent is the same across the board, and folks satisfy that rent either by paying it all themselves or a combination of their own money and their voucher; is that right?

A    Correct.

Q    All right.  Now, does -- did South Oxford -- now, to be a part of that voucher program, not every apartment complex in Virginia is a part of that voucher program; correct?

A    I believe that's incorrect.

Q    Okay.

A    But again, Pinetree was not a Section 8 designated community.

Any apartment community in Virginia, if presented or if there is a resident that applies and

Page 51

qualifies, regardless of whether or not they have a Section 8 voucher, if they qualify, would be rented an apartment.

The Section 8 voucher is covered under -- I can't quote the law right now, but source of income.

Q    All right.  Well, what I understand is Ms. Ghee went to PRHA, and they gave her a list of apartments that would accept their vouchers.

Did you understand that there was a list in the Petersburg area of apartments that would accept the voucher?

A    All jurisdictions have a list.

Q    Okay.  All right.  And so you -- do you know what percentage, rough percentage of residents at Pinetree -- or let's not say residents.  We'll say apartments -- how many apartments of the 144, this is an approximation, were being -- were -- were receiving or submitting vouchers?

A    Again, I don't recall.

Q    You don't know if it's 30 percent or 70 percent?

A    No, I don't.

Q    Okay.  All right.  Can you just tell us a little bit -- you told us about your budgeting activities, that you would go up to New York once a

Page 52

year.

And those -- those Christmas parties that you defined, would Friedman, Hazan, and Rubinstein be at those Christmas parties or holiday parties?

A    I -- I assume so.

Q    All right.  And would awards be given out to employees at those parties?

A    Yes, sometimes.

Q    All right.  And those awards would be presented by the ownership group?

A    I don't know.

Q    Okay.

A    I don't recall.

Q    But South Oxford employees would receive awards at those awards presentations?

A    Yes.

Q    And at those presentations, both Beachwold employees and South Oxford were collectively there; is that right?

A    I don't believe they were at every holiday party.  There are some holiday parties that they may have attended and others they may not.

Q    All right.  What was the last holiday party that you recall attending?

A    It may have been my last December there I

Page 53

think.

Q    And where was it at?

A    It was here in Richmond, but I don't -- I don't remember where.

Q    All right.  So who was -- so the -- the Richmond holiday party, was that -- did -- so, I'm sorry, I thought the holiday party you were referring to were taking place at places like Dallas, New York, Miami and the like.  But you're saying they were all local; is that right?

A    No.  South Oxford Management has properties all up and down the -- the country, so they have parties and meetings all over the place.

Q    Right.

A    I don't attend all of them.

Q    All right.  So at the holiday -- did you ever attend any national or eastern seaboard type meetings, holiday parties for South Oxford?

A    I don't think it was a -- I don't think that we call it a holiday party.  It's a conference.

Q    Okay.  Is that an annual conference?

A    Yes.

Q    All right.  And that -- would you always attend the annual conference?

A    For the time that I was there, I attended.

Page 54

Q    All right.  Where -- where were the locations for those conferences?

A    In Texas.  In Dallas I believe.

Q    All right.  Always in Dallas?

A    The ones that I attended.

Q    All right.  And whose headquarters are in Dallas?

A    South Oxford.

Q    All right.  Do you know where Beachwold Residential's headquarters is?

A    I believe it's in New York.

Q    All right.  Was -- at those annual conferences, was ownership present?

A    I believe they were at some.  I don't take attendance so I don't know.

Q    Yeah, but, I mean, it would not be unusual for Friedman, Hazan, Rubinstein to be present at that annual conference; correct?

A    No, it would not --

MR. KENNEDY:  Object to the form.

THE WITNESS:  -- be unusual.

BY MR. KRUDYS:

Q    All right.  Who would you say -- was there a particular person that generally ran that conference that would -- that put it altogether?

Page 55

A    I don't know who put it together.

Q    All right.  Would Gideon Friedman always speak at that conference?

A    Not to my recollection, no.

Q    Was -- did at least either Hazan or Friedman or Rubinstein, one of the three of them, speak at the conference, each conference?

A    I -- I don't remember.

Q    Okay.  Do you recall any speakers at the conferences?

A    They're typically speakers from different vendors that would come in.

Q    I see.  And vendors would be like PestNow, a termite extermination service; is that right?

A    No.  HV Supply, national vendors.

Q    I -- I see.  Okay.

Could -- can you -- how frequently did you visit Pinetree Apartments?

A    Approximately once per week.

Q    And who would you meet with when you went there?

A    Typically, the property manager.

Q    And what would you do while you were meeting with the property manager?

A    Review financials, occupancy, walk the

Page 56

community, any pressing issues.

Q    When -- when you talk about financials, what do you mean by that?  What financials?

A    The financial reports, so like the general ledger.

Q    Okay.  And there would be a separate general ledger for Pinetree Apartments from, for instance, Maddox Landing and the like; is that correct?

A    Yes.

Q    Okay.

MR. KRUDYS:  Marc, could you please pull up Exhibit Number 149, page 8, please.

(Plaintiff's Deposition Exhibit 149 was marked for identification)

BY MR. KRUDYS:

Q    All right.  So in this process, we would ask particular questions of Pinetree Apartments, LLC, and they would provide responses to us as part of the legal process.

A    Uh-huh.

Q    And here is a listing of community managers at the bottom under A.

Page 57

MR. KRUDYS:  Marc, would you kindly make that a little bigger so Ms. Yohannes could see it.

Great.  Thank you.

BY MR. KRUDYS:

Q    All right.  So this is a list of community managers at the apartments.  Is that another -- is that -- are community managers essentially the property managers?

A    Yes.

Q    Okay.  So there's five people listed: Booker, Mason, Spruill, Gamby and Brown.

A    Uh-huh.

Q    Do you recall those as the property managers that were present during the time that you served as the regional?

A    Yes.

Q    Okay.  And, I'm sorry, is your title -- what was your title, regional -- what were the other words associated with it?

A    The regional manager.

Q    Manager.  Okay.

So there -- this shows the dates at which each one was there.  And I notice that Spruill is employed from October of '22 to '24, and Mason goes

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026

Page 58

up to 4/20 -- 4/20/22.  Do you see that?

A    Uh-huh.

Q    All right.  Now, let's first talk about Tori Booker.  She's just there for a month.

Did she move to like another South Oxford property?

A    No, she did not.

Q    Okay.  Why was she -- why was she only employed there for a month?

A    If I recall, I believe she walked off the job.

Q    Okay.  Just -- just quit is what you're saying?

A    Yeah.

Q    All right.  Okay.  So is there -- was there any property manager from when she quit 6/15/2022 --

A    Uh-huh.

Q    -- up until October of 2022?

A    I don't believe so.

Q    All right.  So then when you would go once a week, who would you meet with during that period of time?

A    If we had a leasing agent or an assistant manager there, I'd be meeting with that person.

Now, sometimes for properties like this

Page 59

where there's a gap in staffing, I would also be assisting the site team.

Q    So what does that mean, to be assisting the site team?

During that time when you had no community manager, were you basically performing the role of community manager yourself?

A    I would have to invoice -- process invoices, things of that nature.

Q    All right.  So how -- does it -- do you need -- did you -- did it call for one property manager, one community manager, or did the property have two community managers at the same time?

A    The property typically would have a community manager and a leasing agent or an assistant.

Q    All right.  So there's only generally one community manager that was allocated toward it.  But during the time period from like 2019 to 2024, there were at least three, four, or five depending upon how you characterize them; is that right?

I mean, like Ebone Gamby, it says she was a temporary community manager.  Why was she a temporary community manager as opposed to a community manager?

A    I don't remember.

Page 60

Q    Rhonda --

A    I believe -- I believe Ebone was there when I took over the portfolio.  But I don't remember.

Q    Okay.  Rhonda Brown, she is an assistant community manager but she -- I don't recall her name coming up in depositions.

Did she -- did she go to the office every day?

A    I don't remember.  I don't -- she wasn't an assistant community manager at Pinetree.  I believe during that time she was a leasing agent.

Q    Okay.  You recall her more as a leasing agent; is that right?

A    Yeah.

Q    And was she a part-time leasing agent?

A    No.  She was a full-time employee.

Q    Okay.  But if -- if she's a full-time employee from 2019 through 2025, and it only requires one leasing agent, why were there so many other leasing agents?

A    If you will notice, there's no overlap in the timing.

Q    I'm sorry, I didn't -- I'm not understanding you, what you meant by that.  So --

A    I'm looking at your timing, and I see

Page 61

Rhonda from 2019 to 2025, June.

Q    Right.

A    Ebone Gamby was there from June of 2019.  So Ebone would have been the community manager, Rhonda the leasing agent.

Q    All right.  So if you have Rhonda as the leasing agent and there's one leasing agent for the property, why were -- why were other leasing agents hired if Rhonda is the leasing agent?

A    What other leasing agents are you referring to?

MR. KRUDYS:  Marc, can you go a little bit below that?

BY MR. KRUDYS:

Q    I'm referring to Holly Gravely.

MR. KRUDYS:  And then if you go over to the next page, Marc.

THE WITNESS:  I'm sorry, you said Holly who?

BY MR. KRUDYS:

Q    Holly Gravely, do you remember her as a leasing professional?

A    No.

Q    It says that she worked there one day.  But do you know why she only worked there one day?

Page 62

A    I don't know her.

Q    Okay.  And then you have Tiffany Morgan, Laquisha Seaborne, J'Keia Williams, Keivona Brogden, David Buchanan, Sheila Hardy, Raven Jones, and Matthew Lucas all listed as leasing agents during that time period that Rhonda was the leasing agent.

Why were all those folks employed if Rhonda's the leasing agent?

A    I see "rehire" for Sheila Hardy.  Sheila Hardy assisted at Pinetree but actually worked at Clearfield.  Raven Jones was at Pinetree for a time and then I believe she was rehired at The Bend.

Matthew Lucas was not there for very long. He was actually over at Clearfield I believe.

Q    What --

A    Keivona --

Q    Okay.

A    She was hired but she was at The Bend.

I don't remember who Laquisha was.  I don't -- I don't know that person but I don't think I was working there.

J'Keia was there.  And then I think -- I think she left and went to another company, maybe came back.

And then Tiffany Morgan was at Pinetree,

Page 63

then she went to Maddox Landing.

So all those individuals were not working at Pinetree at the same time.

Q    I see.  Were any of these employees terminated?

A    I'm pretty sure Matthew Lucas was.

I don't remember about the rest of them.

Q    All right.  And did you work with any of the maintenance technicians at the property?

A    They worked for the property.  But did I have direct contact with them on a daily basis?  No.

Q    All right.  Who -- what maintenance persons do you recall working at the property during the time that you were the regional manager?

A    William Norris is one person for Pinetree that I remember.  We had several temps.

Q    Was William Norris ever disciplined by you during the time that he worked for South Oxford Management?

A    I -- I don't remember if he was directly disciplined by me.

Q    Or --

A    Do you have a document?

Q    Or indirectly disciplined?

A    He may have been indirectly disciplined,

Page 64

yes.

Q    And what do you recall him being indirectly disciplined for?

A    I don't recall the details.

Q    How about Ricky McConnell, do you recall him?

A    The name is familiar.

Q    Was he terminated?

A    I don't remember.

Q    Alvin Peebles, do you remember him?

A    Yes.

Q    Was he terminated?

A    I think so but I can't confirm.

Q    All right.  And can you recall why he was terminated?

A    I don't recall if he was.  I can't -- I'm not sure if he was terminated or if he resigned.

Q    All right.  How about Torey Olds, do you remember him?

A    I -- I don't -- the name sounds familiar but I don't -- he's not clear in my mind.

MR. KRUDYS:  Marc, can you pull up and show a photo, Exhibit Number 2, Plaintiff's 2?

(Plaintiff's Deposition Exhibit 2

Page 65

was marked for identification)

BY MR. KRUDYS:

Q    Do you -- this is a photo of Ms. Ghee and her deceased son Mark obviously before the fire.

A    Okay.

Q    Did you -- did you ever know, meet her?

A    No.

Q    Did -- did you know that she was a tenant at the time?

A    No.

Q    The -- did you hear of the fire?

A    It was on the news.  Yes.

Q    All right.  And at that time Ms. Fatone was serving in your role; is that correct?

A    Miss who?

Q    I might pronounce -- Kaitlin?

A    Yes, Kaitlin, uh-huh.

Q    Yeah.  Did -- did you ever talk to her about the fire?

A    No.

Q    Okay.  Did you ever visit the property after the fire?

A    No.

Q    Did you -- did you ever reach out to

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                                    Pages 66..69

Page 66

Ms. Ghee after the fire?

A    No, sir.

Q    Do you know a tenant by the name of Donisha Bugg?

A    No.

Q    Do you know a tenant by the name of Diane Taylor?

A    No.

Q    All right.  I will show you that the --

MR. KRUDYS:  Marc, can you pull up Exhibit Number 149, page 3?

THE VIDEOGRAPHER:  (Complies).

BY MR. KRUDYS:

Q    All right.  Ms. Ghee was in apartment G8. And at the middle of the page, you can see other residents of G8 listed:  Diane R. Taylor, Donisha Bugg, and A'Kari Russell Parham.

Do you know any of those individuals?

A    No, sir, I do not.

Q    All right.  So if you --

MR. KRUDYS:  Marc, if you go over to Exhibit Number 5.

THE VIDEOGRAPHER:  (Complies).

BY MR. KRUDYS:

Q    This is a sworn statement that was provided

Page 67

by Ms. Bugg, who you saw was a resident of G8.  And it talks about, at paragraph 5, "My son A'Kari Russell Parham and I along with my mother Diane Taylor lived in Pinetree Apartments."

And as you saw, the prior residents of G8 were those individuals, Taylor, Bugg, and Parham.

If you want to, I'll show you.

Marc, could you please flip back to Exhibit Number 149, page 3.

BY MR. KRUDYS:

Q    So there's, right in the middle of the page, prior residents of G8, Taylor, Bugg, Parham.

MR. KRUDYS:  And then, Marc, if you go back to Exhibit 5, paragraph 5, please.

(Plaintiff's Deposition Exhibit 5 was marked for identification)

BY MR. KRUDYS:

Q    Again, so we have Taylor, Bugg, and her son Parham all living in there during the period from 2017 to the middle of 2019.

And then if we go to Exhibit Number 6, this is part of an addendum to the sworn -- to the sworn statement.  Go to paragraph 10 on page 2, please.

Page 68

(Plaintiff's Deposition Exhibit 6 was marked for identification)

BY MR. KRUDYS:

Q    So this is Ms. Bugg's sworn statement.  She talks at paragraph 10 about "There was termite damage above the sliding glass door to my bedroom as well as above the sliding glass door to my mother's bedroom. The termite damage above the sliding glass door in my mother's bedroom was more noticeable.  Also I saw termite damage to the beam supporting the G7's wooden patio deck."  That would be the deck above hers.

And then if you look at paragraph 12, it would talk about many small holes in the wood above the sliding glass door.

And in paragraph 16, she says, "I did not see Pinetree ever repair the termite damage."

Did you ever know of termite damage to apartment G8 during the time that you served as the regional -- I mean as the -- the regional manager?

A    Not to my recollection, no.

Q    So if -- if any type of termite damage was to be addressed or was addressed by Pinetree maintenance personnel, you would agree with me that

Page 69

there should be a work order concerning that; is that right?

A    Repairs for termite damage would be outside the scope of a work order.  So remediation would go through the holder of the termite bond.  And then any extensive repairs would be contracted out.

Q    All right.  Well, we don't see any type of repair work to G8 after Ms. -- Ms. Taylor, Ms. Bugg, and her son were in the apartment.  All we have are work orders done by residential maintenance personnel.

So you're saying that any type of termite remediation, that that should have required a outside professional to come in and treat and/or repair; is that right?

A    If it was found and reported.

Q    Okay.  All right.  Well, when there's a turnover of the apartment, when there's a vacant -- so when Ms. Taylor and Ms. Bugg moved out of the apartment, typically apartments stood vacate -- vacant for a period of time, maybe a few months, and then the oldest apartment would be turned over and they would prep it for the next tenant; correct?

A    When apartment -- when an apartment is vacated, general practice is to have the apartment

Page 70

turned over within seven days.

Q    Okay.  But weren't there a number of apartments that sat for a few months before they were rented out again?

A    I can't confirm that.  However, I'm sure you can obtain occupancy reports that can give you those details.

Q    Okay.  So, but the turnover of the apartments, that would generally involve or did involve Pinetree maintenance technicians and supervisors and not outside professionals like exterminators and contractors unless those exterminators and contractors were brought in; correct?

A    Every apartment that's turned over would involve an outside contractor to paint the apartment, clean the apartment, repair or replace -- or replace flooring as needed.  That's part of the turn process.

Q    Well, I mean, Norris, we took his deposition.  We took Ricky McConnell's deposition.  They talked about them and then another guy by the name of Mr. Green doing the turnovers, but they didn't talk about any private contractors coming in as part of the turnover process.

What is the basis for your view that a

Page 71

private contractor would be involved with the turnover of the apartments?

A    Because painting was always done by an outside contractor.  Carpet cleaning or carpet replacement was always done by an outside contractor.

Q    Okay.  Let us look at Exhibit Number -- Number 9 -- I'm sorry, Number 11, Plaintiff's 11.

(Plaintiff's Deposition Exhibit 11
 was marked for identification)

THE WITNESS:  Okay.
BY MR. KRUDYS:

Q    All right.  This is Apartment G8.  And this is the turnover that is being done.  It's being done, if you look at the top, 5/24/2022.

Do you see that?

A    Yeah.

Q    All right.  And so the person that is describing the problem is M. Lucas, Matthew Lucas, saying chipping painting around windowsills and sliding doors.

Do you see that?

A    Yes.

Q    All right.  So, and the person that

Page 72

allegedly went in and repaired that was Peebles; right, a maintenance technician?

A    Okay.

Q    All right.  So here you've got chipping paint being repaired by Peebles, a maintenance technician.

Where can I -- where would I look to find out who the private contractor was that allegedly painted the apartment at the time of turnover?

A    The contractor who painted the apartment would have submitted an invoice for the work.

Q    Okay.  If you --

MR. KRUDYS:  Marc, if you go over to Exhibit Number 149, page 11.

THE VIDEOGRAPHER:  (Complies).
BY MR. KRUDYS:

Q    All right.  This is that listing before of the information where the -- Pinetree provides us information.  And here's a listing of contractors.  "Additional work in the sliding glass door area of various units was also performed by other contractors as reflected in the produced records, including Budget glass, Ready Carpet, Real Property Management Solutions, and Great Solutions Painting, Inc."

Are any of those entities the ones that you

Page 73

say did the -- were all -- did the painting for the turn over?

A    They look familiar.  But I can't testify as to which particular units they worked in.

Q    All right.  We have -- we received invoices from MBS and some other private contractors, but we haven't received anything from Real Property Management Solutions and Great Solutions Painting.

Your understanding is if those entities were involved with the painting of the apartment, they would have presented a -- an invoice to show their work; is that right?

A    I'm saying any company that was involved in painting apartments would have produced an invoice.

Q    And was every apartment that was turned over painted by an outside contractor?

A    If the entire apartment needed to be painted, it would have been done by an outside contractor.

Q    What if only touch-up painting was done rather than the entire apartment, who would do that?

A    Depending on the workload, the in-house team may have done it.  But, again, it would depend on what their workload is --

Q    All right.

Page 74

A   -- at the time.

Q   What percentage -- I know this is just an estimate.  I'm not holding you to it.  But what percentage of apartments received a full painting by an outside contractor and what percentage did not?

A   That I can't say.

Q   If we don't have an invoice for Apartment G8 at or time -- at or about the time of the turnover by an outside contractor, does that mean that all the work was done by an internal tech team, or likely done by an internal tech team?

A   I can't make that assumption.

Q   All right. Well, if -- if there's going to be outside painting of -- an outside contractor that came in -- well, let's do it this way.

If the entire apartment was repainted, that would be done by an outside contractor; right?

A   It should have been done by an outside contractor, yes.

Q   Right.  And so, and if an outside contractor did that painting, they would have submitted an invoice for the work; correct?

A   That would be my assumption.

Q   How much did it approximately take to repaint, what was a typical invoice for repainting

Page 75

completely a two-bedroom apartment?

A   I don't recall.

Q   Can you say if it's $200, $400, 600, 800, anything at all?

A   I don't recall.

Q   All right.  So if the work -- if the only work that was done to the apartment at the time of turnover was by internal maintenance technicians of the property, that would be reflected in work orders performed by them; is that right?

A   Sometimes.

Q   What do you mean sometimes?  Is it -- does that mean that sometimes work would be done at the apartment that would be not reflected in a work order?

A   The site teams typically have a -- a turnover board in their office where they -- where they would track the -- the turn process.

Q   Is the -- when you talk about turnover boards, are we talking about like a whiteboard in their office?

A   Correct.

Q   All right.  So that's not a permanent record, that's just a white board; is that right?

A   Correct.

Page 76

Q   So is it possible that turnover work is being done that's only shown in the whiteboard that wouldn't be reflected in work orders; is that right?

A   It is a possibility.

Q   All right.  If we go to Exhibit Number 10 -- by the way, I'm -- I'm trying to -- I need -- I need to -- everybody to weigh in.  Are you good without taking a five-minute break, or do you need a break?

MR. KRUDYS:  Gwenda, are --

THE WITNESS:  I'll take a five-minute break.  Let me refresh my coffee.

MR. KRUDYS:  All right.

Marc, do you want to take us off the record?

THE VIDEOGRAPHER:  Going off the record at 11:00 a.m.

(Recess)

THE VIDEOGRAPHER:  Going back on the record at 11:11 a.m.

MR. KRUDYS:  Marc, would you kindly show the witness Exhibit 10.

Page 77

(Plaintiff's Deposition Exhibit 10 was marked for identification)

BY MR. KRUDYS:

Q   I showed you an invoice a moment ago -- I mean a work order related to Apartment G8 which was previously identified as Exhibit 11.  That was about the chipping paint around windowsills and sliding doors.

A   Okay.

Q   Now I'm showing you Number 10, which is the same apartment, the same time period.  There's a slight change in the time period.  But here it says, "The windows need to be fixed.  They are difficult to open and close.  M Lucas."

So M. Lucas is that leasing agent that was terminated, and the person that's actually doing the work is Peebles; is that right?

A   According to what's displayed.

Q   And then if you look at the top of the document, it says that the work was called in on the 24th but completed on the 31st; is that right?

A   Correct.

Q   All right.  And then, and if we pull up Exhibit Number 11 again just briefly, the same

Page 78

apartment, same person that made the request, M. Lucas, same person that does the work, it also was done on the 31st, completed on the 31st; is that right?

A    Correct.

Q    All right.  Can --

MR. KRUDYS:  Marc, can you please play Exhibit Number 12.

I think this is going to be a -- it's either photos or audio.  Let's see what it is.

Do you have it there, Marc?  If you don't, just let me know.

THE VIDEOGRAPHER:  Yes.  One moment, please.

(Plaintiff's Deposition Exhibit 12 was marked for identification)

(Exhibit Number 12 audio was played for the witness)

BY MR. KRUDYS:

Q    Do you know whose voice that is, the woman's voice?

A    No, I do not.

Page 79

Q    All right.  Do you recognize the voice of the man in the background?  We could play it one more time for you.

(Exhibit Number 12 audio was played)

BY MR. KRUDYS:

Q    Do you recognize the name of the individual, the man in the background?

A    No, I don't.

Q    All right.  This was a common complaint at Pinetree Apartments, mold around windows and sliding glass doors?

MR. KENNEDY:  Object to the form.

BY MR. KRUDYS:

Q    Is that right?

A    I -- I don't recall.

Q    Well, do you recall such complaints being made by residents, mold and/or moisture around sliding glass doors and windows?

A    I recall getting those complaints or seeing the reports of them throughout the portfolio, not just one particular unit or one particular property.

Q    All right.  So you're saying that not only was it at Pinetree, but it was at other apartments

Page 80

owned by Beachwold and managed by South Oxford; is that right?

A    Those complaints were made at other properties, yes.

Q    Okay.  Do -- do you know what was causing the moisture to come around the sliding glass doors?

A    I do not.  I don't have expertise in that department.

Q    We took the deposition of Mr. Norris.  And he said that on over a dozen times, contractors were come in -- would be brought in to replace, among other things, flashing around sliding glass doors.

Did you know of that work?

A    I'm aware that some work was done, yes.

Q    All right.  Why was water getting in by the flashing around sliding glass doors, if you know?

A    I don't.  I'm -- that's not my expertise.

Q    Well, both Mr. Norris and Mr. McConnell testified that it was because the flashing was improperly installed.

Were you ever told that, when you were the regional manager, that the flashing around the sliding glass doors was improperly installed?

A    I'm sure I was made aware if it was entered into a proposal from a contractor.

Page 81

Q    Okay.  Well, you saw a number of proposals from contractors involving replacing plywood beams, Tyvek around sliding glass doors that had been rotted out; correct?

A    Yes.  I saw a number of proposals.

Q    All right.  And you raised those with upper management ownership; is that right?

A    That's correct.

Q    All right.  And why did you raise those issues with upper management?

A    It would typically because of the scope of the work and the cost involved [as spoken].

Q    A slightly different topic.  If you pull up Exhibit Number 14.

(Plaintiff's Deposition Exhibit 14 was marked for identification)

BY MR. KRUDYS:

Q    This is the first page of the lease. Ms. Ghee entered into two leases, one in 2022 and one in 2023.  This is the 2022 lease, and it's between her, Nyeisha L. Ghee, this is in paragraph 1 under "parties," and Pinetree Apartments.

Who's Pinetree Apartments?  In other words,

Page 82

there's a building.  There is a building that says Pinetree Apartments outside.  But that is -- what's the legal entity that was the owner of the property?

A    I don't remember.

Q    So I'll show you Exhibit Number 15.  It's the other lease that Ms. Ghee signed.  And it is, again, Pinetree Apartments.

(Plaintiff's Deposition Exhibit 15 was marked for identification)

BY MR. KRUDYS:

Q    Did all the leases say that, Pinetree Apartments, as opposed to Pinetree Apartments, LLC, or Clearfield, or Beachwold?

Did they all say Pinetree Apartments as the owner of the property?

A    It depends on how the master lease was set up with Blue Moon.  So each property would have its own master lease.

Q    When you say Blue Moon, what is Blue Moon?

A    All the leases were created using the National Apartment Association software.

Q    All right.  But the blanks were filled in. Who filled in the blanks?

Page 83

A    Either the leasing agent or the property manager, whoever --

Q    All right.

A    -- created the lease.

MR. KRUDYS:  Marc, can you pull up Exhibit Number 14, the original lease again, the first page?

BY MR. KRUDYS:

Q    And then we're going to walk through, I'm going to just show you it and then zoom in on an aspect of it.

Remember we saw M. Lucas requesting that certain repairs be made to the property?  Let's go and see who signs this lease on behalf of Pinetree.

MR. KRUDYS:  If we flip through the next few pages, and Marc, I'll tell you to stop when we get to an appropriate place.  Next page, please.  Now we're up to page 4.  Next page, 5. Keep going, Marc, 6, 7.  Here, it is.

BY MR. KRUDYS:

Q    So Matthew Lucas is the, if you show it there, the owner or owner's representative.  And so who is he the representative for?

A    It -- it says owner's representative.

Q    Right.  But, but who is the owner of the

Page 84

property?

A    It would be Pinetree Apartments, as listed on I believe the first page.

Q    Okay.  And -- but you don't know -- is Pinetree Apartments, just like it like you're -- was that a fictitious name for a legal entity?

A    I can't testify to whether or not that was a fictitious name.

Q    All right.  If we go to -- so Matthew -- Matthew Lucas, the same person -- would that have been the same person that did the walk-through with her, the leasing agent?

A    Upon move-in?

Q    Yes.  She signed it on June 1st and moved in on June 1st.  Would he have been the one that did the walk-through with her, likely?

A    It would have been his responsibility.

Q    Okay.  And he was terminated for basically lying and stealing; right?

A    Correct.  Yeah.

Q    Okay.  If we go to Exhibit Number 14.

And by the way, did Mr. Lucas ever share any information with you about the walk-through of Ms. Ghee's apartment with her?

A    No.

Page 85

MR. KRUDYS:  I'm sorry, Marc.  Exhibit 16. I apologize.

(Plaintiff's Deposition Exhibit 16 was marked for identification)

BY MR. KRUDYS:

Q    So this is a schematic of Apartment G8 where Ms. Ghee was.  And you can see the primary bedroom where she was in when she was trying to escape the fire.

The -- the only direct access to -- is to the -- to the outside from that bedroom is through the sliding glass door; is that right?

MR. KENNEDY:  Object to the form.

THE WITNESS:  I'm sorry.  I don't -- could you repeat the question?

BY MR. KRUDYS:

Q    Yeah.  This is the primary bedroom in which Ms. Ghee was in with her baby when she was trying to escape the fire.

The only direct access to the outside is through the sliding glass door from that room; correct?

MR. KENNEDY:  Same objection.

Page 86

THE WITNESS:  It is a direct access.

BY MR. KRUDYS:

Q    All right.  Well, can you identify any other direct access from that bedroom?

A    I would assume the front door.

Q    Okay.  But you have to go out the bedroom door into the hallway to get to the front door; correct?

A    Yes.

Q    And to get to the other sliding glass door, you'd have to exit the bedroom, go into the hallway, go through the door of the children's playroom to exit the sliding glass door; correct?

A    Yes.

Q    So the only direct exit from the bedroom right to the outside during a fire is that sliding glass door in the primary bedroom; correct?

A    That I can see.

Q    Yeah.  And did -- there's no other windows in that room other than that sliding glass door; correct?

A    I don't see any windows indicated.

Q    All right.  Did -- did Pinetree undertake to ensure -- did -- you understand that at the time you were working as the -- as the regional manager,

Page 87

the importance of having those sliding glass doors operative?  Did you understand the importance of that?

A    Yes.

Q    Did you have any type of meetings or discussions with anyone specifically related to fire risks in the apartments at Pinetree?

A    I don't remember.

Q    If we go to Exhibit 17, this is an overview that we received from the Petersburg property office which shows the apartment complex.

(Plaintiff's Deposition Exhibit 17 was marked for identification)

BY MR. KRUDYS:

Q    You recognize the apartment complex from this photo?

A    Yeah.

Q    And the apartment complex is on this large swamp; correct?

MR. KENNEDY:  Object to the form.

THE WITNESS:  Next to the swamp?

BY MR. KRUDYS:

Q    Yeah.  It's right next to the swamp;

Page 88

correct?

A    Correct.

Q    All right.  And the apartments had a variety of moisture complaints by residents; correct?

A    If they were reported, I'm sure they are documented.

Q    Was there also an obligation to do a quarterly walk-through of the apartments, quarterly check going into the interiors of the apartment?

A    To the best of my recollection, the site teams are required to do semiannual inspections. I -- I don't recall details of the day-to-day operations.  Again, I haven't worked with this company for over two years.

Q    All right.  The -- would there -- was there a document that would show the semiannual inspections?

A    The site teams typically would have either an inspection sheet or inspection log.

Q    All right.  That was not produced in this case because it was destroyed.  Was -- was that -- if it was ever created.

Do you know why that, those documents were destroyed?

MR. KENNEDY:  Object to the form.

Page 89

THE WITNESS:  I don't know.

BY MR. KRUDYS:

Q    Was there a -- so -- a policy that dealt with document retention at Pinetree Apartments?

A    I -- I don't recall.  I would refer you back to South Oxford.

Q    Well, I'm asking you because as the regional manager, do you recall any type of a policy?

Like give me -- let me give you an example. As a lawyer, the bar generally tells me to retain documents for a six-year period.

Do you recall Pinetree or South Oxford having any type of guideline that said retain documents for a period of time?

A    I don't recall.

Q    All right.  If we look at Exhibit Number 19, please.

(Plaintiff's Deposition Exhibit 19 was marked for identification)

BY MR. KRUDYS:

Q    So at the bottom of the page, it's from Alyssa Allen to Tracy Arruda.  "These are the photos before and after I also have to clean up my own mold

Page 90

problem too... Even though I put in request to get it fix."

And then if you go above that, it shows -- let's see. So the bottom was a January 8th e-mail at 7:18 p.m. And the top is a January 9th, 10:38 a.m. e-mail.

So -- and the -- the "from" is from you; correct, on the upper e-mail?

A    It says from Tracy Arruda.

Q    Oh. I'm sorry. The top says from Nadra Yohannes; right?

A    That one does, yes.

Q    Okay. That's what I was referring to, the top one.

MR. KRUDYS: And then, Marc, if you expand that a little beyond that.

BY MR. KRUDYS:

Q    Okay. So here's your signature block, and you're listing yourself as district manager.

You have an e-mail address of "SOMliving." That is the South Oxford Management e-mail address; correct?

A    Correct.

Q    And that 614 Peninsula Drive, what does that refer to?

Page 91

A    The office of Cottage Grove.

Q    Okay. And so you were in that office for a period of time, and then thereafter, did you switch your signature block to have your home address?

A    No.

Q    You always maintained the 614 Peninsula Drive even after the Cottage Address was no longer?

A    I believe so, or it may have been changed to another company address. But by no means would I have listed my home address on my signature block.

Q    Okay. All right. So even if it has -- so in your signature block, if it says 614 Peninsula Drive, it may be that that Cottage address is where you actually were working, or it may have been where you previously worked, one of those two; right?

A    On January 9th of 2020, that's where I was working.

Q    Okay. All right. And you say, "Please ensure that William takes care of this today and update me when completed. Thanks."

The William that you're referring to is William Norris, the residential maintenance technician at Pinetree; correct?

A    Correct.

Q    And then the reason that you're providing

Page 92

this directive is, you have the authority to direct people like William Norris; correct?

A    Correct.

Q    So that you were essentially the boss of everybody that worked at Pinetree Apartments during the time that you were regional manager; correct?

A    Tracy Arruda was essentially the boss of everyone that worked for South Oxford Management in Virginia.

Q    All right. So, but she's your report-to; correct?

A    I report to her.

Q    Right. So it goes --

A    Yeah.

Q    So the thing went from -- who was Arruda's boss at the time? Ferguson?

A    Bev Ferguson, yes.

Q    So it goes from Bev Ferguson, then to Tracy Arruda, then to you --

A    Yes.

Q    -- and then to Pinetree Apartments; correct?

A    Correct.

Q    So between Tracy Arruda and Pinetree Apartments for about a four-year period was -- was

Page 93

you in the regional manager position; correct?

A    Correct.

Q    And Tracy -- and you certainly knew more about Pinetree Apartments than Tracy Arruda did; correct?

A    Correct.

Q    All right. And if you look to the next page, on page 120, Bates Number --

MR. KRUDYS: Kevin, that's Bates Number, at the bottom, 120, 121, 122, 123 and 129.

BY MR. KRUDYS:

Q    These are all pictures of the tenant showing black mold around the sliding glass doors; correct?

A    It looks like pictures of what would or could be mold.

Q    Yeah. So it's all black, and you see the chipping paint around the area too; correct?

A    Yes.

Q    All right. So, and you received a number of these from Pinetree apartment tenants; correct?

MR. KENNEDY: Object to the form.

BY MR. KRUDYS:

Q    These photos and complaints about moisture and mold around sliding glass doors?

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                       Pages 94..97

Page 94

A    Those would have been submitted to the on-site team.

Q    Okay.  But you also received them.

Like, for instance, you got a copy of this e-mail and you told Norris to take care of it; right?

A    If it came -- if it came up to me, yes, I would have directed the team to handle it.

Q    How did it come up to you?

How -- how was it that this one, it started out with Alyssa Allen at the bottom and she's writing to Tracy Arruda.  Do you understand Ms. Allen -- this is in the first page of Exhibit 19.  Ms. Allen, do you understand her to be a tenant at Pinetree Apartments?

A    According to the subject line.

Q    Yes.

A    That would be my assumption.

Q    And did Tracy Arruda get upset at the fact that a tenant directly e-mailed her as opposed to you?

A    I can't testify as to her emotional state.

Q    But did she previously and in connection with any e-mails tell you "I don't want to get e-mails directly from tenants"?

A    I don't recall.

Page 95

Q    All right.  If we go to Exhibit 20, please.

(Plaintiff's Deposition Exhibit 20 was marked for identification)

BY MR. KRUDYS:

Q    All right.  Here's a complaint by Kimberly Jones at Apartment A2.  She makes a complaint on 3/24/20.

Is -- is -- it says date completed at -- so she makes the complaint in the morning and it's completed at -- in the afternoon.  And she talks about her living room ceiling leaking.

Was this taken care of?

A    I don't know.  That was from 2020.

Q    Well, if it says "date completed," doesn't that mean that it's taken care of?

A    That would be my assumption.

Q    All right.  But the -- the actual part about parts and labor and who did the work, that's all blank; correct?

A    That's correct.

Q    All right.  Who -- when these -- when these work orders were completed, like this one is completed, did you get a copy of them?

Page 96

A    No, I did not.

Q    Who would get a copy of them when they were completed?

A    They would be closed out in the management software system.  Copies were not --

Q    All right.  Did you have --

A    -- e-mailed in '21.

Q    Were you able to get access to that software system during the time you served as regional manager?

A    Yes, I was.

Q    All right.  Is this the type of thing that you would discuss when you went to the properties about once a week?

A    If the work order is created and completed, then it's closed out in the system, so it wouldn't be on my dashboard to discuss.

Q    Well, I mean, I have, I'll just represent, many, many work orders here that are just not filled out.  Nobody -- there's no employee name.  There's no indication as to what was done.  Nobody signs it and the like.

My question is:  Who was it that oversaw this process that should have been able to point out, Hey, these things aren't getting completed?

Page 97

Whose job was that, if anybody?

MR. KENNEDY:  Object to the form.

THE WITNESS:  That would have been the property manager.

BY MR. KRUDYS:

Q    Okay.

A    And/or the maintenance supervisor.

Q    And that property manager position was unfilled for a period of time; correct?

A    Correct.

Q    For a number of months?

A    Correct.

Q    When Ms. Ghee moved into the property in June of 2022, June 1st of 2022, was there a property manager at that time?

A    I don't remember.

Q    If we go to Exhibit Number 21.

(Plaintiff's Deposition Exhibit 21 was marked for identification)

BY MR. KRUDYS:

Q    So it -- this is for Apartment L8.  And it's a complaint from Tarnisha Rose.  And she says "There appears to be black mold growing inside the

Page 98

window seals of the windows and patios."

And then here, Norris says "cleaned window seals with bleach and water." This one is -- is completed under technician notes, but it's authorized by, signed by, dated, invoice number is blank.

Was that ever filled in, authorized by, signed by, dated, and invoice number, is that ever filled in?

A    I don't recall.

Q    All right. If there -- if all of those are blank in the work orders that we have, what does that mean, if anything?

A    It just means they weren't filled in.

Q    Okay. It would have been that the property manager, or if there wasn't a property manager at the time, the maintenance tech supervisor that would have had the obligation of ensuring that this was completed; correct?

A    Correct.

Q    All right. So I kind of raised that at another deposition.

I know that like in a hotel, after you stay at a room, that the cleaning staff comes through, and then when they're done, there is a supervisor that comes in and makes sure that the cleaning staff did

Page 99

their assigned task.

Did you ever have a supervisor that would come in and follow up on the work orders to make sure that they were completed as stated?

A    That's not typical practice, no.

Q    Okay. Why is it that Pinetree was taking it -- I mean, so here's a tenant that is complaining about black mold growing inside the windowsills of the windows and patios. We've already discussed that that was a complaint that was raised by some tenants.

Why is it that South Oxford is undertaking or Mr. Norris is undertaking to do this type of work?

Is that because moisture around the windows and the patios was the responsibility of South Oxford?

MR. KENNEDY: Object to the form.

THE WITNESS: I -- I can't testify to that. I don't -- I'm not an expert in maintenance or mold.

BY MR. KRUDYS:

Q    All right. But when tenants com- -- like if I were to call in and say, you know, that I'm not getting good reception from the rabbit ears on my TV, that would -- you would say to that "that's not my problem"; right? We can agree with that?

Page 100

A    No. If a tenant were to call in a service request, a service team member would respond. And then the follow-up work or additional work would be determined based on that initial inspection.

So when Mr. Norris goes out, the tenant calls in and says there's black mold, that's the tenant's description of what they're seeing. His response would be based on what he found.

Q    All right. Well, did -- did Pinetree replace lightbulbs in the rooms?

A    Yes.

Q    All right. Did Pinetree replace batteries in the smoke detector?

A    Yes.

Q    All right. Did -- if my -- if my range or oven wasn't working and I called Pinetree, you guys would come in and seek to fix that; right?

A    Correct.

Q    Okay. And if I had water and moisture on my carpet, what if I -- what if I were to have knocked over a pot and put water onto the carpet? Is that something that you guys would take care of, or would you say, "Mark, that's your problem, you're the tenant, you caused that, you've got to take care of it?"

Page 101

A    If you knocked over the pot of water, it would be your responsibility.

Q    Okay. So there are certain things that are my responsibility as tenant, and there are certain things that you consider to be your responsibility as the management company for the property; right?

A    Correct.

Q    All right. Okay.

And how about mold and moisture and decay inside walls caused by moist -- caused by water or termites, is that something that's my responsibility or your responsibility?

MR. KENNEDY: Object to the form.

THE WITNESS: That would be the responsibility of the owner, yes.

BY MR. KRUDYS:

Q    Okay. And why do you say that?

A    That's above and beyond normal wear and tear by the tenant.

Q    Okay. All right. If we go to Exhibit Number 22.

(Plaintiff's Deposition Exhibit 22 was marked for identification)

Page 102

BY MR. KRUDYS:

Q    All right.  Here's a description of an -- I'm sorry, I jumped ahead.  I didn't mean to speak too quickly.

All right.  Here's a call that comes on June 6 -- I'm sorry, January 6.  And it's scheduled for work on the 11th and it's completed on the 11th. Do you see that?

A    Yes.

Q    All right.  So, and the complaint was mold on the wall near the patio in the second room. Again, it's another mold/moisture complaint around the patio sliding glass door.

Can we agree with that?

A    That's the complaint.

Q    I'm sorry, the work order; correct?

A    That's what it says, master bedroom and second bedroom.

Q    Okay.  So --

A    That's the description of the problem.

Q    All right.  So I'm in my office.  I don't have any mold or moisture on the -- on the walls in my office.

Why is it that there's always repeated reports of moisture and water around sliding glass

Page 103

doors?

What did you understand was causing that?

MR. KENNEDY:  Object to the form.

BY MR. KRUDYS:

Q    Or one of --

A    I'm not an expert in building construction. I can't say.

Q    Well, did you -- I mean, you're the -- you're the regional manager at that period of time. You're getting lots of complaints about that.

Did you ever undertake to find out what the cause of that was?

MR. KENNEDY:  Object to the form.

THE WITNESS:  Again, every time there was a service call that came in, it would be responded to and repairs made based on the findings.

So, for instance, someone may call in and say they have mold and it turns out to be mildew.  And that could be caused by a number of different factors.

MR. KRUDYS:  Can we go to -- bear with me for a moment.

Can we go to Exhibit Number 138B?

MR. KENNEDY:  What was the number?

MR. KRUDYS:  138B.  Pinetree 00820 is the

Page 104

Bates number.

(Plaintiff's Deposition Exhibit 138B was marked for identification)

BY MR. KRUDYS:

Q    So here is a counseling form for Mr. Norris; correct?

A    Correct.

Q    And it relates to The Bend, this property in your portfolio that he worked at for a period of time before becoming the maintenance supervisor at Pinetree; correct?

A    Uh-huh.

Q    Is that right?

A    Correct.

Q    All right.  And so a counseling form is basically, you're telling him, hey, you're not doing this right and you need to improve in these areas; correct?

A    Typically, yes.

Q    All right.  So if you look under "prohibited conduct" further down, and it says, for instance, on March 8, 2022, "Community manager was notified that work orders were not being completed.

Page 105

Community manager called William and asked why one of the maintenance technicians was not running tickets. At that time, he told me that he did not want to hear this noise and hung up the phone."

So here's a -- he's being counseled because he is not processing and completing work orders; correct?

A    According to the counseling.

Q    Okay.  And then if you go to the next page, in about the middle of the page, he's being counseled on February 28th, 2022, for ordering dishwashers and water heaters without the community manager's approval.

Who was -- and the community manager at the time of this property was Judy Walton; correct?

A    Yes.

Q    All right.  Now, he -- did you get along with Mr. Norris?

A    Yes.

Q    Right.  Did -- did he ever tell you that Judy Walton had it out for him?

A    Unfortunately, I received that complaint from more than one employee, but they could not provide anything specific.

Q    Okay.  So, but William Norris is being

Page 106

counseled for, among other things, causing expenses to be occurred without getting approval; correct?

A    That is what it says.

Q    All right.  Now, he's not ordering these dishwashers for himself or for his home, the water heaters, he's ordering them for The Bend apartment complex; correct?

A    I would assume so.

Q    So the concern is that he may be causing -- he may be causing the -- the budget to be out of whack, to be -- he's incurring expenses that y'all don't know of; is that right?

MR. KENNEDY:  Object to the form.

BY MR. KRUDYS:

Q    Correct?

A    It says that he was ordering the appliances without the approval of the community manager.

Q    All right.  He testified to us that he had a budget to follow, and that -- and that's true; right?  He was -- he had a budget to follow for maintenance?

A    Correct.

Q    And initially, one of his first years when he came into the position, he was significantly over budget; correct?

Page 107

A    I -- I don't recall those details.

Q    Well, he's testified he was significantly over budget and then was counseled for that, and then the budget came more into whack.  Do you remember any of that?

A    No, I do not.

Q    All right.  When you testified before that work orders, if they were filled in, they were completed and taken care of.

The head maintenance tech person at Pinetree had been counseled for, among other things, not getting to work orders; right?

A    Are you referring to William?

Q    Yes.

A    According to the evidence that you're showing me, he was counseled for not completing work orders at another property, not Pinetree.

Q    Right.  But he was under your -- you're the regional manager at that time; right?

A    Correct.

Q    Okay.  And you signed off and said -- you signed off on the accuracy of this.  By including your name, you're basically saying "William Norris, stop doing this"; correct?

MR. KENNEDY:  Object to the form.

Page 108

THE WITNESS:  By signing it, I'm signing as a witness to the counseling being delivered.

BY MR. KRUDYS:

Q    Okay.  So did you look into that counseling yourself?

A    The counseling was based on what was reported by the property manager.

Q    All right.  But it's not just signed by Judy Walton, it -- you also sign off on it; correct?

A    Correct, because I witnessed her delivering the counseling to --

Q    Okay.

A    -- William.

Q    And he says it's very insightful; correct?

A    I don't know what his response was.

Q    Okay.  All right.  If we go to Exhibit Number 23 -- actually the, let's go to Exhibit Number 24.  I'm just trying to move it along.

(Plaintiff's Deposition Exhibit 24 was marked for identification)

BY MR. KRUDYS:

Q    All right.  So this is a text message from Holly Johnson.  Do you understand Holly Johnson to be

Page 109

a tenant at Pinetree Apartments?

A    I don't know.

Q    All right.  Well, if you read the text, this is my -- and I don't know how it is on your screen, so you have to tell us if we need -- if we need to make it larger for you.

MR. KRUDYS:  So the part that says "This is my patio door," can we make that a little larger for her, Marc?

THE VIDEOGRAPHER:  (Complies).

MR. KRUDYS:  There, we go.

BY MR. KRUDYS:

Q    All right.  "This is my patio door in my master bedroom at one of your properties, Pinetree in Petersburg, Virginia.  I have contacted management on several different occasions."

This is something you had heard before, tenants saying that they had repeatedly complained about the same issue; correct?

MR. KENNEDY:  Object to the form.

BY MR. KRUDYS:

Q    Ma'am, did you have --

A    I'm sorry, you've -- you've shown me several work orders from different years.  So repeated complaint, yes.

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                          Pages 110..113

Page 110

Q    Yeah.  And -- and some of those complaints from the tenants were that I have complained multiple times over multiple months and even multiple years about a problem and it's not been corrected; correct?

MR. KENNEDY:  Object to the form.

THE WITNESS:  If that's what they're saying.

BY MR. KRUDYS:

Q    Okay.  So she says, "I have contacted management on several different occasions."

So your thought was -- I mean, the way this is supposed to work is, the work order is supposed to be completed when a complaint is made, and then it's repaired.  That's how it's supposed to occur; correct?

A    That is how it's supposed to work.

Q    All right.  So it says, "I have contacted management on several different occasions.  Maintenance came by and stated a contractor would have to fix the issue.  My request to get this fixed continues to get ignored yet I am always reminded to pay my thousand dollars in rent.  This is unexpected mold and mildew, water pouring in from the outside when it rains.  This has to be fixed immediately.  I was forced to stuff plastic in the hole and cover it

Page 111

with tape to try to keep" out the water -- "to keep the water out."

So this is a complaint that is being made by Holly Johnson in July of 2020 concerning her apartment, and specifically water pouring in through her sliding glass door area; correct?

A    That is the complaint, yes.

Q    And -- and it goes right to you; right?

A    Yes.

Q    All right.  And if you look at the -- the photos behind it, 3056, you can see the chipping and the paint around the sliding glass door, that wall there.  Do you see that?

A    Yes.

Q    All right.  And then the next page, this -- do you see all this plastic, the tape that is being put up there, as she says, to keep the water out?

A    Yes.

Q    All right.  Had you seen these types of photos submitted to you previously?

A    I -- I don't recall.  But if they were, I'm sure you have access to my e-mail account that I had with South Oxford.

Q    Let's go over to Exhibit Number 25.  I think this might be a recording or a video.  Can you

Page 112

play the -- what you have there, Marc?

(Plaintiff's Deposition Exhibit 25 was marked for identification)

(Whereupon, the video Plaintiff's Exhibit 25 was played for the deponent)

BY MR. KRUDYS:

Q    Do you see the water dripping in from where the sliding glass door meets the -- the wood above it, the ceiling, and all that black mold above that area?

A    Correct.

Q    All right.  And did -- did you -- and you received -- did you -- did you know of this video?

A    I don't recall.

Q    All right.  You would agree with me this is an unsatisfactory situation?

A    Yes.

Q    All right.  And it's something that Pinetree had the -- you understood at the time that it's something that Pinetree had the responsibility to correct; correct?

MR. KENNEDY:  Object to the form.

Page 113

THE WITNESS:  I understand looking at it now that it's the responsibility of Pinetree to correct.

BY MR. KRUDYS:

Q    All right.  Let's go -- but did you know that at the time?

A    I don't recall if I saw this video.

Q    All right.  But if it was presented to one of the property managers or the maintenance tech, this is something that should have been taken care of immediately; correct?

A    Correct.

Q    All right.  Go over to Exhibit Number 28.

(Plaintiff's Deposition Exhibit 28 was marked for identification)

BY MR. KRUDYS:

Q    Here -- here is a -- there's 28.  Here's another photo of cracking of paint around the sliding glass door.

How did this -- how -- you know this, this paint is so dried and cracking, or it's -- you could see it's cracking.

How did -- how did it get to this point

Page 114

without the maintenance technicians working on it? Do you know?

A    I don't know.

Q    Okay.  Well, if -- if they had, in fact, those, either the quarterly reviews that Mr. Norris testified to or the -- the semiannual reviews that you testified to that may have occurred, this is something that clearly should have been caught; right?

MR. KENNEDY:  Object to the form.

THE WITNESS:  I don't know when that photo was taken.

MR. KRUDYS:  All right.  Let's go to Exhibit Number 30.

(Plaintiff's Deposition Exhibit 30 was marked for identification)

BY MR. KRUDYS:

Q    This is an e-mail that you received from William Norris in September 8th of 2020; is that right?

A    That's the date indicated.

Q    Yeah.  And he's writing as the service manager to you; correct?

Page 115

A    I assume so.

Q    All right.  And he -- it's his signature at the bottom that says service manager.  Do you see that?

A    No, I can't see that.  If -- do you want to scroll up?

Q    It's right there in yellow at the bottom, "William A. Norris, Service Manager."

A    I think it's the way my screen is, but okay.

Q    Okay.  We can -- tell me when you're able to see it.  Do you need to move the box around?

Sometimes like the video or the boxes of us might get in the way.  If you move them to the side, you should be able to see it.

Just let me know when you're able to see it.

A    I -- I see it.

Q    Okay.

A    Okay.

Q    All right.  So you see "William A. Norris, Service Manager" at the bottom; correct?

A    Okay.

Q    All right.  So he writes.  He's talking about the wettest month of August in history.  "Here

Page 116

at Pinetree we experienced heavy wind driven rains on numerous occasions causing," it says "singles" but I'm sure he means "shingles and metal flashing to blow off buildings."

Did -- you received this information from him in or about September of 2020; correct?

A    That's the timestamp.

Q    And it says, "During our inspections of the gutters we noticed rotten and decaying," it says "facial boards," but you understand fascia boards to be that wood piece that is right under the roof?  Do you know what --

A    Uh-huh.

Q    -- a fascia board is?  Is that right?

A    Yes.

Q    All right.  And so he's saying that he's noticed them as being rotten and decaying.

Do you see that?

A    Yes.

Q    All right.  And he's talking about the roofing system, "the plywood beneath the shingles is soft, creating valleys and waves which you can plainly see."

Now, you understand that outside exterior wood is supposed to be hard, not soft; right?

Page 117

A    Correct.  Yes.

Q    It says "To date we are having water leaks around sliding glass doors, around roof vent collars and along walls in the apartment."

He mentions multiple sliding glass doors. He uses plural; right?

A    Yes.

Q    And then he says, "The good news is we're not talking the entire complex.  We're in the process of getting estimates for repairs.  But at some point because the systems are at least 26 years and the shingles are beyond their life expectancy, we may want to consider this issue.  Thanks."

So did you raise this issue with Tracy Arruda, Ms. Ferguson, or any of the management ownership at Beachwold?

A    I did.  And I believe several roofs were replaced.

Q    Okay.

A    And several patio door or the area around several patio doors where issues were found were also repaired and/or replaced.

Q    And who made the decision to make those repairs?

A    The final decision would have come from the

Page 118

ownership.  Those are extraordinary expenses that would have to be approved.

Q    All right.  So ownership again means Beachwold, and that refers to Gideon Friedman, Hazan, and what is the -- what is the third name again?

A    Their asset management team.

Q    Oh, their asset management team.  So that would include DeStefano, Rob Glass and Chuck --

A    Correct.

Q    Correct?  Okay.

A    Correct.

Q    All right.  And then if we go over to Exhibit Number 31.

(Plaintiff's Deposition Exhibit 31 was marked for identification)

BY MR. KRUDYS:

Q    Here's a -- a complaint that is going into Apartments 247.  Would I be right in saying that Apartments 247 sponsored this website, and residents of Pinetree and a whole bunch of other apartments could utilize it to make complaints that would then go to South Oxford Management?

A    Apartments 247 is a paid service.

Page 119

Q    Okay.  It's -- and do you -- you pay them in order to be -- for this service?

A    Correct.

Q    All right.  And so it says -- and you're paying from South Oxford Management -- let me ask you a question.  When -- if I'm a tenant in the period in which you're the regional manager and I come in and I want to pay my rent, to who is -- to whom do I write the check out to?

A    Pinetree Apartments.

Q    All right.  And where is that check deposited?

A    To the property's bank account.  But I -- I don't have those details.

Q    All right.  So did you ever monitor the bank account that checks would be paid into?

A    No.

Q    Who had that responsibility for monitoring where the checks are paid?

A    That would be through our corporate office and accounting.

Q    And are we talking Beachwold?  Are we talking South Oxford or --

A    South Oxford.

Q    South Oxford.  But that's the person that

Page 120

is managing the money.  You don't actually know the recipient, which account or who actually receives that money; right?

A    I don't have those details, no.

Q    All right.  But you understand that the apartment complexes are purchased by Beachwold Residential; correct?  Or just Beachwold.  You're not sure of the name.  But Beachwold is the one that goes out and pays for the apartments; right?

A    Correct.  Yes.

Q    And then the tenant writes a check to the apartment complex, and Beachwold Residential pays money to South Oxford Management to manage the properties; correct?

A    Correct.

Q    And so like a property like Pinetree, there's no actual employees for Pinetree; correct?  There's only the ownership group of Beachwold and South Oxford; correct?

A    Correct.

Q    All right.  If we go over to this exhibit here, it's L8 which is 3100 Pinetree Drive.  So this -- that's the address for Pinetree.  And it says Apartment L8.  "There appears to be black mold growing inside the window seals of the windows and

Page 121

patios."

This is another complaint about black mold around sliding glass doors; correct?

A    That is the complaint, yes.

Q    And then if we go to Exhibit Number 32.

(Plaintiff's Deposition Exhibit 32 was marked for identification)

MR. KRUDYS:  Let me just -- Gwenda, I know I'm going fast, but am I -- is it okay?
You're okay?  Good.  Okay.

BY MR. KRUDYS:

Q    So Exhibit Number 32, this is Keidre' Lewis-Davis making a complaint.  Subject line:  Water coming into -- coming inside apartment, exclamation point, exclamation point, exclamation point.

She's complaining that "it's now been two years I have had to pay rent for an apartment where water is leaking through my patio door into my room causing mold and mildew."

Now --

MR. KRUDYS:  I'm sorry, Marc, just a little below that, the original e-mail.  Do you see that paragraph?  There, it is.

Page 122

BY MR. KRUDYS:

Q   So "It has now been two years that I've had to pay rent for an apartment where water is leaking through my patio door into my home and causing mold and mildew."

Now, the way it's supposed to happen is that a tenant makes a complaint, a work order is completed. If the maintenance techs can do it, they do it; if they can't, they get an outside contractor to do it. And then the contractor takes care of the problem.

But she's saying she -- she's been doing this for two years, and the next line, "I was told contractors were supposed to come in and do the repairs but that never happened."

She's making this complaint that the process is not working as it's supposed to; right?

A   That, that is her complaint. But unless I can see her complaint from two years prior to confirm that she complained then and nothing was done then, I can't say whether her complaint is true and valid.

Q   Well --

A   I can only test -- I can only see here that she's saying she's been complaining for two years.

Q   I see. So why don't we open up the same

Page 123

page and look below this document?

So this is her complaining in November of 2020. Let's look below.

Now it's June 2020, approximately --

A   Uh-huh.

Q   -- five months before. And she says five months before, "I have been trying to get this issue fixed for almost a year."

So here, she's saying in June that for almost a year she's been trying to get this issue fixed. And both of these are in writing, and both of them are going to Pinetree; correct?

A   I assume wherever the e-mail was going.

Q   All right. And if we look over to exhibit -- the next page of the same exhibit.

A   Okay.

Q   And it says below, this is again Keidre' Lewis saying, "I have file several maintenance request to have water leak from my bedroom window fixed" -- (remote audio interference).

A   Okay.

Q   And she's stating in writing this same problem; correct?

A   Okay. Was it ever fixed? That was from 2020 so I don't recall. I don't know this person.

Page 124

Q   Well, she's -- there's an e-mail that is going in November. You saw that, that says -- in the November e-mail it says "it's been two years and I haven't gotten it replaced." I show you an e-mail in June. She says "it's been one year and had not been -- it's been replaced." [sic]

I show you a message in July saying it's not been repaired. She's made -- you've seen multiple written statements to South Oxford complaining about the same issue over a number of months; correct?

A   Correct.

Q   All right. Let's go to Exhibit Number 33.

(Plaintiff's Deposition Exhibit 33 was marked for identification)

BY MR. KRUDYS:

Q   All right. Here you receive an -- or -- an e-mail from the Pinetree manager. And I'll help you out. I think the Pinetree manager is Dionne Mason. And the reason I believe that if you look at Exhibit 34 --

MR. KRUDYS: Marc, could you go to Exhibit 34?

Page 125

(Plaintiff's Deposition Exhibit 34 was marked for identification)

BY MR. KRUDYS:

Q   So here it's a signature block. Is that -- do you pronounce it Dionne? Is that how it's pronounced?

A   I don't know how she pronounces her name.

Q   Okay. But she worked for you?

A   Yes.

Q   All right. How long did she work for you?

A   I think maybe less than a year.

Q   All right. But you would have had weekly meetings with her; right?

A   Correct.

Q   And you don't know how to pronounce her name?

A   I said "Dionne." I don't know if that's how she pronounces her name.

Q   Well, what did you call her? Did you call her Ms. Mason or did you call her by her first name?

A   I called her Dionne.

Q   Okay. All right. So going back to Exhibit Number 33, you -- ma'am, you've -- you kind of looked

Page 126

away.  Are -- is this -- do you find this deposition to be a bit annoying?

MR. KENNEDY:  Object to the form.

THE WITNESS:  It's just we're going over like individual work orders from years ago and --

MR. KRUDYS:  Marc, can you show her page -- Exhibit Number 3?

THE WITNESS:  -- unfortunately I haven't worked for this company for over two years.  So a lot of intricate details I don't recall.

(Plaintiff's Deposition Exhibit 3 was marked for identification)

BY MR. KRUDYS:

Q    This is our client, ma'am.

MR. KENNEDY:  Mark, I'm objecting to this. She is not a witness to damages.  This picture has no relevance to her deposition.  Please take it down.  This is harassment of a witness.

MR. KRUDYS:  This is what our client has to live with.

Go to Exhibit Number 33, please.

Page 127

BY MR. KRUDYS:

Q    Did you know that that was the extent of her injuries, ma'am?

MR. KENNEDY:  Object to the form.

THE WITNESS:  No.

BY MR. KRUDYS:

Q    Okay.

A    I have -- I had nothing to do with this incident so I did not inquire about it.

Q    When you talked to Crystal Spruill or any of the other people that used to work there, did -- did you talk about the injuries that she suffered?

A    No.

Q    On Exhibit Number 33, it says "Has a decision for approval been given about units needing the patio repairs?  C. Ligon H10 came in yesterday concerning growth on all her windows and concerned because her and her son has been getting sick more often."

So here is a parent talking to the apartment complex about mold around and growth around the windows and her son is getting more sick; correct?

A    That's what's noted.

Q    And it was affecting six different

Page 128

apartments; correct?

A    That's what's listed.

Q    And the sliding glass doors of all of these, what happened with regard to the -- this situation?

A    I don't remember.

Q    One of them was Eric Hansen; correct?

A    That's what's listed.

Q    Okay.  In Apartment G4?

A    Correct.

Q    All right.  Let's go over to Exhibit Number 34.  "I have contacted MBS."  This is an e-mail from the Pinetree manager to you, from Ms. Mason to you. "I've contacted MBS to confirm an estimate was submitted concerning patio repairs and estimate."

Rob, that's Rob glass; right?

A    I'm not sure.

Q    Well, do you know of any other Rob at, at -- working for the South Oxford/Beachwold complex?

A    That's -- Rob Glass is the only Rob I know of.  I don't know --

Q    All right.  So --

A    -- if that's the same Rob or if that's a Rob from MBS.

Q    I see.

Page 129

"Rob Wilson over again today for approval. There are six units that require repairs but E1 has to be completed in 30 days.  The remaining five units are," and it talks about them.

So what are the repairs that are being referenced, if you know?

A    I beg your pardon?

Q    What are the repairs that are being referenced?  Those are -- it says "concerning patio repairs and estimate."  Do you know what it's about?

A    I don't recall.  That's from 2021.  If it says "concerning patio repairs and estimate," I would assume it's concerning patio repairs.

Q    All right.  If you go to Exhibit Number 35, this is a complaint that was made by Hester Graves on or about, and if you look toward the top of the e-mail, September 24, 2023.

Do you see that?

A    Okay.  Yes.

(Plaintiff's Deposition Exhibit 35 was marked for identification)

BY MR. KRUDYS:

Q    All right.  And then if you look at the

Page 130

service requested, "There is a leak in the master bedroom over sliding door. When you touch over the door it's soft to the touch."

Did I read that correctly?

A    Yes.

Q    And that's in unit H1?

A    Yes.

Q    All right. And you would agree with me that, you know, the wood above the sliding glass door should not be soft to the touch?

A    Yes.

Q    All right. And then I'm skipping ahead and not hitting every exhibit, but Exhibit Number 37.

(Plaintiff's Deposition Exhibit 37 was marked for identification)

BY MR. KRUDYS:

Q    Here is a complaint for Apartment F8 by Brianna Cunningham concerning "windows and patio doors are showing signs of moisture." Is that correct, at problem description?

A    That's correct.

Q    All right. It says that work is done and it referenced Kilz as a sealant. But who's the

Page 131

person that actually did the work?

A    I -- I don't know. It doesn't show.

Q    It's once again blank as to who did it; right?

A    Yeah.

Q    All right.

A    Yes.

(Plaintiff's Deposition Exhibit 38 was marked for identification)

BY MR. KRUDYS:

Q    If we go to Exhibit Number 38, here's a -- a complaint with regard to Apartment F1 on January 18th, 2024. And it's about moisture and also around master bedroom door. It talks about "Second bedroom around patio door has signs of moisture, and also around master bedroom door."

Now, below it says, "MBS came out today and repaired patio door and wall." This is that outside firm that comes in and they do, among other things, they rip off the siding, they take back the Tyvek and they replace the wood below that; correct?

A    That was the company that was used mostly.

Q    All right. Now, but you don't know how

Page 132

many times that was actually done?

A    No. It was done on several occasions and invoiced, so South Oxford would have records to that effect.

Q    But you -- you never came to a determination as to what was causing the repeated problem of moisture and leaks around sliding glass doors on patio -- on patios?

A    It varied, from my understanding. Some had something to do with the installation of flashing. Others had something to do with missing Tyvek.

Q    All right. And installation of flashing, do you know what flashing is?

A    Not really.

Q    Okay. Did you ever make any questions, did you ever ask anybody what is this problem? When you say that the flashing was installed improperly, did you ever ask anybody what that means?

A    I always deferred that to our project manager or asset management.

Q    And who specifically are we talking about?

A    Rob Glass.

Q    All right. If you look at Exhibit Number 53, here's a complaint by Kim Saunders. And this is going to be on a slightly different topic.

Page 133

(Plaintiff's Deposition Exhibit 53 was marked for identification)

BY MR. KRUDYS:

Q    This is about termites. "Tub has some type of insect that appears to look like termites but not sure."

That's the complaint that came in with regard to Kim Saunders; is that right?

A    That's the complaint.

Q    And then Norris is the person, the technician that goes there. And he said "Found bugs that is look like flying ants, reported this to leasing office to have exterminator to investigate."

Now, you don't know of any particular training that Mr. Norris or any of the other technicians received from Pinetree or South Oxford concerning identification of termites and/or treating termites; right?

A    No, I don't.

Q    You understand that to be the domain of an outside exterminator, not with regard to somebody like Mr. Norris; correct?

A    Correct.

Page 134

Q    All right.  And so Norris says, Mr. Norris says found bugs that look like flying ants.

If we look at Exhibit Number 54.

(Plaintiff's Deposition Exhibit 54 was marked for identification)

BY MR. KRUDYS:

Q    Here is, it's dealing with Apartment F6, Kim Saunders, it's a photo, says looks like termites. And there's, you know, dozens of termites around the -- the tub.  Do you see that?

A    I see the bugs.

Q    All right.  You say bugs because you're not sure if they are termites or not; right?

A    That's correct.

Q    All right.  If you look at Exhibit Number 55, here is -- so in the time period --

MR. KRUDYS:  If you look at the bottom left-hand corner, Marc.

(Plaintiff's Deposition Exhibit 55 was marked for identification)

Page 135

BY MR. KRUDYS:

Q    This is concerning the same apartment.  And it's -- above that, it's March of 2021 is when the check was done, in February of '21 when the treatment was done.

You're the -- you are the regional -- I mean -- yeah.  You're the regional manager at that time; right?

A    Correct.

Q    And so your outside inspection company is saying "I found swarmer termites in bathroom tub in Unit F6"; correct?

A    Yes.

Q    All right.  And then if we go over to Exhibit Number 57A.

(Plaintiff's Deposition Exhibit 57A was marked for identification)

BY MR. KRUDYS:

Q    57A, it talks about "treated interior pool house exposed wood for termites."  That's PestNow saying that.  And it's on or about September 27th of '23, and it relates to -- I'm looking for the apartment.  I don't see it.  But it's September 27th.

Page 136

And if we look over, October 31 at Exhibit 57B.

(Plaintiff's Deposition Exhibit 57B was marked for identification)

BY MR. KRUDYS:

Q    So MBS would come in, and when they would perform repairs, they would sometimes take photos of their work; is that right?

A    Yes.

Q    All right.  And this appears to be an invoice submitted with a photo of their work; correct?

A    Yes.

Q    All right.  And it says:  Cut out and removed damaged sheetrock from bedroom wall above patio door.  Removed 4X4 post under exterior deck that was not installed properly.  Vinyl siding is cut away.  Replaced all rotten Celtics with half-inch OSB.  And then it also says reinstalled 2X4s below that.

So this is MBS saying this is the work that they did with regard to apartment U1 -- I mean H1 in or about October of '23; correct?

Page 137

A    Yes.

Q    And so they're actually not only replacing the siding and the like, but they're replacing the 4X4s and other wood that is inside the apartment; correct?  Is that the --

A    According to the scope of the work, yes.

MR. KRUDYS:  At Exhibit 57C, Marc, if you go to that one.

(Plaintiff's Deposition Exhibit 57C was marked for identification)

BY MR. KRUDYS:

Q    Bates Number 5242 at the bottom, this is an e-mail from you in November of '23 to Sasha Rubinstein.  Who do you understand Sasha Rubinstein to be?

A    I believe he -- I don't even know if it was a he or a she, but they work in acquisitions at Beachwold.  But it's not somebody that I was very familiar with.

Q    All right.

A    I do believe it was a he, though.  I'm not sure.

Q    Yeah.  I think on the picture we saw, that

Page 138

it was a he, too.  I recall that.

So, but Sasha is involved because there's tours, there's tours of the property.  These are folks looking at buying the property; correct?

A    Yes.

Q    All right.  And this -- there was an effort to try to sell the property as early as when you arrived, when you -- even when you first came in, you are aware that as early as 2019, there were efforts by South Oxford -- I mean, I'm sorry, by Beachwold and the management group to sell Pinetree; correct?

A    Yes.

Q    And that never stopped during the entire time that you're the regional manager, there's efforts to try to sell the property; correct?

A    No.  The property was only put on the market I think during my last year there.

Q    Well, weren't --

A    I think their plan changed at some point. Initially they were not going to keep the portfolio. Then they wanted to grow the portfolio and then they wanted to sell the portfolio.

Q    Well, in 2019, weren't there statements made by upper management to not undertake particular repairs because they were trying to sell the

Page 139

property?

A    I don't recall what happened in 2019.

MR. KRUDYS:  We are just going to take a -- a five-minute break and then we're going to do the last hour.  And then we'll finish by 1:30, okay?

THE WITNESS:  Awesome, thanks.

MR. KRUDYS:  Thanks.

THE VIDEOGRAPHER:  Going off the record at 12:22 p.m.

(Recess)

THE VIDEOGRAPHER:  Going back on the record at 12:33 p.m.

BY MR. KRUDYS:

Q    All right.  We took a five-minute break, and we're going to work 'til 1:30.

If you go to 44A, please.

(Plaintiff's Deposition Exhibit 44A
was marked for identification)

BY MR. KRUDYS:

Q    All right.  This is a letter from Rhonda

Page 140

Grubbs.  Have you ever spoken with Rhonda Grubbs? She's an office manager at PestNow.

A    Yes.

Q    Okay.  And you understood that she was like the -- she would be the communicator for PestNow. Maybe there were others.  But she was a person that worked in the office.  Here, it is, "office manager." And she would communicate with South Oxford in connection with termite issues and other insect issues; correct?

A    Yes.

Q    All right.  So it say -- this is a letter dated February 25, 2019.

How -- how new were you at Pinetree in February of 2019?

A    I was not employed by South Oxford in February of 2019.

Q    Okay.  When did you join again?  I apologize.

A    May.

Q    Okay.  All right.  And who was your predecessor?

A    I don't know.

Q    Okay.  Did you have a predecessor?

A    I don't know.

Page 141

Q    Okay.  So it says here, "We recommend treating the entire building."

And they're talking about, this is the second paragraph, Building E, "by trenching and rodding the full exterior.  We will also be treating the interior of Unit 3 by removing a section of the carpet in the living room and drilling to inject termiticide into the concrete floor."

You -- do you know what -- what, if any follow-up was done with regard to this e-mail, understanding that you were not there yet?

A    I don't know.

Q    All right.  If you go over to Exhibit Number 44B.

(Plaintiff's Deposition Exhibit 44B
was marked for identification)

BY MR. KRUDYS:

Q    Have you ever seen these e-mails before? They're February of 2019.

A    Not to my recollection.

Q    All right.  At the bottom, it says, "PestNow found termites" -- this is that yellow box toward the bottom.  "PestNow found termites eating

Page 142

through the wood into the laundry closet drywall and behind the siding.  Unable to tell how far they had spread but because it's a middle unit, PestNow recommends treating the whole building."

Did I read that correctly?

A   Yes.

Q   All right.  So it says above that, it's sent from Ned Tentindo at Ross Management Services to Dan DeStefano.  And so you understood that Ross Management was the predecessor company, and here's a person from Ross e-mailing over to Dan DeStefano and Jennifer Roberts concerning this termite issue; correct?

A   Correct.

Q   And what did you understand Jennifer Roberts' position to be?

A   When I was hired on, she was head of compliance.

Q   Okay.  In the e-mail above it, the -- it says -- and so your -- you know Ms. Fantone (as spoken), the person that followed you, she was your successor?  Is that right?

A   Um...

MR. KRUDYS:  Charlie, what's the --

THE WITNESS:  What's her name again?  Are

Page 143

you referring to Kaitlin?

BY MR. KRUDYS:

Q   Kaitlin Fattone.

A   Yes.

Q   All right.

A   She followed me.

Q   All right.  So look at the e-mail above, please:  "Gideon, termites reported at one building at Pinetree."

This is DeStefano writing, copying Roberts.  And he's writing to Gideon about Building E.

"Gideon, termites reported at one building.  Trying not to spend money at the property but we don't have much choice."

I deposed her yesterday.  She was speaking on behalf of the company.  And she said the reason they were trying not to spend money on the property is they were trying to sell it.  And she went on to say that's a very common thing when you're trying to sell the property, is not to spend money on it.

Did you know that's what the company was trying to do prior to your arrival, not spend money on the property so that they could sell it?

A   No, --

MR. KENNEDY:  Object to the form.

Page 144

THE WITNESS:  -- I did not.

BY MR. KRUDYS:

Q   Okay.  Well, do you know why DeStefano is saying trying not to spend money at the property but we don't have a choice?

A   I can't speak to anything that happened before I joined the company.

Q   Okay.

A   Or why they're saying what they're saying.

Q   All right.  Well, the reason I'm asking that question is perhaps they would have informed you about this.  And did anybody?

You're saying nobody informed you about this?

A   Had I been informed, I would not have accepted the position.

Q   What do you mean by that?

A   I wouldn't have joined a company that was going to be sold.  I relocated from Illinois to Virginia.

Q   I see.  But, so they -- when they hired you, they -- they never told you that they had been -- they had undertaken efforts to try to sell the property?

A   I was hired with the understanding of what

Page 145

I was told, is that Beachwold wanted to bring the management of the Virginia portfolio under South Oxford Management.

Q   And why did they want to do that?  Did they say?

A   No.  If they did, I don't remember.

Q   And who told you that they wanted to bring the portfolio under South Oxford?

A   Tracy Arruda.

Q   So when you joined -- you know how you mentioned the -- the properties before with regard to the portfolio, Chesterfield, the two in Colonial Heights, Pinetree, and then the one in Newport News?  Did those, did that portfolio exist when you joined, or did it expand after you joined?

A   It expanded after I joined.

Q   And which ones were the ones that were added to it?

A   Maddox in Colonial Heights and The Bend.

Q   But those properties were eventually sold; right?

A   That's my understanding.

Q   All right.  Were they sold after you left in January of 2024 or before?

A   After.

Page 146

Q    All right.  Well, did -- did you leave because you kind of saw the writing on the wall, that Pinetree, The Bend, all of these properties except for I believe Maddox Place were all going to be sold?

A    The entire portfolio was up for sale, and I had an opportunity to leave prior to the sale.

Q    When did the entire portfolio go up for sale?

A    I don't remember the exact date, but there --

Q    How --

A    -- should be records of when the property was -- the properties were listed.

Q    In relation -- if you left in mid January of 2024, what is your best estimate as to how many months before you left the entire portfolio was up for sale?

A    I would say at least six months maybe.

Q    Okay.  And who was the one that told you the entire portfolio was up for sale?

A    Tracy.

Q    And did she tell you why?

A    Not specific details other than, --

Q    What --

A    -- you know, they were not going to be

Page 147

expanding the portfolio in Virginia.

Q    And did they tell you why?

A    No.

Q    All right.  But when you're brought in, they told you that they were going to expand, and here they are putting the entire portfolio up for sale.

What was your reply?  Like, what was your response when you heard that?

A    "Okay.  Well, what happens to my job?"

Q    And what did they say?

A    I was offered the opportunity to transfer --

Q    To where?

A    -- and relocate.

Q    To where and to what position?  Did they specify?

A    Relocate to Connecticut.  I didn't have a portfolio spelled out for me.

Q    All right.  Where in Connecticut?

A    It would -- there was no specific location given.

Q    All right.  Well, Kaitlin Fattone is -- lives in Connecticut now.

Do you know of any other South Oxford

Page 148

employees that live in Connecticut in addition to her?

A    No.  I'm sure there are.  They have a lot of properties there.  But I -- you know, I'm not in contact with...

Q    So did -- so -- so South Oxford and Beachwold were not getting out of the business, they were just getting out of Virginia except for Maddox.

Did they explain why that was occurring, why Virginia?

A    No, they didn't go into detail with me about it.

Q    All right.  But didn't -- didn't you ask the question why are you -- why do you plan to sell these properties and keep the others?

A    And keep -- and keep what?

Q    And keep others?

A    I simply assumed it was part of their -- their business plan.  That was a business decision.

Q    And when you say "their business plan," you're referring to the ownership group; correct?

A    Yes.

Q    And the ownership group would make decision -- when -- when -- when Pinetree was sold, did South Oxford Management -- when Pine -- Pinetree

Page 149

and the other portfolio in Virginia were sold, South Oxford was no longer the management company; correct?

A    I don't know.

Q    Well --

A    To my understanding, the portfolio sold well after I was gone.

Q    Yeah.  I understand it was sold in August of '24.

A    Okay.

Q    Or at least Pinetree was.

A    Oh, okay.

Q    I'm not quite sure about the other properties.

Okay.  So if we go to Exhibit Number 44C.

(Plaintiff's Deposition Exhibit 44C was marked for identification)

BY MR. KRUDYS:

Q    So the first e-mail that I showed you where Gideon is being -- Gideon Friedman is being told about termites was February of 2019 in Building E. February 2019, Building E.

Now, that's at Exhibit 44B.  Now we're going over to 44 Charlie or C.  And if you look down,

Page 150

it says the March 2019.  But March 2019, you -- have you joined the entity yet or not?

A    No, I had not.

Q    Okay.  And I apologize.  I have it written somewhere.  But when did you join the entity?

A    May of 2019.

Q    Yeah, May.  All right.

So the other one was about February 2019, Building E.  Here now is Building N in March of 2019.  And if you read with me, it says it's from Gid- -- it's from DeStefano to --

MR. KRUDYS:  No, the one down from that, Marc.  Yeah, the one from DeStefano to Gideon Friedman.  There, you go.

BY MR. KRUDYS:

Q    (As read):  "Gideon, we have bad termite infestation at Pinetree.  Photos attached.  We're moving forward with treatment of this building for $3,000.  There is interior repair and the exterminator notes framing damage."

What -- when you -- the term framing damage, you understand that to be the 2X4s and the like that support a building; correct?

A    I -- I can't speak to that.  That's not my speciality.

Page 151

Q    All right.  Well, you un- -- you were a regional manager for an apartment complex portfolio.  You do understand that a building has 2X4s that help to support it, and you do understand that concept; is that right?

A    I understand the concept of supporting walls and structure.

Q    Right.

A    I don't know the specifics or the dimensions of whatever boards would be holding them up.

And, again, I do want to state for the record you're referencing e-mails that were prior to me being hired by this company.

Q    No, I -- I -- I understand that.  And I think --

A    Okay.

Q    -- I pointed out that you don't get there 'til May, and we're dealing with first February and now March.

A    Correct.

Q    And so he goes on to say, "Ross' construction manager will assess.  This is the second termite building in a month-they are not adjacent buildings or particularly close.  I asked Ross to

Page 152

walk all unit interiors and think we need to have the exterminator survey the exteriors.  I'll provide an update as soon as I have one.  Thanks."

Did I read that correctly?

A    Yes.

Q    All right.  And then -- and then Kate Kerrigan above that, do you know who Kate is?

A    No, I don't.

Q    All right.  She says "Those pictures, wow."

And then if you look at 44D.

(Plaintiff's Deposition Exhibit 44D was marked for identification)

BY MR. KRUDYS:

Q    All right, here's the pictures that Kate's referring to, Kate Kerrigan's referring to.

You see the termites in the area above the sliding glass door, and then on the second picture, by the carpet by the sliding glass door.  And then in picture 4 -- 5423, in the crevices of the sliding glass door, and again at 5424, do you see the termites in the -- in the rug area and the area around the sliding glass door?

A    Yes.

Page 153

Q    And so did -- before you were hired, did anybody tell you about the severity of termite damage at Pinetree Apartments?

A    I don't recall, no.

Q    All right.  So, in other words, you -- sitting here today, you don't recall anybody ever giving you a heads up about that situation before you got hired; is that right?

A    That's right.

Q    All right.  And you saw in the e-mail where they said -- where they talked about how the properties aren't particularly close.

Did you see that?

A    Yes.

Q    All right.  So just bear with me for a second.

So if we go over to -- so the -- the properties we talked about were Building E and Building N.

MR. KRUDYS:  Marc, if you go over to Exhibit Number 23.  And 23 has some sub-exhibits in it.  I am looking for the sub-exhibit that is -- just bear with me.  I'm having difficulty finding what I'm looking for.  I'll make sure in one other place, so just bear with me.

Page 154

(Counsel conferring)

MR. KRUDYS:  Why don't we -- we'll come back to that?  And if you need to join, I might be able to look it up too.

I apologize to everybody.  I'm looking for something and I just cannot find it.  If not, we'll move on.

BY MR. KRUDYS:

Q    Did Gideon Friedman -- did you ever have a conversation with Dan DeStefano about termite damage at Pinetree?

A    A verbal conversation?  I don't recall.

Q    You -- did you have a written conversation -- an e-mail conversation with him?

A    If there was communication, there may or may not have been.  I don't remember.

Q    Well, what was your understanding with regard to termite damage at Pinetree during the time that you were working there, understanding that you got there in May of 2019 and some of these documents predate you getting there?

A    From what I can remember, the last was that they found termite damage in the pool house.  That was treated.  The property also had termite bonds.

Page 155

That was renewed I believe annually with an inspection.

Q    All right.  Well, did -- there are multiple e-mails -- okay.  Thank you.

There's multiple e-mails that talk about Pinetree noting that there's only -- they're just doing exterior inspections, and if South Oxford wants an interior inspection, they have to request it.

Do you recall that rule, that if there is to be an interior inspection, South Oxford had to request it?

A    I don't recall.

Q    Okay.

MR. KRUDYS:  All right.  The -- the document that I'm looking for, Marc, is 42A.

(Plaintiff's Deposition Exhibit 42A was marked for identification)

BY MR. KRUDYS:

Q    And you understand this to be a schematic layout of the apartments at Pinetree?

A    Yes.

Q    All right.  And so Building E is -- so if you look toward the bottom, Building G --

Page 156

A    Uh-huh.

Q    -- where Ms. Ghee and her son were, sons were in is all the way to the bottom right; correct?

A    Okay.

Q    And then Building E, there was termite damage in that building, among others; correct?

A    Okay.

Q    And then -- and then they also noted live termites.  This is a March of 2019 document, Exhibit 43, live termites on the exterior of Buildings B --

MR. KRUDYS:  And, Marc, if you see it says here B, C, G, Q, O, P, and J had active termites.

So if we go to that map, the other map, so Exhibit 42A.  So if you -- so B, Marc, could you mark B, yellow mark B?  Yes.  And could you put that in yellow?  Are you able to just highlight it?  No, I mean in highlight.  I want to highlight a number of buildings with a highlighter, just yellow.  There, you go.

BY MR. KRUDYS:

Q    So Building B, Building C, Building G, Building K, Building O, Building P, Building J.  And then the pool house building was all the way up to the left where that, like, blue water is; is that

Page 157

right?

So these are the buildings that are noted in just one document.  This is March 2019 of Pinetree.

The -- I'll represent to you that the termite company PestNow suggested that all of the buildings be treated because of the understanding of termites.  But only certain buildings were treated; correct?

MR. KENNEDY:  Object to the form.

THE WITNESS:  I don't know.

BY MR. KRUDYS:

Q    Okay.  Well, I'm -- I'm going to represent to you that only certain buildings were treated.

Did anybody ever tell you that the exterminator recommended that all buildings be treated but only some of them be treated -- only some of them were?

A    I don't recall.

Q    All right.  And then if you look at a number of exhibits, like Exhibit Number 44.

(Plaintiff's Deposition Exhibit 44 was marked for identification)

Page 158

BY MR. KRUDYS:

Q    Toward the bottom left, this again predates your time, but it's April of 2019. "I found live wood destroying insects in the property," do you see that at the bottom?

A    Yes.

(Plaintiff's Deposition Exhibit 45 was marked for identification)

BY MR. KRUDYS:

Q    All right. And then if you look at Exhibit Number 45, this is for the time period April of 2019, just a month before you arrive. "I found evidence of wood destroying insects. I found termite damage."

Did -- were any of these PestNow documents involving wood damage, termites, were those available to you when you came on duty as the regional manager?

A    I don't recall.

Q    Wouldn't this be the type of information that you would have access to? This is a cost, an expense for the property, treating termites; right?

A    Given that -- well, it's based on the date of the invoice. So any invoices that were processed in the system prior to South Oxford Management taking

Page 159

over, I would not have access to those. Those would have been with Ross Management.

Q    All right. Let's go over to -- so when Ross Management took over, they didn't provide you the documents of their communications with PestNow preceding South Oxford --

A    No, they did not.

Q    -- Management?
Why not?

A    I don't know.

Q    Did you ask for them?

A    I had no communication with them.

Q    All right. But like, if I'm -- if I'm a teacher and I take over -- let's say another teacher goes out on maternity leave and I'm taking over for the class, you would see why I would want to see the grades of the students before I came onboard; right?

A    Absolutely.

Q    Right.

A    However, a transition and the transfer of documents was not my responsibility.

Q    Whose responsibility was it?

A    You would have to inquire with South Oxford Management.

Q    All right. Do you have a sense as to or an

Page 160

understanding as to who sent -- whose responsibility that would be, a particular person?

A    No.

Q    If we go over to Exhibit 50A, please, 50A, 50 alpha.

(Plaintiff's Deposition Exhibit 50A was marked for identification)

BY MR. KRUDYS:

Q    All right. Here's a document dated May 17th at -- okay. So this is three days before -- I understand you come onboard, your date of employment has been told to me as 5/20/2019.

And does that sound right to you, 5/20/2019?

A    That was my date of hire, I believe. And I relocated to Virginia sometime in June.

Q    All right. Did you start receiving e-mails after your date of hire?

A    I believe I started receiving e-mails because I was going through onboarding and training.

Q    All right. So this e-mail is May 17th, 2019. It's from Dan DeStefano and it says -- this is middle of the page, Marc -- "Gideon, we're managing

Page 161

AP."

And "AP" means accounts payable; right?

A    Yes.

Q    And when somebody refers to managing AP, that means they're trying to control expenses; right?

A    Or overseeing it, yeah.

MR. KENNEDY:  Object to the form.

BY MR. KRUDYS:

Q    Yeah. Okay.

"Gideon, we're managing AP at Clearfield and Cottage. However Pinetree requires $30,000 in funding at this time."

So DeStefano is basically saying, basically they're keeping costs in line at Clearfield and Cottage, that property in Newport News, but he's saying "However, Pinetree requires $30,000 in funding at this time. This is primarily driven by the recent termite treatment, 21,104. May we wire the funds?"

So your understanding is that -- and you may not have received this e-mail. I understand that. But you understand this e-mail to state that costs are being kept under control at Clearfield and Cottage, however Pinetree requires $30,000, and DeStefano is asking his boss, Gideon Friedman, whether or not he can pay the amount for the termite

Page 162

treatment; right?  I --

A    It appears to be, yeah.

Q    A better way to say it is that he's requesting the right to send $30,000 because they have a recent termite treatment of $21,000; correct?

A    Yes.

Q    Okay.  And then Gideon, the person with final approval, says "Yes, go ahead" above it.  Do you see that?

A    Yes.

MR. KRUDYS:  Marc, can you show her the fuller page?  There, it goes.

BY MR. KRUDYS:

Q    So you could see that "yes, go ahead" was from Gideon Friedman.

And then "cc Bud Fagerli," do you know who Bud Fagerli is?  Or it might be "Fagerli."

A    I know he was connected to Beachwold, but I believe he may have retired right when I started.

Q    Okay.  All right.  If we go over to Exhibit Number 51, please.

(Plaintiff's Deposition Exhibit 51 was marked for identification)

Page 163

BY MR. KRUDYS:

Q    Toward the bottom of the page, 5/6/2020. "I did a thorough exterior" -- oh, let me give you context.

May of 2020, and it's talking about Building G.  "I did a thorough exterior inspection of Building G for termites.  Pinetree staff is aware that if an interior inspection is needed, they are to contact us."

So this -- remember before I asked you a bit ago about this rule that Pinetree would -- I mean that PestNow would do the exterior, but if they wanted an interior inspection, they needed to contact PestNow, and you said you weren't familiar with that rule?

I'm kind of showing you here.  Does this -- does this in any way refresh your recollection as to that rule?

A    No, not -- no, it doesn't.

Q    All right.  So the termiticide, termiticide, you've heard of the word pesticide, but termiticide is like a pesticide for termites.

Had you ever heard termiticide, the term before?

A    I've heard of termites, but -- and I've

Page 164

heard of pesticide, not termiticide.

Q    Yeah.  I hadn't either until this case too. But, so I'll represent to you termiticide is the name they give for the pesticide directed to termites.

And so did you know that -- were you aware -- you understand that the chemicals used to treat termites are going to be hazardous materials; right?

A    I would assume so.

Q    Okay.  And they are.

And the question then is:  Did you know that there's a label on it that specifies how the termiticide is supposed to be applied?

A    I would assume so.

Q    Okay.  Well, that label requires termiticide to have an interior inspection.  But PestNow didn't do the interior inspections unless specifically told by Pinetree.

So, again, I'm returning to that rule.  Do you -- do you have any understanding as to -- basically, there -- the rule was federal compliance or -- and state compliance with the termiticide law which was the label, follow the label, was up to Pinetree, they had to request the interior inspection.  And did you -- and your understanding is

Page 165

you don't know why there was that rule that Pinetree had to request that; correct?

MR. KENNEDY:  Object to the form.

THE WITNESS:  I -- I don't recall.

BY MR. KRUDYS:

Q    Yeah.  And there's really no Pinetree employees, so when they're referring to Pinetree, they're talking about Pinetree Apartments and South Oxford staff; right?

A    Correct.

Q    Okay.

MR. KRUDYS:  If you look over at Exhibit 51A, Marc.

(Plaintiff's Deposition Exhibit 51A was marked for identification)

BY MR. KRUDYS:

Q    And this is an e-mail.  So you're now on the property.  It's July of 2020.  It's about 13 or more months after you've joined.  And it's an e-mail from Ashlee Vega to Nadra Yohannes.  Do you know who Ashlee Vega is?

A    I don't remember.

Q    It says at the bottom "Ashlee Vega,

Page 166

Beachwold Residential, LLC."

You understand that she's at least a Beachwold employee?

A    Yes.

Q    All right.  So it talks about -- at the very beginning, it talks about "Hi Nadra.  I just wanted to touch base on the termite inspection for Clearfield and Pinetree.  Thank you."

And then it talks -- and then on July 9th, 2020, you see where you respond "The inspection for Clearfield is scheduled for today.  I should get the report by Friday.  I'll forward as soon as it's received."

And then Vega replies "That's great news" and says a little bit more.  "Is there a Pinetree inspection scheduled?"

And above that, you write "No."  Do I -- "Do you need to have" one -- "a new one done for them as well?"

And then -- and then Ashlee replies, "Yes. The lender just asked us to have a new inspection done for Pinetree because the last one was completed in 2019 and there was evidence in some buildings of termites."

Now, it refers to a lender.  Do you know if

Page 167

this is part of that sell process, looking to try to sell the properties, or is the lender referring to the lender that provided the financing for the purchase of Pinetree?

I'm asking if you know.

A    At that point the property was not up for sale in 2020, so I would have to refer you back to Beachwold to clarify which lender.

Q    Okay.  Well, this refer -- this says that -- and you receive an e-mail saying the last inspection for termites was in 2019.  Here we are in July of 2020.

Do you know why there was no inspection during that period of time?

A    No, I don't.  But, again, my understanding with the bonds was that the inspections were done annually.  So they would become due on or around that time.  And based on the prior e-mails and invoices that you showed me, the last inspection or whatever activity was happening was in April or May of 2019.

Q    If you go to Exhibit Number 68, Marc.

(Plaintiff's Deposition Exhibit 68 was marked for identification)

Page 168

BY MR. KRUDYS:

Q    So we have received a number of affidavits from former tenants about the property.  You've seen them for Ms. Taylor, Ms. Bugg.

Here's one from Vanessa Schane.  She was in the apartments for a long period of time, from 2010, lived in Unit L10.  She moved out in 2014 but then she continued to visit her family, who remained in the -- in the -- in the apartment complex until 2024. That's all at paragraph 4.

And then she talks about mold in the ceiling of the apartment.  "There was mold on the ceiling near the washing machine and elsewhere," that's in paragraph 5.

And then in paragraph 6, "We complained about the mold but maintenance workers merely painted over the mold."

You had received that complaint before from tenants, saying that the Pinetree maintenance personnel were just painting over the mold; correct?

MR. KENNEDY:  Object.  Object to the form.

THE WITNESS:  Mold and mildew are two different things treated in different ways.  And so a tenant saying that the maintenance techs are painting over the mold, I don't believe I

Page 169

was ever provided evidence from the tenants that it was mold.

BY MR. KRUDYS:

Q    All right.  Well, did you -- you were never provided -- I mean, like here's an exhibit, Number -- I mean if we go to same exhibit, B, 68B.

THE VIDEOGRAPHER:  Do you mean the second page?  I only have a 68 --

MR. KRUDYS:  Behind it I have a 68 alpha, a bravo.  Do you not have those?

THE VIDEOGRAPHER:  I'm sorry, I do not.

MR. KRUDYS:  Okay.  That's all right.  I can -- I think we can do it this way.

BY MR. KRUDYS:

Q    So these folks took many photos of their apartment.  So you're able to see -- I always make my thing go away so I don't have to look at myself.

Where is the -- so you'll just have to tell me.  Can you see this document?

A    Yeah.  I see the, looks like black spots on a ceiling.

Q    All right.  And then here's another one. Here is B -- I mean C.  And again, black spots on the ceiling, do you see that?

A    Yes.

Page 170

Q   Okay.  And they're complaining about mold. It looks like it could be mold; right?

MR. KENNEDY:  Object to the form.

THE WITNESS:  I can't say.

BY MR. KRUDYS:

Q   All right.  Well, they're complaining about mold.  They have pictures of black spots on their ceiling.  That's where they're saying there's mold.

You can't -- you have nothing to rebut the accuracy of their statements; right?

A   And I have nothing to -- to validate it.

Q   Well, I showed you pictures of it and I've got their sworn statements saying that they had black mold and that they complained about it to Pinetree for years.

A   Right.  What I see are pictures of black spots on the ceiling.  I'm not an expert and I cannot judge what is mold based on a photo.

Q   All right.  All right.  But you then did receive literally dozens of invoices for the treatment of -- I mean the replacement of wood damage at the apartments.

MR. KRUDYS:  Like if we go over to Exhibit Number 93, and so if we go to the second page in, Marc.

Page 171

(Plaintiff's Deposition Exhibit 93 was marked for identification)

BY MR. KRUDYS:

Q   This is an invoice for June of 2022.  It's by MBS Construction Services.  And it's talking about removed siding -- sliding glass patio door, cut out sheetrock, removed rotten header above the door, removed insulation from exterior wall, removed rotten door jack.

Did I read that correctly?

A   Yes.  Uh-huh.

Q   Okay.  So that -- you received dozens of these reports from outside contractors saying that when they were asked to look around the sliding glass door for moisture, the wet wood that was found, the black mold, and when you pulled back the -- the siding or the sheetrock, they found often rotten wood below the surface; correct?

MR. KENNEDY:  Object to the form.

THE WITNESS:  What I -- what I can testify to is that, like I said, once a service request is called in, a team member is dispatched.  And if what they find is above and beyond their

Page 172

scope, we would get an outside contractor.

I do recall towards the end, MBS is a company that we used to make the repairs and/or replacements whenever it was found.

BY MR. KRUDYS:

Q   Well, I mean, I asked the question of Mr. Norris in every case, was moisture found below the surface of where the contractor went, and he said in every single case it was.  In no case did they check and they did not find the moisture and the damage associated with it.  So --

A   Okay.

Q   -- if every time you're looking you're finding moisture damage, doesn't that mean you should check all the apartments for that moisture damage?

MR. KENNEDY:  Object to the form.

BY MR. KRUDYS:

Q   Sixteen times you look below the surface and 16 times you find, among other things, rotten wood, rotten headers, wet materials, doesn't that -- wasn't that an indication to y'all to go and check around all of the sliding glass doors for that rotten wood?  Didn't -- did you -- first off, did you ever think to do that?

A   To rip out the walls of every apartment?  I

Page 173

don't understand what you're asking.

If -- if damage was found, then it was repaired.  If the tenants called in an inspection or work order or something to say that they have moisture, then it would be responded to.

BY MR. KRUDYS:

Q   All right.  Well, you -- you heard -- you said you didn't quite know what flashing meant, and I -- I understand that.

But you understood that flashing basically is that material that is around the sliding glass doors, and you understood that it was installed improperly and that water was getting inside the walls of the building; right?

MR. KENNEDY:  Object to the form.

THE WITNESS:  Where the repairs were made, at times that was explained that that was the issue that caused water to get in.

BY MR. KRUDYS:

Q   So, so let me just show you.  This is my pad here.  Can you see my pad?

A   Uh-huh.

Q   This is -- I'll say that this is drywall, okay?  And then this is the water.  The water is pouring in.  It's inside the wall because the

Page 174

flashing is applied incorrectly.

You understand that there's going to be a period of time in which the water will be accumulating inside the wall, that there won't be any outer appearance of damage until it affects the drywall; you understand that, right?

MR. KENNEDY:  Object to the form.

THE WITNESS:  I understand what you're saying.

BY MR. KRUDYS:

Q    All right.  Did you -- if -- and that makes sense, what I just explained.  There's going to be a period of time in which, if moisture and water is getting inside the walls of the building because the flashing is improperly installed, eventually you'll see damage and you'll see water leaking in like the videos we've seen and wet sheetrock and the like.

But at -- for a period of time, the water will be accumulating inside the walls without any external appearance; right?

MR. KENNEDY:  Object to the form.

BY MR. KRUDYS:

Q    For a period of time, that makes sense; right?

A    On the exterior or the interior.

Page 175

Unfortunately, I don't know how you would find damage if you don't have any indication of damage.

Q    Well, you know that flashing is -- is improperly installed around the building.  Norris and McConnell have testified to that.  If you want, I could read their transcript.

They -- did they tell -- and they told you about that flashing being incorrectly installed; right?

A    In the units where the repairs were needed, yes.

Q    And -- and indeed MBS Construction and other maintenance companies told you about that same thing:  Hey, when we look behind the wall, we're finding rotten header above door.

Do you know what a header above the door is?

A    Yes.

Q    All right.  So this is --

MR. KRUDYS:  Marc, if you'd go over to Exhibit Number 1.

(Plaintiff's Deposition Exhibit 1 was marked for identification)

Page 176

BY MR. KRUDYS:

Q    So this is the header around Ms. Ghee's sliding glass door.  And then the jack studs are the one on the side.

And you see how --

A    Okay.

Q    -- the putty knife is in there and how it's all moist and -- and do you see where the putty knife is?

A    Yes.

Q    All right.  So you were being told by MBS Construction and -- and the people that work for you that rotten headers and rotten door jack studs and the like are being found around sliding glass doors; right?

A    Yes, where --

Q    All right.

A    Where inspections were conducted, yes.

Q    All right.  So, and then I asked Norris, "Question:  And what are the types of moisture issues that they have reported?"

"The most prominent one is moisture around the windows and moisture around sliding glass doors."

"Why do you say that those are the most prominent complaints?"

Page 177

"Because, actually, that's all there is. We found the moisture, when it rains, moisture is getting inside behind the siding, and therefore it starts to leak inside."

"Question:  When it leaks onto the carpet and the carpet becomes wet and drywall gets wet; is that right?"

"That's correct."

And he talks about confirming that there's leaks around the sliding glass door and then he says "incorrect flashing."  And he says that that problem had been known since 2019.

And then I asked him, "in every occasion that they" -- oh.

"Question:  Every time you have a contractor that comes in and they find the flashing is improperly put in; correct?"

"That's what they're saying, yes."

And then he goes on to say that -- I have it here someplace, but I think he says it occurred on 16 different occasions.

So every time those contractors check, they find this problem around the sliding glass doors. And it's -- it's multiple times.  It's over I think a dozen -- 16 or so times that we document it.

Page 178

My question is: When you're finding it so prevalently, why didn't you go in and inspect all around the sliding glass doors to see if there was that damage to the jack studs and to the headers?

MR. KENNEDY: Object to the form.

THE WITNESS: Sixteen times out of 144 units would not require removing the drywall from 144 units. And though I'm no construction specialist, I would assume you would need to remove the drywall in able to -- in order to see the -- the studs and supporting wood or what-have you.

BY MR. KRUDYS:

Q Now, most of the time they're going in from the outside. They're removing the siding. Then they take the Tyvek and they see the problem. You can approach it from the outside.

A Again, I'm not a construction specialist. But you would have to remove a portion of the building to look for damage that you're not able to see visibly; correct?

Q And that would have saved Ms. Ghee's son's life and would have kept her skin from being burned off her face. So isn't that a justifiable cost to spend?

Page 179

MR. KENNEDY: Object to the form.

THE WITNESS: I don't know anything about the cause of the fire so I cannot suppose what would have prevented it.

BY MR. KRUDYS:

Q Well, it's not about preventing the fire, it's about escaping from a fire. If the sliding glass --

A I don't know the details, sir.

Q All right. Well --

A I don't know the details. And I'd rather not.

Q Well, you knew about rotten headers above sliding glass doors; right?

MR. KENNEDY: Object to the form.

THE WITNESS: I knew it was found in some of the repairs that were done.

BY MR. KRUDYS:

Q Why do you think a header, a wood beam is placed across a sliding glass door? It's to provide support; right?

MR. KENNEDY: Object to the form.

THE WITNESS: I don't know. I'm not a construction specialist.

Page 180

BY MR. KRUDYS:

Q Well, it doesn't take a construction specialist to know that the 2X4s, the 2X6s, the headers and all, are to provide support; correct?

A Again, I'm not in construction. I'm not a builder.

MR. KRUDYS: We'll take a -- a two-minute break.

THE VIDEOGRAPHER: Going off the record at 1:26 p.m.

(Recess)

THE VIDEOGRAPHER: Going back on the record at 1:27 p.m.

MR. KRUDYS: All right. You told us about your formal stop at 1:30. We're going to respect that. We do have additional questions, but we're going to stop at this time. We appreciate your time and attention. We wish you the best until we see you again.

We'll be in contact through your counsel concerning that, but we greatly appreciate your time and attention, and we wish you a good day.

THE WITNESS: Thank you.

Page 181

MR. KENNEDY: I'm going to object to keeping the record open, but Mark and I can talk about that.

MR. KRUDYS: Yeah.

All right. Thank you very much.

THE WITNESS: Thanks.

THE VIDEOGRAPHER: This marks the end of today's testimony. We are going off the record at 1:28 p.m.

MR. KENNEDY: Thank you.

AND FURTHER THIS DEPONENT SAITH NOT.

SIGNATURE RIGHTS RESERVED.

(Deposition concluded at 1:28 p.m.)

* * * * *

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                                                                          Pages 182..184

Page 182

CHANGES REQUESTED TO THE DEPOSITION OF:

NADRA YOHANNES

TAKEN:  January 6, 2026

PAGE/LINE:                    DESCRIPTION

_____

_____

_____

_____

_____

_____

_____

_____

          DATE: _____

     SIGNATURE: _____

NOTARY PUBLIC: _____

MY COMMISSION EXPIRES: _____

REPORTED BY: GWENDA E. APPLEGATE, RMR, CRR

Page 183

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

          I, Gwenda E. Applegate, Registered Stenographic Court Reporter, Notary Public in and for the Commonwealth of Virginia at Large, and whose commission expires November 30, 2029, do certify that the aforementioned appeared before me, was sworn by me, and was thereupon examined by counsel; and that the foregoing is a true, correct, and full transcript of the testimony adduced.

          I further certify that I am neither related to nor associated with any counsel or party to this proceeding, nor otherwise interested in the event thereof.

          Given under my hand and notarial seal at Palmyra, Virginia, this 25th day of January 2026.

_____

          Gwenda E. Applegate, Notary Public
          Commonwealth of Virginia at Large
          Notary Registration Number 115863

Page 184

Halasz Reporting & Videoconference
1011 East Main Street
Richmond, Virginia 23219
(804)708-0025

January 25, 2026
Kevin M. Kennedy, Esq.
Via email:  kkennedy@wilsav.com
Re:  Deposition of NADRA YOHANNES

Dear Mr. Kennedy:

          You will find attached to this email a PDF copy of the deposition transcript of NADRA YOHANNES and signature page thereto.  Please have Ms. Yohannes print the errata page of the transcript, which printed page will serve as the original signature page.  After reviewing the transcript, the deponent should make any changes deemed necessary on the original errata page, noting page and line number of the change desired and a brief explanation of the reason for the change.

          Within 30 days of receipt of this letter, forward the signed and notarized original signature page to Mr. Krudys.  Thank you for your prompt attention to this matter.

          Kind Regards,

          Gwenda E. Applegate, RPR, CRR
          gwenda.applegate@halaszreporting.com

cc:  Mark J. Krudys, Esq.

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026

Index: $1,500..4/20/22

## $

**$1,500** 49:14 50:1

**$2,000** 49:10

**$200** 75:3

**$21,000** 162:5

**$3,000** 150:19

**$30,000** 161:11,16,23 162:4

**$400** 75:3

## 0

**00820** 103:25

## 1

**1** 81:23 175:21,23

**10** 67:25 68:7 76:6,24 77:1,11

**10:38** 90:5

**11** 71:7,9 72:14 77:7,25

**11:00** 76:17

**11:11** 76:22

**11th** 102:7

**12** 28:15 48:7,25 68:14 78:8,16,19 79:5

**120** 93:8,10

**121** 93:10

**122** 93:10

**123** 93:10

**129** 93:10

**12:22** 139:10

**12:33** 139:15

**12th** 28:5

**13** 165:20

**138B** 103:23,25 104:3

**14** 81:14,16 83:6 84:21

**144** 42:14,19 51:16 178:6,8

**149** 56:13,15 66:11 67:9 72:14

**15** 82:5,9

**158** 18:9,13 38:4

**16** 68:17 85:1,4 172:19 177:21,25

**17** 87:9,13

**17th** 160:12,23

**18th** 131:15

**19** 36:1,12 89:17,19 94:12

**1996** 32:13 36:6,10

**1:26** 180:10

**1:27** 180:15

**1:28** 181:9,15

**1:30** 139:5,18 180:17

**1st** 84:14,15 97:14

## 2

**2** 64:23,25 67:25

**20** 36:1 95:1,3

**200** 42:17

**2000s** 36:22

**2010** 168:6

**2014** 8:14 168:7

**2016** 36:1

**2017** 67:22

**2019** 27:24 28:4 31:2 35:14 59:19 60:18 61:1,3 67:22 138:9,23 139:2 140:13,15,17 141:21 149:22,23 150:1, 6,8,9 154:21 156:9 157:3 158:3,13 160:24 166:23 167:11,20 177:12

**2020** 91:16 95:15 111:4 114:21 116:6 123:3,4,25 163:5 165:20 166:10 167:7,12

**2021** 129:11 135:3

**2022** 31:7,8 58:18 81:21,22 97:14 104:24 105:11 171:6

**2023** 27:24 81:22 129:17

**2024** 28:5 31:3 59:19 131:15 145:24 146:15 168:9

**2025** 29:7 60:18 61:1

**2026** 7:1,5

**20th** 28:4

**21** 96:7 97:17,19 135:4

**21,104** 161:18

**22** 57:25 101:21,23

**23** 108:17 135:24 136:25 137:15 153:21

**24** 28:7 29:6 31:9 48:25 57:25 108:18, 20 129:17 149:8

**247** 118:20,21,25

**24th** 77:22

**25** 28:7 32:5 111:24 112:3,7 140:13

**26** 28:7 117:11

**27th** 135:23,25

**28** 113:13,15,19

**28th** 105:11

**2x4s** 136:21 150:22 151:3 180:3

**2x6s** 180:3

## 3

**3** 66:11 67:9 126:8,13 141:6

**3/24/20** 95:9

**30** 51:20 114:14,16 129:3

**300** 43:2

**3056** 111:11

**31** 118:13,15 136:1

**3100** 120:22

**31st** 77:22 78:3

**32** 121:5,7,14

**33** 124:13,15 125:25 126:24 127:14

**34** 124:23,25 125:2 128:12

**35** 129:14,21

**37** 130:13,15

**38** 131:9,13

## 4

**4** 83:18 152:21 168:10

**4/20** 58:1

**4/20/22** 58:1

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026

Index: 400..amount

**400**  43:2

**42A**  155:15,17 156:15

**43**  156:10

**44**  149:25 157:21,23

**44A**  139:19,21

**44B**  141:14,16 149:24

**44C**  149:14,16

**44D**  152:10,12

**45**  158:8,13

**4800**  33:17

**4X4**  136:18

**4x4s**  137:4

---

**5**

**5**  66:22 67:2,14,16 83:18 168:14

**5/20/2019**  160:14,16

**5/24/2022**  71:16

**5/6/2020**  163:2

**50**  160:5

**500,000**  43:3

**50A**  160:4,7

**51**  162:21,23

**51A**  165:13,15

**5242**  137:14

**53**  132:24 133:2

**54**  134:3,5

**5423**  152:21

**5424**  152:22

**55**  134:18,22

**57A**  135:15,17,21

**57B**  136:2,4

**57C**  137:7,10

---

**6**

**6**  7:1 67:23 68:2 83:19 102:6 168:15

**6/15/2022**  58:16

**600**  75:3

**614**  90:24 91:6,12

**68**  167:21,23 169:8,9

**68B**  169:6

**6th**  7:4

---

**7**

**7**  83:19

**70**  51:21

**7:18**  90:5

---

**8**

**8**  27:9,11,12,13,15,19 50:22 51:2,4 56:13 104:24

**800**  75:3

**8th**  90:4 114:21

---

**9**

**9**  71:7

**93**  170:24 171:2

**9478**  31:12

**9:31**  7:1,5

**9th**  90:5 91:16 166:9

---

**A**

**A'KARI**  66:17 67:2

**A-S-T-I-L-B-E**  31:16

**a.m.**  7:1,5 76:17,22 90:5

**A2**  95:8

**Absolutely**  159:18

**accept**  51:8,10

**accepted**  144:16

**access**  85:12,22 86:1,4 96:8 111:22 158:21 159:1

**account**  44:6 111:22 119:13,16 120:2

**accounting**  26:9 44:5 119:21

**accounts**  161:2

**accumulating**  174:4,19

**accuracy**  107:22 170:10

**acquisitions**  25:8 137:19

**active**  156:12

**activities**  51:25

**activity**  167:20

**actual**  95:19 120:17

**added**  145:18

**addendum**  67:24

**addition**  148:1

**additional**  72:20 100:3 180:18

**Additionally**  48:24

**address**  12:7 30:25 31:5,11 90:20,21 91:4,7,9,10,13 120:23

**addressed**  68:24

**adjacent**  151:24

**affecting**  127:25

**affects**  174:5

**affidavits**  168:2

**afternoon**  95:12

**agent**  46:11,14 47:12 58:23 59:15 60:11,13,15,19 61:5,7,9 62:6,8 77:16 83:1 84:12

**agents**  60:20 61:8,10 62:5

**agree**  68:25 99:25 102:14 112:18 130:8

**ahead**  102:3 130:12 162:8,14

**allegedly**  72:1,8

**Allen**  89:24 94:10,11,12

**allocated**  59:18

**allowances**  23:23

**alpha**  160:5 169:9

**altogether**  54:25

**Alvin**  64:10

**Alyssa**  89:24 94:10

**America**  37:5

**Amir**  16:10 17:8 18:20 25:7,10,11

**amount**  48:11,13 49:14 161:25

**and/or** 9:17,20 24:10,14 69:14 79:19 97:7 117:22 133:19 172:3

**Ann** 19:6,13 22:15

**announced** 29:23

**annoying** 126:2

**annual** 47:13 53:21,24 54:12,18

**annually** 155:1 167:17

**ants** 133:14 134:2

**AP** 161:1,2,4,10

**apartment** 33:15 42:5,22 43:16,17 48:5 49:4,6 50:1,5,18,24 51:3 66:14 68:20 69:9,18,20,22,24,25 70:15,16, 17 71:14 72:9,10 73:10,15,17,21 74:7, 16 75:1,7,14 77:6,12 78:1 82:23 84:24 85:8 87:11,17,20 88:9 93:21 95:8 97:23 106:6 111:5 117:4 120:6,12,24 121:16,19 122:3 127:21 128:9 130:19 131:14 134:9 135:2,25 136:24 137:4 151:2 168:9,12 169:16 172:25

**apartments** 9:9 24:5 25:16,18,20 26:6,9,12,16,20,24 27:8 31:5 33:13 35:24 38:10 39:21 42:15 43:9 45:21 46:18 48:2 49:7,25 50:2 51:8,10,16 55:18 56:7,20 57:7 67:4 69:20 70:3,9 71:2 73:14 74:4 79:12,25 81:24,25 82:2,7,14,16 84:2,5 87:7 88:3,8 89:4 92:5,21,25 93:4 94:14 109:1 118:20, 21,22,25 119:10 120:9 128:1 153:3 155:22 165:8 168:6 170:22 172:15

**apologize** 15:19 85:2 140:19 150:4 154:6

**appearance** 174:5,20

**appears** 97:25 120:24 133:7 136:12 162:2

**appliances** 106:16

**applied** 164:13 174:1

**applies** 50:25

**approach** 178:17

**appropriately** 49:16

**approval** 41:12 47:14,24 105:13 106:2,17 127:15 129:1 162:8

**approved** 44:15 118:2

**approximate** 42:21,25 49:14

**approximately** 8:13 10:22 48:1 55:19 74:24 123:4

**approximation** 51:17

**April** 158:3,13 167:20

**area** 12:6,18 31:25 36:21 51:10 72:20 93:18 111:6 112:13 117:20 152:18,23

**areas** 104:19

**arrival** 143:22

**arrive** 158:14

**arrived** 138:8

**Arruda** 15:18,19 16:20 20:4 22:15 35:18 37:16,19 39:7,10 47:9 89:24 90:9 92:7,19,24 93:4 94:11,18 117:15 145:9

**Arruda's** 92:15

**Arrunda** 16:20

**Arunda** 15:16 19:11,14

**Ashlee** 165:22,23,25 166:20

**aspect** 83:11

**assess** 151:23

**asset** 21:15,16,19,20 23:18 29:15 118:6,7 132:20

**assets** 41:24

**assigned** 99:1

**assistant** 58:23 59:16 60:4,10

**assisted** 62:10

**assisting** 59:2,3

**Association** 82:23

**assume** 14:15 46:6 49:19,25 52:5 86:5 106:8 115:1 123:13 129:13 164:9,14 178:9

**assumed** 148:18

**assumption** 46:8 48:20 74:12,23 94:17 95:18

**Astilbe** 31:12,15

**attached** 150:17

**attend** 32:9 53:15,17,24

**attendance** 54:15

**attended** 40:16 52:22 53:25 54:5

**attending** 52:24

**attention** 20:12 180:20,24

**audio** 78:10,19 79:5 123:20

**August** 115:25 149:7

**authority** 50:4 92:1

**authorized** 98:4,6

**awards** 52:6,9,15

**aware** 80:14,24 138:9 163:7 164:6

**Awesome** 139:7

---

**B**

**baby** 85:20

**back** 20:4,14 36:2 62:24 67:8,13 76:21 89:6 125:24 131:22 139:14 154:4 167:7 171:18 180:14

**background** 36:16 79:2,9

**bad** 150:16

**bank** 119:13,16

**bar** 89:10

**base** 30:15 166:7

**based** 30:16 31:6 46:8,9 48:24 100:4, 8 103:16 108:6 158:23 167:18 170:18

**basically** 20:21 41:18 46:20 48:10 59:6 84:18 104:18 107:23 161:13 164:21 173:10

**basis** 24:2 42:8 47:13 48:21 63:11 70:25

**Bates** 93:8,9 104:1 137:14

**bathroom** 135:11

**batteries** 100:12

**Beachwold** 16:25 17:3,6,9,14,16 18:18 19:4 20:19 21:17,22,24,25 22:1, 4,6,7,8,10,14,18,24 23:7,11,14,15,16 25:4,6 34:6,19 38:19,21,22 39:9,16 40:1 41:20 44:18 45:25 46:5,17,21 47:7 52:17 54:9 80:1 82:15 117:16 118:4 119:22 120:6,7,8,12,18 137:20 138:10 145:1 148:7 162:18 166:1,3 167:8

**beam** 68:12 179:19

**beams** 81:2

**bear** 103:21 153:15,23,25

**bedroom** 50:1 68:8,9,11 85:10,13,19 86:4,6,11,15,17 102:17,18 109:14

123:19 130:2 131:16,17,18 136:17

**beg** 129:7

**begin** 48:5

**beginning** 166:6

**behalf** 83:14 143:16

**Bend** 33:17 62:12,18 104:10 106:6 145:19 146:3

**beneath** 116:21

**Bev** 92:17,18

**Beverly** 17:17 18:21 22:16 39:8,10

**bigger** 19:13 57:2

**birthdays** 12:3

**bit** 31:24 51:24 61:12 126:2 163:11 166:15

**black** 93:13,17 97:25 99:8 100:6 112:12 120:24 121:2 169:20,23 170:7, 13,16 171:18

**blank** 95:21 98:5,11 131:3

**blanks** 82:24,25

**BLDG** 28:25 29:5,6,16

**bleach** 98:3

**blend** 20:20

**block** 90:18 91:4,10,12 125:6

**blocks** 19:14

**blow** 116:4

**blue** 15:14,15 82:19,21 156:25

**board** 50:9,11 75:17,24 116:14

**boards** 75:20 116:10 151:10

**bond** 69:5

**bonds** 154:25 167:16

**Booker** 57:12 58:4

**boss** 92:4,7,16 161:24

**bottom** 20:15 56:25 89:23 90:4 93:10 94:10 115:3,7,22 134:19 137:14 141:23,25 155:25 156:3 158:2,5 163:2 165:25

**box** 115:12 141:24

**boxes** 115:13

**bravo** 169:10

**break** 45:5 76:8,9,12 139:4,17 180:8

**Brianna** 130:20

**briefly** 23:17 77:25

**bring** 145:1,7

**Brogden** 62:3

**brought** 70:13 80:11 147:4

**Brown** 57:12 60:4

**brunch** 11:1

**Buchanan** 62:4

**Bud** 18:23 162:16,17

**buddy** 30:1

**budget** 38:9,25 39:2,5,6 41:4,5,7,12, 14,18,20 42:2,3,6,7,11,21,25 43:6,7, 12,13,23,24 45:20 47:3,6,8,13,20,23 48:1,12 49:22 72:23 106:10,19,20,25 107:3,4

**budget already** 47:16

**budgeting** 38:12 47:4 48:4 51:24

**budgets** 43:5

**Bugg** 66:4,17 67:1,6,12,20 69:8,19 168:4

**Bugg's** 68:6

**bugs** 133:13 134:2,13,14

**builder** 180:6

**building** 26:17 32:23 82:1 103:6 141:2,4 142:4 143:8,11,12 149:22,23 150:9,18,23 151:3,24 153:18,19 155:24,25 156:5,6,22,23,24 163:6,7 173:14 174:14 175:4 178:20

**buildings** 116:4 151:25 156:10,19 157:2,7,8,14,16 166:23

**bunch** 118:22

**burned** 178:23

**business** 148:7,19,20

**buying** 24:14 138:4

---

**C**

**calculations** 48:8

**call** 15:7,10,13 48:7 53:20 59:11 99:22 100:1 102:5 103:15,17 125:21,22

**called** 33:21,24 77:21 100:16 105:1 125:23 171:24 173:3

**calls** 100:6

**cap** 43:15

**capacities** 37:10

**capital** 44:10,15

**card** 37:7

**care** 91:19 94:5 95:14,17 100:22,24 107:9 113:10 122:10

**carpet** 71:4 72:23 100:20,21 141:7 152:20 177:5,6

**carries** 8:24

**case** 13:9,11 14:19,23 23:8 28:18 88:21 164:2 172:7,9

**casualty** 26:19

**caught** 114:8

**caused** 100:24 101:10 103:19 173:18

**causing** 80:5 103:2 106:1,9,10 116:2 121:21 122:4 132:6

**ceiling** 95:13 112:12 168:12,13 169:21,24 170:8,17

**celebrate** 12:3

**Celtics** 136:20

**CFO** 19:2,3

**change** 8:13 77:13

**changed** 91:8 138:19

**characterize** 59:21

**charge** 9:20 50:9

**Charlie** 7:14 142:24 149:25

**Charlottesville** 13:2

**chat** 11:24

**check** 88:9 119:9,11 120:11 135:4 172:10,15,21 177:22

**checks** 119:16,19

**chemicals** 164:6

**Chesapeake** 13:2

**Chesterfield** 33:6,15 34:3 145:12

**Chicago** 35:24 37:11

**chief** 17:6,9 19:1

**Chiffriller** 21:8

**children's** 86:12

**chipping** 71:21 72:4 77:8 93:18 111:11

**choice** 143:14 144:5

**Christmas** 11:1 52:2,4

**Chuck** 17:20 18:1,21 25:7,11,12 118:8

**citizen** 32:14

**citizenship** 32:16

**clarify** 24:22 36:14 167:8

**class** 159:16

**clean** 70:17 89:25

**cleaned** 98:2

**cleaning** 71:4 98:23,25

**clear** 64:21

**Clearfield** 33:20,22,24 62:11,14 82:15 161:10,14,22 166:8,11

**client** 126:17,22

**close** 77:15 151:25 153:12

**closed** 96:4,16

**closest** 30:2,4

**closet** 142:1

**coffee** 76:12

**collars** 117:3

**colleague** 11:18

**colleagues** 10:11 29:22

**collection** 22:22

**collective** 38:12

**collectively** 41:24 52:18

**Colonial** 33:7,19 34:4 145:12,19

**com-** 99:21

**combination** 50:6,13

**common** 79:11 143:19

**communicate** 140:8

**communication** 10:2 154:16 159:12

**communications** 9:24 159:5

**communicator** 140:5

**community** 49:1 50:23,24 56:1,24 57:6,8 59:5,7,12,13,15,18,23,24 60:5, 10 61:4 104:24 105:1,12,14 106:17

**companies** 34:24 36:10,11 175:13

**company** 12:11,13 21:19,21 37:7,21 40:9,12,14,17,22 44:3 45:15 46:10 62:23 73:13 88:14 91:9 101:6 126:10 131:24 135:10 142:10 143:16,21 144:7,18 149:2 151:14 157:6 172:3

**compensation** 9:17

**complained** 109:18 110:2 122:20 168:15 170:14

**complaining** 99:7 121:18 122:24 123:2 124:10 170:1,6

**complaint** 79:11 95:7,8,11 97:24 99:10 102:10,12,15 105:22 109:25 110:13 111:3,7 118:19 121:2,4,15 122:7,16,18,19,21 129:15 130:19 131:14 132:24 133:9,11 168:18

**complaints** 79:18,21 80:3 88:4 93:24 103:10 110:1 118:23 176:25

**completed** 77:22 78:3 91:20 95:10, 12,16,24,25 96:3,15,25 98:4,18 99:4 102:7 104:25 107:9 110:13 122:8 129:3 166:22

**completely** 75:1

**completing** 105:6 107:16

**complex** 33:16 42:5,25 43:16 50:18 87:11,17,20 106:7 117:9 120:12 127:21 128:19 151:2 168:9

**complexes** 38:10 120:6

**compliance** 23:20,22 142:18 164:21, 22

**Complies** 18:11 66:12,23 72:15 109:10

**concept** 151:4,6

**concern** 106:9

**concerned** 127:17

**concluded** 181:15

**concrete** 141:8

**conduct** 104:23

**conducted** 176:18

**conference** 41:21 53:20,21,24 54:18, 25 55:3,7

**conferences** 40:18 54:2,13 55:10

**conferring** 154:1

**confirm** 64:13 70:5 122:19 128:14

**confirming** 177:9

**connected** 162:18

**Connecticut** 147:18,20,24 148:1

**connection** 8:21 11:16 38:2 94:22 140:9

**construction** 103:6 151:23 171:7 175:12 176:12 178:8,18 179:24 180:2, 5

**contact** 15:9 19:7 63:11 148:5 163:9, 13 180:22

**contacted** 15:8 109:15 110:9,17 128:12,14

**context** 163:4

**continued** 168:8

**continues** 110:21

**contract** 43:14 46:16,19

**contracted** 69:6

**contractor** 70:16 71:1,4,5 72:8,10 73:16,19 74:5,9,14,17,19,21 80:25 110:19 122:9,10 172:1,8 177:16

**contractors** 43:20 70:12,13,23 72:19,21 73:6 80:10 81:2 122:14 171:15 177:22

**control** 161:5,22

**controlled** 38:8

**conversation** 154:11,13,15

**conversations** 18:4

**Copies** 96:5

**copy** 94:4 95:25 96:2

**copying** 143:10

**corner** 134:20

**corporate** 119:20

**correct** 8:10 11:4,19 13:6 15:21,22 22:12,18,19 24:7 25:13 27:10 30:8,9 31:10,18 33:4,11,14 34:14,21 37:12 38:23 44:19,23,25 50:15,19 54:18 56:9 65:15 69:23 70:14 74:22 75:22, 25 77:23 78:5 81:4,8 84:20 85:24 86:8,13,17,21 87:21 88:1,2,4 90:8,22,

23 91:23,24 92:2,3,6,11,22,23 93:1,2,
5,6,14,18,21 95:21,22 97:9,10,12
98:18,19 100:18 101:7 102:16 104:8,
9,13,16,20 105:7,15 106:2,7,15,22,25
107:20,24 108:9,10,14 109:19 110:4,
15 111:6 112:14,24 113:3,11,12
114:25 115:22 116:6 117:1 118:9,10,
11 119:3 120:7,10,14,15,17,19,20
121:3 123:12,23 124:11,12 125:16
127:23 128:1,7,10 130:22,23 131:23
133:24,25 134:16 135:9,12 136:14,25
137:5 138:4,11,15 140:10 142:13,14
148:21 149:2 150:23 151:21 156:3,6
157:9 162:5 165:2,10 168:20 171:20
177:8,17 178:21 180:4

corrected  110:4

correctly  130:4 142:5 152:4 171:12

cost  46:12 50:5 81:12 158:21 178:24

costs  48:22 161:14,22

Cottage  30:17,18 31:5 33:10 91:1,7,
13 161:11,15,23

counsel  9:3,6 17:22,23 154:1 180:22

counseled  105:5,10 106:1 107:3,11,
16

counseling  104:7,17 105:8 108:2,4,
6,11

country  31:25 32:2,3 35:10 53:12

court  8:20 14:5

cover  43:6,8,12,13 110:25

covered  51:4

cracking  113:20,23,24

create  47:12

created  82:22 83:4 88:22 96:15

creating  116:22

credit  23:20 37:7

credits  23:24

crevices  152:21

Crystal  10:20,22 11:17 13:9 14:23
30:6 127:10

Cunningham  130:20

current  19:20 28:22

cut  136:16,19 171:8

Cuthbert  7:14

cutting  43:8

D

daily  26:23 63:11

Dallas  53:8 54:3,4,7

damage  68:7,10,12,18,19,23 69:3
150:20,22 153:2 154:11,19,24 156:6
158:15,17 170:21 172:11,14,15 173:2
174:5,16 175:1,2 178:4,20

damaged  136:17

damages  126:19

Dan  16:1,24 18:22 142:9,11 154:11
160:24

dashboard  96:17

date  15:6 29:19 95:10,16 114:23
117:2 146:9 158:23 160:13,17,20

dated  98:5,7 140:13 160:11

dates  57:23

David  62:4

day  48:3 60:8 61:24,25 180:24

day-to-day  24:2 88:12

days  28:15,19 70:1 129:3 160:12

deal  41:23,24

dealing  24:13 134:9 151:19

dealt  89:3

death  14:19

Deborah  20:25

decay  101:9

decaying  116:9,17

deceased  65:5

December  27:24 28:14 52:25

deciding  44:14

decision  44:21 117:23,25 127:15
148:19,24

decisions  26:11,23 44:10

deck  68:13 136:18

deferred  132:19

defined  44:17 52:3

delivered  108:2

delivering  108:10

department  23:22 44:5 80:8

depend  73:23

depending  59:20 73:22

depends  82:18

deponent  112:7 181:12

deposed  143:15

deposited  119:12

deposition  7:13 8:16 10:1,5,10 13:13
14:8,14 18:13 56:15 64:25 67:16 68:2
70:20 71:9 77:1 78:16 80:9 81:16 82:9
85:4 87:13 89:19 95:3 97:19 98:21
101:23 104:3 108:20 112:3 113:15
114:16 118:15 121:7 124:15 125:2
126:1,13,20 129:21 130:15 131:9
133:2 134:5,22 135:17 136:4 137:10
139:21 141:16 149:16 152:12 155:17
157:23 158:8 160:7 162:23 165:15
167:23 171:2 175:23 181:15

depositions  60:6

describing  41:10 71:20

description  100:7 102:2,20 130:22

designated  50:23

Destefano  16:1,25 18:22 44:13,22
118:8 142:9,11 143:10 144:3 150:11,
13 154:11 160:24 161:13,24

destroyed  88:21,24

destroying  158:4,15

detail  148:11

details  24:16 64:4 70:7 88:12 107:1
119:14 120:4 126:11 146:23 179:9,11

detector  100:13

determination  132:6

determined  100:4

Diane  66:6,16 67:3

differentiate  20:8

difficult  77:14

difficulty  153:23

dimensions  151:10

Dionne  124:21 125:7,19,23

direct  63:11 85:12,22 86:1,4,15 92:1

**directed** 94:7 164:4

**directive** 92:1

**directly** 25:3 63:20 94:19,24

**director** 17:14 21:15,16 23:19

**disciplined** 63:17,21,24,25 64:3

**discuss** 13:15 96:13,17

**discussed** 99:9

**discussion** 13:10 47:8 49:15

**discussions** 41:18 87:6

**dishwashers** 105:11 106:5

**dispatched** 171:24

**displayed** 77:19

**district** 90:19

**document** 28:3 63:23 77:21 88:16
89:4 123:1 155:15 156:9 157:3 160:11
169:19 177:25

**documented** 88:6

**documents** 10:4 43:20 88:23 89:11,
14 154:21 158:16 159:5,21

**dollars** 49:9 110:22

**domain** 133:22

**Donisha** 66:3,16

**door** 68:8,9,10,16 72:20 85:14,23
86:5,7,10,12,13,17,20 102:13 109:8,
13 111:6,12 112:11 113:21 117:20
121:20 122:4 130:2,3,9 131:16,17,18,
20 136:18 152:19,20,22,24 171:8,9,
11,17 175:15,16 176:3,13 177:10
179:20

**doors** 71:22 77:9 79:13,20 80:6,12,
16,23 81:3 87:1 93:13,25 103:1 117:3,
5,21 121:3 128:3 130:21 132:8 172:22
173:12 176:14,23 177:23 178:3
179:14

**dozen** 80:10 177:25

**dozens** 134:11 170:20 171:14

**dressed** 8:19

**dried** 113:23

**drilling** 141:7

**dripping** 112:10

**Drive** 90:24 91:7,13 120:22

**driven** 116:1 161:17

**drywall** 142:1 173:23 174:6 177:6
178:7,10

**due** 167:17

**duly** 7:9

**duty** 158:18

**Dylan** 21:8

**E**

**e-mail** 90:4,6,8,20,21 94:5 111:22
114:20 121:24 123:13 124:1,3,4,20
128:12 129:17 137:15 141:10 142:19
143:7 149:20 153:10 154:15 160:23
161:20,21 165:19,21 167:10

**e-mailed** 94:19 96:7

**e-mailing** 142:11

**e-mails** 14:18 94:23,24 141:20
151:13 155:4,5 160:19,21 167:18

**E1** 129:2

**early** 36:22 138:7,9

**ears** 99:23

**eastern** 53:17

**eating** 141:25

**Ebone** 10:15 59:22 60:2 61:3,4

**effect** 132:4

**effort** 38:13 138:6

**efforts** 138:9,15 144:23

**election** 32:20

**emigrate** 32:12

**emigrated** 36:4

**emotional** 94:21

**employed** 16:21 17:16 21:18 31:2
57:25 58:9 62:7 140:16

**employee** 16:25 17:3 25:25 26:3,5
60:16,18 96:20 105:23 166:3

**employees** 11:9,10,11 22:16 26:24
30:5 52:7,14,18 63:4 120:17 148:1
165:7

**employment** 11:17 160:14

**end** 29:11,12 172:2 181:7

**enjoyed** 32:5

**ensure** 86:24 91:19

**ensuring** 98:17

**entered** 80:24 81:21

**entire** 33:1 73:17,21 74:16 117:9
138:13 141:2 146:5,7,16,20 147:6

**entirety** 24:3

**entities** 9:10,12,17,20 18:18 21:24
22:3,6 34:5 72:25 73:9

**entity** 20:19 22:6 25:17,19,22,24,25
29:9 33:21,24 39:24 45:18,24,25
46:10,13 82:3 84:6 150:2,5

**entries** 47:20

**Eric** 128:7

**Erica** 21:6

**escape** 85:11,21

**escaping** 179:7

**essence** 48:16,18

**essentially** 39:3 48:5 57:8 92:4,7

**estimate** 74:3 128:14,15 129:10,12
146:15

**estimates** 117:10

**Ethan** 16:13 17:13

**event** 40:10 41:1

**events** 40:12,14,15

**eventually** 145:20 174:15

**evidence** 107:15 158:14 166:23
169:1

**evident** 34:16

**exact** 12:7 15:6 17:15 29:19 38:1
39:14 146:9

**exclamation** 121:16,17

**executive** 17:6 19:17 20:1,6

**exhibit** 18:7,9,13 38:4 56:13,15
64:23,25 66:10,22 67:8,14,16,23 68:2
71:6,9 72:14 76:5,24 77:1,7,25 78:8,
16,19 79:5 81:14,16 82:5,9 83:5 84:21
85:1,4 87:9,13 89:16,19 94:12 95:1,3
97:17,19 101:20,23 103:23 104:3
108:16,17,20 111:24 112:3,6 113:13,
15 114:14,16 118:13,15 120:21 121:5,
7,14 123:15 124:13,15,22,24 125:2,24

126:8,13,24 127:14 128:11 129:14,21 130:13,15 131:9,13 132:23 133:2 134:3,5,17,22 135:15,17 136:1,4 137:7,10 139:21 141:13,16 149:14,16, 24 152:12 153:21 155:17 156:9,15 157:21,23 158:8,12 160:4,7 162:20,23 165:12,15 167:21,23 169:5,6 170:23 171:2 175:21,23

**exhibits** 157:21

**exist** 145:14

**exit** 86:11,13,15

**expand** 90:15 145:15 147:5

**expanded** 145:16

**expanding** 147:1

**expectancy** 117:12

**expenditure** 43:24 44:1,3

**expenditures** 44:10

**expense** 44:15 158:22

**expenses** 43:14 106:1,11 118:1 161:5

**experienced** 116:1

**expert** 99:18 103:6 170:17

**expertise** 80:7,17

**explain** 47:21 148:9

**explained** 173:17 174:12

**exposed** 135:22

**extensive** 69:6

**extent** 127:2

**exterior** 116:24 136:18 141:5 155:7 156:10 163:3,6,12 171:10 174:25

**exteriors** 152:2

**extermination** 55:14

**exterminator** 133:15,23 150:20 152:2 157:16

**exterminators** 70:12,13

**external** 174:20

**extraordinary** 118:1

**extrapolate** 49:2

**Ezra** 40:8

---
**F**
---

**F1** 131:14

**F6** 134:9 135:12

**F8** 130:19

**face** 11:23 178:24

**facial** 116:10

**fact** 94:18 114:4

**factors** 103:20

**Fagerli** 18:23 162:16,17

**fall** 48:13

**familiar** 18:2,3,24 64:7,20 73:3 137:21 163:14

**family** 40:4,6 168:8

**Fantone** 142:20

**Farahmand** 20:25

**fascia** 116:10,14

**fast** 121:11

**Fatone** 15:1 65:14

**Fattone** 143:3 147:23

**February** 105:11 135:4 140:13,15,17 141:21 149:22,23 150:8 151:19

**federal** 164:21

**fee** 46:12

**feet** 42:11

**Ferguson** 17:17 18:21 22:16 38:5 39:10 47:9 92:16,17,18 117:15

**fictitious** 84:6,8

**figured** 42:7

**figures** 49:21

**file** 123:18

**filled** 82:24,25 96:19 98:6,8,13 107:8

**final** 41:11 117:25 162:8

**finalized** 38:15,19 47:16,19

**finally** 16:8

**finance** 25:9

**financial** 19:1 56:4

**financials** 48:8 55:25 56:2,3

**financing** 167:3

**find** 72:7 103:11 126:1 154:7 171:25 172:10,19 175:1 177:16,23

**finding** 153:24 172:14 175:15 178:1

**findings** 103:16

**finish** 139:5

**finished** 47:23

**fire** 65:5,12,20,23 66:1 85:11,21 86:16 87:6 179:3,6,7

**firm** 29:2 131:21

**five-minute** 45:5 76:8,11 139:4,17

**fix** 90:2 100:17 110:20

**fixed** 77:14 110:20,24 123:8,11,20,24

**flashing** 80:12,16,19,22 116:3 132:10,12,13,17 173:8,10 174:1,15 175:3,8 177:11,16

**flip** 67:8 83:15

**floor** 141:8

**flooring** 70:18

**flying** 133:14 134:2

**folks** 13:8 16:18 23:7 24:9,18 28:10 38:5,25 44:20 50:12 62:7 138:4 169:15

**follow** 99:3 106:19,20 164:23

**follow-up** 100:3 141:10

**food** 37:3

**forced** 110:25

**form** 20:22 22:25 44:24 46:24 54:20 79:14 85:15 87:22 88:25 93:22 97:2 99:16 101:13 103:3,13 104:7,17 106:13 107:25 109:20 110:5 112:25 114:10 126:3 127:4 143:25 157:10 161:7 165:3 168:21 170:3 171:21 172:16 173:15 174:7,21 178:5 179:1, 15,22

**formal** 180:17

**formally** 28:14 34:12

**formulated** 42:9

**formulating** 39:2 42:2

**forward** 150:18 166:12

**found** 69:16 100:8 117:21 133:13 134:2 135:11 141:24,25 154:24 158:3,

14,15 171:17,19 172:4,7 173:2 176:14 177:2 179:16

**four-year** 92:25

**framing** 150:20,21

**free** 9:20

**frequently** 55:17

**Friday** 166:12

**Friedman** 16:6 17:5 18:20 24:11 25:11 38:4 39:12,17 40:7,8 41:13,16 44:13,21 46:22 52:3 54:17 55:2,6 118:4 149:21 150:14 154:10 161:24 162:15

**Friedman's** 40:4

**friend** 30:7

**friendly** 30:5

**friends** 10:25 11:5,25

**front** 86:5,7

**full** 7:16 74:4 141:5

**full-time** 60:16,17

**fuller** 162:12

**functions** 24:3

**funding** 161:12,16

**funds** 161:18

---

### G

**G4** 128:9

**G7's** 68:12

**G8** 66:14,16 67:1,5,12 68:20 69:8 71:14 74:8 77:6 85:8

**gain** 32:16

**Gamby** 10:15 57:12 59:22 61:3

**gap** 59:1

**Gate** 29:9,12

**Gates** 12:9,10,16 28:22 29:11,13

**gatherings** 40:21

**gave** 28:14 51:7

**general** 17:22,23 34:7 36:7 46:9 56:4, 7 69:25

**generally** 9:25 11:20 23:10 36:23 54:24 59:17 70:9 89:10

**generic** 22:8

**Gerkman** 21:6

**get along** 105:17

**Ghee** 51:7 65:4 66:1,14 81:21,23 82:6 85:9,20 97:13 156:2

**Ghee's** 14:19 84:24 176:2 178:22

**Gid-** 150:10

**Gideon** 16:6 17:5 18:20 25:7,10,11 40:3 46:22 55:2 118:4 143:8,11,12 149:21 150:13,16 154:10 160:25 161:10,24 162:7,15

**give** 15:7,9 28:10 29:19 49:5 70:6 89:9 163:3 164:4

**giving** 153:7

**glass** 16:4 17:2 44:13,22 68:8,9,10,16 72:20,23 79:13,20 80:6,12,16,23 81:3 85:14,23 86:10,13,17,20 87:1 93:13, 25 102:13,25 111:6,12 112:11 113:21 117:3,5 118:8 121:3 128:3,16,20 130:9 132:7,22 152:19,20,22,24 171:8,16 172:22 173:11 176:3,14,23 177:10,23 178:3 179:8,14,20

**good** 7:12 8:15 45:6,7,11,12 76:7 99:23 117:8 121:12 180:24

**grades** 159:17

**grass** 43:8

**Gravely** 61:15,21

**Graves** 129:15

**great** 57:4 72:24 73:8 166:14

**greatly** 180:23

**Green** 35:24 36:11 37:10,19,20,21 70:22

**group** 10:25 11:5,8,16,21,23,24 29:3 35:23 37:20,23 38:3,16,18,21,25 39:1, 14,16,18 41:11 44:16,17 52:10 120:18 138:11 148:21,23

**Grove** 30:17,18 31:5 33:10 91:1

**grow** 31:25 32:2,3 138:21

**growing** 97:25 99:8 120:25

**growth** 127:17,21

**Grubbs** 140:1

**guideline** 89:13

**gutters** 116:9

**guy** 70:21

**guys** 27:16 45:11 100:16,22

**Gwenda** 27:6 45:10 76:10 121:10

---

### H

**H1** 130:6 136:24

**H10** 127:16

**half-inch** 136:20

**hallway** 86:7,11

**handle** 94:7

**handled** 26:14

**Hansen** 128:7

**happen** 35:4 122:6

**happened** 35:1,6 48:24 49:1 122:15 128:4 139:2 144:6

**happening** 167:20

**happy** 49:23

**harassment** 126:21

**hard** 116:25

**Hardy** 62:4,9,10

**Hazan** 16:10 17:8 18:21 24:11 25:12 38:4 39:12,17 41:13,16 44:22 46:23 52:3 54:17 55:5 118:4

**hazardous** 164:7

**head** 107:10 142:17

**headed** 23:22

**header** 171:9 175:15,16 176:2 179:19

**headers** 172:20 176:13 178:4 179:13 180:4

**headquarters** 54:6,10

**heads** 153:7

**hear** 65:12 105:3

**heard** 33:21 40:2 109:17 147:9 163:21,23,25 164:1 173:7

**heaters** 105:12 106:6

**heavy** 116:1

**Heights** 33:7,19 34:4 145:13,19

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026

Index: held..issue

**held** 40:19

**Hester** 129:15

**hey** 48:10 96:25 104:18 175:14

**high** 32:7

**highlight** 156:17,18,19

**highlighter** 156:20

**hire** 46:10 160:17,20

**hired** 35:16,17 46:13 61:9 62:18 142:17 144:21,25 151:14 153:1,8

**historical** 48:6

**historicals** 49:1

**history** 115:25

**hitting** 130:13

**holder** 69:5

**holding** 74:3 151:10

**Holdings** 21:25 22:10

**hole** 110:25

**holes** 68:15

**holiday** 40:17,22 41:2 52:4,20,21,23 53:6,7,16,18,20

**Holly** 61:15,18,21 108:25 111:4

**home** 30:14,15,23 31:9,11 91:4,10 106:5 122:4

**homes** 42:10

**hotel** 98:22

**hour** 139:5

**house** 135:22 154:24 156:24

**housing** 27:9,11 50:4

**Hudson** 12:9,10,16 28:22 29:9

**hung** 105:4

**HV** 55:15

**I**

**identification** 18:14 56:16 65:1 67:17 68:3 71:10 77:2 78:17 81:17 82:10 85:5 87:14 89:20 95:4 97:20 101:24 104:4 108:21 112:4 113:16 114:17 118:16 121:8 124:16 125:3 126:14 129:22 130:16 131:10 133:3, 19 134:6,23 135:18 136:5 137:11

139:22 141:17 149:17 152:13 155:18 157:24 158:9 160:8 162:24 165:16 167:24 171:3 175:24

**identified** 24:20 34:3 77:7

**identify** 24:24 39:15,16 86:3

**Illinois** 144:19

**immediately** 110:24 113:11

**importance** 87:1,2

**improperly** 80:20,23 132:17 173:13 174:15 175:4 177:17

**improve** 104:19

**improvements** 44:11

**in-house** 73:22

**incident** 127:9

**include** 44:21 118:8

**including** 72:22 107:22

**income** 43:13 48:12,13 51:5

**incorrect** 50:20 177:11

**incorrectly** 174:1 175:8

**incurring** 106:11

**indication** 96:21 172:21 175:2

**indirectly** 63:24,25 64:2

**individual** 39:23 41:9 44:20 79:9 126:5

**individuals** 11:15 21:4,11 24:17 25:2 39:14,19 63:2 66:18 67:6

**industry** 48:7

**infestation** 150:17

**information** 39:4 72:18,19 84:23 116:5 158:20

**informed** 144:11,13,15

**Ingalls** 12:24

**initial** 100:4

**initially** 30:16 106:23 138:20

**inject** 141:7

**injuries** 14:19 127:3,12

**input** 39:5

**inquire** 127:9 159:23

**insect** 133:7 140:9

**insects** 158:4,15

**inside** 43:22 97:25 99:8 101:10 120:25 121:16 137:4 173:13,25 174:4, 14,19 177:3,4

**insightful** 108:14

**inspect** 178:2

**inspection** 88:19 100:4 135:10 155:2,8,10 163:6,8,13 164:16,25 166:7,10,16,21 167:11,13,19 173:3

**inspections** 88:11,17 116:8 155:7 164:17 167:16 176:18

**installation** 132:10,12

**installed** 80:20,23 132:17 136:19 173:12 174:15 175:4,8

**instance** 24:5 30:5 50:3 56:8 94:4 103:17 104:24

**insulation** 171:10

**insurance** 26:15,18,19

**integrated** 47:8

**interaction** 24:1

**interference** 123:20

**interior** 43:9 135:21 141:6 150:19 155:8,10 163:8,13 164:16,17,24 174:25

**interiors** 88:9 152:1

**internal** 74:10,11 75:8

**intricate** 126:11

**investigate** 133:15

**investment** 17:9 29:3

**investments** 17:14

**invoice** 59:8 72:11 73:11,14 74:7,22, 25 77:5 98:5,7 136:13 158:24 171:6

**invoiced** 132:3

**invoices** 44:4 59:9 73:5 158:24 167:18 170:20

**involve** 70:9,10,16

**involved** 24:9,17,25 25:3,8 39:2 44:13 71:1 73:10,13 81:12 138:2

**involving** 81:2 158:17

**issue** 109:19 110:20 117:13,14 123:7, 10 124:10 142:12 173:18

**issues** 56:1 81:10 117:21 140:9,10 176:20

**J**

**J'KEIA** 10:17 62:3,22

**jack** 171:11 176:3,13 178:4

**Jacqueline** 21:7

**Jake** 21:6

**Jamaica** 32:4,8

**january** 7:1,4 28:5,15 29:6 31:3 90:4, 5 91:16 102:6 131:15 145:24 146:14

**Jennifer** 21:7,9,12 23:18 142:12,15

**job** 24:3 28:22 58:11 97:1 147:10

**Johnson** 108:25 111:4

**join** 140:18 150:5 154:4

**joined** 144:7,18 145:10,14,15,16 150:2 165:21

**joining** 29:9

**Jones** 62:4,11 95:8

**judge** 8:22 14:6 170:18

**Judy** 105:15,21 108:9

**July** 111:4 124:7 165:20 166:9 167:12

**jumped** 102:3

**June** 61:1,3 84:14,15 97:14 102:6 123:4,9 124:5 160:18 171:6

**jurisdictions** 51:12

**justifiable** 178:24

**K**

**Kaitlin** 15:1 65:17,18 143:1,3 147:23

**Kate** 152:6,7,17

**Kate's** 152:16

**keeping** 161:14 181:2

**Keidre'** 121:14 123:17

**Keivona** 62:3,16

**Kennedy** 8:21 9:7,24 10:3,11 15:8 20:22 22:25 44:24 45:10,12 46:24 54:20 79:14 85:15,25 87:22 88:25 93:22 97:2 99:16 101:13 103:3,13,24

106:13 107:25 109:20 110:5 112:25 114:10 126:3,18 127:4 143:25 157:10 161:7 165:3 168:21 170:3 171:21 172:16 173:15 174:7,21 178:5 179:1, 15,22 181:1,10

**Kerrigan** 152:7

**Kerrigan's** 152:17

**Kevin** 9:7 93:9

**Kilz** 130:25

**Kim** 132:24 133:10 134:10

**Kimberly** 95:7

**kind** 13:3 30:22 36:24 46:21 50:10 98:20 125:25 146:2 163:16

**kindly** 7:18 8:1 14:7 31:15 57:1 76:23

**Kivo** 19:6,13,22 22:15

**knew** 22:7 36:17 93:3 179:13,16

**knife** 176:7,8

**knocked** 100:21 101:1

**Krudys** 7:11,13 13:23 14:1 18:8,16 19:12,16 20:24 23:3 27:2,3 28:1,2 45:1,10,13,14 47:2 54:22 56:12,18 57:1,5 61:12,14,16,20 64:22 65:3 66:10,13,21,24 67:10,13,19 68:5 71:13 72:13,16 76:10,13,23 77:4 78:7, 22 79:7,15 81:19 82:12 83:5,8,15,20 85:1,7,18 86:2 87:16,24 89:2,22 90:15,17 93:9,11,23 95:6 97:5,22 99:20 101:16 102:1 103:4,21,25 104:6 106:14 108:3,23 109:7,11,12,21 110:8 112:9 113:4,18 114:13,19 118:18 121:10,13,23 122:1 124:18,24 125:5 126:7,16,22 127:1,6 129:24 130:18 131:12 133:5 134:8,19 135:1,20 136:7 137:7,13 139:3,8,16,24 141:19 142:24 143:2 144:2 149:19 150:12,15 152:15 153:20 154:3,9 155:14,20 156:11,21 157:12 158:1,11 160:10 161:8 162:11, 13 163:1 165:5,12,18 168:1 169:3,9, 12,14 170:5,23 171:5 172:5,17 173:6, 19 174:10,22 175:20 176:1 178:13 179:5,18 180:1,7,16 181:4

**L**

**L10** 168:7

**L8** 97:23 120:22,24

**label** 164:12,15,23

**labor** 95:20

**Landing** 33:20 56:8 63:1

**Lane** 31:12,15

**Laquisha** 62:3,19

**large** 20:14 87:20

**larger** 109:6,8

**laundry** 142:1

**law** 51:5 164:22

**lawyer** 89:10

**layout** 155:22

**leading** 41:18

**leak** 123:19 130:1 177:4

**leaking** 95:13 121:20 122:3 174:16

**leaks** 117:2 132:7 177:5,10

**lease** 81:20,22 82:6,18,20 83:4,6,14

**leases** 81:21 82:13,22

**leasing** 58:23 59:15 60:11,12,15,19, 20 61:5,7,8,9,10,22 62:5,6,8 77:16 83:1 84:12 133:15

**leave** 29:14 146:1,6 159:15

**leaving** 29:17,23,24 31:8

**ledger** 56:5,7

**left** 28:19,21,22 29:8 62:23 145:23 146:14,16 156:25 158:2

**left-hand** 134:20

**legal** 10:11 14:4 26:11 56:22 82:3 84:6

**lender** 166:21,25 167:2,3,8

**letter** 139:25 140:12

**Lewis** 123:18

**Lewis-davis** 121:15

**license** 32:24

**licenses** 32:23

**life** 37:1 117:12 178:23

**lightbulbs** 100:10

**Ligon** 127:16

**list** 13:7 51:7,9,12 57:6

**listed** 21:4 57:11 62:5 66:16 84:2 91:10 128:2,8 146:13

**listing** 56:24 72:17,19 90:19

**lists** 23:6

**literally** 170:20

**live** 12:4 31:22 126:23 148:1 156:8,10 158:3

**lived** 67:4 168:7

**lives** 12:6 147:24

**living** 27:19 67:21 95:13 141:7

**LLC** 25:18,20 26:6,9,12 33:22,25 56:20 82:14 166:1

**local** 53:10

**location** 147:21

**locations** 40:20 41:1 54:2

**log** 88:19

**long** 41:22 62:13 125:12 168:6

**longer** 91:7 149:2

**looked** 125:25

**lot** 126:11 148:3

**lots** 103:10

**Lucas** 62:5,13 63:6 71:20 77:15,16 78:2 83:12,21 84:10,22

**Lucy** 40:7

**lying** 84:19

**M**

**M-A-Y-S** 8:8

**machine** 168:13

**Maddox** 33:20 56:8 63:1 145:19 146:4 148:8

**made** 26:11,22 44:9 45:17 78:1 79:19 80:3,24 83:13 103:16 110:13 111:3 117:23 124:8 129:15 138:24 173:16

**maintained** 91:6

**maintenance** 43:14 63:9,12 68:25 69:10 70:10 72:2,5 75:8 91:22 97:7 98:16 99:18 104:12 105:2 106:21 107:10 110:19 113:9 114:1 122:8 123:18 168:16,19,24 175:13

**make** 19:13 36:2 44:21 48:22 57:1 74:12 99:3 109:6,8 117:23 118:23 132:15 148:23 153:24 169:16 172:3

**makes** 95:8,11 98:25 122:7 174:11,23

**making** 121:15 122:16

**man** 79:2,9

**manage** 12:17 46:11 120:13

**managed** 23:12 24:19 34:17 37:24 80:1

**management** 11:3,12 12:11,13 13:5 16:21,23 17:19 19:18,23 20:18 21:15, 16 22:17,23 23:6,12,15,18 26:4,15 27:23 29:1,18 30:3,11 33:2 34:9,10, 11,17,23,25 36:21,22 37:2,4,9,21 38:8 39:11 45:18,19 46:1,4,10,11,14,17,18, 21 47:12 53:11 63:19 72:23 73:8 81:7, 10 90:21 92:8 96:4 101:6 109:15 110:10,18 117:15 118:6,7,24 119:5 120:13 132:20 138:11,24 142:8,10 145:2,3 148:25 149:2 158:25 159:2,4, 8,24

**manager** 12:23 21:19,20 29:16 33:3 38:11 39:22 55:22,24 57:21,22 58:16, 24 59:6,7,12,15,18,23,24 60:5,10 61:4 63:14 68:21 80:22 83:2 86:25 89:8 90:19 92:6 93:1 96:10 97:4,8,15 98:15 103:9 104:24 105:1,14 106:17 107:19 108:7 114:25 115:3,8,22 119:7 124:20,21 128:13 132:20 135:7 138:14 140:2,7 151:2,23 158:18

**manager's** 105:12

**managers** 56:24 57:7,8,9,15 59:13 113:9

**manages** 12:23 46:1

**managing** 24:21 46:5 120:1 160:25 161:4,10

**map** 156:14

**Marc** 18:6,8,10 19:12 20:14 21:3 27:2 28:1 56:12 57:1 61:12,17 64:22 66:10, 21 67:8,13 72:13 76:14,23 78:7,11 83:5,16,19 85:1 90:15 109:9 112:1 121:23 124:24 126:7 134:20 137:7 150:13 153:20 155:15 156:11,15 160:25 162:11 165:13 167:21 170:25 175:20

**March** 104:24 135:3 150:1,9 151:20 156:9 157:3

**Marie** 19:6,13 22:15

**mark** 7:12 13:22 65:5 100:23 126:18 156:16 181:2

**marked** 18:14 56:16 65:1 67:17 68:3 71:10 77:2 78:17 81:17 82:10 85:5 87:14 89:20 95:4 97:20 101:24 104:4 108:21 112:4 113:16 114:17 118:16 121:8 124:16 125:3 126:14 129:22 130:16 131:10 133:3 134:6,23 135:18 136:5 137:11 139:22 141:17 149:17 152:13 155:18 157:24 158:9 160:8 162:24 165:16 167:24 171:3 175:24

**market** 48:23 138:17

**marks** 181:7

**married** 40:4

**Mason** 57:12,25 124:21 125:22 128:13

**master** 82:18,20 102:17 109:14 130:1 131:16,18

**material** 173:11

**materials** 164:7 172:20

**maternity** 159:15

**matter** 13:13

**Matthew** 62:5,13 63:6 71:20 83:21 84:9,10

**Mays** 8:6,10,11

**MBNA** 37:5

**MBS** 43:20 44:12 73:6 128:12,14,24 131:19 136:8,23 171:7 172:2 175:12 176:11

**Mcconnell** 64:5 80:18 175:5

**Mcconnell's** 70:20

**means** 91:9 98:13 116:3 118:3 132:18 161:2,5

**meant** 60:24 173:8

**meet** 40:6 48:12 55:20 58:21 65:7

**meeting** 55:24 58:24

**meetings** 41:14 53:13,18 87:5 125:15

**meets** 112:11

**member** 100:2 171:24

**members** 11:15,21 18:17 23:7 25:8 37:15 38:3 41:19

**mentioned** 145:11

**mentions** 117:5

**mesh** 28:6 49:16

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                            Index: message..offered

**message**  108:24 124:7

**met**  7:14 40:3

**metal**  116:3

**Miami**  53:9

**mid**  146:14

**middle**  66:15 67:11,22 105:10 142:3 160:25

**migrate**  30:22

**mildew**  103:19 110:23 121:21 122:5 168:22

**mind**  13:16 64:21

**mispronouncing**  15:19

**missing**  132:11

**Mitch**  21:6,12,14 23:18 24:12

**moist**  101:10 176:8

**moisture**  79:19 80:6 88:4 93:24 99:13 100:19 101:9 102:22,25 130:21 131:15,17 132:7 171:17 172:7,10,14, 15 173:5 174:13 176:20,22,23 177:2

**mold**  79:12,19 89:25 93:13,16,25 97:25 99:8,19 100:6 101:9 102:10,22 103:18 110:23 112:12 120:24 121:2, 21 122:4 127:21 168:11,12,16,17,20, 22,25 169:2 170:1,2,7,8,14,18 171:18

**mold/moisture**  102:12

**moment**  13:16 77:5 78:13 103:22

**money**  48:11 50:13 120:1,3,13 143:13,17,20,22 144:4

**monitor**  119:15

**monitoring**  119:18

**month**  58:4,9 115:25 158:14

**month-they**  151:24

**monthly**  48:21

**months**  15:11 48:7,25 69:21 70:3 97:11 110:3 123:6,7 124:11 146:16,18 165:21

**Moon**  82:19,21

**Morgan**  62:2,25

**morning**  7:12 95:11

**mother**  67:3

**mother's**  68:9,11

**move**  58:5 108:18 115:12,14 154:8

**move-in**  84:13

**moved**  69:19 84:14 97:13 168:7

**moving**  150:18

**multiple**  35:2,3 110:2,3 117:5 124:9 155:3,5 177:24

---

**N**

**N-A-D-R-A**  7:20

**Nadra**  7:8,17 8:6,9,11 90:10 165:22 166:6

**named**  21:24

**names**  8:3 16:9 21:6

**Nata**  21:8,10

**national**  53:17 55:15 82:23

**nature**  43:9 59:9

**Ned**  142:8

**needed**  70:18 73:17 163:8,13 175:10

**needing**  127:15

**Negro**  21:9

**Newport**  30:16 33:8,9 34:5 145:13 161:15

**news**  30:16 33:8,9 34:5 65:13 117:8 145:13 161:15 166:14

**noise**  105:4

**normal**  101:18

**Norris**  63:15,17 70:19 80:9,18 91:22 92:2 94:5 98:2 99:12 100:5 104:8 105:18,25 107:23 114:5,21 115:8,21 133:12,17,24 134:1 172:7 175:4 176:19

**North**  33:6,15

**noted**  127:24 156:8 157:2

**notes**  98:4 150:20

**notice**  28:10,14 57:24 60:21

**noticeable**  68:11

**noticed**  116:9,17

**notified**  104:25

**noting**  155:6

**November**  123:2 124:2,3 137:15

**number**  36:9 49:22 56:13 64:23 66:11,22 67:9,23 70:2 71:6,7 72:14 76:5 77:11,25 78:8,19 79:5 81:1,5,14 82:5 83:6 84:21 89:16 93:8,9,20 97:11,17 98:5,7 101:21 103:19,23,24 104:1 108:17 111:24 113:13 114:14 118:13 121:5,14 124:10,13 125:25 126:8,24 127:14 128:11 129:14 130:13 131:13 132:23 134:3,17 135:15 137:14 141:14 149:14 153:21 156:19 157:21 158:13 162:21 167:21 168:2 169:5 170:24 175:21

**numbers**  49:18

**numerous**  116:2

**Nyeisha**  81:23

---

**O**

**oath**  8:21 49:19

**Obama**  32:18

**object**  20:22 22:25 44:24 46:24 54:20 79:14 85:15 87:22 88:25 93:22 97:2 99:16 101:13 103:3,13 106:13 107:25 109:20 110:5 112:25 114:10 126:3 127:4 143:25 157:10 161:7 165:3 168:21 170:3 171:21 172:16 173:15 174:7,21 178:5 179:1,15,22 181:1

**objecting**  126:18

**objection**  85:25

**objections**  8:23

**obligation**  88:7 98:17

**obligations**  8:24

**obtain**  70:6

**occasion**  177:13

**occasions**  109:16 110:10,18 116:2 132:2 177:21

**occupancy**  48:19 55:25 70:6

**occur**  110:14

**occurred**  35:13,14 106:2 114:7 177:20

**occurring**  148:9

**October**  57:25 58:18 136:1,25

**offered**  147:12

**office** 30:17,19,22 31:5 60:7 75:17,21 87:10 91:1,2 102:21,23 119:20 133:15 140:2,7

**officer** 17:6,9 19:1

**oftentimes** 19:2

**oldest** 69:22

**Olds** 64:18

**on-site** 39:4 94:2

**onboard** 35:15 159:17 160:13

**onboarding** 160:22

**ongoing** 47:5

**open** 77:15 122:25 181:2

**operating** 43:13 47:13

**operational** 26:23

**operations** 88:13

**operative** 87:2

**opportunity** 29:15 146:6 147:12

**opposed** 59:24 82:14 94:19

**order** 69:1,4 75:15 77:6 96:15 102:16 110:12 119:2 122:7 173:4 178:10

**ordering** 105:11 106:4,6,16

**orders** 69:10 75:9 76:3 95:24 96:19 98:11 99:3 104:25 105:6 107:8,12,17 109:24 126:5

**original** 83:6 121:24

**OSB** 136:21

**outer** 174:5

**oven** 100:16

**overlap** 60:21

**oversaw** 23:23 96:23

**overseeing** 161:6

**overview** 87:9

**owned** 23:11 34:5,19 37:23 39:20,24, 25 80:1

**owner** 82:3,17 83:22,25 101:15

**owner's** 83:22,24

**ownership** 23:15 29:3 35:23 37:20 38:3,15,17,21 39:1,13,16,18 41:11 44:16,17 46:10 52:10 54:13 81:7 117:16 118:1,3 120:18 148:21,23

**Oxford** 11:3,11 13:4 16:21,23 17:18 19:18,23 20:20 22:17,23 23:6,11 26:3, 24 27:23 29:14,18,22 30:3,11 31:2 33:2 34:10,11,17,25 38:8 39:11 41:20 44:5,7 45:17,19 46:1,4,17,21 47:6,11 50:17 52:14,18 53:11,18 54:8 58:5 63:18 80:1 89:6,12 90:21 92:8 99:11, 15 111:23 118:24 119:5,23,24,25 120:13,19 124:9 132:3 133:18 138:10 140:8,16 145:3,8 147:25 148:6,25 149:2 155:7,10 158:25 159:6,23 165:9

**Oxford/beachwold** 128:19

---

**P**

**p.m.** 90:5 139:10,15 180:10,15 181:9, 15

**pad** 173:21

**pages** 83:16

**paid** 20:11 26:18 28:15,19 44:2,4 45:16,17,20 46:4,13 118:25 119:16,19

**paint** 43:17 70:16 72:5 77:8 93:18 111:12 113:20,23

**painted** 72:9,10 73:16,18 168:16

**painting** 43:8 71:3,21 72:24 73:1,8, 10,14,20 74:4,14,21 168:20,25

**paragraph** 67:2,14,25 68:7,14,17 81:23 121:25 141:4 168:10,14,15

**pardon** 129:7

**parent** 127:20

**Parham** 66:17 67:3,6,12,21

**part** 10:25 35:23 37:19 39:17 43:22 47:7 50:17,18 56:21 67:24 70:18,24 95:19 109:7 148:18 167:1

**part-time** 60:15

**parties** 52:2,4,7,21 53:13,18 81:24

**Partners** 22:1,10 28:25 29:16

**parts** 95:20

**party** 40:17,22 41:2 52:21,23 53:6,7, 20

**past** 15:11 48:7,25

**patio** 68:13 102:11,13 109:8,13 117:20,21 121:20 122:4 127:16 128:15 129:9,12,13 130:20 131:17,20 132:8 136:18 171:8

**patios** 98:1 99:9,14 121:1 132:8

**Pause** 13:19

**pay** 44:7 45:17 50:6 110:22 119:1,8 121:19 122:3 161:25

**payable** 161:2

**paying** 9:13 26:15 50:5,12 119:5

**pays** 120:9,12

**Peebles** 64:10 72:1,5 77:18

**Peninsula** 90:24 91:6,12

**people** 22:22 42:10 45:15 47:9 57:11 92:2 127:11 176:12

**per-apartment** 42:8

**percent** 51:20,21

**percentage** 27:18 51:14 74:2,4,5

**perform** 46:17 136:9

**performed** 26:8 72:21 75:10

**performing** 59:6

**period** 24:5 27:22 28:16 29:4 34:9 35:25 42:15 58:21 59:19 62:6 67:21 69:21 77:12,13 89:11,14 91:3 92:25 97:9 103:9 104:11 119:6 134:18 158:13 167:14 168:6 174:3,13,18,23

**permanent** 75:23

**permit** 14:6

**person** 30:2,4 35:17 54:24 58:24 62:20 63:15 71:19,25 77:17 78:1,2 84:10,11 107:10 119:25 123:25 131:1 133:12 140:6 142:11,21 160:2 162:7

**personal** 43:14

**personnel** 68:25 69:11 168:20

**persons** 24:20 27:19 36:17 40:3 63:12

**perspective** 24:14

**pesticide** 163:21,22 164:1,4

**Pestnow** 55:13 135:22 140:2,5 141:24,25 142:3 157:6 158:16 159:5 163:12,14 164:17

**Petersburg** 25:17 33:7,12 34:4 50:3 51:10 87:10 109:15

**phone** 14:7 15:7 105:4

**photo** 64:23 65:4 87:18 113:20 114:11 134:10 136:13 170:18

**photos** 78:10 89:24 93:24 111:11,20 136:9 150:17 169:15

**physical** 25:16 31:4

**physically** 30:10 31:1

**pick** 49:14

**picture** 126:19 137:25 152:19,21

**pictures** 37:14 93:12,15 152:9,16 170:7,12,16

**piece** 116:11

**Pine** 25:15 148:25

**Pinetree** 9:9,11,16,20 11:10 24:5 25:16,17,20 26:6,9,12,16,19,23 27:8, 19,23 33:12,25 34:8,22 35:2 38:9 39:20 42:14 45:21 46:18 48:2 49:7 50:22 51:15 55:18 56:7,20 60:10 62:10,11,25 63:3,15 67:4 68:18,24 70:10 72:18 79:12,25 81:24,25 82:2,7, 13,14,16 83:14 84:2,5 86:23 87:7 89:4,12 91:23 92:5,21,24 93:4,21 94:13 99:6 100:9,12,16 103:25 104:13 107:11,17 109:1,14 112:22,23 113:2 116:1 118:22 119:10 120:16,17,22,23 123:12 124:20,21 128:13 133:18 138:11 140:14 143:9 145:13 146:3 148:24,25 149:10 150:17 153:3 154:12,19 155:6,22 157:4 161:11,16, 23 163:7,11 164:18,24 165:1,6,7,8 166:8,15,22 167:4 168:19 170:14

**place** 53:8,13 83:17 146:4 153:25

**places** 37:10 53:8

**plainly** 116:23

**plaintiff's** 18:9,13 56:15 64:23,25 67:16 68:2 71:7,9 77:1 78:16 81:16 82:9 85:4 87:13 89:19 95:3 97:19 101:23 104:3 108:20 112:3,6 113:15 114:16 118:15 121:7 124:15 125:2 126:13 129:21 130:15 131:9 133:2 134:5,22 135:17 136:4 137:10 139:21 141:16 149:16 152:12 155:17 157:23 158:8 160:7 162:23 165:15 167:23 171:2 175:23

**plan** 138:19 148:14,19,20

**plastic** 110:25 111:16

**play** 48:9 78:7 79:2 112:1

**played** 78:19 79:5 112:7

**playroom** 86:12

**plural** 117:6

**plywood** 43:21 81:2 116:21

**point** 8:9 34:22 96:24 113:25 117:10 121:17 138:19 167:6

**pointed** 151:18

**policy** 89:3,8

**pool** 135:21 154:24 156:24

**portfolio** 12:20,21 13:1 41:23 46:11 60:3 79:22 104:11 138:20,21,22 145:2,8,12,14 146:5,7,16,20 147:1,6, 19 149:1,5 151:2

**portion** 30:15 178:19

**position** 19:22,24 28:21 93:1 97:8 106:24 142:16 144:16 147:16

**possibility** 76:4

**post** 136:18

**pot** 100:21 101:1

**pouring** 110:23 111:5 173:25

**practice** 46:9 69:25 99:5

**preceding** 159:6

**predate** 154:22

**predates** 158:2

**predecessor** 140:22,24 142:10

**preliminary** 39:3

**premiums** 26:15

**prep** 69:23

**preparation** 10:1,5,10

**present** 7:14 41:13,15,20 47:6,13 54:13,17 57:15

**presentations** 52:15,17

**presented** 50:25 52:10 73:11 113:8

**presenting** 47:24

**president** 16:23 17:18 19:18 20:1,2,6 32:18 39:11

**pressing** 56:1

**pretty** 63:6

**prevalently** 178:2

**prevented** 179:4

**preventing** 179:6

**previous** 37:1

**previously** 7:15 11:2 15:20 37:15 77:7 91:15 94:22 111:20

**PRHA** 51:7

**price** 42:10

**primarily** 30:12 161:17

**primary** 85:9,19 86:17

**principal** 17:9

**prior** 35:19 37:4,10 67:5,12 122:19 143:22 146:6 151:13 158:25 167:18

**private** 11:24 70:23 71:1 72:8 73:6

**probing** 36:24

**problem** 71:20 90:1 99:25 100:23 102:20 110:4 122:11 123:23 130:22 132:7,16 177:11,23 178:16

**proceeding** 8:23 14:5

**process** 38:12,25 47:4 48:4 56:19,22 59:8 70:18,24 75:18 96:24 117:9 122:17 167:1

**processed** 44:4 158:24

**processing** 105:6

**produced** 72:22 73:14 88:20

**professional** 61:22 69:14

**professionally** 19:8

**professionals** 70:11

**program** 50:17,19

**prohibited** 104:23

**project** 48:20 132:19

**projected** 48:22

**projecting** 48:18

**projections** 48:9

**prominent** 176:22,25

**pronounce** 65:17 125:7,17

**pronounced** 125:8

**pronounces** 125:9,20

**properly** 136:19

**properties** 12:18 23:11 24:10,14,15, 19,21,24,25 33:7,19 34:2,18 35:2,3,9 42:4 53:11 58:25 80:4 96:13 109:14 120:14 145:11,20 146:3,13 148:4,15

149:13 153:12,18 167:2

**property**  12:11,12,23 23:25 25:2
26:14,19 29:1 30:24 31:6 33:6 36:21,
22 37:2,4,9,24 41:25 42:6 46:1,5,11
55:22,24 57:9,14 58:6,16 59:11,12,14
61:8 63:9,10,13 65:22 72:23 73:7 75:9
79:23 82:3,17,19 83:1,13 84:1 87:10
97:4,8,13,14 98:14,15 101:6 104:10
105:15 107:17 108:7 113:9 120:16
138:3,4,7,15,16 139:1 143:13,17,20,
23 144:4,24 146:12 154:25 158:4,22
161:15 165:20 167:6 168:3

**property's**  119:13

**proposal**  80:25

**proposals**  81:1,5

**provide**  56:21 105:24 152:2 159:4
179:20 180:4

**provided**  66:25 167:3 169:1,5

**providing**  9:17 91:25

**public**  11:23

**pull**  18:7,8,9 56:12 64:22 66:10 77:24
81:13 83:5

**pulled**  171:18

**Purcell**  20:15

**purchase**  24:10,23,25 25:2 167:4

**purchased**  120:6

**purposes**  49:15

**put**  10:1 43:18 54:25 55:1 90:1 100:21
111:17 138:16 156:16 177:17

**putting**  147:6

**putty**  176:7,8

---

### Q

**qualifies**  51:1

**qualify**  51:2

**quarterly**  88:8 114:5

**question**  10:14 16:4,6 24:22 34:17
36:8,20 45:8,23 50:10 85:17 96:23
119:6 144:11 148:14 164:11 172:6
176:20 177:5,15 178:1

**questions**  56:20 132:15 180:18

**quickly**  102:4

**quit**  58:12,16

**quote**  51:5

---

### R

**rabbit**  99:23

**rains**  110:24 116:1 177:2

**raise**  81:9 117:14

**raised**  81:6 98:20 99:10

**ran**  41:7 54:24

**range**  49:5 100:15

**Raven**  62:4,11

**RBC**  32:23

**reach**  65:25

**read**  21:5 109:3 130:4 142:5 150:10,
16 152:4 171:12 175:6

**ready**  48:23 72:23

**Real**  72:23 73:7

**reason**  27:4 91:25 124:22 143:16
144:10

**rebut**  170:9

**recall**  10:16,19 15:6 16:15 17:15,23
19:5,25 25:21 26:21 29:25 30:20
32:17 33:24 38:1 40:10 41:1 42:17
43:4 51:19 52:13,24 55:9 57:14 58:10
60:5,12 63:13 64:2,4,5,14,16 75:2,5
79:17,18,21 88:12 89:5,8,12,15 94:25
98:9 107:1 111:21 112:17 113:7
123:25 126:11 129:11 138:1 139:2
153:4,6 154:13 155:9,12 157:19
158:19 165:4 172:2

**receive**  48:14 52:14 124:19 167:10
170:20

**received**  28:3 73:5,7 74:4 87:10
93:20 94:3 105:22 112:16 114:20
116:5 133:18 161:20 166:13 168:2,18
171:14

**receives**  120:2

**receiving**  9:19 51:18 160:19,21

**recent**  161:17 162:5

**reception**  99:23

**Recess**  76:19 139:12 180:12

**recipient**  120:2

**recognize**  21:11,12 79:1,8 87:17

**recollection**  55:4 68:22 88:10 141:22
163:17

**recommend**  141:1

**recommended**  157:16

**recommends**  142:4

**record**  7:5 13:22 75:24 76:15,16,21
139:9,14 151:13 180:9,14 181:2,8

**recording**  111:25

**records**  72:22 132:3 146:12

**recruited**  35:18

**recruiting**  35:20

**refer**  19:2 25:5 27:14,16 34:18 89:5
90:25 167:7,9

**referenced**  129:6,9 130:25

**referencing**  151:13

**referred**  23:15,16 27:9 33:10 34:18

**referring**  25:6,11 38:21 53:7 61:10,15
90:13 91:21 107:13 143:1 148:21
152:17 165:7 167:2

**refers**  118:4 161:4 166:25

**reflected**  72:22 75:9,14 76:3

**refresh**  76:12 163:17

**regard**  26:23 41:12 42:1 44:10 45:4
47:19 48:11 128:4 131:14 133:10,23
136:24 141:10 145:11 154:19

**region**  33:5

**regional**  20:1 33:3 38:11 39:22 57:16,
19,21 63:14 68:21 80:22 86:25 89:8
92:6 93:1 96:10 103:9 107:19 119:7
135:6,7 138:14 151:2 158:18

**Rehabilitation**  50:4

**rehire**  62:9

**rehired**  62:12

**reinstalled**  136:21

**related**  22:6 77:6 87:6

**relates**  104:10 135:24

**relation**  146:14

**relevance**  36:15 126:20

**relevant**  42:15

**relocate** 147:15,18

**relocated** 144:19 160:18

**remained** 168:8

**remaining** 129:3

**remains** 30:7

**remediation** 69:4,13

**remember** 33:23 36:12 40:23 41:10, 15 49:8 53:4 55:8 59:25 60:3,9 61:21 62:19 63:7,16,20 64:9,10,19 82:4 83:12 87:8 97:16 107:4 128:6 145:6 146:9 154:17,23 163:10 165:24

**reminded** 110:21

**remote** 123:20

**remotely** 30:12

**remove** 178:10,19

**removed** 136:17,18 171:8,9,10

**removing** 141:6 178:7,15

**renewed** 155:1

**rent** 49:7 50:9,11,12 110:22 119:8 121:19 122:3

**rental** 48:12

**rented** 51:2 70:4

**repaint** 74:25

**repainted** 74:16

**repainting** 74:25

**repair** 43:14,18 68:18 69:8,14 70:17 150:19

**repaired** 72:1,5 110:14 117:22 124:8 131:20 173:3

**repairs** 69:3,6 83:13 103:16 117:10, 24 122:15 127:16 128:15 129:2,5,8, 10,12,13 136:9 138:25 172:3 173:16 175:10 179:17

**repeat** 85:17

**repeated** 102:24 109:25 132:6

**repeatedly** 109:18

**replace** 70:17 80:11 100:10,12 131:23

**replaced** 117:18,22 124:4,6 136:20

**replacement** 71:5 170:21

**replacements** 172:4

**replacing** 43:21 81:2 137:2,3

**replies** 166:14,20

**reply** 147:8

**report** 19:8 20:11 92:12 166:12

**report-to** 15:17 92:10

**reported** 15:20 69:16 88:5 108:7 133:14 143:8,12 176:21

**reporter** 27:6

**reports** 56:4 70:6 79:22 102:25 171:15

**represent** 42:18 96:18 157:5,13 164:3

**representation** 9:14,19

**representative** 83:22,23,24

**represented** 9:3

**request** 78:1 90:1 100:2 110:20 123:19 155:8,11 164:24 165:2 171:23

**requested** 130:1

**requesting** 83:12 162:4

**require** 129:2 178:7

**required** 69:13 88:11

**requires** 60:18 161:11,16,23 164:15

**RESERVED** 181:13

**resident** 50:25 67:1

**residential** 16:25 17:3,6,10,14 18:18 20:19 21:17,25 22:4,10,18 23:8,14 32:23 45:25 69:10 91:22 120:7,12 166:1

**Residential's** 54:10

**residents** 51:14,15 66:16 67:5,12 79:19 88:4 118:21

**resigned** 64:17

**respect** 180:18

**respond** 100:2 166:10

**responded** 103:15 173:5

**response** 100:8 108:15 147:9

**responses** 56:21

**responsibility** 47:10,11,12 84:17 99:14 101:2,4,5,11,12,15 112:23

113:2 119:18 159:21,22 160:1

**rest** 14:7 63:7

**retain** 9:8 89:10,13

**retention** 89:4

**retired** 162:19

**returning** 164:19

**review** 39:7,8 55:25

**reviewed** 10:4 39:9 43:5

**reviews** 41:4,5,7,21 114:5,6

**Rhonda** 60:1,4 61:1,5,6,9 62:6 139:25 140:1

**Rhonda's** 62:8

**Richman** 21:6

**Richmond** 12:6 53:3,6

**Ricky** 64:5 70:20

**RIGHTS** 181:13

**rip** 131:22 172:25

**ripping** 43:20

**risk** 20:17

**risks** 87:7

**Rob** 16:4 17:2 44:13 118:8 128:16,18, 20,23,24 129:1 132:22

**Roberts** 21:7,13 23:19 142:12 143:10

**Roberts'** 142:16

**rodding** 141:5

**role** 23:21 24:20 59:6 65:15

**roof** 116:11 117:3

**roofing** 116:21

**roofs** 117:17

**room** 41:21 85:23 86:20 95:13 98:23 102:11 121:20 141:7

**rooms** 100:10

**Rose** 97:24

**Ross** 34:8,12,14,23,24 142:8,9,11 151:25 159:2,4

**Ross'** 151:22

**rotted** 81:3

**rotten** 116:9,17 136:20 171:9,10,19 172:19,20,22 175:15 176:13 179:13

**rough**  51:14

**Rubinstein**  17:20 18:1,21 21:7 25:12 39:12,17 41:13,15 52:3 54:17 55:6 137:16

**rug**  152:23

**rule**  8:23 155:9 163:11,15,18 164:19, 21 165:1

**run**  41:8

**running**  105:2

**Russell**  66:17 67:3

**S**

**SAITH**  181:12

**sale**  24:6,10,23,25 25:2 146:5,6,8,17, 20 147:7 167:7

**Samuel**  40:7

**Sasha**  21:7 137:15,16 138:2

**sat**  70:3

**satisfy**  50:12

**Saunders**  132:24 133:10 134:10

**saved**  178:22

**Schane**  168:5

**scheduled**  102:6 166:11,16

**schematic**  85:8 155:21

**school**  32:7

**schooling**  32:9

**scope**  69:4 81:11 137:6 172:1

**screen**  109:5 115:9

**scroll**  115:6

**seaboard**  53:17

**Seaborne**  62:3

**sealant**  130:25

**seals**  98:1,3 120:25

**season**  7:21

**section**  27:9,11,12,13,15,19 50:22 51:2,4 141:6

**seek**  100:17

**sell**  138:7,11,15,22,25 143:18,20,23 144:23 148:14 167:1,2

**selling**  24:15

**semiannual**  88:11,16 114:6

**send**  162:4

**senior**  16:22

**sense**  159:25 174:12,23

**separate**  43:24,25 44:3,11 56:6

**separately**  9:14

**September**  29:7 114:21 116:6 129:17 135:23,25

**served**  39:21 57:16 68:20 96:9

**service**  55:14 100:1,2 103:15 114:24 115:3,8,22 118:25 119:2 130:1 171:23

**services**  26:9 37:3 43:15 46:12,18 142:8 171:7

**serving**  65:15

**set**  43:23 82:18

**setting**  41:21

**severity**  153:2

**Shapiro**  21:6,12,14 23:18 24:12 44:22

**share**  11:16 19:17 29:21 84:22

**sheet**  88:19

**sheetrock**  136:17 171:9,19 174:17

**Sheila**  62:4,9

**shingles**  116:3,21 117:12

**show**  18:7 64:22 66:9 67:7 73:11 76:23 82:5 83:10,21 88:16 124:4,7 126:7 131:2 162:11 173:20

**showed**  24:9 37:14 38:4 77:5 149:20 167:19 170:12

**showing**  77:11 93:13 107:16 130:21 163:16

**shown**  76:2 109:23

**shows**  57:23 87:11 90:3

**shut**  30:22

**sic**  124:6

**sick**  127:18,22

**side**  115:14 176:4

**siding**  43:21 131:22 136:19 137:3 142:2 171:8,19 177:3 178:15

**sign**  108:9

**signature**  90:18 91:4,10,12 115:2 125:6 181:13

**signed**  82:6 84:14 98:5,7 107:21,22 108:8

**significantly**  106:24 107:2

**signing**  108:1

**signs**  83:14 96:21 130:21 131:17

**similar**  13:3

**simple**  48:15

**simply**  148:18

**single**  172:9

**singles**  116:2

**sir**  66:2,19 179:9

**site**  12:24 59:2,4 75:16 88:10,18

**sitting**  153:6

**situation**  28:9,13 47:5 48:10 112:19 128:5 153:7

**six-year**  89:11

**Sixteen**  172:18 178:6

**skin**  178:23

**skipping**  130:12

**sliding**  68:8,9,10,16 71:22 72:20 77:8 79:12,20 80:6,12,16,23 81:3 85:14,23 86:10,13,16,20 87:1 93:13,25 102:13, 25 111:6,12 112:11 113:20 117:3,5 121:3 128:3 130:2,9 132:7 152:19,20, 21,24 171:8,16 172:22 173:11 176:3, 14,23 177:10,23 178:3 179:7,14,20

**slight**  77:13

**slightly**  81:13 132:25

**small**  68:15

**smoke**  100:13

**soft**  116:22,25 130:3,10

**software**  82:23 96:5,9

**sold**  30:24 31:6 144:19 145:20,23 146:4 148:24 149:1,5,7

**solemnity**  8:24

**Solutions**  72:24 73:8

**someplace**  49:10,11 177:20

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                              Index: SOMLIVING..Taylor

**SOMLIVING**  90:20

**son**  14:20 65:5 67:2,20 69:9 127:18, 22 156:2

**son's**  178:22

**sons**  156:2

**sound**  160:15

**sounds**  12:12 18:3 64:20

**source**  51:5

**South**  11:3,11 13:4 16:21,23 17:18 19:18,23 20:20 22:17,23 23:6,11 26:3, 24 27:23 29:14,17,22 30:3,11 31:2 33:2 34:10,11,17,24 38:7 39:11 41:20 44:5,7 45:17,19 46:1,4,17,21 47:5,10, 11 50:16 52:14,18 53:11,18 54:8 58:5 63:18 80:1 89:6,12 90:21 92:8 99:11, 14 111:23 118:24 119:5,23,24,25 120:13,19 124:9 128:19 132:3 133:18 138:10 140:8,16 145:2,8 147:25 148:6,25 149:1 155:7,10 158:25 159:6,23 165:8

**speak**  10:15,17,20,24 13:9 15:4 16:2, 10,14 55:3,7 102:3 144:6 150:24

**speakers**  55:9,11

**speaking**  15:13 143:15

**specialist**  178:9,18 179:24 180:3

**speciality**  150:25

**specialty**  32:22

**specific**  105:24 146:23 147:21

**specifically**  87:6 111:5 132:21 164:18

**specifics**  151:9

**specifies**  164:12

**spell**  7:18,23 8:1,7 31:15

**spelled**  7:21 147:19

**spend**  143:13,17,20,22 144:4 178:25

**spoke**  10:22 13:8 16:19

**spoken**  10:9,13,14 14:23 15:24,25 16:19 81:12 140:1 142:21

**sponsored**  118:21

**spots**  169:20,23 170:7,17

**spread**  142:3

**spreadsheet**  39:6

**Spruill**  10:21 11:6,17 12:4 13:9 14:14, 18,23 57:12,24 127:10

**square**  42:10

**staff**  98:23,25 163:7 165:9

**staffing**  59:1

**start**  48:6,18 160:19

**started**  94:9 160:21 162:19

**starts**  177:4

**state**  7:16 94:21 151:12 161:21 164:22

**stated**  99:4 110:19

**statement**  66:25 67:25 68:6

**statements**  124:9 138:23 170:10,13

**stating**  123:22

**stay**  98:22

**stealing**  84:19

**stood**  69:20

**stop**  83:16 107:24 180:17,19

**stopped**  138:13

**stretches**  13:1

**structure**  151:7

**students**  159:17

**studs**  176:3,13 178:4,11

**stuff**  40:18 110:25

**style**  41:21

**sub-exhibit**  153:22

**sub-exhibits**  153:21

**subject**  94:15 121:15

**submitted**  72:11 74:22 94:1 111:20 128:15 136:13

**submitting**  51:18

**successor**  142:22

**suffered**  127:12

**suggested**  157:6

**suit**  8:20

**supervisor**  97:7 98:16,24 99:2 104:12

**supervisors**  70:11

**Supply**  55:15

**support**  150:23 151:4 179:21 180:4

**supporting**  68:12 151:6 178:11

**suppose**  179:3

**supposed**  110:12,14,16 116:25 122:6,14,17 164:13

**surface**  171:20 172:8,18

**survey**  152:2

**swamp**  87:21,23,25

**swarmer**  135:11

**swear**  7:6

**switch**  35:12,14 91:3

**switched**  34:9,24 35:10

**sworn**  7:9 66:25 67:24 68:6 170:13

**system**  96:5,9,16 116:21 158:25

**systems**  117:11

---

**T**

**T-S-I-T-S-V-I-D-Z-E**  21:10

**T12**  48:7

**takes**  91:19 122:10

**taking**  43:21 53:8 76:8 99:6 158:25 159:15

**talk**  21:14 56:2 58:3 65:19 68:15 70:23 75:19 127:12 155:5 181:2

**talked**  18:22 44:12 70:21 127:10 153:11,18

**talking**  23:17 44:18 49:9 75:20 115:24 116:20 117:9 119:22,23 127:20 132:21 141:3 163:5 165:8 171:7

**talks**  67:2 68:7 95:12 129:4 131:16 135:21 166:5,6,9 168:11 177:9

**Tanya**  40:7

**tape**  111:1,16

**Tarnisha**  97:24

**task**  99:1

**tax**  23:19,24

**Taylor**  66:7,16 67:4,6,12,20 69:8,19 168:4

**teacher**  37:3 159:14

**team**  18:17 22:14,21 23:7 25:4,6,8 37:14 38:3 39:4,9 59:2,4 73:23 74:10, 11 94:2,7 100:2 118:6,7 171:24

**teams**  75:16 88:11,18

**tear**  101:19

**tech**  74:10,11 98:16 107:10 113:9

**technician**  72:2,6 91:23 98:4 133:13

**technicians**  63:9 70:10 75:8 105:2 114:1 133:18

**techs**  122:8 168:24

**telling**  104:18

**tells**  89:10

**temporary**  59:23

**temps**  63:16

**tenant**  65:9 66:3,6 69:23 93:12 94:13, 19 99:7 100:1,5,24 101:4,19 109:1 119:6 120:11 122:7 168:24

**tenant's**  100:7

**tenants**  27:12,13,15 93:21 94:24 99:10,21 109:18 110:2 168:3,19 169:1 173:3

**Tentindo**  142:8

**term**  38:20 150:21 163:23

**terminated**  63:5 64:8,12,15,17 77:17 84:18

**termite**  55:14 68:7,10,12,18,19,23 69:3,5,12 140:9 142:12 150:16 151:24 153:2 154:11,19,24,25 156:5 157:6 158:15 161:18,25 162:5 166:7

**termites**  101:11 133:6,7,19,20 134:10,11,15 135:11,22 141:24,25 143:8,12 149:22 152:18,23 156:9,10, 13 157:8 158:17,22 163:7,22,25 164:4,7 166:24 167:11

**termiticide**  141:8 163:20,21,22,23 164:1,3,13,16,22

**terms**  15:13

**test**  122:23

**testified**  7:9 80:19 106:18 107:2,7 114:6,7 175:5

**testify**  46:25 73:3 84:7 94:21 99:17 171:22

**testimony**  8:22 14:22 181:8

**Texas**  54:3

**text**  108:24 109:3

**texts**  14:18

**Thanksgiving**  12:3

**Theresa**  20:15

**thing**  92:15 96:12 143:19 169:17 175:14

**things**  43:8,9 59:9 80:12 96:25 101:3, 5 106:1 107:11 131:21 168:23 172:19

**thinking**  29:22

**thought**  53:7 110:11

**thousand**  49:9 110:22

**tickets**  105:2

**Tiffany**  62:2,25

**til**  139:18 151:19

**timbers**  43:22

**time**  9:25 17:21,24 19:22 22:3 23:8 24:5 26:20 27:4,5,20,22 28:11,17 29:4 30:16 31:1,11 32:17 33:1 34:9,12,19 35:4,6,10,15,25 36:10 39:21 42:5,15 43:4 45:5 53:25 57:15 58:22 59:5,13, 19 60:11 62:6,11 63:3,13,18 65:10,14 68:20 69:21 72:9 74:1,8 75:7 77:12,13 79:3 86:24 89:14 91:3 92:6,16 96:9 97:9,15 98:16 103:9,14 104:12 105:3, 15 107:19 112:22 113:6 134:18 135:8 138:14 154:19 158:3,13 161:12,17 167:14,18 168:6 172:13 174:3,13,18, 23 177:15,22 178:14 180:19,20,24

**times**  12:2 35:5 80:10 110:3 132:1 172:18,19 173:17 177:24,25 178:6

**timestamp**  116:7

**timing**  60:22,25

**title**  17:15 19:11,17 20:4,6,8 21:15 33:3 57:18,19

**Toano**  31:14,17

**today**  7:4,13 8:22 9:4 10:1,5 91:19 129:1 131:19 153:6 166:11

**today's**  181:8

**told**  14:4 28:3 51:24 80:21 94:5 105:3 122:13 144:22 145:1,7 146:19 147:5 149:21 160:14 164:18 175:7,13 176:11 180:16

**top**  71:16 77:20 90:5,10,14 129:16

**Topaz**  21:8

**topic**  81:13 132:25

**Torey**  64:18

**Tori**  58:4

**touch**  130:2,3,10 166:7

**touch-up**  73:20

**tours**  138:3

**track**  75:18

**Tracy**  15:16,18 16:19 19:11,14 20:4 22:15 35:18 37:16,19,23 39:7,10 89:24 90:9 92:7,18,24 93:3,4 94:11,18 117:14 145:9 146:21

**training**  133:17 160:22

**transcript**  175:6

**transfer**  45:16 147:13 159:20

**transition**  159:20

**travel**  41:3

**traveling**  41:1

**treat**  69:14 164:7

**treated**  135:21 154:25 157:7,8,14,17 168:23

**treating**  133:19 141:2,5 142:4 158:22

**treatment**  135:4 150:18 161:18 162:1,5 170:21

**trenching**  141:4

**trial**  8:25

**true**  106:19 122:21

**truthfulness**  8:25

**Tsitsvidze**  21:8

**tub**  133:6 134:12 135:11

**turn**  14:7 48:21,22 70:18 73:2 75:18

**turned**  69:22 70:1,15 73:15

**turnover**  69:18 70:8,24 71:2,15 72:9 74:8 75:8,17,19 76:1

**turnovers**  70:22

**turns**  103:18

**TV**  99:23

**two-**  49:25

NYEISHA S. GHEE vs PINETREE APARTMENTS
YOHANNES, NADRA on 01/06/2026                                    Index: two-bedroom..white

**two-bedroom**  49:6 75:1

**two-minute**  180:7

**type**  8:23 13:3 32:22,24 40:15 53:17 68:23 69:7,12 87:5 89:8,13 96:12 99:12 133:6 158:20

**types**  111:19 176:20

**typical**  43:13 74:25 99:5

**typically**  43:25 55:11,22 59:14 69:20 75:16 81:11 88:18 104:21

**Tyvek**  81:3 131:22 132:11 178:16

---

### U

**U.S.**  32:10,12,14 36:5

**U1**  136:24

**uh-huh**  19:19 46:3 56:23 57:13 58:2, 17 65:18 104:14 116:13 123:5 156:1 171:13 173:22

**umbrella**  46:22

**un-**  151:1

**Unable**  142:2

**understand**  9:1,9,11,16 16:19,24 17:2,5,8,13 18:5 19:10,21,24 20:13 21:16 22:5,17 23:10,21 24:4,8 28:20 34:2,15 40:11,25 45:22 46:16 51:6,9 86:24 87:2 94:11,13 103:2 108:25 113:1 116:10,24 120:5 133:22 137:16 142:15 149:7 150:22 151:3,4,6,15 155:21 160:13 161:20,21 164:6 166:2 173:1,9 174:2,6,8

**understanding**  12:24 17:12 23:2,4, 9,13 25:1 28:6 34:7 35:1 39:25 42:19 60:24 73:9 132:9 141:11 144:25 145:22 149:5 154:18,20 157:7 160:1 161:19 164:20,25 167:15

**understood**  16:22 20:5 24:13 112:22 140:4 142:9 173:10,12

**undertake**  86:23 103:11 138:24

**undertaken**  144:23

**undertaking**  99:11,12

**unexpected**  110:22

**unfilled**  97:9

**unit**  42:12,22 79:23 130:6 135:12 141:6 142:3 152:1 168:7

**units**  42:14 48:20,22 72:21 73:4 127:15 129:2,3 175:10 178:7,8

**unsatisfactory**  112:19

**unusual**  54:16,21

**upcoming**  49:3

**update**  91:20 152:3

**upper**  81:6,10 90:8 138:24

**upset**  94:18

**utility**  23:23

**utilize**  118:23

**utilized**  22:11

---

### V

**V-A-I-S-M-A-N**  16:13

**vacant**  69:18,21

**vacate**  69:20

**vacated**  69:25

**vacation**  28:19

**Vaisman**  16:13 17:13

**valid**  122:21

**validate**  170:11

**valleys**  116:22

**Vanessa**  168:5

**varied**  132:9

**variety**  37:9 88:4

**Vega**  165:22,23,25 166:14

**vendors**  55:12,13,15

**vent**  117:3

**verbal**  154:13

**vice**  16:22 19:18 20:1,2,6

**video**  111:25 112:6,16 113:7 115:13

**videos**  10:7 174:17

**view**  70:25

**Village**  35:24 36:11 37:10,19,20,21

**Vinyl**  136:19

**Virginia**  13:2 50:3,18,24 92:9 109:15 144:20 145:2 147:1 148:8,10 149:1 160:18

**visibly**  178:21

**visit**  55:18 65:22 168:8

**voice**  78:23,24 79:1

**vote**  32:18

**voucher**  50:2,6,8,14,17,19 51:2,4,11

**vouchers**  27:13,16,19 51:8,18

---

### W

**W-Y-N-T-E-R**  7:24

**walk**  55:25 83:9 152:1

**walk-through**  84:11,16,23 88:8

**walked**  48:3 58:10

**wall**  102:11 111:12 131:20 136:17 146:2 171:10 173:25 174:4 175:14

**walls**  101:10 102:22 117:4 151:7 172:25 173:14 174:14,19

**Walton**  105:15,21 108:9

**wanted**  138:21,22 145:1,7 163:13 166:7

**washing**  168:13

**water**  80:15 98:3 100:19,21 101:1,10 102:25 105:12 106:5 110:23 111:1,2, 5,17 112:10 117:2 121:15,20 122:3 123:19 156:25 173:13,18,24 174:3,13, 16,18

**waves**  116:22

**ways**  168:23

**wear**  101:18

**website**  18:19 19:20 22:13 118:21

**week**  55:19 58:21 96:14

**weekly**  125:14

**weeks**  10:23

**weigh**  76:7

**west**  31:19

**wet**  171:17 172:20 174:17 177:6

**wettest**  115:25

**whack**  106:11 107:4

**what-have**  178:12

**white**  75:24

**whiteboard** 75:20 76:2

**William** 40:7 63:15,17 91:19,21,22 92:2 105:1,25 107:13,23 108:13 114:21 115:8,21

**Williams** 10:18 62:3

**Williamsburg** 31:19

**Wilson** 129:1

**wind** 116:1

**window** 98:1,2 120:25 123:19

**windows** 77:14 79:12,20 86:19,22 98:1 99:9,13 120:25 127:17,22 130:20 176:23

**windowsills** 71:21 77:8 99:8

**winter** 7:21,22

**wire** 161:18

**witnessed** 108:10

**woman's** 78:24

**wood** 68:15 112:11 116:11,25 130:9 131:23 135:22 137:4 142:1 158:4,15, 17 170:21 171:17,19 172:20,23 178:11 179:19

**wooden** 68:12

**word** 163:21

**words** 22:5 57:20 81:25 153:5

**work** 12:12,15 13:4 14:3 22:22 25:22, 24 27:22 28:12,16 29:5 30:1 31:1,9 34:12,14 36:9 37:3 39:5 47:18 63:8 69:1,4,8,10 72:11,20 73:12 74:10,22 75:6,7,9,13,14 76:1,3 77:6,18,21 78:2 80:13,14 81:12 95:20,24 96:15,19 98:11 99:3,12 100:3 102:7,16 104:25 105:6 107:8,12,16 109:24 110:12,16 122:7 125:12 126:5 127:11 130:24 131:1 136:10,13,23 137:6,19 139:18 173:4 176:12

**worked** 11:2 16:20 19:23 20:5,17 26:20 27:20 28:4 30:3,11,12,13 34:11 35:24 36:10 37:5,9,15,18,19,23 38:7 41:11 47:4 61:24,25 62:10 63:10,18 73:4 88:13 91:15 92:5,8 104:11 125:10 126:10 140:7

**workers** 168:16

**working** 24:6 30:11,18,23 47:23 49:17 62:21 63:2,13 86:25 91:14,17 100:16 114:1 122:17 128:19 154:20

**workload** 73:22,24

**works** 9:9,11 12:8,9

**wow** 152:9

**write** 119:8 166:17

**writes** 115:24 120:11

**writing** 94:10 114:24 123:11,22 143:10,11 146:2

**written** 43:5 124:9 150:4 154:14

**Wynter** 7:17

### Y

**y'all** 106:11 172:21

**Y-O-H-A-N-N-E-S** 8:2

**year** 12:3 32:17 36:5 41:6 49:3 52:1 123:8,10 124:5 125:13 138:17

**years** 15:25 16:3,5,7,12 30:20 32:5 36:12 40:24 88:14 106:23 109:24 110:3 117:11 121:19 122:2,13,19,24 124:3 126:5,10 170:15

**yellow** 115:7 141:24 156:16,17,20

**yesterday** 127:16 143:15

**Yohannes** 7:8,17 8:1,10,13 57:2 90:11 165:22

**York** 41:3 47:5,17,18 51:25 53:8 54:11

### Z

**zoom** 83:10